No. 25-2499

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

United States of America, ex rel. JOHN HENDRIX, Relator,

*Plaintiff - Appellee*,

v.

J-M MANUFACTURING COMPANY, INC., DBA J-M Eagle,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Central District of California,
No. 5:06-cv-00055-GW-MAR

———————————

## RECORD EXCERPTS
## Volume III of VI

———————————

DAVID BERNICK
ELIZABETH LARSEN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004

PAUL CHAN
SHOSHANA E. BANNETT
BIRD, MARELLA, BOXER
LINCENBERG & RHOW, PC
1875 Century Park, E 23rd Floor
Los Angeles, CA 90067

PAUL D. CLEMENT
*Counsel of Record*
C. HARKER RHODES IV
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant*

August 29, 2025

1   David Bernick (admitted pro hac vice)
        dbernick@paulweiss.com
2   PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
3   1285 Avenue of the Americas
    New York, New York  10019-6064
4   Telephone: (212) 373-3000
    Facsimile:  (212) 757-3990
5
    Ekwan E. Rhow – State Bar No. 174604
6       erhow@birdmarella.com
    Paul S. Chan – State Bar No. 183406
7       pchan@birdmarella.com
    Marc E. Masters – State Bar No. 208375
8       mmasters@birdmarella.com
    BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
9   DROOKS, LINCENBERG & RHOW, P.C.
    1875 Century Park East, 23rd Floor
10  Los Angeles, California  90067-2561
    Telephone:  (310) 201-2100
11  Facsimile:   (310) 201-2110

12  Attorneys for Defendant J-M Manufacturing
    Company, Inc. dba JM Eagle

13

14                  UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

16

17  UNITED STATES *et al.*,            CASE NO. 5:06-cv-00055-GW-PJW

18          Plaintiffs,                **J-M MANUFACTURING
                                       COMPANY, INC.'S RENEWED
19      vs.                            MOTION FOR JUDGMENT AS A
                                       MATTER OF LAW**
20  J-M MANUFACTURING COMPANY,
    INC. dba JM EAGLE *et al.*,        *Filed concurrently with Declaration of
21                                     Neil P. Kelly*
            Defendants.
22                                     Date:  January 17, 2019
                                       Time: 9:30 a.m.
23                                     Ctrm.: 9D
24
                                       Assigned to Hon. George H. Wu,
25                                     Courtroom 9D

26

27

28

                J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(3 of 262), Page 3 of 262     Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 3 of 262
Case 3:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 2 of 55   Page ID
#:140312

1

## NOTICE OF MOTION AND MOTION

2  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3       PLEASE TAKE NOTICE that Defendant J-M Manufacturing Company, Inc.

4  ("J-M") will and hereby does renew its motion for judgment as a matter of law

5  pursuant to Federal Rules of Civil Procedure 50(b) on all claims for damages

6  asserted by plaintiffs City of Reno, Nevada ("Reno"), City of Norfolk, Virginia

7  ("Norfolk"), Calleguas Municipal Water District ("Calleguas"), Palmdale Water

8  District ("Palmdale") and South Tahoe Public Utility District ("South Tahoe")

9  (collectively, "Plaintiffs") in this Phase 2 trial.  (*See* Dkt. 2729, Dkt. 2738.)

10       This motion is made on the grounds that the damages theory Plaintiffs

11  presented during the Phase 2 trial—that Plaintiffs suffered damages because the pipe

12  they received will fail earlier than the pipe they bargained for—fails as a matter of

13  law because (1) the bargain on which damages must be predicated was set forth in

14  written documents and the evidence at trial conclusively established that those

15  written documents did not impose a longevity requirement; (2) the Phase 1 jury did

16  not decide any longevity requirement; and (3) Plaintiffs failed to present legally

17  sufficient evidence to support this damages theory.  The motion is also made on the

18  grounds that the damages claim Plaintiffs made in closing—for the cost of replacing

19  all pipe in all of the projects today—fails as a matter of law because (1) the Court

20  ruled such a claim could not be made absent risk of imminent failure or a threat to

21  public health, evidence of which Plaintiffs failed to present (and, in fact, presented

22  evidence that the risk of failure was not imminent); and (2) Plaintiffs explicitly

23  abandoned their claim for the cost of replacement of all pipe before trial.[1]  Finally,

24  this motion is made on the grounds that Plaintiffs have made multiple, improper

25

26  [1]   The Court previously denied without prejudice J-M's motion for judgment as a
matter of law.  Ex. 1, Trial Tr. 8015:21–25.  This motion does not address the issue

27  of civil penalties, on which the parties agree the Court should defer decision until
resolving the present motion.  Dkt. 2807.

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(4 of 262), Page 4 of 262    Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 4 of 262
Case 5:06-cv-00055-GW-MAR    Document 2809    Filed 12/12/18    Page 3 of 55    Page ID
#:140313

changes to their legal and factual theories of the case, and must be precluded from prolonging this litigation any further.

This motion is based on this notice, the attached Memorandum of Points and Authorities, the Declaration of Neil P. Kelly, the pleadings, records, and files in this case, and such other matters that may be raised at the hearing.

DATED: December 12, 2018          PAUL, WEISS, RIFKIND, WHARTON
                                  & GARRISON LLP

                                  By: _____/s/ David Bernick_____
                                            David Bernick


DATED:  December 12, 2018         BIRD, MARELLA, BOXER, WOLPERT,
                                  NESSIM, DROOKS, LINCENBERG &
                                  RHOW, P.C.

                                  By: _____/s/ Paul S. Chan_____
                                            Paul S. Chan

                                  *Attorneys for Defendant*
                                  *J-M Manufacturing Company, Inc.*
                                  *dba JM Eagle*

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(5 of 262), Page 5 of 262    Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 5 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 4 of 55   Page ID
#:140314

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................v

I.    INTRODUCTION ..................................................................................1

II.   JUDGMENT AS A MATTER OF LAW CAN BE ENTERED
      FOLLOWING A MISTRIAL ...................................................................2

III.  THE COURT SHOULD ENTER JUDGMENT FOR J-M BECAUSE
      PLAINTIFFS' LONGEVITY THEORY OF DAMAGES WAS
      DEFECTIVE AS A MATTER OF LAW AND LACKED A
      SUFFICIENT EVIDENTIARY BASIS AT TRIAL..................................3

      A.   Plaintiffs Must Be Held to the Damages Theory They Chose To
           Try ..............................................................................................3

      B.   Before Trial, Plaintiffs Abandoned All Claims for the Cost of
           Replacing All Their Pipe Now ..................................................6

      C.   The Remaining Theories Plaintiffs Tried All Claimed
           Diminished Value Based upon Reduced Longevity .................8

      D.   Plaintiffs' Damages Claim for Diminished Longevity Fails as a
           Matter of Law Because Longevity Was Not Part of the Parties'
           Bargain and Was Not Decided in Phase 1 ...............................9

           1.   The bargain that controls Phase 2 damages is defined by
                the project specifications...........................................10

           2.   It was undisputed at trial that the specified standards
                imposed no longevity requirement ............................15

           3.   Plaintiffs have agreed that the Court should decide
                whether the specifications control as a matter of law ...............16

           4.   Plaintiffs' damages claim for reduced longevity also fails
                as a matter of law because longevity was not in the Phase
                1 verdict.................................................................18

      E.   Plaintiffs Failed To Provide a Legally Sufficient Evidentiary
           Basis for Their Longevity-Based Damages Claims ...............18

           1.   Mr. Lehmann's damages calculations were legally
                insufficient.............................................................19

           2.   Plaintiffs' engineering experts failed to prove the
                longevity of compliant pipe in use, of J-M pipe made from
                1996-2006, or of Plaintiffs' pipe ...............................26

           3.   Plaintiffs failed to prove a mathematical relationship
                between short-term testing, long-term strength, and
                longevity................................................................33

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(6 of 262), Page 6 of 262    Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 6 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 5 of 55   Page ID
#:140315

IV.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF
      LAW NOTWITHSTANDING PLAINTIFFS' CLAIM DURING
      CLOSING FOR THE COST OF REPLACEMENT OF ALL THEIR
      PIPE TODAY ............................................................................37

      A.   Plaintiffs Abandoned Their Claim for the Present Cost of
           Replacement Pipe in the Face of the Court's Rulings, and It
           Conflicted with the Case Plaintiffs Tried .............................39

      B.   Plaintiffs' Evidence Was Legally Insufficient To Support Their
           Claim for the Present Cost of Replacement Pipe ..................40

V.    PLAINTIFFS CANNOT BE PERMITTED TO CONTINUE THEIR
      CASE ON ANY GROUNDS ........................................................41

VI.   CONCLUSION ..........................................................................46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(7 of 262), Page 7 of 262    Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 7 of 262
Case 5:06-cv-00055-GW-MAR    Document 2809    Filed 12/12/18    Page 6 of 55    Page ID
#:140316

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4

*02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,

5
   399 F. Supp. 2d 1064 (N.D. Cal. 2005) .............................................................25

6

*Ab-Tech Constr., Inc. v. U.S.*,

7
   31 Fed Cl. 429 (1994) ......................................................................................12

8

*Accrentra, Inc. v. Staples, Inc.*,

9
   851 F. Supp. 2d 1205 (C.D. Cal. 2011) ...........................................................19

10

*Apple, Inc. v. Samsung Elec. Co., Ltd.*,

11
   No. 11–CV–01846 (LHK) ..................................................................................5

12

*Beck Park Apartments v. U.S. Dept. of Housing and Urban Dev.*,
   695 F.2d 366 (9th Cir. 1982)............................................................................17

13

*BMY-Combat Sys. Div. of Harsco Corp. v. United States*,

14
   44 Fed. Cl. 141 (1998) .....................................................................................11

15

*United States v. Brooke*,

16
   4 F.3d 1480 (9th Cir. 1993)................................................................................4

17

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,

18
   509 U.S. 209 (1993)....................................................................................19, 25

19

*Browder v. General Motors Corp.*,

20
   5 F. Supp. 2d 1267 (M.D. Ala. 1998) ..............................................................38

21

*Chaffey Joint Union High School District v. FieldTurf USA, Inc.*,
   No. 16-cv-204 (JGB), 2017 WL 3048658 (C.D. Cal. Feb. 28, 2017) .................12

22

*U.S. ex rel. Chilcott v. KBR, Inc.*,

23
   No. 09-cv-4018, 2013 WL 5781660 (C.D. Ill. Oct. 25, 2013) ...........................17

24

*Commercial Contractors v. U.S.*,

25
   154 F.3d 1357 (Fed. Cir. 1998) ...................................................................11, 14

26

*Crescenta Valley Water District v. Exxon Mobile Corp.*,

27
   No. CV 07-2630-JST, 2013 WL 12116333 (C.D. Cal. Jan. 8, 2013).................25

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(8 of 262), Page 8 of 262    Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 8 of 262
Case 5:06-cv-00055-GW-MAR    Document 2809    Filed 12/12/18    Page 7 of 55    Page ID
#:140317

*Daff v. United States*,
   31 Fed. Cl. 682 (1994) .......................................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)............................................................................19

*Goebel v. Denver and Rio Grande W. R.R. Co.*,
   215 F.3d 1083 (10th Cir. 2000)..........................................................19

*State of Ca. ex rel. Grayson v. Pac. Bell. Tel.*,
   142 Cal. App. 4th 741 (2006)............................................................12

*ING Bank v. Am. Reporting Co., LLC*,
   859 F. Supp. 2d 700 (D. Del. 2012) ..................................................38

*Int'l Game Tech., Inc. v. Sec. Judicial Dist. Ct. of Nev.*,
   127 P.3d 1088 (Nev. 2006) ...............................................................12

*Jones v. City of Oakland*,
   No. 11-cv-4725 (YGR), 2013 WL 1333933
   (N.D. Cal. March 29, 2013) .................................................................3

*Lewis v. City of Alexandria*,
   756 S.E.2d 465 (Va. 2014).................................................................12

*Lloyd v. Ashcroft*,
   208 F. Supp. 2d 8 (D.D.C. 2002) ........................................................5

*United States v. Luce*,
   873 F.3d 999 (7th Cir. 2017)..............................................................11

*M&G Polymers USA, LLC v. Tackett*,
   135 S. Ct. 926 (2015).........................................................................10

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)..............................................................................5

*Marbled Murrelet v. Babbitt*,
   83 F.3d 1060 (9th Cir. 1996)..............................................................19

*Mauro v. S. New Eng. Telecomms., Inc.*,
   208 F.3d 384 (2d Cir. 2000)...............................................................38

*Merchant Transaction Sys., Inc. v. Nelcela, Inc.*,
   No. CV 02-1954-PHX-MHM, 2009 WL 723001
   (D. Ariz. Mar. 18, 2009) ............................................................5

*United States ex rel. Nottingham v. Thomas*,
   No. 4:11cv99 (DEM), 2015 WL 7424738, at *6
   (E.D. Va. Oct. 26, 2015) ..........................................................12

*PPM America, Inc. v. Marriott Corp.*,
   875 F. Supp. 289 (D. Md. 1995) ...............................................3

*Promega Corp. v. Life Tech. Corp.*,
   875 F.3d 651 (Fed. Cir. 2017)...................................................4

*Roberts v. Ariz. Bd. of Regents*,
   661 F.2d 796 (9th Cir. 1981)...................................................38

*United States ex rel. Roby v. Boeing Co.*,
   302 F.3d 637 (6th Cir. 2002)...................................................11

*Rodriguez v. Cnty. of Stanislaus*,
   799 F. Supp. 2d 1131 (E.D. Cal. 2011) ...................................3

*United States v. Sci. App. Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ................................9, 10, 40

*Sharkey IRO/IRA v. Franklin Res.*,
   263 F.R.D. 298 (D. Md. 2009)................................................38

*In re Silicone Breast Implants*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004)....................................26

*Simonian v. Univ. and Comm. College Sys. of Nev.*,
   128 P.3d 1057 (Nev. 2006) .....................................................12

*Summers v. Delta Air Lines, Inc.*,
   508 F.3d 923 (9th Cir. 2007)....................................................3

*Total Containment, Inc. v. Dayco Products, Inc.*,
   177 F. Supp. 2d 332 (E.D. Pa. 2001)........................................4

*Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*,
   29 F.3d 137 (4th Cir. 1994).....................................................26

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
856 F. Supp. 2d 1136 (C.D. Cal. 2012) ...............................................3

*United States of Am. for the Use of Salinas Constr., Inc. v. Western
Surety Company*,
No. C14-1963 (JLR), 2016 WL 3632487 (W.D. Wash. 2016) ...........................19

*Univ. Health Servs. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016) ...................................................10

*Wagner v. Prof. Eng'rs in Ca. Govt.*,
354 F.3d 1036 (9th Cir. 2004) ...........................................5

*United States ex rel. Wall v. Circle C. Constr., LLC*,
813 F.3d 616 (6th Cir. 2016) ....................................12, 25

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) ..............................................19, 25

*United States v. Woodbury*,
359 F.2d 370 (9th Cir. 1966) ...........................................9

**STATUTES**

31 U.S.C. § 231 (1976) ....................................................11

31 U.S.C. § 3729(a)(1)(G) ................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(b) ...................................................2, 3

Fed. R. Evid. 702 ..........................................................19

Fed. R. Evid. 703 .........................................................19

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(11 of 262), Page 11 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 11 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 10 of 55   Page
ID #:140320

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

After eight years of litigation, the parties have explored every potentially relevant fact, briefed, re-briefed, and argued every imaginable legal issue, and tried every relevant issue before two juries.  Throughout, Plaintiffs have been given the latitude to explore every possible legal and factual theory they could dream of.  At the same time, they have been permitted to take advantage of the Phase 1 verdict, despite that fact that it resulted from a Phase 1 trial that the Court has accurately described as a "train wreck."  The table is now set for the Court to rule on the legal sufficiency of Plaintiffs' case.  J-M has repeatedly asked for such a ruling, and having been given every privilege that they have asked for, Plaintiffs have finally joined in the same request.

This brief respectfully requests three things.

The first request is for the Court to enter judgment in J-M's favor as a matter of law on the damages theory that Plaintiffs presented at the five-week trial that recently concluded.  That theory was that Plaintiffs suffered damages because the pipe they received will fail earlier than the pipe they bargained for.  That theory fails as a matter of law because the bargain on which damages must be predicated was set out in written specifications, which called for compliance with certain standards, but those standards disclaimed, rather than imposed, any requirement for pipe longevity.  Plaintiffs' theory also fails as a matter of law because the Phase 1 jury did not decide whether J-M falsely represented compliance with any longevity requirement.

The Court must also enter judgment as a matter of law based upon Plaintiffs' failure of proof at trial.  Plaintiffs failed to present sufficient proof of: (1) the predicted times and costs of failure and replacement, which were presented solely by Mr. Lehmann; (2) the longevity of compliant pipe, J-M pipe manufactured from 1996–2006, and Plaintiffs' pipe at issue; or (3) the mathematical relationship of three short-term tests with long-term strength and longevity, upon which both the

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(12 of 262), Page 12 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 12 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 11 of 55   Page
ID #:140321

fact of lost value and all of Plaintiffs' damages calculations completely depended. Nor did Plaintiffs even attempt to bear their burden of proving the difference between the value they were promised and the benefits they unquestionably have received.

The second request is for the Court to enter judgment as a matter of law on the damages claim Plaintiffs chose to make in closing, in violation of the Court's instructions, the Court's clear rulings, the basic rules of trial procedure, and the bedrock principles of due process. Plaintiffs' closing claim was for the cost of replacement pipe for all pipe in all of the projects today. The Court ruled before trial that such a claim could not be made absent risk of imminent failure or a threat to public health. Plaintiffs responded by expressly abandoning any such claim, and their evidence at trial was that no such replacement was necessary because pipe was not expected to fail for some time into the future. This is reflected in the jury instructions Plaintiffs proposed and the Court provided. Plaintiffs urged the jury in closing to simply ignore all of this.

The third request is embedded in the first two, but based on an additional ground. That request is to preclude Plaintiffs from continuing this case. This case is exceptional in light of Plaintiffs' multiple, unilateral, and uniformly improper decisions to change their legal and factual theories of the case. With the end of the evidence and trials, the Court must put an end to Plaintiffs' inappropriate tactics.

## II. JUDGMENT AS A MATTER OF LAW CAN BE ENTERED FOLLOWING A MISTRIAL

Under Federal Rule of Civil Procedure 50, a party may renew its motion for judgment as a matter of law after a mistrial and discharge of the jury.[2] "The same standard applies to a motion for judgment as a matter of law made after a mistrial

---

[2] Fed. R. Civ. P. 50(b).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

because of jury deadlock."[3]  The standard for judgment as a matter of law after a mistrial is "no stricter than after a jury verdict."[4]  Judgment as a matter of law "should be entered notwithstanding the jury's failure to reach a verdict if insufficient evidence was presented to support a verdict for the nonmoving party."[5]

Judgment as a matter of law is warranted where, as here, "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue."[6]  Rule 50 "allows a court to remove . . . claims, defenses, or entire cases . . . from the jury" where the evidence cannot "support a particular outcome."[7]  In particular, judgment as a matter of law should be granted when the "evidence contains no proof beyond speculation to support a verdict."[8]

## III.   THE COURT SHOULD ENTER JUDGMENT FOR J-M BECAUSE PLAINTIFFS' LONGEVITY THEORY OF DAMAGES WAS DEFECTIVE AS A MATTER OF LAW AND LACKED A SUFFICIENT EVIDENTIARY BASIS AT TRIAL

### A.   Plaintiffs Must Be Held to the Damages Theory They Chose To Try

Plaintiffs are legally bound by their strategic decisions before and during

---

[3] *Rodriguez v. Cnty. of Stanislaus*, 799 F. Supp. 2d 1131, 1139 (E.D. Cal. 2011) (citing *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000), *cert. granted and vacated on other grounds by* 534 U.S. 801 (2001)).

[4] *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 856 F. Supp. 2d 1136, 1142 (C.D. Cal. 2012).

[5] *PPM America, Inc. v. Marriott Corp.*, 875 F. Supp. 289, 293 (D. Md. 1995) (citations omitted).

[6] *Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 926 (9th Cir. 2007) (quoting Fed. R. Civ. P. 50(a)).

[7] *Id.*

[8] *See, e.g.*, *Jones v. City of Oakland*, No. 11-cv-4725 (YGR), 2013 WL 1333933, at *2 (N.D. Cal. March 29, 2013) (citing *First Union Nat. Bank v. Benham*, 423 F.3d 855, 863 (8th Cir. 2005)).

1  trial.[9]  Whether grounded in the principles of waiver, fundamental due

2  process/fairness to the parties, or judicial estoppel, the courts have been clear that a

3  party cannot abandon legal theories to try to obtain a strategic advantage only to

4  revive those theories after the theories the party chose to pursue instead failed.  As

5  the Federal Circuit has said (reciting established law):  "***When a plaintiff***

6  ***deliberately takes a risk by relying at trial exclusively on a damages theory that***

7  ***ultimately proves unsuccessful*** . . . ***a district court does not abuse its discretion by***

8  ***declining to give that plaintiff multiple chances to correct deficiencies in its***

9  ***arguments or the record.***"[10]  In *Promega*, after a finding of patent infringement was

10  made, the plaintiff disclaimed any demand for royalties, seeking only damages in

11  the form of lost profits, arguing:  "Royalties?  Don't want them.  Wouldn't have

12  taken them.  Don't expect them."[11]  The district court and Federal Circuit on appeal

13  both found that the plaintiff had thus "expressly waived its right to any award based

14  on a reasonable royalty," and entered judgment as a matter of law when the plaintiff

15  could not sustain the one damages theory it pursued at trial.[12]

16      Similarly, in a retrial limited to the issue of damages, the court in *Total*

17  *Containment, Inc. v. Dayco Products, Inc.* precluded the plaintiff from proffering

18  "new theories after making a tactical decision not to do so at the prior trial," based

19  on concerns of fairness to the parties.[13]  Specifically, to avoid "potential unfairness

20  and prejudice to the parties," the court precluded plaintiff from "introduc[ing]

---

[9] *United States v. Brooke*, 4 F.3d 1480, 1485 n.6 (9th Cir. 1993) ("Like all litigants, the government must accept the consequences of its strategic decisions.").

[10] *Promega Corp. v. Life Tech. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) (emphasis added).

[11]  *Id.* at 660.

[12] *Id.*

[13] 177 F. Supp. 2d 332, 338–39 (E.D. Pa. 2001); *see id* (citing *Rochez Bros. v. Rhoades*, 527 F.2d 891, 894 (3d Cir. 1975), for the proposition that "retrials are not given to provide the plaintiff with an opportunity to improve its case").

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(15 of 262), Page 15 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 15 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 14 of 55   Page
ID #:140324

1   evidence for costs associated with the development of its own brand of primary

2   pipe" when it had not pursued this theory at the first trial.[14]

3           This bedrock principle of litigation is also at the heart of judicial estoppel—

4   parties may not change their positions mid-proceedings simply because it suits their

5   current strategy, especially when they have used their prior positions to successfully

6   persuade the courts to rule in their favor.[15]  Nor can they oppose judgment as a

7   matter of law (let alone request another bite at the apple in a retrial), on the basis of

8   a theory of damages that they did not submit to the jury.[16]

9

10  [14] *Id.* (citing *Habecker v. Clark Equip. Co.*, 36 F.3d 278, 288 (3d Cir. 1994) (holding
    that district court did not abuse its discretion in precluding plaintiff from pursuing a
11  new theory in a subsequent trial where "at the first trial, no evidence was admitted
    on the new theory, no argument was made to the jury, and no points for charge were
12  requested on that point")); *see also Apple, Inc. v. Samsung Elec. Co., Ltd.*, No. 11–
    CV–01846 (LHK), Dkt. 2271 ("Order re: Damages") at 26 (N.D. Cal. March 1,
13  2013), Dkt. 2316 ("Case Management Order") at 3 (N.D. Cal. April 29, 2013)
    (granting in part Samsung's motion for judgment as a matter of law when damages
14  award was based on improper notice dates and Apple had not presented sufficient
    evidence at trial to recalculate damages for some of the infringing sales using the
15  proper dates, and limiting Apple in the retrial on damages to those sales and the
    same theory it had pursued at the first trial).
16
    [15] *See New Hampshire v. Maine*, 532 U.S. 742, 742–43 (2001) ("Where a party
17  assumes a certain position in a legal proceeding, and succeeds in maintaining that
18  position, he may not thereafter, simply because his interests have changed, assume a
    contrary position, especially if it be to the prejudice of the party who has acquiesced
19  in the position formerly taken by him." (citations omitted)); *Wagner v. Prof. Eng'rs
    in Ca. Govt.*, 354 F.3d 1036, 1050 (9th Cir. 2004) (reversing, as an abuse of
20  discretion, district court's granting of summary judgment based on "resurrected"
    theory because plaintiff was judicially estopped from pursuing position it had
21  previously decided to abandon in order to "gain an advantage in the litigation").

22  [16] *See Merchant Transaction Sys., Inc. v. Nelcela, Inc.*, No. CV 02-1954-PHX-
23  MHM, 2009 WL 723001, at *18 (D. Ariz. Mar. 18, 2009) (holding court need not
24  consider new theories of the case after party was provided full and fair opportunity
    to present their claim at trial); *Lloyd v. Ashcroft*, 208 F. Supp. 2d 8, 11 (D.D.C.
25  2002) ("A plaintiff cannot change the theory of his case in his post-trial motion in
26  order to survive a Rule 50 motion for judgment as a matter of law. He is bound by

27

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(16 of 262), Page 16 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 16 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 15 of 55   Page
ID #:140325

1    In the present case, as discussed further below, Plaintiffs expressly waived

2  any claim for the cost of replacing all their pipe today, only to assert precisely that

3  claim in closing.  As the court in *Promega* made clear, such strategic decisions have

4  consequences, and litigants must be held to them in further proceedings.  So too, as

5  in *Total Containment* and *Habecker*, it would abrogate the most basic principles of

6  fairness and due process to allow Plaintiffs to pursue damages based on *future*

7  replacement at trial and then seek the cost of replacement *today* when the Court

8  ruled out construction costs.  Plaintiffs are also judicially estopped from disclaiming

9  any intent to pursue present replacement costs in order to avoid judicial rebuke for

10  pursuing factually unsupported and fundamentally inconsistent theories,[17] only to

11  present to the jury an inconsistent theory after the close of evidence.

12  **B.    Before Trial, Plaintiffs Abandoned All Claims for the Cost of**

13  **Replacing All Their Pipe Now**

14    Plaintiffs spent four years preparing and arguing their theories of damages in

15  this case.  Those theories were the basis for pretrial discovery and their legal

16  sufficiency was briefed, re-briefed, and argued to the Court repeatedly by the

17  parties.  One of Plaintiffs' theories was that they should recover damages based

18  upon the cost of replacing all of their pipe within the next six months to two years,

19  before it actually failed.[18]  J-M challenged this theory on multiple grounds,

20  including that it conflicted with Plaintiffs' claim for insurance to cover future

21  failures and that there was no evidence of a threat of imminent failure or danger to

22  public safety justifying immediate replacement.[19]  After briefing and argument, the

_____

what he pled and attempted to prove at trial.").

[17] *See* Dkt. 2494 at 19.

[18] Dkt. 2270 (Exemplar Pls.' Submission Stating Damages Theory) at 3 ("Plaintiffs
will also seek the full cost of replacing the J-M pipe, which includes both the cost of
the pipe itself and the expense associated with its replacement." (emphasis added)).

[19] Dkt. 2466 (J-M's *Daubert* Motion); Dkt. 2478 (J-M's *Daubert* Reply); Dkt. 2521

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(17 of 262), Page 17 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 17 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 16 of 55   Page
ID #:140326

Court precluded Plaintiffs from seeking the full costs of replacing their pipe now—
including the present cost of the pipe—absent evidence (which Plaintiffs did not
have) "of a likelihood that Plaintiffs' J-M pipe would fail within six months to two
years or posed a clear and *present* danger to health and safety, requiring
replacement."[20]

In response, Plaintiffs represented to the Court and J-M that they would not
seek damages based on immediate replacement.[21]  Plaintiffs proffered jury
instructions for the damages trial were in accord.[22]

_____

(J-M'S MIL No. 3).

[20] Dkt. 2494 at 19 (quoting *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales
Practices Litig.*, 277 F.R.D. 586, 607 (S.D. Cal. 2011), for the proposition that
opinions of the party offering "varying opinions from [their] own experts also weigh
in favor of a finding of unreliability")).

[21] *E.g.*, Ex. 9, Hr'g Tr. 39:21–40:20 (Sept. 11, 2018) ("THE COURT: Let me stop.
Let me ask this question of both parties: Aside from the issue of replacement costs
as, you know consequential damages, it seems to me this issue really goes toward
the contract price. In other words, I can understand this stuff that you're arguing --
you know, the degree of something from the contract price, but *if we don't include
the replacement costs of digging up the pipe and putting in new pipe and stuff of that
sort, this is an approximation, I suppose, of some request for an amount of money
that approaches the contract price, you know, because the more the pipe has been in
the ground and been used, you know, this provides some value, and if the benefit of
the bargain is defined as the contract price, then we're just arguing about some
percent of the contract price*. MR. HAVIAN: **Your Honor, that is a piece of it**, but
it's also highly relevant to the replacement cost theory. . . . Your Honor, the -- one
thing I should make clear: We've heard the court's rulings on full replacement costs,
in other words, **replacing all the pipe even not predicted to fail. We're not going to
continue to pursue that**; we disagree with the court's ruling." (emphases added)).

[22] Dkt. 2645-1 (Proposed Jury Instructions) at 8:17–9:1 ("As to actual damages,
Plaintiffs contend that, as a result of J-M's failure to manufacture and test its pipe in
a manner that assured that it had the quality, strength and durability as required
under the applicable industry standards, **the pipe Plaintiffs purchased will fail
sooner than pipe that conformed to the applicable industry standards and thus
will have to be replaced sooner**." (emphasis added)).

**ER389**   7

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

## C. The Remaining Theories Plaintiffs Tried All Claimed Diminished Value Based upon Reduced Longevity

Plaintiffs' remaining damages claims were all based on the contention that a portion of Plaintiffs' existing pipe had reduced longevity and would need to be replaced at specifically estimated times in the future. Tracking their proposed instructions, reduced longevity in fact predicated each of Plaintiffs' proffered damages proofs at trial, from Dr. Davis's opinions on the longevity of compliant pipe, to Mr. Paschal's calculations of reduced long-term strength (based on abbreviated HDB tests) and the precise impact on longevity, to Mr. Edwards's parallel calculations based upon Quick Burst tests, to Mr. Cathcart's replacement cost estimates, to Mr. Lehmann's calculations of reduced longevity and the present value of replacement.  All of this was in line with Plaintiffs' opening statement, which presented damages calculations premised on *future* failure.[23]  Each of these claims incorporated as one component the cost of buying new pipe to replace that proportion of pipe predicted to fail prematurely *in the future*.

At the conclusion of the trial, the Court held that the labor costs of removal

---

[23] *See* Ex. 23, Pls' Opening Slide titled "Actual Damages" ("Plaintiffs seek to be placed in the same position as if J-M had delivered pipe that complied with industry standards and would not fail prematurely. In order to be placed in the same position, Plaintiffs seek damages for: The Cost of Predicted Pipe Failures [$11 Million - $14 Million]; Insurance for Predicted Pipe Failures [$13 Million - $16 million]; Cost of Pipe [$1.1 Million].").  While the ***contract*** price was listed and subsequently included in Mr. Cathcart's testimony, what counts is that he used the different and much higher cost of ***replacement pipe*** as the basis for his opinions and those opinions went to the total cost of replacing Plaintiffs' pipe (the cost of pipe + removal and reinstallation costs).  And, to the essential point here, the only ***damages*** calculations Plaintiffs submitted were presented by ***Mr. Lehmann***, who used the replacement pipe costs as an input to the calculation of the cost of replacing the portion of Plaintiffs' pipe that he predicted would fail ***in the future***.  *See, e.g.*, Ex. 17, Trial Ex. 31281-C-7 (Arcadis Rpt. at App'x C); Ex. 1, Trial Tr. 6507:5–6508:7; Ex. 18, Trial Ex. 31293 (Lehmann's revised SGL-11 (Oct. 30, 2018)).

(19 of 262), Page 19 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 19 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 18 of 55   Page
ID #:140328

1   and reinstallation were impermissible consequential damages.[24]  But, Plaintiffs'

2   evidence of (and claim for) reduced longevity and the cost of pipe upon premature

3   future failure *remained undisturbed*.  Accordingly, the jury was instructed, just as

4   Plaintiffs requested in their proposed instructions, that Plaintiffs' damages claim

5   was based upon reduced longevity:

> As to actual damages, Plaintiffs contend that, as a result of J-M's failure to
> manufacture and test its pipe in a manner that assured that it had the quality,
> strength and durability as required under the applicable industry standards,
> ***the pipe Plaintiffs purchased will fail sooner than pipe that conformed to
> the applicable industry standards and thus will have to be replaced sooner*.**"
> (emphasis added)).[25]

### D.      Plaintiffs' Damages Claim for Diminished Longevity Fails as a Matter of Law Because Longevity Was Not Part of the Parties' Bargain and Was Not Decided in Phase 1

14          The law requires, the Court has ruled, and Plaintiffs have long conceded that

15   the "benefit of the bargain" is the proper measure of damages in this False Claims

16   Act case.[26]  That the "bargain" in this case is reflected in Plaintiffs' specifications

17   has taken much longer to establish, but it is equally clear on the law and undisputed

18   on the facts.  Plaintiffs conceded at trial that the specifications and the standards

19   they incorporated contain no longevity requirement.  It follows as a matter of clear

20   False Claims Act law (under both the federal FCA and the state analogs that are

21   interpreted consistent with the federal law) that damages for claimed reduced

---

[24] *See* Dkt. 2753.

[25] Dkt. 2756 (Final Phase 2 Instructions) at 3.

[26] Dkt. 2688 (Oct. 9, 2018 Benefit of the Bargain ruling) at 1; *see United States v. Sci. App. Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010) (citing *United States v. Bornstein*, 423 U.S. 303, 316 n.13 (1976)); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966); Dkt. 2647 (Pls.' Submission re. Damages for Anticipated Failures) at 1 (conceding applicability of "benefit of the bargain" measure).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(20 of 262), Page 20 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 20 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 19 of 55   Page
ID #:140329

1  longevity are not recoverable.  Plaintiffs will undoubtedly continue to fight this

2  conclusion by citing irrelevant contract law.  But they have now agreed that the

3  Court should decide the role of the specifications in defining the "benefit of the

4  bargain."  Plaintiffs' claims for reduced longevity are also barred as a matter of law

5  for the separate and independent reason that reduced longevity was not a predicate

6  for the Phase 1 jury's verdict.[27]

7             **1.     The bargain that controls Phase 2 damages is defined by the**

8                    **project specifications**

9             False Claims Act law is clear that, where a written contract sets out the

10  product or services to be supplied to the government, that contract defines the

11  "bargain" the government has struck and, in turn, sets the bar for any claim for

12  damages based upon the benefit of that bargain.[28]  The law is equally clear that the

13  FCA does not displace the law of contracts and redefine the scope of the parties'

14  agreement.[29]

---

15  [27] Ex. 1, Trial Tr. 325:11–13 ("MS. SHER: . . . ***So for Mr. Bernick to say that the***

16  ***first trial didn't litigate longevity, I understand why he's saying that. We didn't***

17  ***litigate 100 years***, although actually it came up." (emphasis added)).

18  [28] *See, e.g.*, *Sci. App.*, 626 F.3d at 1278–79 (holding that jury could "award FCA

19  damages for any loss in value to the NRC attributable to [defendant's] failure to
    provide completely impartial conflict-free services ***required by the NRC contracts***"

20  (emphasis added)).

21  [29] *See Univ. Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999

22  (2016) ("It is a settled principle of interpretation that, absent other indication,
    Congress intends to incorporate the well-settled meaning of the common-law terms

23  it uses" and that the FCA does not abrogate the common law absent "textual indicia
    to the contrary." (citations omitted)); *see also M&G Polymers USA, LLC v. Tackett*,

24  135 S. Ct. 926, 933, 935–37 (2015) (interpreting collective-bargaining agreement

25  "according to ordinary principles of contract law," holding that "traditional rules of
    contractual interpretation require a clear manifestation of intent before conferring a

26  benefit or obligation" and a "written agreement is presumed to encompass the whole
    agreement of the parties," and overruling the Sixth Circuit because it inferred

27  benefits in the agreement, improperly "placing a thumb on the scale")).

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Thus, in the most factually apposite FCA cases that the Court analyzed repeatedly and in-depth, the plaintiffs were able to recover damages for the benefit of the bargain for which they specifically contracted. In *Roby*, the Sixth Circuit upheld a ruling applying the benefit of the bargain measure of damages and awarding as damages the cost of a helicopter where the parties had specifically contracted for "remanufactured helicopters as units, not as assemblages of assorted parts."[30] Similarly, the Federal Circuit in *Commercial Contractors* upheld an award of the costs of remedying deficiencies in channel construction when the defendant had specifically contracted to provide construction services, but did not comply with quality control standards specified in the contract.[31] The other cases Plaintiffs repeatedly cited are in accord.[32]

These cases also show courts giving meaning to the "by reason of/because of" language in the FCA, which reflects the FCA's incorporation of the common law proximate causation requirement that the only damages that are recoverable are those commensurate with the loss of benefits caused by the defendant's false statement or claim.[33] Plaintiffs' eleventh-hour gambit to ground their damages

---

[30] *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 646–47 (6th Cir. 2002).

[31] *Commercial Contractors v. U.S.*, 154 F.3d 1357, 1373–74 (Fed. Cir. 1998).

[32] *See, e.g.*, *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 148–49 (1998) (awarding "[c]osts of inspection and repair incurred by the government" where the contractor failed to perform tests on every unit sold, as required by the contract); *Daff v. United States*, 31 Fed. Cl. 682, 695 (1994), *aff'd* 78 F.3d 1566 (Fed. Cir. 1996) (awarding costs of testing and repairing military equipment where defendant violated its contractual obligations to inspect equipment, record observations, and report any deficiencies).

[33] 31 U.S.C. § 3729(a)(1)(G) (providing for recovery of "damages which the Government sustains *because of* the act of" the defendant (emphasis added)); *see* 31 U.S.C. § 231 (1976) (providing for "damages which the United States may have sustained *by reason of* [the act of the defendant]" (emphasis added)); *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017) (holding that FCA applies the common law proximate cause standard and explaining that "[t]he statutory language of the

---

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(22 of 262), Page 22 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 22 of 262
Case 5:06-cv-00055-GW-MAR    Document 2809    Filed 12/12/18    Page 21 of 55    Page
ID #:140331

1  claims in the (until then) barely mentioned state FCAs at issue does not affect this

2  analysis because the equivalent California, Nevada, and Virginia False Claims Act

3  statutes are interpreted consistently with the federal FCA, and Plaintiffs have

4  identified no False Claims Act case that says otherwise.[34]

5          This is not surprising.  Before trial, Plaintiffs themselves relied upon the

_____

FCA does not suggest that Congress sought to depart from the established common-law understanding of causation in fraud cases. The FCA simply allows the Government to recover damages which the Government sustains *because of* the act of that person."); *e.g.*, *United States ex rel. Wall v. Circle C. Constr., LLC*, 813 F.3d 616, 617 (6th Cir. 2016) (holding that where defendant violated FCA law by underpaying employees, damages were limited to difference between the wages the defendant should have paid and what it actually did pay because "the government bargained for two things: the buildings, and payments of Davis-Bacon wages. It got the buildings but not quite all of the wages."); *see also Ab-Tech Constr., Inc. v. U.S.*, 31 Fed Cl. 429, 434 (1994), *aff'd* 57 F.3d 1084 (Fed. Cir. 1995) (holding that because "no proof has been offered to show that [Plaintiffs] suffered any detriment to [their] *contract interest* because of [defendant's] falsehoods," Plaintiffs could claim no damages (emphasis added)); *id.* ("Damages represent compensation for a loss or injury sustained. . . . [T]he Government got essentially what it paid for.").

[34] *See State of Ca. ex rel. Grayson v. Pac. Bell. Tel.*, 142 Cal. App. 4th 741, 746 n.3 (2006) ("Given the very close similarity of California's act to the federal act, it is appropriate to turn to federal cases for guidance in interpreting the act." (citations omitted)); *Chaffey Joint Union High School District v. FieldTurf USA, Inc.*, No. 16-cv-204 (JGB), 2017 WL 3048658, at *4 (C.D. Cal. Feb. 28, 2017) (denying summary judgment and allowing plaintiff's claims under the CFCA for full replacement costs of synthetic field turf to proceed where plaintiff had contracted with defendants "for the purchase *and installation* of a synthetic turf field" (emphasis added)); *Simonian v. Univ. and Comm. College Sys. of Nev.*, 128 P.3d 1057, 1060 (Nev. 2006) (holding that "Nevada's FCA is modeled after the federal FCA"); *Int'l Game Tech., Inc. v. Sec. Judicial Dist. Ct. of Nev.*, 127 P.3d 1088, 1101 (Nev. 2006) ("Nevada's FCA was expressly modeled after the federal FCA."); *Lewis v. City of Alexandria*, 756 S.E.2d 465, 479 n.4 (Va. 2014) (noting that "[t]he VFATA is based on the federal civil False Claims Act (FCA)," and holding that "FCA cases thus provide guidance for our review"); *United States ex rel. Nottingham v. Thomas*, No. 4:11cv99 (DEM), 2015 WL 7424738, at *6 (E.D. Va. Oct. 26, 2015) ("The [VFATA] allows for damages identical to those set forth in the False Claims Act."), *adopted* 2015 WL 7430020 (E.D. Va. Nov. 20, 2015).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(23 of 262), Page 23 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 23 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 22 of 55   Page
ID #:140332

1  written contracts when it suited their purposes.[35]  But, at the same time, they

2  disingenuously searched in vain to find support in FCA law for the proposition that

3  damages could be awarded for a lost benefit that was **not** part of the parties' bargain.

4  As Plaintiffs ultimately admitted, all they could come up with were breach of

5  contract (and warranty) cases, which adopt a different standard based upon

6  foreseeability.[36]

7      At trial, Plaintiffs' representatives agreed that the specifications and

8  submittals defined the scope of the parties' obligations,[37] and the Court reiterated

9

---

10  [35] Dkt. 2515-1 at 6 (citing *Brotherson v. Professional Basketball Club*, 262 F.R.D.,
564, 571–72 (W.D. Wash. 2009) (quoted for the proposition that "[s]ubjective
11  expectations do not govern the determination"; "[o]bjectively reasonable
expectations do" and "the objectively reasonable expectations of the parties" are
12  "readily determinable" from the contract itself) and *Founding Mem. of the Newport
Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944,
13  956 (2003) (quoted for the proposition that "California recognizes the objective
theory of contracts, under which it is the objective intent, as evidenced by the words
14  of the contract, rather than the subjective intent of one of the parties, that controls
interpretation . . . . The parties' undisclosed intent or understanding is irrelevant to
15  contract interpretation.")).

16

17  [36]  *See, e.g.*, Dkt. 2646 at 5:21–7:20; Dkt. 2436-1 at 68–69.  *See also* Ex. 12, Hr'g
18  Tr. 60:22–61:3, 62:2–5 (Oct. 5, 2018) ("THE COURT: . . . There's enough federal
False Claims Act cases for me to figure out generally where the problems are, and
19  the questions or resolution. I'm looking for the state court to see if the state courts
have resolved the issue. If they haven't resolved the issue under the False Claims
20  Act, I'm not going to look to their law insofar as breach of contract or for fraud
because, again, I'm not concerned -- that doesn't concern me. . . . MR. LITMAN:
21  ***You are asking for the broom stick of the wicked witch of the west. The actual
22  adjudication of state False Claims Act is fairly sparse, but the principle that it
incorporates contract damages is robust and universal.***" (emphasis added)); *id.*
23  42:8–15.

24

25  [37] *E.g.*, Ex. 1, Trial Tr. 4313:7–16 (Calleguas) ("Q. . . . So the contracts, the
26  submittals, those set forth the obligations of the parties; correct? A. Yes. And the
plans. Q. And the plans. And so those are the documents that at the end of the day it
27  is all written down in one place what everybody's obligations are; is that fair? A. As
to Graycon and Calleguas, yes. Q. As to? A. The parties to the contracts."); *id.*
28

---

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

that "the benefit of the bargain depends on what was in the contract."[38]

The parties' arguments regarding the final jury instructions again focused on whether the written specifications and submittals controlled the substance of the "bargain." After yet another round of briefing from the parties at Plaintiffs' insistence, Plaintiffs were still unable to find any law to the contrary, and unsuccessfully sought refuge in *Commercial Contractors*.[39] The Court ultimately instructed the jury that what Plaintiffs "contracted for" was the touchstone of the "value" Plaintiffs were entitled to as part of the parties' bargain.[40] The verdict form

---

1303:14–16 (Norfolk) ("Q. Is it your understanding that anything required by the contract is reflected in writing? A. Yes."); *id.* 1108:16–20 (South Tahoe); *id.* 1740:3–8 (Palmdale); *id.* 2053:10–2053:18 (Reno); *id.* 1086:18–1087:1 (South Tahoe).

[38] Ex. 1, Trial Tr. 1750:4–5.

[39] In *Commercial Contractors*, the defendant contractor submitted false claims for construction of a channel, and the court held that the government was entitled to the costs of remedying the deficiencies caused by improper construction that affected the structural integrity of the channel. 154 F.3d at 1373–74. ***However, J-M's sole contractual role was to supply pipe.*** J-M's role as a supplier thus distinguishes this case from *Commercial Contractors*, where the defendant was a general contractor providing both materials and construction services. *See* Ex. 1, Trial Tr. 260:24–261:4 ("THE COURT: *I agree. The reason why Commercial Contractors may not be applicable, even if one were to accept the approach of the Court in Commercial Contractors, is that there, you are right, it was the contractor, and here we have a supplier of pipe to a contractor. And so, therefore, the scenario is quite different.*" (emphasis added)).

[40] Dkt. 2756 (Updated Final Jury Instructions) at 8; *see* Ex. 1, Trial Tr. 6492:4–7 ("THE COURT: I will give you the one that you think is so important. The one on the bottom of page 8, 'would have expected based upon J-M's contractual representation of compliance.'"); *id.* 6493:19–21 ("THE COURT: I think Mr. Bernick is certainly right in terms of expected versus – it should be 'would have had' as opposed to 'expected.'"); *id.* 6495:6–9 ("THE COURT: *I will actually put in 'contracted' rather than 'paid' on the paragraph 8 of page 8, the one that begins, 'each plaintiff must prove,' because that is contracted.*" (emphasis added)).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(25 of 262), Page 25 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 25 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 24 of 55   Page
ID #:140334

1  similarly used the contracts to predicate each of the three questions put to the jury.[41]

2  ## 2.  It was undisputed at trial that the specified standards

3  imposed no longevity requirement

4  Plaintiffs' experts, as well as Plaintiffs' representatives and Plaintiffs'

5  counsel, all conceded at trial that *the parties' contracts and the standards they*

6  *incorporated did not include any longevity requirement that J-M pipe needed to*

7  *meet*.[42]  Plaintiffs' counsel has explicitly conceded this:

8  > MR. HAVIAN: . . . We told the jury – we argued to the jury the
   > standards don't address longevity. So, if the issue were just that, *if*

9  > *Mr. Bernick was right, that unless you see longevity in the standards*

10 > *or in the contracts, the case is over.  You might as well just give*

   > *them a directed verdict if the Court agrees with that argument.*[43]

11

   *          *          *

12

   _____

13 [41] Dkt. 2806, Special Verdict Form.

14 [42] *Id.* 4322:1–4 (Calleguas) ("Q. And you would agree with me that the contract has
   no specific longevity set forth in it; correct? A. It doesn't list a number of years.");
15 *id.* 1308:12–15 (Norfolk) ("Q. And there's no mention anywhere in the contract or
   the standards that the pipe should last for any particular length of time, correct? A.
16 Correct."); *id.* 1757:2–4 (Palmdale) ("Q. There is no representation about specific
   life span, correct?  A. Not that I'm aware of."); *id.* 2057:7–16 (Reno) ("Q. First of
17 all, with respect to the specifications, there is nothing in Reno's specifications
   saying the pipe chosen for the project must have any specific life span or service
18 life, correct? A. Correct.  Q. And there is no contract term in any of the contracts
   for these projects containing any promise or representation that the pipe must last a
19 hundred years or at least a hundred years; that is not in the contract terms, correct?
   A. Correct."); *id.* 1108:5–14 (South Tahoe) ("Q. . . . . There's no requirement in any
20 of the District's specifications that the pipe chosen must meet any particular pipe
   lifespan or service span, correct?  A. I don't recall any estimated lifespan in the
21 contract documents.  Q. No term of the contract or any promise by anybody,
   including J-M, that the pipe must last exactly 100 years or at least 100 years.  That's
22 not part anywhere in the contract, correct?  A. No."); *id.* 2694:9–13 (Paschal) ("Q.
   But in point of fact the standards themselves, there is no standard that requires a
23 certain service life, right?  True or not?  A. Specifically within the standards we've
   been discussing today, that's correct.").
24
   [43] Ex. 1, Trial Tr. 8419:20–8420:1 (emphasis added).
25

26

27

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

THE COURT: I mean, again, if we take out subjective – if we are saying that subjective intent is not to be determinative of the issue, if the contracts themselves do not specify longevity –

MR. HAVIAN: Well, they specify compliance with the standards.

THE COURT: Compliance with the standards, ***but the standards themselves do not indicate a period of time as to longevity***.

MR. HAVIAN: ***That's right***.[44]

As the Court indicated at the beginning of the trial, J-M is entitled to judgment as a matter of law on this basis alone:

THE COURT: Well, my indication is I will allow them to make the argument. ***If at the end of the trial I conclude from all the evidence that has been presented that you are, in fact, right, that there is no connection between a hundred-year estimate and the damages which they can get under the False Claims Act, then I will have to give you a directed verdict."***[45]

### 3. Plaintiffs have agreed that the Court should decide whether the specifications control as a matter of law

When it became apparent that the jury would be hopelessly deadlocked absent further guidance from the Court on the scope of the parties' bargain, Plaintiffs finally conceded what J-M has long urged—that the Court should resolve as a matter of law the question of whether the parties' bargain was defined by the

---

[44] *Id.* 8431:11–20 (emphasis added); *see also* Ex. 8, Hr'g Tr. 10:5–6 (Sept. 7, 2018) ("***Nobody bargained for a particular life span of the pipe.***" (emphasis added)); *id.* 10:6–7 (MR. HAVIAN: "***Our clients don't say we bargained for a particular life span.***" (emphasis added)); *id.* 33:14–16 ("MR. HAVIAN: ***There is no agreement on the life span. And we don't argue that there is an agreement on the life span.***" (emphasis added)); Ex. 9, Hr'g Tr. 18:21–24 (Sept. 11, 2018) (MR. HAVIAN: "***[W]e are not seeking to sort of establish for purposes of the trial that 100 years was a promise that was made and that's part of the bargain. That's not our position, never has been.***" (emphasis added)).

[45] Ex. 1, Trial Tr. 329:10–16 (emphasis added).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(27 of 262), Page 27 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 27 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 26 of 55   Page
ID #:140336

1   specifications and standards at issue.[46]  Plaintiffs also conceded (because they

2   believed it advantageous to do so) that the parties' subjective expectations of

3   longevity were irrelevant.[47]  Plaintiffs further conceded that, if the Court determined

4   that the contracts and standards defined the scope of the parties' bargain, the Court

5   must direct judgment in J-M's favor as a matter of law because neither included a

6   longevity requirement:

7          MR. HAVIAN:  . . . [Y]our Honor, *if it has to be in the contract
           *and/or it has to be in the standards, then we are done. It is not – we*
8          *are done. Just give a directed verdict*.  Don't send the jury back out.
           Give a directed verdict on that basis. . . . But frankly, *if the Court is*
9          *now going to accept that it has to be either in the contract or the*
           *standards, then we lose.*[48]
10

11

12         The Court also brought home the absence of any *evidence* supporting a

13   bargain on longevity:

14          THE COURT: But let me just ask you, the problem I have with your
            argument is that you are attempting to argue some sort of damages
15          that flow from some sort of loss of longevity because of the failure to
            produce compliant pipe.
16

17

18   _____
     [46] Ex. 1, Trial Tr. 8634:13–17 ("MR. HAVIAN: . . . So at some point, the court, I
19   think, has to come to grips with whether it's going to either squarely accept or reject
     J-M's argument that unless longevity is in the contract or in the standards, which the
20   parties agree it's not, then plaintiffs can't recover damages.").

21   [47] *Id.* 8414:2–3 ("MR. HAVIAN: . . . The parties' subjective expectations are
22   irrelevant."); *id.* 8419:5–7 ("MR. HAVIAN: . . . What we do agree on is that
     evidence of the parties' subjective expectations of pipe longevity cannot be
23   considered in determining any actual damages.").

24   [48] Ex. 1, Trial Tr. 8432:2–7 (emphasis added).  Moreover, the Court can and should
     interpret the plain language of the contractual documents.  *See Beck Park*
25   *Apartments v. U.S. Dept. of Housing and Urban Dev.*, 695 F.2d 366, 369 (9th Cir.
26   1982) ("Interpretation of a contract is a matter of law."); *U.S. ex rel. Chilcott v.*
     *KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) ("It is
27   for the Court to determine the proper interpretation of the contract's terms.").

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(28 of 262), Page 28 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 28 of 262
Case 5:06-cv-00055-GW-MAR  Document 2809  Filed 12/12/18  Page 27 of 55  Page
ID #:140337

*And you don't have anything upon which to base that on.*

Supposedly you could try to base it on your clients' subjective expectations as a basis for that, but if you don't even have that, *I don't understand where you are getting any sort of figure from*.[49]

The Court should thus enter judgment as a matter of law because Plaintiffs did not establish either under FCA law or based on any evidence that the benefit of the bargain included pipe longevity.

> **4.**    **Plaintiffs' damages claim for reduced longevity also fails as a matter of law because longevity was not in the Phase 1 verdict**

Judgment should also be entered in J-M's favor as a matter of law for the separate and independent reason that the Phase 1 jury was not asked to and did not decide whether J-M falsely represented uniform compliance with a longevity requirement in the standards.  There is no question that the longevity of J-M's pipe in use was not litigated or decided in Phase 1.  While Plaintiffs have pointed to the word "durability" in the description of their claim in the Phase 1 instructions, and to representations of longevity in certain Phase 1 evidence, there was no evidence or contention that longevity was required by any standard, Plaintiffs never argued in Phase 1 that it was, and today they concede that it is not.  No longevity requirement in the standards means that longevity was not in the verdict and does not belong anywhere in this standards-based case.

> **E.**    **Plaintiffs Failed To Provide a Legally Sufficient Evidentiary Basis for Their Longevity-Based Damages Claims**

The Court should enter judgment in J-M's favor as a matter of law on Plaintiffs' longevity-based damages claims for the additional reason that Plaintiffs failed to provide a sufficient evidentiary basis to establish several factual predicates,

---

[49] Ex. 1, Trial Tr. 8445:10–20 (emphasis added).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

each of which was essential to their damages case.

### 1. Mr. Lehmann's damages calculations were legally insufficient

The only longevity-based damages calculations Plaintiffs proffered at trial came in through Mr. Lehmann. All of the evidence Mr. Lehmann presented was based upon his actuarial methodology. That methodology, as well as the inputs to its application in this case, was unreliable under *Daubert* and Rules 702 and 703, and thus legally insufficient to support any verdict as a matter of law.[50]

*First*, while Plaintiffs had argued there were two longevity-based damages theories, the first based upon a hypothetical insurance premium and the second based upon the present value of certain pipe that was predicted to fail prematurely in

---

[50] Evidence that fails to meet *Daubert* standards is insufficient under Rule 50. *See Weisgram v. Marley Co.*, 528 U.S. 440, 456 (2000) (holding that lower court properly granted judgment as a matter of law under Rule 50 where it deemed expert evidence introduced at trial was unreliable and therefore inadmissible, and the remaining properly admitted evidence was insufficient to support a verdict); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (affirming judgment as a matter of law in favor of defendant and noting that "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict"); *Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("The district court may also satisfy its gatekeeper role when asked to rule on a . . . post-trial motion." (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993))); *United States of Am. for the Use of Salinas Constr., Inc. v. Western Surety Company*, No. C14-1963 (JLR), 2016 WL 3632487, at *6, 9 (W.D. Wash. 2016) (holding that expert's damages calculations were inadmissible expert testimony pursuant to Rules 701 and 702, and that such objection was properly raised on Rule 50(b) motion); *Accrentra, Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1226–28 (C.D. Cal. 2011) (considering previously raised *Daubert* challenges in ruling on a Rule 50(b) motion), *vacated on other grounds*, 500 F. App'x 922 (Fed. Cir. 2013); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) ("[E]vidence which is unreliable is necessarily insufficient.").

(30 of 262), Page 30 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 30 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 29 of 55   Page
ID #:140339

1  the future,[51] Mr. Lehmann's **only** task was to estimate the ***premium*** that would apply

2  to an insurance policy covering the cost of premature failure of Plaintiffs' pipe.[52]  It

3  was solely for this task that Mr. Lehmann claimed expertise.  In determining

4  whether such an insurance policy might be obtained in the marketplace, Mr.

5  Lehmann relied entirely on general principles of commercial insurance.[53]  He made

6  no effort to go out into the marketplace to look for one.[54]  Nor did Plaintiffs.[55]  Mr.

7

8  [51] Dkt. 2645-1 (Proposed Jury Instructions) at 9:2–9 (Pls.' proposed instruction).

9  [52] Ex. 1, Trial Tr. 5232:23–5233:9 ("Q All right. And briefly, what were you asked
10  to do in this particular case? A. Yes. I was retained by plaintiffs to determine a rate-
   making method that would compensate plaintiffs and insure them for the cost of
11  premature failing of the [PVC] pipe that they bought from J-M, and based on the
12  fact that the pipe was not in uniform compliance with standards. And then, secondly,
   I was asked to apply that rate-making method to the facts of this case and determine
13  an appropriate premium in total for all five plaintiffs and for each of the five
   plaintiffs.").
14
15  [53] Ex. 1, Trial Tr. 5482:18–5483:3 ("Q. . . . Your approach in this case has been an
   insurance approach, right? A. Yes. . . . I determine the premium. Q. . . . And the
16  premium is for a commercial policy, right? A. Yes.").

17  [54] *Id.* 5487:11–15 ("Q. But on this policy, you didn't go out to the marketplace to
   see whether this policy, whether any insurance policy would issue this policy did
18  you? A. I couldn't approach the market because we have confidentiality limits on
19  what we can say about this case.").

20  [55] *See, e.g., id.* 4330:15–20 (Calleguas) ("Q. And you haven't looked into any sort of
   insurance or self-insurance specifically with respect  to the Lake Bard project;
21  correct? A.  We have not.  I know that our own insurer doesn't carry that type of
   coverage, but we haven't investigated other types of insurance."); *id.* 1315:10–15,
22  1319:19–25 (Norfolk) (Q. You've never consulted an insurer to try to insure against
23  the possibility of any of your J-M pile failed, correct? A. Norfolk is self-insured. We
   don't have an insurance policy or insurer. Q.  'No' is the answer, correct? A. No
24  insurance. . . . Q. It doesn't say that you could spend the money in that account on
   any sort of insurance policy, correct? A. Like I said, we don't have any insurance
25  policy because we're self-insured.  You're right. Q. Right. You wouldn't spend the
26  money on an insurance policy, correct? A.  No."); ; *id.* 1817:12–18 (Palmdale). ("Q.
27  . . . The district has not bought any insurance to cover potential future problems with
28  J-M pipe; correct? A.  Independent insurance to cover replacement?  Is that the

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(31 of 262), Page 31 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 31 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 30 of 55   Page
ID #:140340

1    Lehmann admitted outright that his insurance policy does not exist in the real world,

2    and that it was speculative.[56]

3         *Second*, the entirety of Mr. Lehmann's work was based upon actuarial

4    ***standards***, ***methods***, and ***practices***.  He expressly disclaimed expertise in the

5    underlying engineering and pipe science.[57]  As a consequence, it was through

6    actuarial standards, methods, and practices that Mr. Lehmann purported to have a

7    basis for relying upon the engineering models of Mr. Paschal and Mr. Edwards.[58]

8    The actuarial standards called for him to perform a "credibility" assessment of both

9    _____
     question? Q.  Yes. A.   Correct.").

10
     [56] *Id.* 5483:5–10 ("Q. Now, isn't it true that the policy that you're describing and

11   have described to the jury is a policy that ***does not exist today***? A. That's correct. Q.
     Anywhere, right? A. Not that I'm aware of." (emphasis added)); *id.* 5653:20–24

12   ("Q. You said that 100-year policy is ***hypothetical***, remember? A. Yes, I mean, we

13   don't have such a policy in existence today, I was pricing one. Q. ***You said it does
     not exist. It's hypothetical***, correct? A. That's what I said yesterday, yeah, ***I agree***

14   ***with that.***" (emphasis added)).

15   [57] Ex. 21, Lehmann Dep. 23:8–10 ("Q. But you're not an expert in engineering?  A.

16   No."); Ex. 1, Trial Tr. 5248:22–25 ("Q. Was it important for you in your work as an
     actuary to understand the technical and engineering aspects of the product that you

17   were being asked to price?  A. I didn't need to become an engineer."); *see also id.*

18   5249:17–19 ("Q. But you are not holding yourself out as an expert in PVC pipe or
     PVC pipe standards, are you? A. I am not."); *id.* 5620:11–12 ("A. Yeah, I'm really

19   not an expert on PVC pipe, and I haven't read, you know, all the studies.").

20   [58] Trial Tr. 5248:22–5249:19 ("Q. Was it important for you in your work as an

21   actuary to understand the technical and engineering aspects of the product that you
     were being asked to price?  A. ***I didn't need to become an engineer.  That is not –***

22   ***that was not necessary.  But the actuarial, we talked earlier about actuarial***

23   ***standards of practice.  And actuarial standards of practice, there is an actuarial***
     ***standard of practice dealing with actuaries who are working with models that are***

24   ***basically nonactuarial in nature. You know, engineering. . . . I had to become at***

25   ***least enough understanding about the models that I could assess the models, as to***
     ***whether or not they were reasonable or not and whether or not the experts who***

26   ***had developed the models were experts in their fields.***  Q. But you are not holding

27   yourself out as an expert in PVC pipe or PVC pipe standards, are you? A. I am not."
     (emphasis added)).

28

---

**ER403** 21

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1  the historical data (*i.e.*, the actual performance of the pipe at issue) and the non-

2  historical data (*i.e.*, test data on other pipe),[59] and to develop a correct understanding

3  of and properly apply models outside Mr. Lehmann's area of expertise.[60]  Mr.

4  Lehmann failed to meet these basic standards.

5      Thus, as to the credibility assessment, Mr. Lehmann assigned 0% credibility

6  to the historical data of Plaintiffs' pipe in service, despite admitting that he had

7  ***never before*** assigned 0% credibility to the actual experience and 100% credibility

8  to a predictive model.[61]  Moreover, his "first time" work was done only for and in

9  the courtroom; Mr. Lehmann had never even heard of someone else doing so

10  before.[62]  In addition, Mr. Lehmann incorrectly premised his entire analysis on the

11

12  [59] Ex. 15, Trial Ex. 20183 (Actuarial Standard of Practice No. 25 "Credibility
13  Procedures") §§ 3.1, 3.2.

14  [60]  Ex. 16, Trial Ex. 20184 (Actuarial Standard of Practice No. 38 "Using Models
Outside the Actuary's Area of Expertise") § 3.1.

15  [61] Ex. 1, Trial Tr. 5501:13–5502:10 ("Q. . . . Twenty-two years of experience – up to
16  22 years of experience, zero failures of pipe. You gave that zero weight, true or not?
17  A. I've already answered that I gave it zero weight . . . . Q. Isn't it a fact that this is
   the first time in your entire career where you have, assigned all of the weight to
18  predicted models, first time in your career? A. This is a very unique – and it's a – in
   a sense, it's a new product, and so in a new product, you have no subject experience
19  so you have to apply 100 percent predictability [*sic*] to your other data. Q. . . . Isn't
20  it a fact that this is the first time in your career of over 40 years that you've made a
   prediction -- made a prediction solely on the basis of predictive models? A. I've
21  made predictions based on other data, but it's – I just haven't worked on that many
22  new products that I would have had the occasion to base 100 percent. I know that
   others have, but I haven't. Q. So the answer to my question is this is the first time.
23  A. It's the first time that I have relied on this . . . .").

24  [62] *Id.* 5502:19–5503:2 ("Q. Models that have been created ***solely for purposes of***
25  ***litigation***, not published in the open literature, but made solely for litigation. Are
   you aware of anybody who ever heard somebody who made predictions going out
26  for decades solely based upon litigation models? . . . ***That's certainly something***
27  ***you've never heard of before. A. I just indicated that I haven't.***" (emphasis
   added)).

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(33 of 262), Page 33 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 33 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 32 of 55   Page
ID #:140342

idea that Messrs. Paschal and Edwards's models predicted a rate of failure of J-M pipe, when they specifically disclaimed any such prediction.[63]

*Third*, the inputs in Mr. Lehmann's model were flawed assumptions, rendering his calculations unusable. Mr. Lehmann admitted that he relied on the **assumption** that compliant pipe would last exactly 100 years and the assertion that J-M pipe would fail earlier.[64] But, as Plaintiffs' experts acknowledged, there was **no data** to support a precise 100-year longevity for compliant pipe.[65] Moreover, Mr. Lehmann stated that he had not been informed—and thus, his expert opinions failed to consider—what Plaintiffs' engineering experts admitted about 100 years.[66]

---

[63] *See infra* n.73.

[64] Ex. 1, Trial Tr. 5614:6–15 ("Q. Based upon this assumption that 3830 compliant pipe will fail on average in 100 years, at that point in time, based upon that, given Paschal and Edwards' calculations for the strength of the J-M pipe, on average all of that pipe will necessarily fail in less than a hundred years. A. Yes. Q. Okay. So this assumption that all – all pipe, compliant pipe at 3830 will fail in a hundred years drives the fact of there being lesser lifetime for the J-M pipe, correct? A. Yes.").

[65] *Id.* 2699:23–25 (Paschal) ("Q. There's no data that even goes to 100 years, PVC pipe hadn't been around that long, correct? A. That's what I said, yes."); *id.* 1517:10–20 (Davis) ("Q. I want to ask you about a hundred years exactly, 100 years exactly. Is there anything in your report – is there anything in your report that points to research which shows that pipe, normal pipe, compliant pipe, standard pipe, is expected to fail at 100 years exactly? A. No. Q. In fact, in your deposition you said that is too fine a point. You can't say that there is data to say it is going to fail in a given year or after a given duration; correct? A. Correct."); *id.* 5514:7–11 (Lehmann) ("Q. . . . Tell me a single study, Dr. Folkman or anybody else, that says the average actual lifetime of compliant pipe is 100 years, no more, no less. Is there such a study? A. I'm not familiar with studies that say one way or the other."); *id.* 5617:21–5618:4 (Lehmann) ("Q. . . . I'm asking whether you can say that that is actually the correct number, 100 years? A. I don't think anyone can say with certainty about something that far in the future. Q. Did you get that down right? No one can say with certainty that far in the future; is that correct? Is that your testimony? A. That's my testimony.").

[66] *Id.* 5515:14–16 (Lehmann) ("Q. Do you know what these experts, Paschal, Edwards, and Davis, told this jury about 100 years? A. No.").

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

*Fourth*, Mr. Lehmann's predictions based upon the engineering models were **contradicted** by real-world experience.  Pursuant to Mr. Lehmann's model, Plaintiffs should have experienced multiple pipe failures by now.[67]  But Plaintiffs' representatives testified that they experienced ***no failures*** of the pipe at issue to date.[68]  Mr. Lehmann had no answer to this problem, and so, he retreated to the position that it was "too early" to validate his longevity predictions.[69]  Of course, this effectively abandoned the data and the models that were the sole support for his

---

[67] *Id.* 5642:9–17 (Lehmann) ("Q. In the case of Mr. Paschal's 3830 average failure 22 years, isn't it a fact that, roughly, according to his data, 18 percent of plaintiff's pipe should already have failed by today? . . . A. My recollection was it was 14 percent."); *id.* 5643:17–22 ("Q. And you've told us that if you take a look at the test data and you – all that test data for Mr. Paschal you determined for each data point or the data, how long the pipe would actually last, the answer is that 14 percent of it should have failed by today, right? Based on his data. A. Right.").

[68] *Id.* 4287:25–4288:2 (Calleguas) ("Q. . . . Has Calleguas experienced any failure in the Lake Bard project to date since 2003? A. No."); *id.* 1315:17–20 (Norfolk) ("Q. And there have been no failures of any of the sticks of any of the pipe in these projects at issue in this case, correct, Mr. Speer? A. There have been no failures. That's correct."); *id.* 1818:11–14 (Palmdale) ("Q. And in all that time since the J-M pipe was first installed in 1998, there have not been any failures of the J-M pipe in these eight projects; correct? A. Not to date."); *id.* 2066:8–11 (Reno) ("Q. And Reno has never experienced any failures in either of these two projects, once they have been placed in service, correct? A. Yes."); *id.* 1924:3–6 (Reno) ("Q. There have been no failures of the pipe since it was replaced and placed in service; correct? A. Correct."); *id.* 1133:9–12 (South Tahoe) ("Q. With respect to the J-M pipe in these 13 projects, the district has not experienced any failures, correct? A. In reference to the 13 projects, to my knowledge, no, there's been no leaks or failures in the pipe.").

[69] *Id.* 5650:18–20 ("Q. There's no data in the real world of the plaintiff's pipe that validates the prediction, correct? A. It's too early."); *id.* 5454:16–19, 5455:6–10 ("A. . . . And it's very premature to estimate what these will be, but this is the best estimate based on the information that I got from Mr. Paschal and Mr. Edwards. . . . Q. You just said – it's a fair statement to say that these estimates – very premature to be making these statements does [*sic*] you don't have enough data or experience, true? A. I don't have enough data or experience with the plaintiffs.").

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(35 of 262), Page 35 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 35 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 34 of 55   Page
ID #:140344

1   calculations and opinions, which ran contrary to the real-world results.[70]  Mr.

2   Lehmann's damages proofs were thus untethered to reality, rendering the calculation

3   unusable as a matter of law.[71]  Because an expert "model is helpful only if it is

4   predictive; if it cannot be predictive . . . then it fails in its purpose," this unreliable

5   expert evidence is insufficient to support any verdict for Plaintiffs as a matter of

6   law.[72]

7        *Fifth*, while Mr. Lehmann purported to rely upon the engineers' work to

8   predict the longevity of Plaintiffs' pipe, ***those same engineers testified that they***

9   ***could make no predictions or analysis as to Plaintiffs' pipe***, as described further

10  below.  Thus, there was a complete lack of evidence regarding the physical

---

11

12  [70] *Id.* 5647:4–11 ("Q. As we sit here today, what kind of credibility did you give to

13  the actual experience of this pipe in the first 16 years of use? Based upon your data, do you give it zero credibility or do you give it 100 percent credibility? A. As I

14  explained, I considered that data, and I didn't give it any numerical percentage because it's way too early to be – way too early to be using that subject experience

15  to make an estimate.").

16  [71] *See Crescenta Valley Water District v. Exxon Mobile Corp.*, No. CV 07-2630-JST (ANx), 2013 WL 12116333, at *4 (C.D. Cal. Jan. 8, 2013); *see also Circle C Const.*,

17  813 F.3d at 617 ("Actual damages by definition are damages grounded in reality.").

18  [72] *See Weisgram*, 528 U.S. at 454 (holding that "inadmissible evidence contributes

19  nothing to a legally sufficient evidentiary basis," and affirming judgment as a matter of law under Rule 50 because expert evidence introduced at trial was unreliable and

20  therefore inadmissible, and the remaining properly admitted evidence was

21  insufficient to support a verdict (quotations omitted)); *Brooke Grp.*, 509 U.S. at 242 (affirming judgment as a matter of law in favor of defendant and noting that "[w]hen

22  an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion

23  unreasonable, it cannot support a jury's verdict."); *Crescenta Valley*, 2013 WL

24  12116333, at *4 (holding that expert model that is not predictive must be excluded under *Daubert* as unreliable); *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399

25  F. Supp. 2d 1064, 1076–77 (N.D. Cal. 2005) (holding that "[d]amages do, however,

26  need to rest on a 'reasonable basis,'" and granting judgment as a matter of law when

27  jury's award of unjust enrichment damages had no reasonable basis in light of the trial evidence (quoting *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 436 (9th Cir. 1975)).

28

---

**ER407** 25

1 properties of Plaintiffs' pipe or the conditions of its use that would impact longevity,

2 rendering Mr. Lehmann's analysis entirely unsupported.[73]

3      Each of the foregoing failures are classic, fatal *Daubert* problems that render

4 Plaintiffs' expert case entirely unreliable as a matter of law.[74]

5      *Finally*, Plaintiffs disclaimed all of Mr. Lehmann's evidence in closing:

6     MR. HAVIAN: . . . Mr. Lehmann's report was about insurance,

7     doesn't have anything to and [sic] the present value of replacing pipe
in the future. The question before you is what is the value of the pipe

8     we got? . . . ***[T]he experts who testified here, it's true they made***

9     ***predictions about when the pipe would fail. You can set those to one
side if you like, and certainly Mr. Lehmann had nothing to do with***

10     ***any of these*** . . . .[75]

11        **2.**     **Plaintiffs' engineering experts failed to prove the longevity of**

12               **compliant pipe in use, of J-M pipe made from 1996-2006, or**

13               **of Plaintiffs' pipe**

14      *First*, it was undisputed that predicting pipe longevity in service requires

15

16 ───────────────

[73] Ex. 1, Trial Tr. 2424:18–24 (Paschal) ("Q. Well, to be clear, you have not done

17 a specific analysis of plaintiffs' pipe; correct? A. That's correct."); *id.* 3092:7–10,

18 13–18 (Edwards) ("Q. I don't see anything in your report that makes any predictions
with respect to the pipe these—these plaintiffs have. Am I right about that? A. Yes,

19 there are no specific predictions. . . . Q. Mr. Paschal told us that you would need an
awful lot more information to predict rates of failure for actual pipe in use. Do you

20 disagree with that? A. No, I agree with that. Q. That's true of your work, too,

21 correct? A. Yes.").

22 [74] *See Tyger Constr. Co. Inc. v. Pensacola Constr. Co.,* 29 F.3d 137, 142 (4th Cir.

23 1994) ("An expert's opinion should be excluded when it is based on assumptions
which are speculative and are not supported by the record."); *In re Silicone Breast*

24 *Implants*, 318 F. Supp. 2d 879, 889–90 (C.D. Cal. 2004) ("[A]ny step that renders
the expert's analysis unreliable renders the expert's testimony inadmissible. This is

25 true whether the step completely changes a reliable methodology or merely

26 misapplies that methodology." (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d
717, 745 (3d Cir. 1994))).

27 [75] Ex. 1, Trial Tr. 6714:5–8, 6715:13–17.

28

**ER408** 26

(37 of 262), Page 37 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 37 of 262
Case 5:06-cv-00055-GW-MAR    Document 2809    Filed 12/12/18    Page 36 of 55    Page
ID #:140346

1    analysis of field conditions affecting pipe after installation.[76]  The applicable

2    standards make it equally clear that long-term strength does not predict actual

3    lifetime in the field.[77]

4         *Second*, Plaintiffs nowhere proved the actual lifetime of compliant pipe.  Dr.

5    Davis initially said in his report that it was 100 years, but his testimony at trial was

6    far less definite: "at least" 50 years, but it "could easily be a hundred or more."[78]

7

8    [76] Ex. 14, Trial Ex. 20170 at § 5.5 (ASTM D2837) ("*Hydrostatic Design Stress—*
     Obtain the hydrostatic design stress by multiplying the hydrostatic design basis by a
9    service (design) factor selected for the application on the basis of two general
     groups of conditions.  The first group considers the manufacturing and testing
10   variables, specifically normal variations in the material, manufacture, dimensions,
     good handling techniques, and in the evaluation procedures in this test method and
11   in Test Method D 1598 (Note 8).  ***The second group considers the application or
     use, specifically installation, environment, temperature, hazard involved, life***
12   ***expectancy desires, and the degree of reliability selected*** (Note 9)." (emphasis
     added)); Ex. 1, Trial Tr. 1490:3–14 (Davis) (Q. "Okay. ***Operational stresses***. So,
13   now we are not just dealing with the pipe in the laboratory under controlled
     conditions. We are doing pipe that is outside of the laboratory. It is being moved to
14   the site. It is being installed in the ground. It is being covered over, and then it is
     subjected to whatever kinds of stresses it may see during the course of it lifetime;
15   correct? A. Correct. Q. It is a much more complicated – it is a much more
     complicated thing to analyze; correct? A. ***The stress field is more complicated than***
16   ***a single source from internal pressure.***" (emphasis added)); *id.* 2916:15–18
     (Edwards) ("Q. . . .  [N]ow, do you know exactly how long, without any more
17   information, this pipe will last? A. No, you would need to know the stresses that it's
     under during its time in service.").
18
     [77] Ex. 14, Trial Ex. 20170 at §§ 1.6, 7.1 (ASTM D2837); Ex. 20, Trial Ex. UL-21
19   (PPI TR-3, Note 5) at 4 of 92 ("The performance of a material (or a piping product
     made with that material) under actual conditions of installation and use is dependent
20   upon a number of other factors and conditions which are not addressed in this
     report.").
21
     [78] Ex. 1, Trial Tr. 1499:24–1500:5 ("Q. Now, this [50] to 200, can you state to a
22   reasonable degree of certainty today – let's just take J-M pipe from 1996 to 2006.
     Can you state to a reasonable degree of certainty when that will – what its estimated
23   lifetime is? A. No. Beyond the – I expect at least 50 years. Could very easily be a
     hundred or more.").
24

25

26

27

28

**ER409** 27

Mr. Paschal and Mr. Edwards made no estimate.[79]  Dr. Folkman's testimony, based on his actual testing experience, that pipe in the field may last up to 200 years went unrebutted.[80]  By closing, Plaintiffs had abandoned hope of proving a lifetime for compliant pipe, telling the jury they could just pick one.[81]

*Third,* in place of actual data and expert opinions on actual lifetime, all of Plaintiffs' experts who sought to prove the reduced lifetime of J-M pipe simply assumed 100 years exactly as the lifetime of compliant pipe.  This was an explicit "assumption."[82]  Mr. Paschal acknowledged that his calculation required him to pick a number,[83] that industry expectations varied,[84] and that he did not consider

---

[79] *Id.* 2700:7–17 (Paschal) ("Q. . . . You don't actually express an opinion on the question of how long pipe that complies to standards actually will last, ***there is no such opinion in your report, true? A. I don't believe so, no.***" (emphasis added)); *id.* 3008:16–21 (Edwards) ("Q. Do you also need to ***assume***, or did you in this case ***assume*** a benchmark level of how long compliant pipe would last? Yes." (emphasis added)).

[80] *Id.* 4628:10–14 ("A. How long a pipe is going to last is really difficult to estimate because of the many variables involved; however, my personal opinion is a properly manufactured and properly installed pipe, based on what we know, could easily reach 200 years of life.").

[81] *Id.* 6715:21–23 ("MR. HAVIAN: . . . Now, you can quarrel with a hundred years and say, Well, maybe they were wrong; maybe normal pipe will last 125 years or 150 years.").

[82] *Id.* 2688:22–2689:7 (Paschal) ("Q. . . . [I]n your analysis of service life, your benchmark for what was required of the pipe was that with an HDB of 4,000 psi is pipe . . . would have 100 – a 100-year service life, right? A. ***That was the assumption I made, yes***.  Q. Okay.  Come back to that word. It's a pretty important word. ***That was an assumption, right? A. Yes, the basis for the – the basis for the requirement for the service life calculation, yes***." (emphasis added)); *id.* 3008:16–21 (Edwards) ("Q. Do you also need to ***assume***, or did you in this case ***assume*** a benchmark level of how long compliant pipe would last? A. Yes. Q. What was that? A. 100 years.").

[83] *Id.* 2689:8–12 ("Q. And am I right that it was the HDB pipe with an HDB that met the requirement of 4,000 psi would have a 100-year service life exactly? A. ***Yes, as far as the calculations, it requires a fixed number so that was 100 years, yes.***"

(39 of 262), Page 39 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 39 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 38 of 55   Page
ID #:140348

1  Plaintiffs' expectations.[85]  Dr. Davis also testified that there was no support for this

2  assumption.[86]  Mr. Edwards pointed to no data of 100 years—he simply assumed

3  this number based on "industry claims" of 100 years at a minimum, and **disclaimed**

4  any support for 100 years exactly.[87]  Mr. Lehmann could not support 100-year

5  longevity with any data either.[88]

6      *Fourth,* both Mr. Paschal and Mr. Edwards further "assumed" that an HDB

7

8  _____

9  (emphasis added)).

10 [84] *Id.* 2693:5–13 ("Q. Okay. Now, let's go back to the question of HDB equals 100-
   year service life. Recognizing that it's difficult, is it true that if you look through

11 different sources of information, people have different opinions on how long
   compliant pipe should last? A. As I mentioned, the ones we looked at yesterday,

12 there were quite a few that used the 100-year figure; I'm sure there are other people
   that might have other opinions.").

13

14 [85] *Id.* 2693:21–23 ("Q. Did you make any effort to find out what the plaintiffs in this

15 case actually thought the expected life would be? A. No, I did not.").

16 [86] *Id.* 1517:10–20 ("Q. I want to ask you about a hundred years exactly, 100 years
   exactly. Is there anything in your report – is there anything in your report that points

17 to research which shows that pipe, normal pipe, compliant pipe, standard pipe, is
   expected to fail at 100 years exactly? A. No. Q. In fact, in your deposition you said

18 that is too fine a point. You can't say that there is data to say it is going to fail in a
   given year or after a given duration; correct? A. Correct.").

19

20 [87] *Id.* 3008:16–3009:2 ("Q. Do you also need to **assume**, or did you in this case
   assume a benchmark level of how long compliant pipe would last? A. Yes. Q. What

21 was that? A. 100 years. Q. Why did you choose that number? A. The industry . . .
   claims a hundred years life for their pipe, **at a minimum**.  . . . It's pretty widespread

22 in Europe, as well, a claim of at least a hundred years lifetime for PVC pipe that is
   compliant." (emphasis added)); *see also id.* 3009:10–12 (Edwards) ("**Q. Now, are**

23 **you asserting that it will be a hundred years on the money? A. No.**" (emphasis
   added)).

24

25 [88] *Id.* 5514:7–11 ("Q. . . . Tell me a single study, Dr. Folkman or anybody else, that

26 says the average actual lifetime of compliant pipe is 100 years, no more, no less. Is
   there such a study? A. **I'm not familiar with studies that say one way or the other.**"

27 (emphasis added)).

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(40 of 262), Page 40 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 40 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 39 of 55   Page
ID #:140349

1  rating of 4000 psi (3830 psi minimum) equated to a service life of 100 years.[89]  They

2  admitted that this too was not in any standard or method, and that the Plastic Pipe

3  Institute (PPI) (which certifies compliance with the applicable standard) disagreed

4  with their approach.[90]  Indeed, it was undisputed that their approach conflicted

5  outright with the express terms of AWWA C900/905 and ASTM D2837, as

6  described in the unrebutted testimony of Mr. Ferry.  Mr. Ferry explained that an

7  HDB of 4000 psi, coupled with the safety factor incorporated in D2837, contradicts

8  any notion that pipe with an HDB of 4000 psi is expected to fail in 100 years.[91]

---

[89] *Id.* 3086:16–21 (Edwards) ("Q. And now on the service life side, you have the further opinion that the strength required for pipe or the strength of the pipe if it has an HDB of 4,000 PSI is a hundred years, right? A. Yes, that if it has an HDB of 4,000, it would last a hundred years reasonably."); *id.* 2689:8–12 (Paschal) ("Q. And am I right that it was the HDB pipe with an HDB that met the requirement of 4,000 psi would have a 100-year service life exactly? A. Yes, as far as the calculations, it requires a fixed number so that was 100 years, yes.").

[90] Ex. 20, Trial Ex. UL-21 (PPI TR-3) at 4 of 92 ("The term '50-year strength value,' as used in ASTM D2837, is a mathematical extrapolation that is useful in the context of developing an HDS or HDB.  ***It does not constitute a representation that any material with such a value will perform under actual use conditions for that period of time.***" (emphasis added)); Ex. 1, Trial Tr. 2694:9–2695:6 (Paschal) ("Q. But in point of fact the standards themselves, there is no standard that requires a certain service life, right? True or not? A. Specifically within the standards we've been discussing today, that's correct. . . . Q. . . . . [B]ut there is no statement in the standard that says 50 years, 100 years, 200 years, 75 years, correct? A. I think the only statement in the standards would be in reference to doing the extrapolation to 50 years in P[P]I TR-3 where it says that is not necessarily intended to mean that's the useful life of the pipe."); *id.* 3087:1–6 (Edwards) ("***Q. Okay. Now, in point of fact, is it true that according to PPI TR3, that is according to the PPI technical guidance that is used to certify an HDB of 4,000 PSI, according to them, long-term HDB values are not an actual prediction of actual longevity, correct? A. Yes, that's in the TR3.***" (emphasis added)).

[91] Ex. 1, Trial Tr. 5910:9–13 ("Q. In a hundred years, would the rupture stress at operating pressure -- would the operating pressure or the stress rupture number, the LTHS, would they be at all close together or -- if you still have safety factor? A. There is an abundant safety factor there.").

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(41 of 262), Page 41 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 41 of 262
Case 5:06-cv-00055-GW-MAR Document 2809 Filed 12/12/18 Page 40 of 55 Page
ID #:140350

1  Assuming such a short lifetime requires sharply "bending" the regression line down

2  to produce a grossly premature failure.[92]

3      *Fifth*, Plaintiffs' experts admitted that they could not even state the longevity

4  of J-M pipe made from 1996–2006 with a reasonable degree of certainty. Thus, Dr.

5  Davis admitted that the estimated lifetime of J-M pipe from 1996–2006 could not be

6  stated with a "reasonable degree of certainty," and Plaintiffs' expert engineers

7  agreed with this.[93] Instead, Plaintiffs' experts simply assumed that compliant pipe

8  would fail in 100 years and sought to show only that the reduced strength of J-M

9  pipe would translate directly into reduced longevity. No account was taken of other

10  potential causes of future failure arising from stresses in use.[94]  Mr. Edwards in his

---

[92] *Id.* 5913:3–10 ("Q. . . . ***I will take it from a hundred thousand hours to 150
years***. Is there any way you could get to a must fail during that period of time and
remain consistent with the ASTM method and the AWWA standard? . . . [A.] You
can't. ***You can't get there. You have to ignore the safety factor.***" (emphasis
added)).

[93] *Id.* 1499:24–1500:5 (Davis) ("Q. Now, this [50] to 200, can you state to a
reasonable degree of certainty today – let's just take J-M pipe from 1996 to 2006.
Can you state to a reasonable degree of certainty when that will – what its estimated
lifetime is? A. No. Beyond the – I expect at least 50 years. Could very easily be a
hundred or more."); *id.* 2701:2–16 (Paschal) ("Q. . . . Taking J-M pipe from 1996 to
2006, [Mr. Davis] was asked whether he could state to a reasonable degree of
certainty when that will – what its estimated lifetime is. 'Can you state to a
reasonable degree of certainty what its estimated lifetime is?' His answer was, 'No,
I expect at least 50 years, could very easily be 100 or more. 'But when failures
would start to occur, you would see a distribution of failures, a rate increase.' Do
you agree with him that you cannot state to a reasonable degree of certainty when J-
M pipe will fail beyond his expecting at least 150 – 100 to 100-plus years? A. Well,
based on the variability of the test data in that time period I don't think we can state
that because was there a high degree of variability.").

[94] *Id.* 2692:24–2693:4 ("Q. . . . In fact, isn't it true that your analysis, this analysis
here, where you say all of these numbers come down, all these numbers, none of
this, none of these estimates, all is based on pipe and water pressure. None of it
considers all the other factors that are involved in service life, correct? A. ***That's
correct.***" (emphasis added)).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1    report looked at post-installation stresses generally, but his report did not quantify

2    any reduction of longevity for J-M pipe, and he was not permitted to introduce such

3    new analysis at trial.[95]  He too simply assumed that compliant pipe would fail in 100

4    years, and that J-M pipe would fail sooner due to lower strength.[96]

5         *Sixth,* as to Plaintiffs' pipe specifically, Mr. Lehmann alone opined on

6    shortened longevity, relying solely on the work of the engineers.[97]  But those same

7    engineers disclaimed any opinion on Plaintiffs' pipe because they had not done any

8    work with respect to Plaintiffs' pipe.[98]

9         At bottom, Plaintiffs' damages calculations were a classic shell game, except

10   there was no pea after all the maneuvering.

11

12

13

---

14   [95] S*ee id.* 3009:13–23 ("Q. You mentioned in-service stresses. Just can you explain a
     little bit more how the in-service stresses that you talked about before relate to the
15   hundred-year benchmark that you selected.  A. Well, the range of stresses that I
16   have in my report, the middle range is like 3,420 PSI. Actually, if you look at -- MR.
     BERNICK: Objection. This is the issue, Your Honor. It's a hundred years, but now
17   we are getting numbers assigned -- we are building up to a percentage that is
18   represented by those stresses. THE COURT: I'll sustain the objection."); *see also id.*
19   2937:2–10.

20   [96] *Id.* 3017:9–19 ("Q. . . . Okay. So back here in your estimation, pipe that – from
     J-M – from J-M that has this 7068 number will not meet HDB, correct? A. Correct.
21   Q. All right. Is such pipe at a much greater risk of failure? A. Yes. Q. Can it
     reasonably be anticipated that such pipe will exhibit lifetimes under 100 years when
22   exposed to normal in-service stresses? A. Yes.").

23   [97] *Id.* 5446:11–19 (Lehmann) ("Q. They were not asked to issue an opinion on
24   plaintiff's pipe specifically, correct? A. I don't think they were asked that directly,
     no. Q. So they provided a lot of information to you and analysis, but they didn't
25   actually do this work; you did this work on plaintiff's pipe, correct? You used what
26   they did to look at plaintiff's pipe, right? A. It's correct.  I used their work and
     applied it to the plaintiff's pipe, yes.").

27   [98] *Supra* n.73.

28

---

**ER414** 32

(43 of 262), Page 43 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 43 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 42 of 55   Page
ID #:140352

### 3.  Plaintiffs failed to prove a mathematical relationship between short-term testing, long-term strength, and longevity

Per the Court's Phase 2 jury instructions, the Phase 1 jury found that the three short-term tests addressed in Phase 1—Quick Burst, Abbreviated HDB, and Longitudinal Tensile Strength—"bear a relationship" to the long-term strength of pipe generally.[99]  Plaintiffs' damages proofs, however, were premised on a more specific and demanding connection, *i.e.*, that short-term strength tests can actually be used to calculate long-term strength (as defined by ASTM D2837) and then longevity.  Plaintiffs failed to prove such a relationship with reliable evidence under *Daubert*, and their damages model failed as a result.

Plaintiffs' lengthy re-litigation of J-M's historical views on the relationship between Quick Burst test results and HDB turned out to be entirely irrelevant.  Each of the J-M witnesses Plaintiffs called did testify to a "general" relationship, but also testified that no "correlation" or mathematical relationship of the kind Plaintiffs' damages model required had ever been found.  Lenor Jang admitted that there was insufficient data and it was an open question.[100]  Will Fassler said the same thing.[101]

---

[99] Dkt. 2756 (Updated Final Jury Instructions) at 2.

[100] Ex. 1, Trial Tr. 3158:16–20 ("Q. And as you said earlier, that study was never done, or at least it was never completed in order to get that proof confirming there was some correlation between Quick Burst and HDB, correct? A. As far as I know."); *id.* 3161:12–15 ("Q. So it's fair to say as of this time, whether the higher 7200 Quick Burst number was actually required in order to pass HDB, was ***still an open question, still unresolved? A. Yes.***" (emphasis added)).

[101] *Id.* 4223:13–15, 4224:1–8 ("Q. . . . [D]id you at this point in time believe that there was data that actually demonstrated this correlation that you were looking for? . . . [A]. ***There was no systematic data to provide a basis for that.***  [Q]. Could you tell us whether there was any disagreement – as you understood it in your internal R&D group, did you understand that there was any disagreement on that point? A. No. There was no disagreement on that that deserved further study.").

(44 of 262), Page 44 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 44 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 43 of 55   Page
ID #:140353

1    Even K.C. Yang ultimately conceded the same.[102]

2            Plaintiffs' experts similarly failed to establish a mathematical relationship

3    between Quick Burst and HDB.  Dr. Davis admitted he was unaware of any such

4    correlation.[103]  Mr. Paschal acknowledged his Phase 1 testimony that the

5    relationship between Quick Burst and HDB was general and that there was no

6    mathematical calculation linking the two.[104]  The only evidence of such a

7    relationship came from Mr. Edwards, but he admitted that: (1) he too was unaware

8    of any mathematical relationship before his work on Phase 2;[105] (2) his methodology

---

[102] *Id.* 3669:22–3670:13 ("Q. Would you agree with me, Mr. Yang, that you cannot use Quick Burst to mathematically predict long-term strength? A. ***In general I agree with that, yes.*** Q. And you are not here to tell the jury that you know how to do that, are you? A. ***Mathematically, no.*** Q. You are not here to tell the jury that you can take a regression line from Quick Burst in some way and calculate an HDB or a long-term strength, right? A. ***No, you cannot.*** Q. You haven't seen anything, you haven't seen anything in all of the work that you've done over the years with the lawyers and with everybody else, and at JM, you've not seen anything that enables somebody to take Quick Burst tests and mathematically predict long-term strength, fair? A. ***That is a fair statement, it's not mathematically relationship.***" (emphasis added)).

[103] *Id.* 1472:8–12 ("Q. As a polymer scientist, is there a mathematical correlation between the change in the Quick Burst test and the level or the number of the amount of the HDB, mathematical correlation? A. I don't know as we sit here right now.").

[104] *Id.* 2365:23–2366:9 ("'Q. And you have never seen any sort of mathematical correlation between the Quick Burst value of pipe and its HDB; correct? 'A.  It is more of a general relationship. There is not a direct mathematical equation that you use.' Next question: 'Q. You are not aware of any mathematical correlation between Quick Burst value of pipe and HDB; correct? 'A. As I said, it is more general than that in terms of running the Quick Burst and using that to determine your HDB as you start the testing, but it is not a direct mathematical formulation.'"); *id.* 2364:12–14 ("A. . . . [I]n the absence of any other information then there would not be a direct mathematical relationship.").

[105] *Id.* 3023:14–18 ("Q. Well, isn't it true that in this case, you just told on direct examination that all you knew about the relationship between Quick Burst and HDB before was that there was a general relationship, right? A. Yes.").

1  was done solely for the courtroom;[106] (3) his methodology could not be found in any

2  publication;[107] and (4) both the ASTM and the AWWA had rejected such a

3  relationship.[108]  Mr. Edwards also admitted that the Miner's Rule conversion of

4  Quick Burst results to sustained pressure ruptures, which was central to his analysis,

5  was not in the ASTM methods for PVC,[109] and he pointed to no other support.

6  _____

7  [106] *Id.* 3078:4–8, 3078:17–20 ("Q. And the idea that you could take a twice-
   borrowed slope, extend it in both directions, attach it to a Miner's Rule converted

8  Quick Burst result, and come up with a reduced HDB, that is the calculation that no

9  one ever has done before, to your knowledge, correct? . . . ***[M]y question really is:
   That is something you can't find anywhere outside of this courtroom, correct? A.***

10  ***That's correct.***" (emphasis added)).

11  [107] *Id.* 3023:3–6 ("Q. And, again, the calculation was a calculation that you had

12  never done before; it wasn't published anywhere, it wasn't in any standard; it was
   new, right, Mr. Edwards? A. ***Yes, I believe so.***" (emphasis added)); *id.* 3022:1–6

13  ("Q. . . . With all of the steps that you did an presented to the jury, you can't find it

14  in any – published – published anywhere? A. ***Well, it's true that you wouldn't find
   all of those steps put together for a particular analysis in any publication, yes.***"

15  (emphasis added)).

16  [108] *Id.* 3038:22–3039:2 ("Q. Actually, there is an ASTM Standard 1599 that

17  specifically talks about . . . the relationship between Quick Burst and HDB, correct?
   A. There is a statement in that standard, yes. Q. And it says "Generally not

18  indicative," right? A. Yes."); *id.* 3045:20–23 ("Q. . . . Your testimony about the

19  relationship or what you do in relating Quick Burst to HDB is not in AWWA C900,
   right? A. That's correct."); *id.* 3050:24–3051:11 ("Q. . . . Your calculation of Quick

20  Burst for HDB is not accepted, right? A. It's not in the standard. Q. It's not

21  accepted, right? A. Yes, it's not accepted as part of the standard. Q. It's not accepted
   by any organization, any standards organization, correct? A.  It's not in any

22  standard. Q. It's not accepted by any methods organization, right? . . . [A]ny

23  organization like ASTM that does methods, your method is not accepted by them,
   correct? A. My method in total is not, yes."); Ex. 13, Trial Ex. 6708 (ASTM D1599)

24  at § 4.1 ("They are generally not indicative of the long-term strength of

25  thermoplastic or reinforced thermosetting resin pipe, tubing, and fittings."); Ex. 19,
   Trial Ex. 33024 (AWWA Manual M23, PVC Pipe—Design and Installation) at 66

26  of 181 ("Design for long-term, stead-state operating conditions based upon the

27  short-term strength of PVC pipe would be inappropriate.").

28  [109] Ex. 1, Trial Tr. 3065:21–23 ("Q. Miner's Rule has never been adopted for PVC

(46 of 262), Page 46 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 46 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 45 of 55   Page
ID #:140355

1    Plaintiffs' evidence regarding Longitudinal Tensile Strength (LTS) and HDB

2    failed to even address, much less prove, any calculational relationship. Dr. Davis

3    said that he would expect some relationship, but he did nothing to prove one existed,

4    let alone show that it was calculational.[110] Mr. Edwards acknowledged merely a

5    "general" relationship.[111] Unsurprisingly, Plaintiffs' own models confirmed that no

6    calculational relationship exists—their experts did not rely on LTS tests to generate

7    any damages number whatsoever.[112]

8    Absent legally sufficient proof of a calculational relationship between Quick

9    Burst or LTS test results and the HDB of pipe, the damages theories Plaintiffs

10   pursued at trial failed as a matter of law.

11   The same failure of proof extends to the ultimate question of reduced

12   longevity in the field. Plaintiffs' engineers did not even proffer a reliable method

13   _____

14   pipe by either ASTM or AWWA, is that true or not? A. That's true. It's not been

15   adopted by them."); *id.* 3077:7–9 ("Q. Except that this, too, is something that you
     can't find in the ASTM methodology, correct? A. That's right.").

16   [110] *Id.* 1442:8–11, 19–22 ("Q. . . . [I]s there a relationship between the diminution in

17   the longitudinal tensile strength test and long-term strength and durability? A. . . . If
     you have a decrease in one, the longitudinal tensile strength, I would expect a

18   corresponding decrease in the long-term properties as well.").

19   [111] *Id.* 2911:10–13 ("Q. . . . What is your understanding of the relationship between

20   longitudinal tensile strength and long-term strength and durability? A. Well, I think
     there's still a general relationship . . . .").

21
     [112] *Id.* 2360:14–18 (Paschal) ("Q. And the longitudinal tensile strength that you

22   focused on with the jury, that is not part of that calculation, is it? A. . . . It is not

23   directly used in the calculation."); *id.* 2360:5–8 (Paschal) ("Q. In your calculations

24   of reduced strength. You calculate reduced strength, and in doing so you do not use
     longitudinal tensile strength; correct? A. For the HDB analysis, no, I did not."); *see*

25   *also id.* 1467:12–14 (Davis) ("Q. You are not an expert in UL 1285? A. I don't

26   consider myself an expert of standards in general, that's correct."); *id.* 5660:20–23
     (Lehmann) ("Q. Am I correct that none of your calculations are based upon

27   longitudinal tensile strength tests, true? A. My calculations are based on the HDB
     tests and the quick-burst tests.").

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1   for predicting actual longevity in the field from any of the short-term strength tests

2   (including abbreviated HDB).  Mr. Paschal admitted that the abbreviated HDB tests

3   he used could not be used to establish a final HDB under the standards, and that the

4   standards regarding HDB did not tie out to a specific longevity.[113]  Neither Mr.

5   Paschal nor Mr. Edwards tied the tests to the longevity of Plaintiffs' pipe at all. The

6   only witness who purported to do any of that was Mr. Lehmann.

7   **IV.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF**

8   **LAW NOTWITHSTANDING PLAINTIFFS' CLAIM DURING**

9   **CLOSING FOR THE COST OF REPLACEMENT OF ALL THEIR**

10  **PIPE TODAY**

11          After four years of litigating their damages claims based upon reduced

12  longevity and pursuing those claims for more than four weeks at trial, Plaintiffs

13  abruptly abandoned these theories in their closing and asked the jury to award

14  damages based on a theory of recovery the Court had previously foreclosed—*i.e.*,

15  *the pipe costs associated with replacing all of Plaintiffs' pipe now*.[114]  In doing so,

16

17  [113] *Id.* 2747:7–13 ("Q. All the data that you're talking here, let's be real clear -- you
    are talking solely -- you are relying solely on tests that never ran as long as they had

18  to in order to produce the E-10 rating which was necessary for permanent
    certification, correct? These are all abbreviated, abbreviated tests; they are not E-10,

19  true or not? A. That's correct."); *id.* 2694:9–13 ("***Q. But in point of fact the***

20  ***standards themselves, there is no standard that requires a certain service life,***
    ***right? True or not? A. Specifically within the standards we've been discussing***

21  ***today, that's correct.***" (emphasis added)).

22  [114] Ex. 1, Trial Tr. 6639:9–6640:7 ("MR. HAVIAN: . . . [W]e want the money back.

23  How much is that? . . . $2.1 million, 2.171.  You can write that down if you like, you
    can write these numbers down. This document won't go into the jury room with

24  you, but there will be a document that will show you project by project, but ***this is in***

25  ***2016 dollars***. The numbers you'll see in the jury room are 2000 -- 1996 to 2007,
    that's that one point, like a $1.2 million figure, that's the original price when they

26  bought the pipe over a decade ago. ***These are the numbers that reflect the -- what it***

27  ***would cost in 2016 to buy that pipe.***  We're now in 2018, so we've got a couple
    years even on that.  ***But at a minimum, at a minimum, we should get the 2016***

28

(48 of 262), Page 48 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 48 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 47 of 55   Page
ID #:140357

1    Plaintiffs brazenly disregarded their own evidence (that only a proportion of

2    Plaintiffs' pipe would fail prematurely), the jury instructions, and the Court's

3    rulings.  And they went further, asking the jury to award, without regard to the

4    benefits Plaintiffs had received, the full cost of replacing all the pipe immediately.[115]

5    J-M did not even have adequate opportunity to address in discovery Plaintiffs'

6    revived and revised theory.[116]

7

8    _____

9    *price of that pipe back.  We should get our money back***.*" (emphasis added)); *id.*

10   6712:6–10 ("MR. HAVIAN: . . . So when you go to -- we don't know yet what your
     verdict form will look like, but just in case it requires you to put in the dollar value

11   for each project you're awarding damages on, this is the document you'll be looking

12   for, Exhibit 31281-E.").

13   [115] *E.g.*, *id.* 6431:12–24 ("MR. HAVIAN:  Your Honor, I want to make sure that we
     are not being unclear about something.  ***We are going to argue for the full contract***

14   ***price and present dollars based upon the fact that it has no value to us.  And their***
     ***burden is to show offset.  THE COURT: Well, no.  Actually that is not their***

15   ***burden to show offset.  It is the burden on the government to show damages.***"

16   (emphasis added)).

17   [116] This was a clear violation of J-M's due process rights.  *See, e.g.*, *Roberts v. Ariz.*
     *Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (affirming the district court's

18   "specific finding of prejudice to the opposing party, noting that the [new theory] was
     raised at the eleventh hour, after discovery was virtually complete"); *Mauro v.*

19   *S. New Eng. Telecomms., Inc.*, 208 F.3d 384, 386 n.1 (2d Cir. 2000) (affirming the

20   district court's preclusion of a new theory of liability raised for the first time during
     summary judgment briefing); *ING Bank v. Am. Reporting Co., LLC*, 859 F. Supp. 2d

21   700, 704 (D. Del. 2012) ("To allow plaintiff to alter its theory of the case [two

22   weeks before trial] would unduly prejudice the defendant by forcing it to prepare to
     defend against a new theory of the case after discovery has been completed.");

23   *Sharkey IRO/IRA v. Franklin Res.*, 263 F.R.D. 298, 302 (D. Md. 2009) (denying

24   plaintiffs' motion to add a new theory of the case after discovery was essentially
     complete because it resulted in prejudice to the defendants); *Browder v. General*

25   *Motors Corp.*, 5 F. Supp. 2d 1267, 1274 (M.D. Ala. 1998) (granting motion to strike

26   new theories where new theory not disclosed until fifteen days before discovery

27   deadline and defendant could not "possible [*sic*] prepare to defend these new
     theories in such a short time frame").

28

**ER420** 38

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Plaintiffs Abandoned Their Claim for the Present Cost of Replacement Pipe in the Face of the Court's Rulings, and It Conflicted with the Case Plaintiffs Tried

As discussed above, the Court ruled before trial that Plaintiffs could not recover the cost of replacing all of Plaintiffs' pipe today where there was no threat of imminent failure or other hazard to public health.[117] Plaintiffs responded by abandoning that claim.[118] At trial, Plaintiffs presented no such evidence. Indeed, Plaintiffs' evidence said the opposite—that only a proportion of Plaintiffs' pipe was predicted to fail, years in the future. The jury instructions regarding their claims were in accord: Plaintiffs' claim was solely for damages based upon reduced

_____

[117] *See* Dkt. 2494 (June 21, 2018 *Daubert* Ruling) at 19 ("Though Plaintiffs can only receive damages under this damages theory [i.e., replacement costs] if they can prove to the jury that these costs are a reasonable means of placing Plaintiffs in the position they would have been in but for Defendant's misrepresentations, the court does not see a reliability issue in Cathcart's opinion meriting exclusion vis-à-vis *Daubert assuming Plaintiffs can show a likelihood of failure between six months to two years.*" (emphasis added)); Dkt. 2538 (Aug. 2, 2018 Tentative) at 8 (adopting as final relevant section of June 21 Order); Ex. 10, Hr'g Tr. 68:22–69:6 (Sept. 21, 2018) ("THE COURT: . . . Because, again, in those situations where you have extraordinary amounts that are charged against the defendant, it is because of the *situations where it is, you know, life-threatening.* But you guys do not have any, that I see, actual statements of danger -- an imminent danger of a failure." (emphasis added)); Ex. 11, Hr'g Tr. 166:12–21 (Oct. 3, 2018) ("THE COURT: . . . Again, I have indicated that under the benefit of the bargain theory, the type of situation where the person gets over and above the contract price of the item and treble damages from that, there are no cases that talk about other types of tangential situations, with the exceptions of where it is a *threat to life and limb* or something of that sort. And so, again -- and *we obviously don't have that here.*" (emphasis added)); *see also* Dkt. 2688 (Oct. 9 Benefit of the Bargain Ruling) at 3.

[118] *E.g.*, Ex. 9, Hr'g Tr. 40:16–20 (Sept. 11, 2018) ("MR. [HAVIAN]: Your Honor, the – one thing I should make clear: We've heard the court's rulings on full replacement costs, in other words, **replacing all the pipe even not predicted to fail. We're not going to continue to pursue that**; we disagree with the court's ruling." (emphasis added)).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1  longevity.[119]  Plaintiffs' demand for the pipe costs associated with replacing all the

2  pipe today was thus barred by the law and the Court's rulings, and entirely

3  unsupported by the trial record.

4  **B.  Plaintiffs' Evidence Was Legally Insufficient To Support Their**

5  **Claim for the Present Cost of Replacement Pipe**

6  Plaintiffs also failed to satisfy their burden of proving that the benefit they

7  received from their pipe was less than what they bargained for.  The law and the

8  Court's instructions were clear that Plaintiffs had the burden to prove both the

9  benefit promised and the difference (if any) between that and the value of the pipe

10  Plaintiffs received.[120]  Plaintiffs boldly told the Court they were going to ignore this

11  law, despite the Court's repeated rulings that it was Plaintiffs' burden to prove the

12  value received, not J-M's.[121]  It is perhaps no surprise that Plaintiffs blatantly

13  disregarded the Court's rulings—the trial record was undisputed that Plaintiffs have

14  received value from their J-M pipe to date.[122]  Plaintiffs' damages calculations

15

16  _____

[119] Dkt. 2756 (Final Phase 2 Instructions) at 3.

17
18  [120] *See Sci. App.*, 626 F.3d at 1279; Dkt. 2756 (Final Phase 2 Instructions) at 8 ("I have told you that each Plaintiff must prove that the pipe it received was worth less than what it was promised.  This requires you to compare two values: the value of

19  the pipe received and the value of the pipe each Plaintiff was promised and paid for.

20  In considering whether each Plaintiff received the benefit of its bargain, you must determine the value the Plaintiff has obtained from the pipe since it was delivered

21  and installed.").

22  [121] *E.g.*, Ex. 1, Trial Tr. 6431:12–24 ("MR. HAVIAN:  Your Honor, I want to make

23  sure that we are not being unclear about something.  ***We are going to argue for the***

24  ***full contract price and present dollars based upon the fact that it has no value to***
   ***us. And their burden is to show offset.***  THE COURT:  ***Well, no.  Actually that is***

25  ***not their burden to show offset.  It is the burden on the government to show***
   ***damages.***  MR. HAVIAN:  Well, we will show the difference between the value of

26  what we paid and the value of what we got.  And Mr. Bernick is trying to further

27  restrict that.  ***He can argue whatever he wants to argue, but that is the argument***
   ***we are going to make to the jury.***" (emphasis added)).

28

(51 of 262), Page 51 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 51 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 50 of 55   Page
ID #:140360

ignored that value.[123]

## V.  PLAINTIFFS CANNOT BE PERMITTED TO CONTINUE THEIR CASE ON ANY GROUNDS

Plaintiffs have now had the opportunity to litigate this bifurcated case over a period of eight years, and the Court has given them the flexibility to take that opportunity to the limit.  Not only have they conducted massive discovery and put on months of evidence at trial, but they have tested out multiple, conflicting legal and factual theories of their case.  And they have done so unlawfully, by unilaterally changing their legal and factual theories during trial, between trials, and even during closing.

This pattern goes back to Phase 1, where this conduct produced a result the Court has accurately described as a "train wreck."[124]  As the Court has observed,[125]

---

[122] *Id.* 4334:2–5 (Calleguas) ("Q. Right. So the part of the lifetime of the pipe you have already gotten. You have already gotten 16 years of the lifetime of the pipe; right? A. The pipe has performed for 16 years."); *id.* 1317:14–17 (Norfolk) ("Q. And so up until today, Norfolk's gotten the value it would have expected from that pipe, correct? A. It continues to function to carry the water like it was intended to do, yes."); *id.* 1820:10–14 (Palmdale) ("Q. And because the J-M pipe has not failed, continued to deliver water continuously, some cases up to 20 years, the J-M pipe has met the district's expectations at least to date; correct? A. I would say that's correct[.]"); *id.* 2067:20–22 (Reno) ("Q. To date, the pipe has delivered value to Reno by continuously conveying water to these two projects, correct? A. Yes."); *id.* 1137:16–21 (South Tahoe) ("Q. Provided value by continuously delivering water, in some cases up to 22 years, correct? A. That's part of the value. Q. In fact, the district treats the J-M pipe as an asset on its financial documents, correct? A. Yes.").

[123] *Id.* 6638:19–6639:11 ("MR HAVIAN: . . . What's the difference in value -- that's the question the court has asked you to answer -- what is the difference in value between what we paid and what we got? . . . So what we urge you to decide is the value we got was nothing. . . . So even if we'd gotten 16 years ago of value, J-M's gotten 16 years' worth of value of our money, and we want the money back.").

[124] Ex. 8, Hr'g Tr. 119:12–14 (Sept. 7, 2018) ("THE COURT: No. I am trying to -- we don't have the train wreck that Phase I was."); *see also* Ex. 7, Hr'g Tr. 39:8–17 (Aug. 2, 2018) ("THE COURT: My problem with the Phase I trial, it was unclear

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(52 of 262), Page 52 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 52 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 51 of 55   Page
ID #:140361

1  Plaintiffs changed their theory of liability mid-trial in Phase 1, abandoning their

2  proffered theory that they received substandard pipe,[126] and instead arguing that the

3  jury could find liability under the vague "elements" theory of FCA law,[127] and the

4  concept of "representativeness"/"uniform compliance," *i.e.*, if it found ***any false***

5  ***statement*** made about ***any pipe at any time***.[128]  To this end, Plaintiffs told the Phase

6  1 jury that it need not find that any of Plaintiffs' pipe had reduced physical

7

8  _____

9  during major portions of the trial what exactly was being litigated. . . . I have
   consistently said that, and that is the reason why I said Phase I would have no res

10  judicata effect as to the later -- the non-exemplary plaintiffs because I had a question
   as to what exactly was the nature and what was being litigated."); Ex. 5, Hr'g Tr.

11  23:11–14, (Jan. 12, 2015) ("THE COURT: [B]ut the only problem is that given what
   happened in the first phase of the [trial], it is – you know, the dust settled, but I

12  don't know what happened in Phase 1.").

13  [125] Ex. 3, Hr'g Tr. 27:5–7 (Feb. 24, 2014) ("THE COURT: . . . I must agree with

14  defense counsel that the plaintiff's theory, for lack of a better term, evolved.").

15  [126] *E.g.*, Ex. 2, Hr'g Tr. 23:25–24:1 (May 7, 2012) ("MR. HAVIAN: We are only
   going to be talking about the substandard products theory.").

16

17  [127] Ex. 4, Hr'g Tr. 28:23–29:4 (Dec. 18, 2014) ("THE COURT: But the problem
   here is that it is really kind of unclear. That is one of the complaints of the defense is

18  that the plaintiffs kind of, I don't want to say shifted because that is their
   characterization. I would just say quick footed insofar as whether or not it is

19  fraudulent inducement, whether or not it is substandard product, whether or not it is

20  false certification.").

21  [128] Ex. 22, Trial Tr. 7941:2–21 (Nov. 5, 2013) ("MR. HAVIAN: . . . Here plaintiffs
   have shown you that J-M falsely represented uniform compliance with AWWA

22  C905. That's why this claim was false. J-M falsely represented uniform compliance

23  with UL 1285. So that's what you have to decide. You are back there in the jury
   room. Sit down. ***You say, do we agree that J-M was uniformly promising***

24  ***compliance with C905 and was that true?*** So it's actually fairly straightforward . . .

25  ***[I]n terms of the claim that we are presenting to you today, there is only two kinds.***

26  ***. . . Did they falsely represent that their pipe uniformly complied with C900 and***
   ***C905, yes or no? Did they uniformly represent that their UL pipe complied with***

27  ***UL, yes or no?*** . . . And you will go through that same exercise for each of the

28  projects." (emphasis added)).

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1   properties.[129]

2        Between the Phase 1 trial and Phase 2, Plaintiffs shifted theories again,

3   asserting that their damages should be measured not by "representativeness," but by

4   the reduced physical properties (and thus longevity) of their pipe.[130]

5        Plaintiffs moved dervish-like through the Phase 2 trial. On the eve of trial,

6   Plaintiffs unilaterally decided to add a new "present value" theory of recovery

7   nowhere set out in their Court-ordered enumeration of Phase 2 damages theories.[131]

8   During the trial itself, Plaintiffs repeatedly revised their damages case: Mr. Paschal

9   unilaterally abandoned his 3830 psi UCL calculation of pipe longevity on the

10  witness stand,[132] Mr. Cathcart re-did the entirety of his replacement cost analysis

11  mid-trial,[133] and Mr. Lehmann revised his damages calculations based upon both

12  Mr. Paschal and Mr. Cathcart's changes.[134]

13

14  [129] Ex. 22, Trial Tr. 8136:8–20 (Nov. 6, 2013) ("MR. HAVIAN: . . . The court will
    never instruct you anywhere that we have to show we got substandard pipe. . . . [I]t

15  is not about substandard products and we do not have to show that in this phase of
    this case in order to prevail. That is nowhere in the jury instructions.").

16

17  [130] Ex. 1, Trial Tr. 8061:15–20 ("THE COURT: No. No. I am not talking about your
    presentation. I am talking about your theory of damages. In other words, even way

18  before this case -- the Phase II portion of the trial ever started, you guys selected a
    basis upon which the plaintiffs would establish damages, which was this reduction

19  in lifespan.").

20  [131] See Ex. 6, Hr'g Tr. 7:16–25 (Dec. 12, 2016) (ordering Plaintiffs to identify the

21  damages theories they would pursue at the Phase 2 trial); Dkt. 2270 (Exemplar Pls.'
    Submission Stating Damages Theory).

22

23  [132] See Ex. 1, Trial Tr. 2265:6–18 ("Q. [I]n terms of your feeling about the validity
    of that calculation, what is your reaction to that? A. I don't think it would be

24  representative at all. . . . [Y]ou are being overly generous in terms of assuming how
    the pipe is actually going to perform.").

25

26  [133] See Dkt. 2705 (J-M's Submission re: Revised Arcadis Expert Rpt.); Dkt. 2711 (J-
    M's Reply to Pls.' Submission re: Revised Arcadis Rpt.).

27  [134] See Ex. 18, Trial Ex. 31293 (Lehmann's revised SGL-11 (Oct. 30, 2018)); Dkt.

28  2727 (J-M's Mot. for Relief re: Pls.' Mid-Trial Change in Damages Theory and

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(54 of 262), Page 54 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 54 of 262
Case 5:06-cv-00055-GW-MAR Document 2809 Filed 12/12/18 Page 53 of 55 Page
ID #:140363

1    Plaintiffs' closing was their notion of a bravura performance.  They

2  abandoned their claims for the lost value of their pipe based upon reduced longevity,

3  disclaimed their expert proofs of premature failure and the resulting shortened

4  service life, and disregarded the corresponding diminution in value their experts

5  calculated.[135]  All of Plaintiffs' own testimony as to why suit was brought (*i.e.*, to

6  address "concerns," "doubts," and "speculation" about ***future failure***) and the

7  purpose of the funds that they had just resolved to create (*i.e.*, for ***future repairs and***

8  ***replacement***)[136] now meant nothing at all.  Instead (contrary to the Court's rulings

9  _____

10  Lehmann Testimony).

11  [135] Ex. 1, Trial Tr. 6522:23–6523:11 ("MR. HAVIAN: . . . [T]he only thing we are
    seeking is the difference between the value of the pipe as promised and the value of
12  the pipe as delivered.  ***It has nothing to do with future replacement.***  It has to do
    with what value have we gotten from this pipe, and is it different from the value we
13  were promised.  ***So these present value calculations that I agree are completely***
    ***relevant if you are going to replace pipe in the future have no relevance*** to the
14  question of when they charged us X dollars for this pipe, were we overcharged.
    What was the difference in value between what we were charged and what we got.
15  So this argument is no longer even relevant." (emphasis added)); *id.* 6637:18–25
    ("MR. HAVIAN: . . . So what do we do? We use the test results we had.  ***We***
16  ***created some predicted times to failure.  Our experts worked with the -- all of the***
    ***data that we had from J-M on the three tests that the jury said were the relevant,***
17  ***three just those three, all the data we had from those, and they created some***
18  ***predicted times to failure.  At this point, those don't matter, doesn't matter*** when
    the pipe -- because that's not the question we have anymore is what will it cost to
19  replace the J-M pipe." (emphasis added)).

20  [136] *E.g., id.* 1819:21–24 (Palmdale) ("Q. So the district's claim for damages is
21  actually based on ***financial harm that it speculates it might incur in the future***;
    right? A. ***Correct***." (emphasis added)); *id.* 4335:23–24 (Calleguas) ("We are just
22  looking to recover costs that ***we are expected to incur***." (emphasis added)); *id.*
    1071:24–1072:5 (South Tahoe) ("Q.  [W]hat are you asking for in terms of how
23  much they should give you?  A. . . . . [T]he damages to make the district whole is to
24  be able to replace that pipe ***when it fails early for our customers***." (emphasis
    added)). *id.* 1291:21–1292:3 (Norfolk) ("Q.  [W]hat is Norfolk's plan for the money
25  that it receives?  A. City council recently passed a resolution where we're going to
26  set aside an escrow fund . . . to put the money in there to save it for ***when the pipe***

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(55 of 262), Page 55 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 55 of 262
Case 5:06-cv-00055-GW-MAR   Document 2809   Filed 12/12/18   Page 54 of 55   Page
ID #:140364

and jury instructions), Plaintiffs asked the jury to award as damages the current cost
of replacing all pipe instead.[137]

Plaintiffs' counsel even took it upon himself to tell the jury that they were just
there to say "amen" to the Phase 1 verdict, thereby countermanding the Court's
instruction to the jury that it alone was to decide whether Plaintiffs' pipe had
reduced strength and longevity compared to what was required by the standards.
Plaintiffs' counsel told the Phase 2 jury that the Phase 1 jury already found that J-M
pipe—including Plaintiffs' pipe—was "inferior."[138]  Plaintiffs' counsel made this
representation, despite having explicitly told the Phase 1 jury *not* to determine the
physical properties of Plaintiffs' pipe, and despite the Court's January 31, 2018
ruling that upheld the Phase 1 verdict and determined that the Phase 1 jury *did not*
make any findings with respect to Plaintiffs' pipe,[139] the Court's June 21, 2018
ruling that "[t]he Phase One Jury *did not determine that non-compliant pipe was
physically inferior to compliant pipe*,"[140] and Plaintiffs' prior arguments and

---

*starts failing* and when we need to start replacing it." (emphasis added)).

[137] *Id.* 6639:24–25 ("MR HAVIAN: . . . But at a minimum, at a minimum, we should get the 2016 price of that pipe back.").

[138] *Id.* 6616:22–6617:3 ("MR. HAVIAN: . . . It is undisputed that J-M pipe is inferior to standards-compliant pipe; that's really important.  You heard a lot of testimony from experts brought in here by J-M, and if you sort of listen to the higher level, sort of sounds like, Wow, it sounds like they're saying the pipe is okay, but of course we know that's not true because of the first jury's finding."); *id.* 6615:25–6616:4 ("MR. HAVIAN: . . . If you hear an argument or you see some evidence and you start to think, Well, maybe they didn't get bad pipe on that project, maybe there was no fraud in connection with that project, think again.  The jury said there was, the first jury.").

[139] Dkt. 2414 at 14 ("As Plaintiffs point out, the fact *the Phase One jury did not render findings with respect to the physical properties of the pipe actually received* by [Plaintiffs] means that the second jury may do so *without* disturbing the Phase One findings." (emphasis added)).

[140] Dkt. 2494 at 11.

---

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(56 of 262), Page 56 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 56 of 262
Case 5:06-cv-00055-GW-MAR    Document 2809    Filed 12/12/18    Page 55 of 55    Page
ID #:140365

1    representations to the Court and Phase 1 jury.

2         The predictable result of Plaintiffs' ever-shifting theories and evidence was a

3    hopelessly confused jury that understandably could not figure out how the Phase 1

4    verdict related to Plaintiffs' Phase 2 damages proofs, or how Plaintiffs' Phase 2

5    damages proofs related to their claim for damages or the questions the jury was

6    asked to decide.  The Court should put an end to Plaintiffs' improper marathon quest

7    to create a viable case and should enter judgment in J-M's favor as a matter of law.

8    **VI.    CONCLUSION**

9         For the foregoing reasons, the Court should enter judgment in J-M's favor as

10   a matter of law.

11   DATED:  December 12, 2018          PAUL, WEISS, RIFKIND, WHARTON
                                        & GARRISON LLP
12

13                                      By:  _____
                                                 */s/ David Bernick*
14                                               David Bernick

15   DATED:  December 12, 2018          BIRD, MARELLA, BOXER, WOLPERT,
                                        NESSIM, DROOKS, LINCENBERG &
16                                      RHOW, P.C.

17

18                                      By:  _____
                                                 */s/ Paul S. Chan*
19                                               Paul S. Chan

20                                      *Attorneys for Defendant*
                                        *J-M Manufacturing Company, Inc.*
21                                      *dba JM Eagle*

22

23

24

25

26

27

28

**ER428** 46

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - TRIAL

| Case No. | EDCV 06-55-GW(PJWx) | Date | November 14, 2018 |
|---|---|---|---|
| Title: | *United States of America, et al. v. J-M Manufacturing Company, Inc.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux / Deborah Gackle |
|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendants: |
|---|---|
| Elizabeth Sher; Kirk Dillman; Eric Havian | David Bernick; Paul Chan; Shoshana Bennett |

Day Court Trial     22nd     Day Jury Trial

    One day trial:    Begun (1st day);    Held & Continued;    ✔ Completed.

    The Jury is impaneled and sworn.

    Opening statements made by

    Witnesses called, sworn and testified.    Exhibits Identified    Exhibits admitted.

    Plaintiff(s) rest.    Defendant(s) rest.

    Closing arguments made by    plaintiff(s)    defendant(s).    Court instructs jury.

    Bailiff(s) sworn.    Jury retires to deliberate.    Jury resumes deliberations.

    Jury Verdict in favor of    plaintiff(s)    defendant(s) is read and filed.

    Jury polled.    Polling waived.

✔ Filed Witness & Exhibit Lists    ✔ Filed jury notes.    Filed jury instructions.

    Judgment by Court for    plaintiff(s)    defendant(s).

    Findings, Conclusions of Law & Judgment to be prepared by    plaintiff(s)    defendant(s).

    Case submitted.    Briefs to be filed by

    Motion to dismiss by    is    granted.    denied.    submitted.

    Motion for mistrial by    is    granted.    denied.    submitted.

    Motion for Judgment/Directed Verdict by    is    granted.    denied.    submitted.

    Settlement reached and placed on the record.

    Clerk reviewed admitted exhibits with counsel to be submitted to the Jury/Court for deliberation/findings.

✔ Counsel stipulate to the return of exhibits upon the conclusion of trial. Exhibit Release Form prepared and filed.

    Trial subpoenaed documents returned to subpoenaing party.

✔ Case continued to    November 29, 2018 at 8:30 a.m.    for a status conference.

✔ Jury notes 16 - 18 are discussed. Jury is deadlocked. Further instruction re deliberations is attached. Jury remains deadlocked.

    Court declares mistrial.

                                                          4    :    00

Initials of Deputy Clerk    JG

cc:

**ER429**

Members of the jury, you have advised me that you have been unable to agree upon a verdict in this case. I have decided to suggest a few thoughts to you.

As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict if each of you can do so without violating your individual judgment and conscience.  Each of you must decide the case for yourself, but only after you consider the evidence impartially with the other jurors.  During your deliberations, you should not be unwilling to reexamine your own views and change your opinion if you become persuaded that it is wrong.  However, you should not change an honest belief as to the weight or effect of the evidence solely because of the opinions of the other jurors or for the mere purpose of returning a verdict.

All of you are equally honest and conscientious jurors who have heard the same evidence. All of you share an equal desire to arrive at a verdict. Each of you should ask yourself whether you should question the correctness of your present position.

I remind you that in your deliberations you are to consider the instructions I have given you as a whole. You should not single out any part of any instruction, including this one, and ignore others. They are all equally important.

You may now return to the jury room and continue your deliberations.

FILED
CLERK, U.S. DISTRICT COURT

November 7, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JG _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | No. EDCV 06-55-GW(PJWx) |
| | ) | |
| Plaintiffs, | ) | **UPDATED FINAL JURY** |
| | ) | **INSTRUCTIONS** |
| | ) | |
| v. | ) | |
| | ) | |
| J-M MANUFACTURING CO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

(60 of 262) Page 60 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 60 of 262
Case 5:06-cv-00055-GW-MAR    Document 2756    Filed 11/07/18    Page 2 of 11    Page ID
#:139749

**Final Jury Instructions**

## I. Introductory Instructions

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case. Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you, whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important. Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

As I told you at the start of the trial, certain facts that are important to this trial have already been decided. You are required to take those facts as true. I will now tell you what those facts are.

The Plaintiffs in this case are various state and local governmental entities/agencies. For purposes of this trial, five representative Plaintiffs have been chosen. They are: (1) Calleguas Municipal Water District in California; (2) City of Norfolk, Virginia; (3) City of Reno, Nevada; (4) Palmdale Water District in California; and (5) South Tahoe Public Utility District in California. I will refer to them collectively as "Plaintiffs." The Defendant is J-M Manufacturing Company, Inc., which I will refer to as "J-M" or "Defendant."

The action involves polyvinyl chloride ("PVC") pipe that J-M manufactured and sold to its distributors that was in turn sold to and used by Plaintiffs in 26 different water system projects. These water systems are located in different parts of the United States and were installed at various times over a 10-year period from 1996 through 2006. Each project was covered by a separate written contract. Those contracts called for various sizes and types of PVC pipe and required that the PVC pipe meet certain standards. For all of the projects and contracts herein, the applicable standards required were "American Water Works Association ("AWWA") C900/905" and/or Underwriters Laboratory, Inc.'s ("UL") 1285. As a result, any pipe supplied for the project had to meet those standards. You will be furnished a copy of the relevant portions of those standards.

Plaintiffs brought this action under certain False Claims Act statutes, which provide in pertinent part that any person (including a corporation) − (1) who knowingly presents (or causes to be presented) to an officer or employee of a governmental entity or agency a false or fraudulent claim for payment or approval, or (2) who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government is liable to that governmental entity or agency.

1

This Court bifurcated the trial on Plaintiffs' claims, meaning that Plaintiffs' claims against J-M are being tried in two parts. The first trial has taken place. It was limited to the issue of whether J-M violated the applicable False Claims Act statutes by causing false claims to be presented to the Plaintiffs or making, using, or causing to be made or used false records or statements to get false claims paid. I will refer to that previous trial as "Phase 1" or the "Phase 1 Trial." The trial that we presently have been involved with is the "Phase 2 Trial" which concerns *solely* the issue of damages.

Plaintiffs contended in the Phase 1 trial that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards. Plaintiffs asserted that this representation was false because J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require.

In particular, Plaintiffs claimed that there had been a substantial decline in three key tests that are part of these industry standards. Those three tests are: (1) abbreviated Hydrostatic Design Basis testing, referred to by shorthand as "HDB" testing; (2) Longitudinal Tensile Strength testing, referred to by shorthand as "LTS" testing; and (3) "Quick Burst" Testing, referred to by shorthand as "QB" testing. Plaintiffs claimed that each of these tests measure, directly or indirectly, the long-term strength and durability of the PVC pipe. Plaintiffs further claimed that the substantial declines in these tests demonstrated that the pipe that J-M manufactured during the period of time Plaintiffs acquired J-M pipe for their 26 projects did not uniformly have the same quality, strength, and durability of the PVC pipe that was initially qualified as complying with the industry standards.

The Phase 1 Jury decided in favor of Plaintiffs and against J-M as to each of the 26 projects at issue. In reaching their decision, the Phase 1 Jury found:

- That, as to each of the 26 projects, J-M represented that every piece of PVC pipe it sold to Plaintiffs was manufactured and tested in accordance with AWWA C900, AWWA C905, and/or UL 1285 standards.

- That these industry standards require that every piece of PVC pipe sold have at least the same quality, strength, and durability of the pipe that was initially qualified by J-M as complying with the industry standards.

- That J-M's representations were false because J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, and durability required by the industry standards.

- That the QB, Abbreviated HDB, and the LTS short term tests bear a relationship with the long-term strength of JM's pipe.

- That J-M's misrepresentations were material to Plaintiffs.

- That J-M presented (or caused to be presented) to each Plaintiff false or fraudulent claims for payment or approval; and J-M made or used (or caused to be made or used) false records or statements in order to get a false or fraudulent claim paid or approved by each Plaintiff.

2

While the Phase 1 Jury found J-M to be liable under the relevant False Claims Act statutes, the Phase 1 Jury was not asked to decide and did not determine: (1) what, if any, actual damages resulted from J-M's violations of the statutes, and (2) the amount of Plaintiffs' damages, if any, caused by J-M's violations of those statutes. Those determinations were left to you as the "Phase 2 Jury" to decide in this trial.

You are bound by all decisions and factual findings of the Phase 1 Jury, as described above. They are matters that cannot be disputed, that you must accept as true, and that cannot be reconsidered or re-examined by you. You will receive a copy of the Phase 1 Jury's Verdict in the Phase 1 Trial.

Under the False Claims Act statutes involved in Phase 2, a Plaintiff can seek recovery of: (1) the amount of actual damages that it sustained because of the false claims submitted by J-M; and (2) civil penalties as provided in the statute for each false claim submitted by J-M. Plaintiffs seek to recover both actual damages and civil penalties against J-M. Each Plaintiff bears the burden of proving its damages for each project by a preponderance of the evidence.

As to actual damages, Plaintiffs contend that, as a result of J-M's failure to manufacture and test its pipe in a manner that assured that it had the quality, strength and durability as required under the applicable industry standards, the pipe Plaintiffs purchased will fail sooner than pipe that conformed to the applicable industry standards and thus will have to be replaced sooner. Plaintiffs seek damages for the difference between the value of the pipe Plaintiffs received and the value the pipe would have had if it had been as represented by J-M.

J-M contends that Plaintiffs cannot establish that they suffered any actual, measurable damages as a result of its violations of the statutes. The pipe that Plaintiffs received has performed as expected for many years now. Each of the Plaintiffs themselves have known about the claims in this case for ten years and never decided to replace their pipe. They have no plans to replace it in the future either. These decisions show that the physical properties of their pipe are as promised and that Plaintiffs have received the benefit of their bargain. Science and the testing methods approved by the AWWA itself say the same thing. Plaintiffs' pipe will last at least as long as they themselves expected.

The parties have agreed to have the Court decide the issue of civil penalties. Therefore, you will not need to determine the number of civil penalties that may be assessed in this case. That is a determination for the Court to make.

When a party has the burden of proof by a preponderance of the evidence, it means you must be persuaded by the evidence presented during the trial that the claim is more probably true than not true. After weighing all of the evidence, if you cannot decide that something is more likely to be true than not true, you must conclude that the party did not prove it.

You should base your decision on all of the evidence, regardless of which party presented it.

You should decide the case as to each Plaintiff and each project separately. Unless otherwise stated, the instructions apply to all parties and projects.

3

(63 of 262) Page 63 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 63 of 262
Case 5:06-cv-00055-GW-MAR    Document 2756    Filed 11/07/18    Page 5 of 11    Page ID
#:139752

The evidence you are to consider in deciding what the facts are consists of:

1.      the sworn testimony of any witness;

2.      the exhibits which are received into evidence;

3.      any facts to which the lawyers have agreed; and

4.      any facts that I instruct you to accept as proven.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

1.      Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they said in their opening statements, their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.      Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

3.      Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

4.      Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overruled the objection, the question can be answered or the exhibit received.  If I sustained the objection, the question cannot be answered, and the exhibit cannot be received.  Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

During the trial, there were a number of instances when I held a "sidebar" with the attorneys

(64 of 262)  Page 64 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 64 of 262
Case 5:06-cv-00055-GW-MAR    Document 2756    Filed 11/07/18    Page 6 of 11    Page ID
#:139753

outside of your hearing to discuss various issues in regards to the evidence or trial procedure.  You are not to consider in your deliberations the fact that an attorney or the Court requested a sidebar, the number of such sidebars, and/or the specific reasons for the sidebars.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

In addition, I will now walk you through certain evidence presented that you must disregard or use for limited purposes.

As I have instructed you, this trial requires that you decide issues that are separate and distinct from those that were decided in the first trial.  The Phase 1 jury has already made findings about J-M's liability, including J-M's historical conduct, and those issues are not for you as the Phase 2 jury to reconsider.  While certain evidence regarding J-M's historical conduct has been permitted in this Phase 2 trial, this trial is not about J-M's historical conduct, and such evidence is not germane to the issues you are to decide except insofar it relates to the issue of the amount of damages, if any, to be awarded in this phase of the trial.

You have seen certain evidence and heard certain testimony from Plaintiffs' witnesses and experts regarding the alleged need for, and cost of, replacing Plaintiffs' pipe, including the costs of installation and removal.  You also have seen certain evidence and heard certain testimony from the witnesses of the present value or loss cost based on such replacement costs, and insurance premium damages based on such costs.  I have held as a matter of law that Plaintiffs may not seek to recover as actual damages the costs of removal of old pipe and the installation of new pipe and/or insurance premium damages based on such costs.  This is a legal determination on the Court's part.

You have heard testimony regarding certain analyses Plaintiffs' experts performed based on a benchmark of 3916 psi. Plaintiffs' experts have withdrawn their damages calculations based on this number and Plaintiffs are not relying upon this number in their damages requests. You must disregard all evidence regarding the 3916 psi benchmark except insofar as Plaintiffs' experts used the 3916 psi slope in their damages calculations based on the 3830 psi and 3830 psi Upper Confidence Limit benchmarks. In no event may you award or determine any potential damages based on the 3916 psi benchmark that Plaintiffs have withdrawn.

During the trial, I allowed jurors to pose questions for witnesses.  However, there were times when I did not ask one or more of those questions or I rephrased the question.  Do not speculate as to why that happened.  Also, do not give undue weight to questions you or other jurors proposed.  You should evaluate the answers to those questions in the same manner you evaluate all of the other evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, part of it, or none of it.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(65 of 262) Page 65 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 65 of 262
Case 5:06-cv-00055-GW-MAR    Document 2756    Filed 11/07/18    Page 7 of 11    Page ID
#:139754

1.      the opportunity and ability of the witness to see or hear or know the things testified to;

2.      the witness's memory;

3.      the witness's manner while testifying;

4.      the witness's interest in the outcome of the case, if any;

5.      the witness's bias or prejudice, if any;

6.      whether other evidence contradicted the witness's testimony;

7.      the reasonableness of the witness's testimony in light of all the evidence; and

8.      any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

The law does not require any party to call as a witness every conceivable person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

During the trial, certain video recordings were played to you which included a transcription of the recorded statements. Please bear in mind that the video recording is the evidence, not the transcript. If you heard something different from what appeared in the transcript, what you heard is controlling.

(66 of 262) Page 66 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 66 of 262
Case 5:06-cv-00055-GW-MAR    Document 2756    Filed 11/07/18    Page 8 of 11    Page ID
#:139755

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath, before the actual trial, in response to questions that were submitted in writing under established court procedures. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Certain charts and summaries not admitted into evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

One or more of the admitted exhibits are in an electronic format. If you wish for an exhibit to be viewed or played back during your deliberation, feel free to make such a request and a computer, projector, printer, and/or accessory equipment will be available to you in the jury room.

All parties are equal before the law, and governmental entities and corporations are each entitled to the same fair and conscientious consideration by you as any other party or person.

Under the law, a corporation is considered to be a person. However, it can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of their authority. The same is true of the Plaintiff government entities in this case.

## II. Instructions as to Damages

In Phase II, you must determine the Plaintiffs' actual damages, if any. Plaintiffs bear the burden of proving damages by a preponderance of the evidence.

Any damages award must be based upon evidence and not upon speculation, guesswork, or conjecture.

Actual damages means the amount of money that will reasonably and fairly compensate the Plaintiff for the damages it suffered as a result of J-M's violations of a False Claims Act statute. Plaintiffs are seeking the difference between the value of the pipe Plaintiffs received and the value the pipe would have had if it had been as represented by J-M.

The Plaintiffs each have the burden of proving their actual damages by a preponderance of the evidence, for each project at issue.

Each Plaintiff has the burden of proving, for each of its projects, that J-M's failure to manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that AWWA C900/905 and/or UL 1285 required caused the physical properties of the J-M pipe it received to be less than what they would have been if J-M had, instead, manufactured or tested that pipe in a manner that assured it uniformly had the quality, strength, or durability required.

If any Plaintiff establishes that the physical properties of the J-M pipe it received for one or more of its projects were less than what they would have been if J-M had, instead, manufactured or tested that pipe in a manner that assured it uniformly had the quality, strength, or durability required, that Plaintiff also has the burden of proving that this difference specifically caused that pipe to have less value.

Each Plaintiff must prove that the pipe it received is worth less than the pipe it contracted for. This measure of damages is called the "benefit of the bargain." When I say that Plaintiffs must prove that J-M's failure to manufacture or test its pipe to assure that it uniformly had the quality, strength, or durability the AWWA or UL standards required must have "caused" the physical properties of each Plaintiff's pipe to be different from and less valuable than the pipe J-M promised. "Cause" means that there is a direct and immediate link between that failure of J-M and any difference in physical properties or value of each Plaintiff's pipe. This means that you must find that any Plaintiff's losses (pipe with less physical properties and less value as a result) were specifically attributable to that failure of J-M. If you conclude that any Plaintiff has not proven that J-M's conduct caused any loss of physical properties in that Plaintiff's pipe or that J-M caused any loss of value for the pipe it received for each project, then you should not award that Plaintiff any damages for that project.

I have told you that each Plaintiff must prove that the pipe it received was worth less than what it was promised. This requires you to compare two values: the value of the pipe received and the value of the pipe each Plaintiff was promised and paid for. In considering whether each Plaintiff received the benefit of its bargain, you must determine the value the Plaintiff has obtained from the pipe since it was delivered and installed. If a Plaintiff proves by a preponderance of the evidence that J-M's failure to manufacture or test its pipe to assure that it uniformly had the quality, strength, or durability the AWWA or UL standards required caused the physical properties of each Plaintiff's pipe to be different from and less valuable than the pipe J-M promised to the point that the Plaintiff received *no value* from the pipe, you must find the value of that pipe is zero and the Plaintiff lost the value it bargained for. If, for any project, you find that a Plaintiff has proven it received some value, but less than J-M represented to it, you must use that value in determining the difference between it and the value that Plaintiff paid for. That difference is the value that Plaintiff lost. If you find that a Plaintiff has not proven that it received less than the value it would have had based upon J-M's representation of compliance with AWWA C900/905 or UL 1285, you must award no damages. The following instruction explains this further.

In determining any damages suffered by Plaintiffs in this case as to any of the false claims, you do not have to determine the actual damages with absolute precision. You may make a just

8

(68 of 262), Page 68 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 68 of 262
Case 5:06-cv-00055-GW-MAR   Document 2756   Filed 11/07/18   Page 10 of 11   Page
ID #:139757

and reasonable estimate, based upon relevant facts, and render your verdict accordingly.  If any
Plaintiff does not meet its burden, you should put zero on the verdict form for the damages suffered
by that Plaintiff.

## III.  Concluding Instructions

Before you begin your deliberations, elect one member of the jury as your presiding juror.
That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.
Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have
considered all of the evidence, discussed it fully with the other jurors, and listened to the views of
your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should.
Do not come to a decision simply because other jurors think it is right.  It is important that you
attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having
made your own conscientious decision.  Do not change an honest belief about the weight and effect
of the evidence simply to reach a verdict.

Because you must base your verdict only on the evidence received in the case and on these
instructions, I remind you that you must not be exposed to any other information about the case or
to the issues it involves.  Except for discussing the case with your fellow jurors during your
deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with
you in any way about the merits of the case or anything to do with it.  This includes discussing
the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet
chat room, blog, Web site or application, including, but not limited to, Facebook, Twitter,
YouTube, Instagram, LinkedIn, Snapchat, or any other forms of social media.  This applies to
communicating with our family members, your employer, the media or press, and the people
involved in the trial.  If you are asked or approached in any way about your jury service or anything
about this case, you must respond that you have been ordered not to discuss the matter and must
report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case
or anything to do with it; do not do any research, such as consulting dictionaries, searching the
Internet, or using other reference materials; and do not make any investigation or in any other way
try to learn about the case on your own.

These rules protect each party's right to have this case decided only on the evidence that
has been presented here in court.  Witnesses here in court take an oath to tell the truth, and the
accuracy of their testimony is tested through the trial process.  If you do any research or
investigation outside the courtroom, or gain any information through improper communications,
then your verdict may be influenced by inaccurate, incomplete or misleading information that has
not been tested by the trial process.  Each of the parties is entitled to a fair trial by an impartial

jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.  Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the Court immediately.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone − including me − how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

A verdict form has been prepared for you.  Please follow the instructions on that form with care.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

(70 of 262), Page 70 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 70 of 262
Case 5:06-cv-00055-GW-MAR    Document 2754    Filed 11/06/18    Page 1 of 4   Page ID
#:139733

**FILED**
CLERK, U.S. DISTRICT COURT

November 6, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JG _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) ) | No. EDCV 06-55-GW(PJWx) |
| Plaintiffs, | ) ) ) | **CIVIL PENALTIES** |
| v. | ) ) ) | |
| J-M MANUFACTURING CO., INC., | ) ) | |
| Defendant. | ) ) | |

(71 of 262), Page 71 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 71 of 262
Case 5:06-cv-00055-GW-MAR   Document 2754   Filed 11/06/18   Page 2 of 4   Page ID
#:139734

*__Hendrix v. J-M Manufacturing Co.__*, Case No. CV-06-55
Civil Penalties

      The primary issue in dispute herein at this point is whether civil penalties under the Nevada and Virginia False Claims Act ("FCA") statutes[1] (respectively Nev. Rev. Stat. Ann. 357.040 and Va. Code Ann. § 8.01-216.3) require[2] such penalties for each individual "stick of pipe" which has been stamped by J-M with reference to C900/905 and/or UL 1285. Both state FCA statutes impose civil penalties on a person who commits certain acts including: (1) "Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or (2) "Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[3] Plaintiffs argue that J-M's liability for civil penalties as to each stick of falsely marked pipe arises from the latter false record/statement violation provision.

      Plaintiffs assert that: (1) "J[-]M places stamps in the stencil line of every stick of its C900 and C905 pipe. These stamps represent that J-M's pipe complied with all applicable standards promulgated by AWWA and Underwriters Laboratories"; and (2) "they will testify that their practice is to have inspectors look specifically for the stamps on the pipe. Without those stamps, Plaintiffs would not pay for the pipe." *See* Plaintiffs' Submission re Penalties for J-M's False Statements on Pipe ("Plaintiffs' Penalties Submission"), Docket No. 2669 at pages 4 and 6 of 13.

      J-M counters by arguing that:

> Plaintiffs' Phase 2 penalty proffer is wrong as a matter of law. There is only one false claim per project. That is because in each case only the contracts themselves, which in each instance incorporated either a J-M brochure or J-M spec sheet that stated the pipe supplied would comply with AWWA, form the

---

[1] Plaintiffs have conceded that, as to the California plaintiff agencies, the pre-2010 California FCA statutes only authorized a civil penalty for each false claim submitted by the defendant. *See* Plaintiffs' Submission of Authorities regarding the Jury's Determination of the Number of Statutory Penalties, Docket No. 2638 at pages 7-8 of 10, citing *Fassberg Construction Co. v. Housing Authority of the City of Los Angeles*, 152 Cal. App. 4th 720 (2007).

[2] It is almost universally held that the civil penalty provisions of a FCA statute are mandatory. *See e.g. United States v. McLeod*, 721 F.2d 282, 285 (9th Cir. 1983).

[3] Henceforth, violations of Nev. Rev. Stat. Ann. 357.040(1)(b) and Va. Code Ann. § 8.01-216.3A(2) will be referenced as "false record/statement violations."

      Prior to 2011, the Virginia statute read: "Any person who . . . (2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth . . . shall be liable to the Commonwealth for a civil penalty . . . ." *See* VA. SB 1262, 2011, c. 676, enacted March 26, 2011. Also, the Nevada statute prior to June 13, 2007, in the relevant section read: "Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim." *See* 2007 Nev. SB 529, 2007, ch. 454, § 23, p. 2398.

      J-M seemingly concedes that the aforementioned quoted language does not make those statutes more akin to California's with regard to civil penalties because they do not deviate from the federal FCA in the way that California Government Code § 12651(a)(2) does. *See* Docket No. 2675 at 2-3 of 7 (citing Cal. Gov't Code § 12651(a)(2), which provides that "any person who commits any of the following acts . . . may be liable to the state or political subdivision for a civil penalty of up to ten thousand dollars ($10,000) for each false claim.").

1

(72 of 262), Page 72 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 72 of 262
Case 5:06-cv-00055-GW-MAR   Document 2754   Filed 11/06/18   Page 3 of 4   Page ID
#:139735

basis of a false claim. * * * * [C]ivil penalties may not be based on individual sticks of stamped pipe because the markings are merely for identification purposes and do not represent a certificate of compliance, and J-M was not required by Reno's or Norfolk's contracts to submit an Affidavit of Compliance pursuant to AWWA C900/905 section 6.3.

The Court asked the parties whether the Phase 1 Jury already found that J-M's use of the "false stamps" constituted a false record/statement violation. *See* October 8, 2019 Civil Penalties Tentative Ruling. More specifically, the Court asked whether any entry in the Jury's Special Verdict Form referenced the markings on J-M's pipe. Plaintiffs seem to concede that the Special Verdict *Form* did not explicitly reference the markings/stamps on J-M's pipe, and they merely argue that the jury indirectly indicated through its verdict that it relied on pipe bearing stamps. *See* Docket No. 2678 at 2 of 8. Plaintiffs argue that in the case of Palmdale, which had eight projects, Plaintiffs had no representations from J-M *other than stamps* on the J-M pipe.[4] *See id.* In support of this argument, Plaintiffs cite to testimony from Phase 1, where their witness answered J-M on cross-examination, testifying that as to Palmdale there were no submittals in connection with J-M materials but that they instead focused on representations "stenciled onto the pipe." *See id.* at 2-3 of 8. According to Plaintiffs, because on the Special Verdict Form the Phase 1 Jury found a false statement for each of the eight projects at issue for Palmdale, the Phase 1 Jury necessarily relied on the stamps. *See id.* at 3 of 8.

The Court would find this argument tenuous and insufficient to find that the Phase 1 Jury necessarily made this finding. It is pertinent that Plaintiffs fail to cite anywhere in the Special Verdict *Form* mentioning false statements as a basis for a false claim. *See generally* Docket No. 2678 (Plaintiffs' submission). Moreover, according to J-M and without Plaintiffs proffering otherwise, no such "false stamps" were discussed in the Phase 1 trial exhibits that the Phase 1 Jury cited. *See* Docket No. 2680 at 2 of 9. Even taking Plaintiffs' witness's testimony related to Palmdale as dispositive (which it is not), Plaintiffs seek that "false stamps" contention to form the basis for civil penalties as to *Norfolk and Reno*, rather than as to Palmdale. *See* Docket No. 2680 Ex. A at 5 of 9. As the Court noted in the October 8, 2018 ruling, it would seem that matter would have to be litigated from the beginning if the Court allowed J-M's stamp markings to form the basis of a false claim or statement at this stage. Further, in raising the false record/ statement violation in Phase 1, it does not appear that the jury was ever specifically referenced the correct state FCA statute that was applicable as to California, Nevada and/or Virginia during the relevant time period.

Additionally, the Court would conclude that J-M's stamping pipe in this context would not constitute a "false record or statement" made or used "to get a false or fraudulent claim paid or approved" or "to obtain payment or approval of a false claim." Plaintiffs argue that statements on spec sheets and brochures were identical to the stamps on the pipe and were incorporated into contracts for the projects.[5] *See* Docket No. 2678 at 3 of 8. However, as noted by J-M, none of the contracts involved as to the Plaintiffs herein required a certification of the

---

[4] However, it must be noted that − Palmdale being in California − the fact of the presence J-M's stamps on each piece of pipe would not have any effect on the issue of civil penalties given the language of California's FCA statute.

[5] The Court does not see ample support for this contention in Plaintiffs' briefing. *See* Docket No. 2678 at 3 of 8.

pipe as being in compliance with C900/905. Further, under the AWWA standards, such certification could specifically be requested and imposed, but with few exceptions, none of the Plaintiffs' projects required such certification.

A potential additional basis for reaching this conclusion is that each piece of pipe so stamped by J-M would mandate that this Court find a separate penalty of between $5,000 and $11,000 for the alleged 2519 sticks of pipe involved in the Reno and Norfolk projects,[6] which would present the issue of a potential violation of the Eighth Amendment prohibition against excessive fines. *See generally United States v. Mackby*, 261 F.3d 821, 829-30 (9th Cir. 2001) (where civil penalties based on 111 claims lead to a fine of $555,000, whereas the actual damages were $58,151.64; and where the Ninth Circuit recognized that "the district courts treble damage award is also subject to an Excessive Fines Clause analysis.").

For the foregoing reasons, the Court would hold that stamping of each piece of pipe with a C900/C905 mark cannot serve as a basis to impose 2519 civil penalties in this case.

---

[6] The range of the civil penalties would roughly be between $12,595,000 and $27,709,000.

3

**ER445**

(74 of 262), Page 74 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 74 of 262
Case 5:06-cv-00055-GW-MAR    Document 2753    Filed 11/06/18    Page 1 of 3   Page ID
#:139730

FILED

CLERK, U.S. DISTRICT COURT

November 6, 2018

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ JG _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>J-M MANUFACTURING CO., INC.,<br><br>Defendant. | No. EDCV 06-55-GW(PJWx)<br><br>**NOTES ON DAMAGES** |

(75 of 262), Page 75 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 75 of 262
Case 5:06-cv-00055-GW-MAR    Document 2753    Filed 11/06/18    Page 2 of 3    Page ID
#:139731

Notes on Damages

1.  *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78  (2d Cir. 2012) (observing that the False
Claims Act does not specify how to calculate damages, "but the Supreme Court has recognized
that the purpose of damages, even as multiplied, under the Act is to make the government
'completely whole' for money taken from it by fraud.") (citing U.S. ex rel. Marcus v. Hess, 317
U.S. 537, 63 S. Ct. 379, 87 L. Ed. 443 (1943)).

2.  FCA damages are normally measured by a "benefit of the bargain" calculation in which a
determination is made of the difference between the value of what the government received and
the amount it paid.  This is typically the method of measuring damages when the Government
paid for goods and services and received a tangible benefit. There are two ways to measure the
benefit of the bargain. Where there is an ascertainable market value for the goods or services, the
measure of damages is the difference between the market value of what the Government received
and retained and the market value that the goods or services would have had if they had been of
the specified quality.  Where the market value of the goods or services is not ascertainable,
damages are determined by the difference between the amount the Government actually paid less
the value of the goods or services received as measured by the factfinder.

        As to the burden of proof in the benefit of the bargain context, "[t]o establish damages,
the government must show not only that the defendant's false claims caused the government to
make payments that it would have otherwise withheld, but also that the performance the
government received was worth less than what it believed it had purchased."  *United States v.
Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010).

3.  Consequential damages: As observed in *Cook County v. United States ex rel. Chandler*, 538
U.S. 119, 131 (2003):

        The FCA has no separate provision for prejudgment interest, which is usually thought
        essential to compensation, *see, e.g., Kansas v. Colorado*, 533 U.S. 1, 10-11, 150 L. Ed.
        2d 72, 121 S. Ct. 2023 (2001), and might well be substantial given the FCA's long
        statute of limitations, § 3731(b).  Nor does the FCA expressly provide for the
        consequential damages that typically come with recovery for fraud, *see* Restatement
        (Second) of Torts § 549(1)(b), and Comment d (1976).

It should be noted that the Supreme Court in referencing consequential damages not provided for
in the FCA cited to the Restatement (Second) of Torts § 549(1)(b) which defines such damages
as "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the
misrepresentation."

4.  Are replacement costs consequential damages or otherwise not allowable under False Claims
Acts statutes?  Note, certain state's false claims act statutes do specifically provide for the
inclusion of consequential damages in their statutes.  *See e.g. Massachusetts v. Schering-Plough
Corp.*, 779 F. Supp. 2d 224, 236 (D. Mass. 2011) ("The MFCA provides for consequential
damages, high prejudgment interest, costs and attorney's fees on top of the FCA penalties and
trebling of damages.").  However, the California, Nevada and Virginia statutes do not.

        As previously discussed by this court, "replacement costs" (as including the expenses for
testing/retesting of delivered goods, repairing the system into which the non-conforming goods
was placed, and/or removing the non-conforming items from the system and substituting in new

conforming products) have only rarely ever been awarded and only in such cases where: (1) the contract involved included such provision [*see e.g. Daff v. United States*, 31 Fed. Cl. 682 (Fed. Cl. 1994)[1]] (2) the nonconforming part was placed into the larger product by the defendant manufacturer which made the entire product worthless and which allowed the plaintiff there to recover the entire cost of the product [*see e.g. United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637 (6th Cir. 2002)], or (3) after referencing contract law principles concerning a *contractor's* defective performance, the court indicated that it would allow the cost of remedying the defects against the contractor so long as the cost was not clearly disproportionate to the probable loss in value caused by the defects [*see Commercial Contractors, Inc. v. United States*, 154 F.3d 1357 (Fed. Cir. 1998)].  All of those cases are pre-*Cook County*.  Further, there has not been any evidence proffered in this action which would cause it to fall within the ambits of those rare cases.

5.  As presently indicated, the issue of the number of violations for purposes of the award of civil penalties is only in dispute as to the Nevada and Virginia Plaintiffs.

The primary issue is whether the Court will allow Plaintiffs to claim J-M's markings on each stick of pipe as a basis for a civil penalty award.  *See* Court's filing on Civil Penalties.

---

[1] Not only is the apply named *Daff* decision somewhat of an outlier in this area but also it must be noted that therein: (1) the government sued to recover on its claim for unliquidated progress payments as a remedy for fraudulent breach of contract, for forfeiture of plaintiff's "claims," *and* for damages and penalties under the False Claims Act; (2) the court did *not* award as FCA damages (and hence did not treble) the difference between the amount of money the government had by then already paid ($11,166,479) and the value that it had received ($5,564,301) (although it did award that sum – untrebled ($5,602,177) – pursuant to the government's forfeiture counterclaim); and (3) the court did award as actual damages the (reduced) costs of testing and repair in the sum of $200,000 which it then trebled to $600,000.  The court in *Daff* did not state any basis for finding that it could award testing and repair costs as actual damages under the FCA and, indeed, readily admitted that " It is unnecessary for the court to determine what part of the relief the government seeks can be granted as part of the false claims counterclaim, and how much flows from finding fraudulent breach of contract or a forfeiture." 31 Fed. Cl. 682 at 689.

Case 5:06-cv-00055-GW-MAR    Document 2428-42    Filed 05/09/18    Page 248 of 371
Page ID #:112337



# Hendrix v. J-M Manufacturing Company, Inc.

# Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

## United States District Court

## Central District of California

Case No. EDCV-06-55-GW (PJWx)

August 2016

**ER449**

(78 of 262), Page 78 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 78 of 262
Case 5:06-cv-00055-GW-MAR    Document 2428-42    Filed 03/09/18    Page 249 of 371
Page ID #:112338

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

# EXPERT REPORT ON PIPE CRITICALITY ANALYSIS AND REPLACEMENT COST OPINION

Prepared for:

United States District Court

Central District of California

Prepared by:

Arcadis U.S., Inc.

445 South Figueroa Street

Suite 3650

Los Angeles

California 90071

Tel 213 486 9884

Fax 213 486 9894

James A. Cathcart, P.E.

National Technical Manager

and

David Hudd

Client Program Manager

Our Ref.:

42650001.0000

Date:

August 2016

arcadis.com

**ER450**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

# CONTENTS

I.   Introduction, Summary of Opinions, and Expert Qualifications ......................................... I-1

    Our Experience .......................................................................................................... I-2

        Arcadis ............................................................................................................... I-2

        James Cathcart ................................................................................................. I-3

        David Hudd ........................................................................................................ I-6

    Expert Testimony ..................................................................................................... I-9

    Materials Considered ............................................................................................... I-10

1   Professional Engineers' Obligations When Designing Water Systems ........................... 1-1

2   Risk Based Pipeline Replacement ............................................................................. 2-1

    Failure Types ........................................................................................................... 2-1

        In situ Failures ................................................................................................... 2-1

        Planned Pipeline Replacement .......................................................................... 2-5

        Pipe Failures and Subsequent Damage ............................................................ 2-6

        Pipe Repair versus Replacement ...................................................................... 2-11

    Replacement Priority Rationale ................................................................................. 2-12

    Likelihood of Failure ................................................................................................. 2-12

    Criticality of Failure .................................................................................................. 2-12

        Triple Bottom Line Approach ............................................................................. 2-13

        COF Project Definition ....................................................................................... 2-13

        Criticality of Failure Criteria .............................................................................. 2-14

        Scoring Rationale .............................................................................................. 2-14

            Pipe Size ...................................................................................................... 2-14

            Service Type ................................................................................................. 2-15

            Critical Customers ........................................................................................ 2-15

            Proximity to Sensitive Areas ........................................................................ 2-16

            Proximity to Buried Infrastructure ................................................................ 2-16

            Proximity to Public Infrastructure ................................................................ 2-17

3   Replacement Planning by System ............................................................................ 3-1

    Calleguas Municipal Water District ........................................................................... 3-1

        System Overview ............................................................................................... 3-1

arcadis.com

**ER451**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

i

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

Scoring Analysis ................................................................................................ 3-2

Replacement Priority ......................................................................................... 3-2

Palmdale Water District .......................................................................................... 3-2

System Overview ................................................................................................ 3-2

Scoring Analysis ................................................................................................ 3-3

Replacement Priority ......................................................................................... 3-5

South Tahoe Public Utility District ........................................................................ 3-5

System Overview ................................................................................................ 3-5

Scoring Analysis ................................................................................................ 3-6

Replacement Priority ......................................................................................... 3-6

City of Reno ............................................................................................................. 3-8

System Overview ................................................................................................ 3-8

Scoring Analysis ................................................................................................ 3-8

Replacement Priority ......................................................................................... 3-8

City of Norfolk ......................................................................................................... 3-10

System Overview ................................................................................................ 3-10

Scoring Analysis ................................................................................................ 3-11

Replacement Priority ......................................................................................... 3-11

4    Replacement Cost Analysis ...................................................................................... 4-1

Basis for Opinion of Probable Construction Cost ................................................ 4-1

Material Quantities ............................................................................................. 4-3

Unit Cost Development ....................................................................................... 4-4

Labor ............................................................................................................. 4-4

Material ......................................................................................................... 4-5

Equipment ..................................................................................................... 4-5

Existing Data ...................................................................................................... 4-5

Facility Replacement Assumptions .................................................................... 4-5

Adjustment Factors ............................................................................................ 4-6

Calleguas Municipal Water District ....................................................................... 4-6

Palmdale Water District .......................................................................................... 4-10

South Tahoe Public Utility District ........................................................................ 4-16

arcadis.com

**ER452**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

ii

(81 of 262), Page 81 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 81 of 262
Case 5:06-cv-00055-GW-MAR    Document 2428-42    Filed 05/09/18    Page 252 of 371
Page ID #:112341

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

City of Reno ........................................................................................................................... 4-25

    Phase 1 Reuse System ................................................................................................. 4-26

    Phase 3 Reuse System Improvements ......................................................................... 4-30

City of Norfolk ....................................................................................................................... 4-33

    Phase 3 Specific Cost Elements .................................................................................. 4-35

    Phase 4 Specific Cost Elements .................................................................................. 4-36

Pipe Material Cost ................................................................................................................. 4-40

Emergency versus Planned Repair Costs ............................................................................. 4-40

Pipe Replacement Alternatives ............................................................................................. 4-41

    Sliplining ....................................................................................................................... 4-41

    Close Fit ....................................................................................................................... 4-42

    Pipe Bursting ................................................................................................................ 4-42

    Cured in Place Pipe ...................................................................................................... 4-42

    Carbon Fiber Reinforced Pipe ..................................................................................... 4-43

    Comparison Project ...................................................................................................... 4-43

        Sliplining Alternative ............................................................................................... 4-43

        Pipe Bursting Alternative ........................................................................................ 4-44

## TABLES

Table 2-1. Criticality of Failure Criteria ................................................................................. 2-14

Table 2-2. COF Criteria – Pipe Size ..................................................................................... 2-15

Table 2-3. COF Criteria – Service Type ................................................................................ 2-15

Table 2-4. COF Criteria – Critical Customers ....................................................................... 2-16

Table 2-5. COF Criteria – Proximity to Environmentally Sensitive Areas .............................. 2-16

Table 2-6. COF Criteria – Proximity to Buried Infrastructure (Horizontal) ............................. 2-17

Table 2-7. COF Criteria – Proximity to Buried Infrastructure (Vertical) ................................. 2-17

Table 2-8. COF Criteria – Proximity to Public Infrastructure ................................................. 2-18

Table 2-9. Example Scoring Sheet ........................................................................................ 2-19

Table 3-1. COF Scoring - CMWD .......................................................................................... 3-2

Table 3-2. COF Scoring - Palmdale ...................................................................................... 3-3

Table 3-3. COF Scoring - STPUD ......................................................................................... 3-6

arcadis.com

**ER453**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

iii

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

Table 3-4. COF Scoring - Reno ................................................................................ 3-9

Table 3-5. COF Scores - Norfolk ............................................................................ 3-11

Table 4-1. Calleguas Municipal Water District Cost Opinion ................................ 4-9

Table 4-2. Palmdale Water District Project Cost Opinion ..................................... 4-14

Table 4-3. Palmdale Water District Cost Summary .............................................. 4-15

Table 4-4. South Tahoe Public Utility District Cost Opinion ................................ 4-23

Table 4-5. South Tahoe Public Utility District Cost Summary .............................. 4-24

Table 4-6. City of Reno Cost Opinion ................................................................... 4-32

Table 4-7. City of Reno Cost Summary ................................................................ 4-33

Table 4-8. City of Norfolk Cost Opinion ............................................................... 4-38

Table 4-9. City of Norfolk Cost Summary ............................................................ 4-40

Table 4-10. Pipe Material Cost ............................................................................. 4-40

# FIGURES

Figure 2-1. Forms of Pavement Failure ................................................................ 2-7

Figure 4-1. Trench Detail ...................................................................................... 4-8

Figure 4-2. Backfill Standard Detail ..................................................................... 4-12

Figure 4-3. Water Service Connection Details ..................................................... 4-13

Figure 4-4. Detail A - Record Drawings (STPUD-0172171) ................................. 4-18

Figure 4-5. Detail A - Water Service Connection ................................................. 4-19

Figure 4-6. Fire Hydrant Detail ............................................................................ 4-20

Figure 4-7. Water Service Connection .................................................................. 4-21

Figure 4-8. Fire Hydrant Detail ............................................................................ 4-22

Figure 4-9. Detail 3 on Sheet D1 of the Phase 1 Reuse System Record Drawings No. 12018 (RENO-0008665) ........................................................................ 4-26

Figure 4-10. Detail 4 on Sheet D9 of Phase 1 Reuse System Record Drawings No. 12018 (RENO-0008665) ........................................................................ 4-27

Figure 4-11. Irrigation Drain Valves per Detail 5 on Sheet D9 of Phase 1 Reuse System Record Drawings No. 12018 (RENO-0008665) ................................ 4-28

Figure 4-12. Detail 5 Irrigation Water Line Trench Section on Phase 1 Reuse System Record Drawings No. 12018 (RENO-0008665) ................................ 4-28

Figure 4-13. Detail 3 Trench Excavation/Backfill ('R1' Alignment) on Phase 1 Reuse System Record Drawings No. 12018 (RENO-0008665) ..................... 4-29

Figure 4-14. Phase 3 Reuse System Improvements Record Drawings No. 12038 (RENO-0008746) ... 4-30

arcadis.com

**ER454**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx                iv

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

Figure 4-15. Sheet C25 of Phase 3 Reuse System Improvements Record Drawings No. 12038 (RENO-0008742). ................................................................................................................. 4-31

Figure 4-16. Detail 7 on Sheet D5 of Phase 3 Reuse System Improvements Record Drawings No. 12038 (RENO-0008749). ................................................................................ 4-31

Figure 4-17. Pipe Bedding Detail .............................................................................................. 4-34

Figure 4-18. Trench Details ....................................................................................................... 4-35

Figure 4-19. Regional Construction Standards Sanitary Sewer Service Connection ............................ 4-36

Figure 4-20. Drop Manhole Detail ............................................................................................. 4-37

Figure 4-21. Phase 4 Sanitary Sewer and Water Replacement (NORFOLK-0036854 – NORFOLK-0037066) ................................................................................................................. 4-38

## PHOTOGRAPHS

Photo 2-1. Prestressed Concrete Cylinder Pipe (PCCP) Water Pipeline Failure Due to External Steel Wires Failing from Corrosion.................................................................................... 2-2

Photo 2-2. Ductile Iron Water Pipeline Joint Failure and Resulting Sinkhole ............................... 2-3

Photo 2-3. Pipe Material Unknown, Water Leak in a Pressurized Pipeline................................... 2-3

Photo 2-4. PVC Pipeline Brittle Failure Adjacent to a Service Tap (reprinted with permission) .............. 2-4

Photo 2-5. PVC Pipeline Failure Caused by Freezing ............................................................... 2-4

Photo 2-6. PVC Pipeline with Longitudinal Pipe Split (reprinted with permission)..................... 2-5

Photo 2-7. Water Main Leak Created an Unsupported Pavement Section................................... 2-8

Photo 2-8 and 2-9. Water Main Break Flooded Streets and Parts of the UCLA Campus.......................... 2-9

Photo 2-10. Catastrophic Failure of 96-Inch Concrete Pipe...................................................... 2-10

Photo 2-11. 40 by 60-Foot Sinkhole in Colorado DOT's Interstate 25 ....................................... 2-11

## APPENDICES

A.  Criticality of Failure Scoring Calculations

B.  Wage Rate Determination Calculations

C.  Pipe Length Measurements and Replacement Cost Opinions

D.  Cost Escalation Calculations and Location Adjustments

E.  Pipe Material Only Cost Opinions

F.  In Situ Pipe Replacement Cost Opinions

G.  Resumes

H.  Material and Documents Reviewed

arcadis.com

**ER455**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

v

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

# I. INTRODUCTION, SUMMARY OF OPINIONS, AND EXPERT QUALIFICATIONS

For this report, we were asked by Plaintiffs to render opinions on the following questions:

1. What obligations do professional engineers have when designing and installing water systems?

2. What can happen when pressurized pipelines fail?

3. What is the criticality of failure of the J-M PVC pipe in the 26 projects that we have been told are at issue in the current damages phase of this case?

4. What are industry practices for the replacement of PVC pipe?

5. What is the replacement priority for the J-M PVC pipe in the 26 projects?

6. What was the cost of the J-M PVC pipe at the time of purchase in those 26 projects?

7. What is the cost of compliant C900/C905 pipe today in the same sizes, pressure classes, and quantity as the J-M PVC pipe in the 26 projects?

8. What is the cost today of replacing the pipe in the 26 projects including the cost of installation?

In considering these questions, we have been instructed that the Phase 1 jury found a lack of uniform compliance with industry standards typically relied upon by utility owners and design engineers in providing a reliable water supply. We have further been instructed that the lack of uniform compliance with strength and durability requirements under American Water Works Association (AWWA) standards C900 and C905, and UL 1285 standard relate to subsequent manufacture of PVC pipe.

Further, although we are both authors of this report, given our respective expertise, I, James Cathcart, am primarily responsible for the opinions regarding questions 1 to 5 above, and I, David Hudd, am primarily responsible for the opinions regarding questions 6 to 8 above.

Our conclusions are set forth in detail below but in summary form, our opinions are as follows:

1. Water utilities in the United States have an obligation to provide safe and reliable drinking water to their customers. They rely on professional engineers to specify, design and oversee construction of water system facilities (including pipelines) in order to meet this obligation. Professional engineers, in turn, rely upon manufacturers of water system materials to comply fully with industry standards, codes, and regulations. Providing non-compliant materials jeopardize the ability of a utility to provide safe and reliable drinking water service.

2. Pipelines can fail catastrophically. When failure occurs, substantial collateral damage can occur to streets, buildings, and automobiles, as well as possible personal injury. Other impacts may also include the effect on local businesses, traffic, erosion, sediment issues, emergency response, potential regulatory fines, and more. This collateral damage can have significantly greater financial impact than the cost of repairing the failed pipe. For these reasons, any responsible utility elects not to operate their facilities to failure. Many utilities develop capital improvement plans that span years or decades to prevent any possible catastrophic failure.

arcadis.com

**ER456**

\\arcadis-us.com\officedata\irvine-ca\projects\42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

I-1

Case No. EDCV 06-55-GW (PJWx)

Expert Report on Pipe Criticality Analysis and Replacement Cost Opinion

3. Current industry practice uses a risk-based analysis to decide where, when and what infrastructure facilities to replace, as outlined in Section 3. The risk-based methodology used in this report identifies discrete water lines constructed with J-M Pipe in each exemplar agency's water distribution system. Once identified, the analysis evaluated the likelihood of failure, and the criticality of failure (or what could happen if the pipe segment fails). Economic, social and environmental impacts were evaluated in the event of a pipe failure, and each discrete pipe segment was assigned a priority ranking. This ranking was conducted under the assumption that a given utility would not simultaneously replace all J-M Pipe currently in use. This is a reasonable assumption given the magnitude of cost of replacement, public disruption, and adverse water delivery impacts resulting from simultaneous construction projects throughout each utility's service area.

4. Typically, well-managed utilities with adequate funding choose not to operate pipelines to failure, and many utilities across the US have developed programs to replace pipelines and other facilities at high risk of failure through the practice of asset management and condition assessment. Utilities will completely remove old pipe (or abandon it in place) and install new pipe of equal or better quality than the original pipe. Alternative methods of replacement include lining the existing pipes with new pipe.

5. Section 3 lists the replacement priority for each COF pipe segment. If portions of pipelines are replaced only at failure, the cost of replacement would be significantly more expensive (on a unit cost basis) than planned replacement of an entire pipeline. Exact costs cannot be calculated due to the situation-specific nature of where, when, and how catastrophic failures will occur. However, over time and several failures, spot repair will ultimately cost more than replacing the entire pipeline.

6. We expect to supplement our report to provide an opinion on the original costs of pipe in the 26 projects. We understand that J-M has not yet provided information in response to Plaintiffs' interrogatories that we expect will inform our opinion.

7. The cost of compliant C900/C905 pipe material only, with no installation, equates to $2.4 million in current, 2016 dollars.

8. Detailed cost opinions were prepared based on original project contract specifications and drawings. These costs were developed for each discrete pipeline used in the risk assessment and priority ranking. The costs were then summed by project as defined in the jury verdict. The total cost opinion for replacing pipe in the five agency's systems equate to $59.4 million in current, 2016 dollars.

This report is based on information available to us at the present time, and we anticipate that we may revise this report if additional information becomes available.

## Our Experience

### Arcadis

Arcadis is a leading global, knowledge-driven service provider with over a century-long history of consulting where we imagine, create and develop sustainable solutions for a myriad of business, financial and environmental issues. From business advisory, consulting and program management to engineering, operations, construction and construction management, we provide global talent to bring full-service capabilities directly to our clients. We have built our reputation by delivering positive outcomes across the entire water cycle -- from source to tap and back again. We are organized into business lines of infrastructure, water, environment and buildings.

**ER457**

\\arcadis-us.com/officedata/irvine-ca/projects/42650 - mckool smith hennigan\001 - hendrix\work product\final report 08_19_16.docx

I-2

(86 of 262), Page 86 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 86 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 1 of 17   Page ID
#:104546

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 06-55-GW(PJWx) | Date | January 31, 2018 |
|---|---|---|---|
| Title | *United States of America, et al. v. J-M Manufacturing Company, Inc.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kirk D. Dillman | Ekwon E. Rhow by telephone |
| Eric R. Havian | Camilla M. Eng |
| Harry P. Litman | David M. Bernick |
| Thomas Watson | Jaren Janghorbani |
| TELEPHONE: | |
| Ellen Head | |
| Margo Laskowska | |
| Peter Broadbent | |
| Paul F. Prather | |
| Susan K. Stewart | |
| Stuart Rennert / Tiffany Heavlin | |

PROCEEDINGS:    **HEARING ON PLAINTIFF'S BRIEFING ON THE PHASE ONE VERDICT, AND (2) DEFENDANT'S SEVENTH AMENDMENT "CHALLENGE"**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling as modified on the record.

Plaintiffs will have until February 9, 2018 to file their proposed jury instructions and trial brief. JM's response to jury instructions and trial brief will be filed by February 16, 2018. Briefs will not exceed seven pages. Further hearing is set for February 22, 2018 at 8:30 a.m.

| | 1 | : | 15 |
|---|---|---|---|

Initials of Preparer    JG

**ER458**

_**United States, et al. v. J-M Mfg. Co., Inc., et al.**_, Case No. CV-06-0055-GW-(PJWx)
Tentative Rulings on: (1) Plaintiff's Briefing on the Phase One Verdict, and (2) Defendant's
Seventh Amendment "Challenge"

# I. Background

The parties are undoubtedly familiar with the somewhat tortured procedural history of this case. The Court bifurcated the trial way back on December 7, 2011. _See_ Order Addressing Bifurcation ("Bifurcation Order"), Docket No. 551. Pursuant to the Bifurcation Order, the parties tried three issues in Phase One of the trial: (1) Falsity, (2) Materiality, and (3) Scienter.[1] _Id._ at 1:4-8. These three issues are sufficient to establish liability under the False Claims Act:

> To establish a cause of action under the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1), the government must prove three elements: (1) a "false or fraudulent" claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false.

_United States v. Mackby_, 261 F.3d 821, 826 (9th Cir. 2001) (citing 31 U.S.C. § 3729(a)(1)); _see also U.S. v. Bourseau_, 531 F.3d 1159, 1171 (9th Cir. 2008) (recognizing a "materiality requirement" for FCA claims).[2]

---

[1] As stated in the Bifurcation Order:

> Plaintiffs allege that J-M falsely represented that (a) **all** (not just some) J-M pipe satisfied the requirements, rules, and standards of the various standards bodies, which pipe and standards were identified with particularity in their November 30th submission; and (b) **all** (not just some) of the pipe was manufactured in a substantially identical manner to the pipe that was originally determined to comply with the standards. Plaintiffs allege that J-M's statements were false because J-M did not properly manufacture "all" its pipe as represented in (a) and (b) above. Plaintiffs further allege that J-M's statements were false because J-M did not uniformly test its pipe as represented in (a) and (b) above. Plaintiffs allege that instead, J-M manufactured or tested its pipe in a manner that did not comply with the foregoing industry standards. Plaintiffs allege that, as a result of JM's inconsistent and substandard manufacturing and testing, J-M's customers received a "lottery ticket," in which there was no assurance that the pipe was made and tested in the manner represented. The first jury will decide whether J-M's manufacturing and testing deficiencies deviated from its representations to such a degree as to render J-M's representations false.

_See_ Docket No. 551 at 8 of 11.

[2] These are also essentially the elements required for a claim brought under 31 U.S.C.A. § 3729(a)(1)(B). _See_ Claire M. Sylvia, The False Claims Act: Fraud Against the Government §§ 4:2, 4:3 (2015). Proof of damages is not

(88 of 262) Page 88 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 88 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 3 of 17   Page ID
#:104548

After a lengthy jury trial, the Phase One jury found for the Exemplar Plaintiffs on all three issues and as to all of the 26 projects identified.[3]  *See generally* Verdict Form ("Verdict"), Docket No. 1794.  Specifically, the Phase One jury found that: (1) Defendant represented that it "uniformly" complied with AWWA C905 and UL1285 ("Industry Standards"); (2) J-M's statements of uniform compliance were knowingly false; and (3) the misrepresentations were material.  *See id.*

Specifically, the Phase One jury found that: (1) Defendant presented or caused to be presented claims for payment that were false or fraudulent; (2) Defendant made, used or caused to be made (or used a false record or statement in order to get) a false or fraudulent claim paid or approved by each Exemplar Plaintiff; (3) Defendant "falsely represented Uniform Compliance with AWWA C905 and UL 1285" to each Exemplar Plaintiff in connection with each project; and (4) Defendant's false statements were material.  *See generally* Verdict.

Defendant filed post-trial motions for judgment as a matter of law, and for a new trial.

---

required to establish liability.  *See id.* § 4:60.  The FCA was amended in 2009 to add language that directly addressed the materiality requirement that most circuits had already read into the statute.  *See id.* § 4:57 (discussing 2009 Amendments to FCA).

[3] In the Final Jury Instructions, the jury was informed that:

> Plaintiffs contend that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards.  Plaintiffs contend that this representation was false because J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require. Plaintiffs contend that J-M made these representations with one of three states of mind - (1) knowing that they were false, (2) consciously avoiding learning the truth, or (3) with reckless disregard for the truth.  Plaintiffs contend that J-M's representations were capable of influencing the governmental Plaintiffs' decisions to pay for J-M pipe.  Plaintiffs contend that each of the five governmental Plaintiffs received a claim for payment for J-M pipe.  The Plaintiffs have the burden of proving these claims by a preponderance of the evidence.
>
> Defendant J-M disagrees with and denies Plaintiffs' allegations.  J-M contends that its PVC pipe was manufactured and tested in accordance with applicable industry standards, including the applicable quality, strength, and durability requirements.  J-M contends that the pipe received by each of the five Plaintiffs met industry standards and has performed as promised for the Plaintiffs.  J-M contends that because certain industry standards were never requested or specified by the Plaintiffs, representations of compliance with those industry standards could not have influenced the Plaintiffs' decision to purchase and/or pay for the pipe.  J-M contends that it acted in good faith at all times, and that it did not knowingly present any false claims for payment to anyone, including to any Plaintiff.

*See* Docket No. 1792 at 3 of 9.

(89 of 262) Page 89 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 89 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 4 of 17   Page ID
#:104549

*See* Docket No. 1833.  The Court denied those motions.  *See* Docket No. 1960.  The parties then engaged in extensive discovery and have briefed a host of issues related to the scope of post-Phase One proceedings, and the effect that the Verdict has moving forward.  The Court resolved some of these issues, including a dispute as to whether the liability findings in Phase One should have a res judicata effect on the non-exemplar Plaintiffs.  *See* Docket No. 1996.  On that issue, the Court found that the Verdict would not be binding on non-exemplar Plaintiffs.  Throughout this briefing Defendant has repeatedly attacked the Verdict but to no avail.  The parties have also designated several expert witnesses most of whom appear to have been deposed.  The parties have also filed various *Daubert* motions.

The next phase of the trial ("Phase Two") will focus on what damages, if any, are owed to the Exemplar Plaintiffs for Defendant's false representation that it uniformly complied with the Industry Standards.  *See* Bifurcation Order at 3:8-17 (addressing scope of Phase Two).  At the Court's direction, Plaintiffs provided a summary of their damage theories, as well as proposed jury instructions.  *See* Exemplar Plaintiffs' Submission Stating Damages Theory ("Pls. Damages Theory"), Docket No. 2270; Plaintiffs' Revised Proposed Phase 2 jury Instructions ("Pls. Prop. JI"), Docket No. 2386.  Plaintiffs indicated that they would be proceeding under a "benefit of the bargain" theory of damages and intend to present three alternative contentions as to the amount of damages.  *See* Pls. Damages Theory at 1:14-2:15.  First, Plaintiffs plan to ask the jury to award them the entire value of the contract price for each project associated with Defendant's false statements of uniform compliance with Industry Standards.  *Id.* at 2:16-26.  As an alternative, Plaintiffs plan to seek the total cost of replacing the offending pipe with compliant pipe.  *Id.* at 3:1-4:5.[4]  Third, and also in the alternative, Plaintiffs will seek the hypothetical cost of an insurance policy that would cover the cost of Plaintiffs' "lack of assurance" created by Defendant's false claims of uniform compliance with the Industry Standards.  *Id.* at 4:6-11.

As to the *Daubert* Motions, which the Court took under submission on December 12, 2017, the Court permitted both parties to brief two additional issues to help guide the Court's conclusions re *Daubert*, and, more importantly, set the parameters of the Phase Two trial.  First, the Court directed Plaintiffs to explain their understanding of the effect of the Phase One Verdict to Phase Two.  Specifically, the Court asked Plaintiff to identify which parts of the Industry

---

[4] The Court is skeptical of both of Plaintiffs' initial contentions, given the fact the nearly all of the pipe at issue remains functional in the ground; and no one, at least as far as the Court is aware, has previously suggested that all of the pipe must be dug up and replaced.  However, this issue is not directly before the Court today.

Standards purportedly formed the basis for the jury's conclusion that Defendant misrepresented uniform compliance with those standards. This issue had been the subject of voluminous briefing since the conclusion of Phase One without the parties coming to a consensus. Now, for the first time, the Court has asked Plaintiffs to cite to the trial record in order to show the "universe of potential bases" for the jury's Phase One findings. In doing so, Plaintiffs have also provided an analytical guide for how the Court should interpret the Verdict for the purposes of Phase Two. *See* Exemplar Plaintiffs' Phase 1 Verdict Analysis ("Pls. Br."), Docket No. 2393.

Defendant filed an opposing brief in which it contends, as it has for some time, that the Verdict itself is fatally flawed on this exact question. *See* Defendant's Opposition to Plaintiffs' Phase 1 Verdict Analysis ("Def. Opp'n"), Docket No. 2399. Defendant argues that the face of the Verdict does not identify how or why the Defendant failed to comply with the Industry Standards, only the fact of non-compliance. *Id.* at 1. According to Defendant, this failure renders the Verdict useless for the purposes of Phase Two. *Id.*[5]

Below, the Court will address both sides' positions on this point in order to determine the meaning of the Verdict, specifically, the universe of the Phase One jury's factual findings. Such a determination is important for many reasons. From a practical perspective however, the Court must ultimately decide one concrete issue on this subject: How should the Court instruct the Phase Two jury as to the Phase One jury's findings?

The Court believes that the answer to this question will greatly aid in the resolution of many related matters. For example, both parties will undoubtedly file motions in limine that will likely theorize that the opposing side's proffered evidence improperly revisits Phase One issues, or is irrelevant given the Phase One findings. Indeed, the bulk of both parties' *Daubert* motions take this approach. Therefore, in the Court's view, the most efficient way for the Court to move things forward will be to decide on Phase Two jury instructions related to the Phase One jury's findings. The Court offers its views on this topic below.

Also, at Defendant's request, the Court gave Defendant one last shot to explain why the Seventh Amendment requires the Court to set aside the Phase One jury Verdict in its entirety as "unusable" for the purposes of Phase Two. *See* Defendant's Submission on Phase 2 Threshold Seventh Amendment Issues ("Def. Br."), Docket No. 2392. Plaintiffs filed an opposition on this

---

[5] Defendant's arguments re the Phase One Verdict also bleed into the second issue before the Court, Defendant's "Seventh Amendment" argument against the Verdict.

(91 of 262) Page 91 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 91 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 6 of 17   Page ID
#:104551

issue.  *See* Exemplar Plaintiffs' Opposition to J-M's Seventh Amendment Submission ("Pls. Opp'n"), Docket No. 2398.  The Court will address, and reject Defendant's argument below at least to the extent that Defendant continues to ask the Court to throw out the Phase One Verdict. The Court also includes a modest, substantive discussion of the relevant Seventh Amendment law because Seventh Amendment issues necessarily inform the Court's analysis of the Phase One Verdict and the contours of Phase Two.

Finally, after establishing the meaning of the Phase One Verdict, and discussing relevant Seventh Amendment law, the Court lays out a tentative framework for what potential arguments and evidence will be "in bounds" as opposed to "out of bounds" for Phase Two.  This should at least limit the inevitable clamoring from both sides that the other is improperly seeking to revisit Phase One issues.

## II.  How the Court Plans to Instruct the Phase Two Jury About the Phase One Findings

### A.  The Parties' Positions

The Phase One jury indisputably returned a Special Verdict in Plaintiffs' favor.  It found that Defendant had presented claims to the respective government-related entities, that those claims included false information (or a false record or statement was made in order to get the claim paid), that Defendant knew the information was false, and that the misrepresentations were material.  The most important (and presently disputed) finding made by the jury was that, for each of the projects identified, "JM falsely represented uniform compliance with AWWA C900 [or C905] and UL1285."

Plaintiffs contend that the jury found that Defendant failed to ensure that the pipe it provided to Plaintiffs had the same long term strength and durability characteristics of the pipe Defendant initially tested to comply with the Standards.  *See* Pls. Verdict Br. at 1:12-22. Plaintiffs contend that throughout the Trial they argued that the Standards required Defendant to ensure that the pipe used for testing was "representative" of the pipe it actually sold.  *Id.* at 1:23-2:7.  Plaintiffs referred to this as the "representativeness requirement" and argued that it was part of the Standards Defendant claimed to be compliant with.  Plaintiffs further contend that "representativeness" was defined solely in terms of long term strength and durability.  *Id.* at 9:11-10:11.  Finally, Plaintiffs contend that the evidence they presented at trial to prove Defendant's failure to meet the representativeness requirement consisted of declines in HDB, LTS and QB test results.  Plaintiffs describe the jury's "central finding" as follows:

(92 of 262) Page 92 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 92 of 262
Case 5:06-cv-00055-GW-MAR  Document 2414  Filed 01/31/18  Page 7 of 17  Page ID
#:104552

> Plaintiffs argued and demonstrated that, although J-M represented that all of its production pipe complied with C900/C905 and UL 1285 by displaying the same long-term strength and durability characteristics as the original qualification pipe, J-M was unable to maintain the same results in three key tests: HDB (ASTM D2837), QB (ASTM D1599), and LTS (UL 1285 § 17.1), and therefore all of its production pipe did not have the expected long-tern strength and durability as the pipe originally qualified.  Thus, the central finding of the Jury was that J-M could not truthfully claim that all of its pipe complied with AWWA C900/C905 and UL 1285 during the period 1996 to 2006.

*Id.* at 1.

According to Plaintiffs, the jury's determination that Defendant "falsely represented uniform compliance with AWWA C900 and UL1285" includes several implied factual findings. First, Plaintiffs contend the jury found that the Standards include a "representativeness requirement" related to long term strength and durability.  *See id.* 1:22-2:7.  Second, Plaintiffs contend the jury found that  Defendant failed to meet the "representativeness requirement."  *Id.* Third, Plaintiffs contend that the jury found that declines in HDB, LTS and QB test results proved Defendant's lack of compliance with the representativeness requirement.  *See id.* at 10:12-12:2.  Central to Plaintiffs' analysis is their contention that the phrase "uniform compliance with [the Standards]" is interchangeable with the phrase "compliance with the representativeness requirement in the Standards".  *See id.* at 2:8-6:2.  Plaintiffs also argue that "representativeness" was defined solely in terms of long-term strength and durability.  *Id.* at 9:11-10:11.  In support of these arguments, Plaintiffs rely on the text of the Verdict, relevant jury instructions, and the evidence and attorney argument presented to the jury.

Defendant counters that the jury's findings are impossibile to discern because the Verdict fails to expressly identify how J-M failed to comply with the Standards, what parts of the Standards the jury found J-M to be in violation of, and which J-M pipe was non-complaint.  *See* Def. Opp'n at 1.  Defendant further argues that the jury's failure to provide more explicit, detailed findings was intentional and a rejection of many of Plaintiffs' proposed theories.  *See id.* at 6:8-14.  Defendant also argues that the Court can only rely on the text of the Verdict and the instructions read to the jury in any attempt to discern the scope of the jury's findings.  *See id.* at 15-19.

For the reasons stated below, the Court ultimately agrees with most of Plaintiffs' analysis

(93 of 262) Page 93 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 93 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 8 of 17   Page ID
#:104553

on this issue.[6]  The Court's analysis is guided by certain Seventh Amendment principles.

**B.   The Seventh Amendment Requires the Court to Give Full Effect to the Phase One Jury's Factual Findings**

"The Seventh Amendment provides that 'no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.'" *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828-29 (9th Cir. 2013) (quoting U.S. Const. amend. VII).   "In [the Ninth Circuit], 'it would be a violation of the Seventh Amendment right to jury trial for the court to disregard a jury's finding of fact.'"  *Id.* (quoting *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991)).   "Thus, in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's *implicit or explicit factual determinations.*'"  *Id.* (*quoting L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993)) (emphasis added).

*Acosta* involved a First Amendment challenge to a city ordinance that permitted the removal of citizens from public meetings for certain disruptive acts, provided that the removal was based on the citizen's disruptive actions, as opposed to the viewpoint being expressed.  *See* 718 F.3d at 828-829.  The plaintiff alleged that his constitutional rights were violated when he was removed from a meeting because he was removed based on his viewpoint.  *Id.*  The jury was instructed that the Constitution permitted the mayor to "bar a speaker from further audience . . . only if the speaker's activity itself − and not the viewpoint of the activity's expression − substantially impaired the conduct of the meeting."  *Id.* at 829.  The jury ruled in the defendant's favor.  *Id.*  Thereafter, the plaintiff sought a declaration from the court, that the statute was applied to him in an unconstitutional manner.  *Id.* at 828.  The trial court denied the declaratory relief requested and the plaintiff appealed.  On appeal, the Ninth Circuit observed that, in finding for defendant, "the jury necessarily found that [plaintiff] caused an actual disturbance. Considering this factual finding, it would be incongruous to declare that the defendants enforced the ordinances in an unconstitutional manner."  *Id.* at 829.

*Acosta* is instructive here because it describes the Seventh Amendment issues related to the Phase One jury's Verdict and offers insight into how the Court should interpret the Verdict.

---

[6] The Court is less persuaded by Plaintiffs' reliance on the jury's incorporation of certain exhibits by reference. Plaintiffs essentially ask the Court to interpret this incorporation by reference as the jury's confirmation of the factual findings contained in those exhibits.  In this regard, Plaintiffs go too far.

7

Specifically, *Acosta* makes clear that the Court is not limited to the face of the Verdict, but also any factual findings that the Verdict's contents necessarily imply. *Id.*

*Gates* is a more straight forward example. *See* 995 F.2d at 1473-74. In *Gates*, a jury found that the plaintiff police officer had been wrongfully terminated by the defendant for refusing to consent to an unlawful search, and awarded the plaintiff substantial damages. *Id.* The plaintiff also sought equitable relief from the court, in the form of reinstatement. *Id.* The court denied plaintiff's request because it found that defendant would have terminated plaintiff for other misconduct. *See id.* The trial court's denial of reinstatement was later overturned on appeal. After reviewing the findings, relevant jury instructions, and the evidence presented at trial, the Ninth Circuit initially stated: "[t]here being no express finding, we must next determine whether it can be inferred from the jury's verdict that it found that the improper insubordination charge was the cause of [plaintiff's] dismissal" and subsequently found that "[i]n light of the causation instruction and the manner in which the case was presented to the jury, *it could not have awarded the level of damages it awarded without finding that [plaintiff] would not have been discharged except for his refusal to be illegally searched.*" (emphasis added). *Id.* Like in *Acosta*, the court reviewed the verdict, the instructions, and the trial record to interpret the scope of the jury's factual findings.

At the district court level, *Lewert v. Boiron, Inc.*, CV 11-10803-AB (JPRx), 2017 WL 25457, *4-5 (C.D. Cal. Jan. 3, 2017) provides another example of how the Seventh Amendment should inform interpretation of a jury's factual findings. Following a verdict for the defendant on a false advertising claim, the court ruled against plaintiff on a related UCL claim based on the jury's finding:

> In the jury trial addressing Plaintiff's CLRA claim, the jury returned a verdict expressly finding "Defendants' representations that Oscillo relieves flu-like symptoms" were not false." *Though the verdict form did not require the jury to make any express findings as to why it found for Defendants on this claim, implicit in this verdict is a finding that Plaintiff failed to prove by a preponderance of the evidence that Oscillo is ineffective in relieving flu-like symptoms, or that Oscillo was nothing more than a sugar pill, such that Defendants' representations would be false.* The evidence Plaintiff presented at trial primarily involved scientific documentation of the dilution process involved in manufacturing Oscillo, *and the jury's implicit finding sufficiently rejected the conclusion that the dilution process caused the*

8

**ER466**

(95 of 262), Page 95 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 95 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 10 of 17   Page
ID #:104555

*product to be ineffective.*

*Id.* (emphasis added).

Other Seventh Amendment concerns arise in a case like the present one, where a trial is bifurcated such that liability and damages are tried in front of separate juries. *See Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1220 (7th Cir. 1999) ("separate trials must not be granted if doing so would violate the Seventh Amendment."). In the context of a bifurcated trial, "questions in a single suit can only be tried by different juries if they are 'so distinct and separable from the others that a trial of [them] alone may be had without injustice.'" *Houseman*, 171 F.3d at 1127 (quoting *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)). "While both juries can examine overlapping evidence, they may not decide factual issues that are common to both trials *and essential to the outcome*." *Id.* (emphasis added) (quoting *PaineWebber, Jackson & Curtis v. Merrill Lynch, Pierce, Fenner & Smith*, 587 F. Supp. 1112, 1117 (D. Del. 1984)). While both *Hauseman* and *Gasoline Products* will be discussed in more detail below in the context of Defendant's "Seventh Amendment challenge" to the Phase One Verdict (and the Court's Bifurcation Order generally), these cases are noteworthy because they discuss additional Seventh Amendment concerns that guide the Court's interpretation of the Phase One Verdict. For example, *Hauseman* makes clear that "the Seventh Amendment is concerned about factual conclusions, not evidence: The prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." 171 F.3d at 1127.

Four important principles emerge from the above authority. First, the Phase One jury's factual findings are binding on the Phase Two jury. *See Acosta*, 718 F.3d at 828-29. Second, the scope of the Phase One jury's findings includes both the expressed findings of the jury, as well as *those* implied by the expressed findings. *See id.*; *see also Gates*, 995 F.2d at 1473-74. Third, in making this assessment, the Court may look to the Verdict itself, the instructions presented to the jury, as well as the evidence proffered at the trial. *See, e.g., id.*; *Lewert*, 2017 WL 25457 at *4-5.

### C.  Application

#### 1.  Text of the Verdict

Here, both sides agree that the jury expressly found that Defendant told each Exemplar Plaintiff, at each project that its pipe "uniformly complied" with the Industry Standards. *See*

9

(96 of 262), Page 96 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 96 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 11 of 17   Page
ID #:104556

Verdict.  Both sides also agree that the jury found that these statements were false with regard to each of the 26 projects at issue.  *Id.*  Both sides would also undoubtedly agree that, implicit in these findings, is the finding that Defendant's pipe did not uniformly comply with the Industry Standards.  However, from the face of the Verdict it is not entirely clear which aspect of the Standards Defendant failed to comply with in a uniform manner.

Thus, in order to further unpack of the Verdict, the Court looks to the instructions provided to the jury as well as any relevant portions of the trial transcript.

2.  <u>Relevant Instructions</u>

The Court instructed the jury as follows regarding the parties' respective positions regarding J-M's compliance with the Standards:

> Plaintiffs contend that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards.  Plaintiffs contend that this represen-tation was false *because J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require....*  J-M contends that its PVC pipe was manufactured and tested in accordance with applicable industry standards, *including the applicable quality, strength, and durability requirements.  J-M contends that the pipe received by each of the five Plaintiffs met industry standards and has performed as promised.*

*See* Final Jury Instructions ("JI"), Docket No. 1792 at 1 (emphasis added).

The jury was not otherwise instructed regarding the content and meaning of the Standards, or the concept of "uniform compliance".  That being said, the language quoted above sheds considerable light on the Verdict.  Plaintiffs' position, communicated to the jury through this instruction, was that J-M's representations were false because "J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require."  *Id.*[7]  In other words, the jury was provided with one ground upon which it could find falsity: J-M's "failure" to manufacture or test pipe to assure uniformity.  Thus, provided the jury listened, and understood Plaintiff's position contained in the instructions, the jury must have found that Defendant "did not manufacture or test its pipe in a

---

[7] The Court assumes, as it must, that the jury understood and followed these instructions.  *See Westinghouse Elec. Corp. v. General Circuit Breaker &, Elec. Supply, Inc.*, 106 F.3d 894, 900 (9th Cir. 1997 ("In interpreting jury verdicts, we must assume that the jury followed the trial court's instructions.") (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 (1985)).

(97 of 262), Page 97 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 97 of 262
Case 5:06-cv-00055-GW-MAR    Document 2414    Filed 01/31/18    Page 12 of 17    Page
ID #:104557

manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require." This conclusion is also consistent with Plaintiff's opening and closing argument, both of which referenced the idea that Defendant's manufacturing process changed over time such that there was no assurance that the pipe being produced had the same strength and durability of the pipe initially tested. *See* Pl. Br. at 2-3(quoting closing and opening arguments).

Though at times Plaintiffs referred to the concept of uniformity as a "representativeness requirement," the central concept was consistent and fits with the jury's finding. Plaintiffs told the jury that Defendant represented that every piece of its pipe had certain strength and long term durability qualities. Plaintiffs also told the jury that Defendant's statements to that effect were false. Plaintiffs also told the jury why those statements were false: J-M failed to manufacture and test the pipe in a manner that assured that it uniformly had the quality, strength or durability that the applicable standards require. As a result, in finding for Plaintiffs, *the jury necessarily concluded that J-M failed to manufacture and test the pipe in a manner that assured that it uniformly had the quality, strength or durability that the applicable standards require.*[8] The Court can only assume that the jury relied on the only testing evidence Plaintiffs presented − the three tests mentioned above and throughout the trial.

### 3. How the Second Jury Should Be Instructed

Plaintiffs propose that the second jury be instructed as follows regarding the Phase One Verdict:

> J-M's liability under the False Claims Act has already been determined by a jury in a previous trial. I will refer to this previous trial as Phase 1. You will receive a copy of the Phase 1 Jury's Verdict, along with all attachments and referenced documents. You are bound by the findings of the Phase 1 Jury Verdict and must follow it. You are solely being asked to determine the damages, if any, that the Plaintiffs are entitled to by reason of J-M's false claims, and the number of false claims that J-M submitted or caused to be submitted to the Plaintiffs and the number of false statements about J-M's meeting applicable industry standards that J-M made or caused to be made.

> In the Phase 1 trial, the Plaintiffs contended that J-M represented that every piece of PVC pipe it sold was manufactured and tested

---

[8] At the risk of the belaboring the point, this finding in turn also plainly implies that the jury found that there were "applicable standards" that require certain "quality, strength, and durability" properties.

11

(98 of 262), Page 98 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 98 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 13 of 17   Page
ID #:104558

in accordance with applicable industry standards. The Plaintiffs
contended that this representation was false because J-M did not
manufacture or test its pipe in a manner that assured that it
uniformly had the quality, strength, or durability that the applicable
industry standards require…. The Plaintiffs had the burden of
proving these claims by a preponderance of the evidence.

J-M disagreed with and denied the Plaintiffs' allegations. J-M
contended that its PVC pipe was manufactured and tested in
accordance with applicable industry standards, including the
applicable quality, strength, and durability requirements. J-M
contended that the pipe received by each of the five Plaintiffs met
industry standards and has performed as promised for the
Plaintiffs….

Plaintiffs' Revised Jury Instructions ("Pls. JI"), Docket No. 2386 at pages 1-2.

For the most part, this language tracks instructions provided to the Phase One jury.

Plaintiffs also propose the following:

As I will explain in more detail now, the Phase 1 Jury found facts
establishing J-M's liability under the False Claims Act as to each
of the five Plaintiffs. The decisions and findings of the Jury in the
Phase 1 trial are binding on you, and you must follow them in this
trial. Damages were not part of the Phase 1 trial. In this trial, you
will determine damages, the number of false claims submitted, and
the number of false statements made…

At the end of the Phase 1 trial, the Jury unanimously decided in
favor of the Plaintiffs and against J-M. As set out in more detail in
the first Jury's Verdict, the Jury found that, for each of the projects
identified:

(1) J-M presented (or caused to be presented) to each Plaintiff false
or fraudulent claims for payment or approval; and J-M made or
used (or caused to be made or used) false records or statements in
order to get a false or fraudulent claim paid or approved by each
Plaintiff.
(2) J-M acted "knowingly."
(3)The false or fraudulent claims and false records or statements
were "material."

*Id.* at 1, 5-6.

The Court would agree that certain portions of these instructions are sound. However,
the Court would also instruct the second jury on the factual findings discussed above, and the

evidence presented to the Phase One jury.  This would include instructions that speak to the nature of the false statements made, *i.e.* statements of uniform compliance, as well as the factual basis for the jury's finding as to falsity − *i.e.* J-M "did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require."  The Court will leave it up to the parties to propose specific instructions to this effect.

## III.  Defendant's "Seventh Amendment" Argument

The Court provided Defendant with a final opportunity to brief its so-called Seventh Amendment Threshold Issue.  Defendant argues that the Court must throw out the Phase One Verdict because it risks violating Defendant's Seventh Amendment rights and runs afoul of Fed. R. Civ. Proc. 42.[9]  *See* Def. Br. at 3:1-7.  Much of Defendant's brief attacks the Court's initial decision to bifurcate the trial.  However, that ship has sailed.  At its core, Defendant's argument is based entirely on *Gasoline Products* and cases applying the general principle announced therein that "questions in a single suit can only be tried by different juries if they are 'so distinct and separable from the others that a trial of [them] alone may be had without injustice.'"  *Houseman*, 171 F.3d at 1127 (quoting *Gasoline Products* Co., 283 U.S. at 500).

*Gasoline Products* was a breach of contract case, in which the First Circuit overturned a verdict based on errors in certain jury instructions with respect to the measure of damages on defendant's counterclaim.  283 U.S. at 496.  Rather than throw out the entire verdict, the First Circuit ordered that a new trial be conducted but restricted the issues to be tried to the determination of damages only.  *Id.*  On review, the Supreme Court initially ruled that "[w]here the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice. based on the jury verdict and the record of the proceedings."  *Id.* at 500.  However, the Court then held that it was impossible to discern from the verdict what the first jury found in terms of the date of contract formation and other terms of the contract which would have to be decided to resolve the damages question.  *Id.* at 499-50.  As a result, the Supreme Court held that the issues that would be required to be resolved in the second trial would be "so interwoven with that of liability that the former cannot be submitted to the jury independently of

---

[9] Fed. R. Civ. Proc. 42(b) provides in relevant part: "the court may order a separate trial of one or more issues . . . . When ordering a separate trial, the court must preserve any federal right to a jury trial."

(100 of 262), Page 100 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 100 of 262
Case 5:06-cv-00055-GW-MAR   Document 2414   Filed 01/31/18   Page 15 of 17   Page
ID #:104560

the latter without confusion and uncertainty, which would amount to a denial of a fair trial." *Gasoline Products*, 283 U.S. at 500.

Defendant argues that the same is true here. Specifically, Defendant contends that Phase One Verdict is so impossible to discern and leaves so much unresolved, that any damages trial will inevitably revisit issues already determined by that jury. The Court disagrees.

As Plaintiffs rightly note, the chief concern of *Gasoline Products* and its progeny arises where (1) a second jury would be compelled to reexamine a first jury's factual finding, (2) the second jury could decide that factual issue in a contrary manner, and (3) no instruction by the Court could prevent such a result. *See id.* at 499; *see also Houseman*, 171 F.3d at 1126; *Abraham v. WPX Prods., LLC*, 317 F.R.D. 169, 248 (D.N.M. 2016). Here, Defendant has yet to identify which of the Phase One jury's factual findings will need to be reexamined in Phase Two.

As detailed above, the Court would find that the Phase One jury determined that (1) J-M represented uniform compliance with certain standards, (2) that representation was false because J-M failed to manufacture and/or test its pipe to assure that it uniformly complied in terms of long term strength and durability, (3) that the Standards required such uniformity, and (4) that the misrepresentation was material. The Phase Two jury will be instructed as to these findings and will not be required or permitted to revisit them. As such, the Seventh Amendment concerns articulated in *Gasoline Products* and its progeny are absent here.

Defendant's principle objections to the Phase One Verdict appear to be that the Phase One jury did not make any specific factual findings with regard to the physical properties of the pipe Plaintiffs received, and that the Phase Two jury will likely be presented with much of the same evidence as the Phase One jury. Neither of these facts implicate the Seventh Amendment, at least at this point.

As Plaintiffs point out, the fact the Phase One jury did not render findings with respect to the physical properties of the pipe actually received by Defendant means that the second jury may do so *without* disturbing the Phase One findings. *See Def. Opp'n at 6:6-15. Moreover, the potential for overlapping evidence is not, in and of itself a Seventh Amendment problem. *See Houseman*, 171 F.3d at 1127. Finally, should it turn out that the second jury does return findings that contradict the first jury's findings, either party may raise Seventh Amendment issues in a post-trial motion. As is, the Court will decline Defendant's invitation to throw out the Verdict at this point.

## IV.  Court's Tentative Thoughts on What Will be In-Bounds and Out-of-Bounds During Phase Two

As detailed above, the Phase One jury determined that Defendant's piping did not uniformly comply with certain industry standards.  Thus, the jury found that Defendant's representations to that effect were false, and material.   Defendant will not be permitted to challenge these findings during Phase Two.  For example, Defendant will not be able to argue that the Standards do not require uniformity or "representativeness".

Further, Defendant is only half correct that the Phase One jury did not render any factual findings as to the *practical effect* of its noncompliance beyond the "material" nature of such information.  The jury did find that misrepresenting compliance with the standards was material.  As instructed, the jury's finding of materiality establishes that Plaintiffs would not have bought pipe from J-M had they known that statements of compliance were false.  Moreover, as indicated above, the basis upon which the jury found Defendant's statements to be false was that Defendant failed to manufacture and/or test its pipe in a manner that would assure uniform compliance with strength and durability standards.  As such, Defendant will not be permitted to argue that it manufactured and/or tested its pipe to assure compliance.

Alternatively, Defendant is correct that the Phase One jury did not make factual findings as to the physical state of the pipe purchased by Plaintiffs, such as a reduced life span.  That is exactly the showing the Court anticipates Plaintiffs may be forced to make to demonstrate recoverable damages apart from statutory damages.  Thus, Plaintiffs' damages theory and the expert testimony offered in support thereof "fits" the jury's findings.  Put differently, the Phase One jury found a lack of a compliance based on manufacturing and testing shortcomings.  The Phase Two jury will be charged with determining what effect, if any, this lack of compliance had on Plaintiffs apart from influencing their decision to buy the pipe in the first place.

## V. *Daubert* Motions

The Court would ask the parties how they wish to proceed with regards to the *Daubert* motions.  The Court has already indicated its intended rulings on those motions.  However, in light of the Court's conclusions herein, it would ask the parties if a more substantive *Daubert* hearing is necessary.  The Court would also inform Defendant that their attempt to "knock out the entirety of Plaintiffs' Damages Case" through *Daubert* is not going to happen.

15

**ER473**

## VI.  RFA Issue

The Court has also reviewed the parties' briefing on the sufficiency of certain responses to Defendant's Requests for Admission and finds that the subject response is sufficient under the rule.  *See* Docket Nos. 2402, 2404, 2410.   As such, the Court would deny the relief requested.

## VII.  Phase Two Jury Instructions

The Court believes that given the litigation history of this case, it is essential to finalize (to the greatest extent possible) the Phase Two jury instructions prior to the start of the Phase Two trial and probably before the final pre-trial conference.  The Court will discuss this issue with the parties.

1  ADAM PAUL LAXALT
   Attorney General
2  SUSAN K. STEWART (State Bar No. 174985)
   Deputy Attorney General
3  SStewart@ag.nv.gov
4  Attorney General's Office
   100 North Carson Street
5  Carson City, Nevada 89701-4717
6  Tel: (775) 684-4173
   Fax: (775) 684-1108
7

8  **Attorneys for State of Nevada**
   **(AND OTHER PLAINTIFFS/ATTORNEYS AS LISTED ON THE DOCKET)**
9

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES, THE STATES OF           Case No. ED CV-06-00055-GW
    CALIFORNIA, DELAWARE,
13  FLORIDA, ILLINOIS, INDIANA,            Hon. George H. Wu
    NEVADA, NEW MEXICO, NEW
14  YORK, and TENNESSEE, THE
    COMMONWEALTHS OF
15  MASSACHUSETTS AND VIRGINIA,            **EXEMPLAR PLAINTIFFS'**
    and THE DISTRICT OF COLUMBIA           **OBJECTIONS AND RESPONSES**
16  ex rel. JOHN HENDRIX,                  **TO DEFENDANT J-M**
                                           **MANUFACTURING COMPANY,**
17              Plaintiffs,                **INC.'S FIRST SET OF**
                                           **INTERROGATORIES IN PHASE 2**
18      v.

19  J-M MANUFACTURING COMPANY,             **Phase 2 Exemplar Plaintiffs Damages**
    INC., d/b/a JM Eagle, a Delaware       **Discovery Cutoff:   May 20, 2016**
20  corporation, and FORMOSA               **Pretrial Conference:   November 10,**
    PLASTICS CORPORATION, U.S.A.,          **2016**
21  a Delaware corporation,                **Trial:       November 29, 2016**

22              Defendants.

23

24

25

26

27

28

(104 of 262)   Page 104 of 262  Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 104 of 262
Case 3:06-cv-00055-GW-MAR   Document 2116-2   Filed 02/22/16   Page 22 of 48   Page
ID #:87259

1 | Interrogatory No. 1 failed to meet industry standards required by the applicable
2 | specifications.

3 |

4 | **INTERROGATORY NO. 8**:

5 |     With respect to each shipment of J-M pipe identified in response to
6 | Interrogatory Nos. 6-7, IDENTIFY how such pipe fails to comply with such
7 | industry standards.

8 |     **RESPONSE**: The Exemplar Plaintiffs incorporate by reference herein
9 | General Objections 1, 2, 5, 7, and 8. The Exemplar Plaintiffs specifically object to
10 | this interrogatory as the issue of J-M's liability for misrepresenting compliance with
11 | industry standards has already been tried, J-M has been found liable, and this
12 | interrogatory is irrelevant to the issue of damages.

13 |     Subject to and without waiving its general and specific objections, the
14 | Exemplar Plaintiffs respond as follows:  As the jury found, after an eight-week trial,
15 | in its 56-page jury verdict (attached hereto as Attachment 1 and incorporated into
16 | this response by reference), "J-M falsely represented uniform compliance with
17 | AWWA C900 [or C905] and UL 1285" for all of the pipe used in the projects
18 | identified in response to Interrogatory No. 1.  Pursuant to Rule 33(d), the Plaintiff
19 | Exemplars refer J-M to the trial exhibits introduced at the Phase 1 trial (e.g., jury
20 | verdict exhibits by entity and project) and the trial testimony of all witnesses, the
21 | exhibits introduced into evidence at trial, and opening and closing arguments at trial.

22 |     The Exemplar Plaintiffs further respond as follows:  The jury found that J-M
23 | failed to uniformly comply with the representativeness requirements of AWWA
24 | C900 and C905, and failed to uniformly comply with the tensile strength
25 | requirement of UL 1285.  JM pipe failed to comply with the representativeness
26 | requirement because it was less strong than the pipe originally qualified, and it
27 | failed to comply with the tensile strength requirement of UL 1285 because J-M was
28 |

(105 of 262) Page 105 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 105 of 262
Case 3:06-cv-00055-GW-MAR Document 2116-2 Filed 02/22/16 Page 23 of 48 Page
ID #:87260

1　never able to pass the UL tensile strength test.  Accordingly, all J-M pipe used in the

2　projects listed in response to Interrogatory No. 1 failed to meet industry standards

3　required by the applicable specifications.

4

5　**INTERROGATORY NO. 9**:

6　　　For each shipment of J-M pipe identified in response to Interrogatory No. 2,

7　as to which you claim that J-M misrepresented the pipe as complying with the

8　"representativeness" requirement of AWWA 900 or 905, IDENTIFY (a) where

9　"representativeness" is defined in the specification; (b) whether and how the

10　misrepresentation affected the physical properties or performance of the pipe; and

11　(c) all market data linking the price of comparable pipe specifically to its

12　"representativeness."

13　　**RESPONSE**: The Exemplar Plaintiffs incorporate by reference herein

14　General Objections 1, 2, 5, 7, and 8.  The Exemplar Plaintiffs specifically object to

15　this interrogatory as the issue of J-M's liability for misrepresenting compliance with

16　industry standards has already been tried, J-M has been found liable, and this

17　interrogatory is irrelevant to the issue of damages.  The Exemplar Plaintiffs further

18　specifically object to this interrogatory to the extent it assumes that J-M's

19　misrepresentations about compliance with industry standards must be "required by

20　project specifications" as a prerequisite to establishing damages and penalties.  The

21　Exemplar Plaintiffs further object to this interrogatory as the phrase "physical

22　properties or performance of the pipe" is undefined by J-M and susceptible to many

23　different interpretations.   For purposes of responding to this interrogatory, the

24　Exemplar Plaintiffs will interpret it as meaning failing to uniformly comply with

25　AWWA C900 and AWWA C905 in precisely the manner found by the jury.

26　　　Subject to and without waiving its general and specific objections, the

27　Exemplar Plaintiffs respond as follows:   As the jury found, the AWWA standards

28

1   to Interrogatory No. 1 is not marketable and has no recognized market value.  The

2   "value" of J-M pipe for which J-M engaged in misrepresentations will also be

3   addressed by experts during the expert phase of discovery.

4

5   **INTERROGATORY NO. 10**:

6       With respect to each shipment of J-M pipe identified in response to

7   Interrogatory Nos. 6-7, IDENTIFY any physical properties of such pipe that differed

8   from those required by the specified standards.

9     **RESPONSE**:  The Exemplar Plaintiffs incorporate by reference herein

10  General Objection 1, 2, 4, 5, 7, and 8.  The Exemplar Plaintiffs specifically object to

11  this interrogatory as the issue of J-M's liability for misrepresenting compliance with

12  industry standards, and the manner in which they misrepresented compliance has

13  already been tried, and J-M has been found liable.  Thus, this interrogatory is

14  irrelevant to the issue of damages.  The Exemplar Plaintiffs further object to this

15  interrogatory as the phrase "physical properties" is undefined by J-M and

16  susceptible to many different interpretations.   For purposes of responding to this

17  interrogatory, the Exemplar Plaintiffs will interpret it as meaning failing to

18  uniformly comply with AWWA C900, AWWA C905, and UL 1285 in precisely the

19  manner found by the jury.

20      Subject to and without waiving its general and specific objections, the

21  Exemplar Plaintiffs respond as follows:  As the jury found, the AWWA standards

22  stamped on every stick of J-M pipe, referenced in J-M's brochures, and called out in

23  the contracts expressly incorporate a representativeness requirement.  During the

24  trial not only did Plaintiffs' expert Jim Paschal testify that AWWA C900 and C905

25  contained a representativeness requirement, but J-M's defense witnesses and its own

26

27

28

1  expert, Gene Palermo, agreed.[3]  The jury found that (1) there is a representativeness

2  requirement; (2) J-M told purchasers that it complied with the representativeness

3  requirement; and (3) J-M's statements were knowingly false.  (Dkt. 1858 at 4-11

4  (post-trial); Dkt. 788 at 4-11 (pre-trial); Consol. Opp. to MSJ (pre-trial); Dkt. 1990

5  (post-trial); Dkt. 1993 (post-trial).  The jury also found that (1) there is a tensile

6  strength requirement in UL 1285; (2) J-M told purchasers that it complied with the

7  tensile strength requirement; and (3) J-M's statements were knowingly false.  *See,*

8  *e.g.*, Special Verdict Form at 2-6 (Project 1 as identified in response to Interrogatory

9  No. 1); *id.* at 8-14 (Projects 2-3) ); *id.* at 15-25 (Projects 4-11); *id.* at 28-32 (Projects

10  12-13); and *id.* at 34-49 (Projects 14-26).  The Exemplar Plaintiffs further state that

11  the pipe was weaker in both the longitudinal and circumferential directions than pipe

12  that complied with AWWA and UL standards, and would therefore have a fraction

13  of the lifespan of compliant pipe.  The Exemplar Plaintiffs further refer J-M to the

14  trial exhibits introduced at the Phase 1 trial, the trial testimony at the Phase 1 trial,

15  and the jury's verdict.

16  **INTERROGATORY NO. 11**:

17    With respect to the PROJECTs identified in response to Interrogatory No. 1

18  and each shipment of J-M pipe identified in response to Interrogatory No. 2,

19  IDENTIFY each shipment of J-M pipe that YOU contend failed to perform as

20

21  [3] Plaintiffs previously have identified the specific provisions of the AWWA
22  standards that embody the representativeness requirement, in pre-trial discovery,
   pre-trial submissions, and at trial.  PPI TR-3 is explicitly incorporated in AWWA
23  C900 and C905, which was stamped on every stick of J-M pipe used in the projects
   identified in response to Interrogatory No, 1.  PPI TR-3 states "[t]he manufacturer is
24  responsible to insure that his product is continually manufactured in such a manner
25  as to maintain the long-term strength and durability consistent with the long-term
   data" from the initial HDB qualification testing.  All experts at the trial agreed that
26  this language embodies the representativeness requirement.

27

28

1   many different interpretations. For purposes of responding to this interrogatory, the

2   Exemplar Plaintiffs will interpret it to mean the calculation of the market value of

3   pipe that was installed in the projects identified in response to Interrogatory No. 1.

4        Subject to and without waiving its general and specific objections, the

5   Exemplar Plaintiffs respond as follows: The Exemplar Plaintiffs contend that the

6   market value of J-M pipe used in the projects identified in response to Interrogatory

7   No. 1 is zero. The Exemplar Plaintiffs further respond that damages, and the

8   manner in which they are calculated, will also be addressed by experts during the

9   expert phase of discovery.

10       The Exemplar Plaintiffs further respond that for financial accounting purposes

11  they depreciate the projects identified in response to Interrogatory no. 1 using a 50-

12  year straight-line depreciation method.

13

14  **INTERROGATORY NO. 24**:

15       With respect to each shipment of J-M pipe identified in response to

16  Interrogatory No. 2, IDENTIFY any estimates made of the longevity of such pipe.

17       **RESPONSE**: The Exemplar Plaintiffs incorporate by reference herein

18  General Objection 1, 3, 5, 6, 7, and 8. Subject to and without waiving those

19  objections, the Exemplar Plaintiffs respond as follows: Pursuant to Fed. R. Civ. P.

20  33(d), the Exemplar Plaintiffs have previously produced all such information in their

21  possession from which the answer to this interrogatory may be determined and as to

22  which the burden of deriving or ascertaining the answer will be substantially the

23  same for J-M and the Exemplar Plaintiffs. To the extent J-M cannot ascertain an

24  answer to this interrogatory from such previously produced business records, J-M

25  can supplement its knowledge from its own records. Further, the Exemplar

26  Plaintiffs refer J-M to the trial exhibits introduced at the Phase 1 trial and the trial

27  and deposition testimony of the Exemplar Plaintiffs' witnesses (e.g., Matthew

28

-36-

**ER480**

(109 of 262)  Page 109 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 109 of 262
Case 3:06-cv-00055-GW-MAR    Document 2116-2    Filed 02/22/16    Page 37 of 48    Page
ID #:87274

1  Knudson, Susan Mulligan, Paul Sciuto, David Speer, and Terri Svetich) and other

2  deposed witnesses for additional information potentially responsive to this

3  interrogatory.  The Exemplar Plaintiffs further respond that J-M represented that the

4  pipe uniformly complied with AWWA C900/C905 and UL standards, that

5  compliant pipe would last longer than other types of pipe that they used in their

6  water systems, and that compliant pipe would have a useful life of 100 years.

7  However, the Jury found that all of the J-M pipe used in the projects identified in

8  response to Interrogatory No. 1 did not uniformly comply with AWWA C900 or

9  AWWA C905 and UL 1285, and that the non-compliance was material.

10  Accordingly, the pipe was not uniformly as strong and durable as required and

11  therefore will not have the same longevity as compliant pipe.  The Exemplar

12  Plaintiffs further respond that damages, and the manner in which they are calculated,

13  will also be addressed by experts during the expert phase of discovery.

14

15  **INTERROGATORY NO. 25**:

16      With respect to any other shipments of PVC pipe YOU have used or currently

17  use, IDENTIFY in detail any estimates made of the longevity of such pipe.

18      **RESPONSE**: The Exemplar Plaintiffs incorporate by reference herein

19  General Objection 1, 2, 3, 4, 5, 7, and 8.  The Exemplar Plaintiffs specifically object

20  to this interrogatory as it is vague and ambiguous as to which PVC pipe or

21  manufacturer of PVC pipe is being referred to in the interrogatory.  The Exemplar

22  Plaintiffs specifically object to this interrogatory as irrelevant to the issue of

23  damages.  It is J-M's misrepresentations found by the Jury that are the subject of the

24  damages trial, not a different manufacturer.

25      Subject to and without waiving its general and specific objections, the

26  Exemplar Plaintiffs respond as follows:  Estimates of the longevity of PVC pipe

27  were made by J-M and other manufacturers in published materials, and through

28

-37-
**ER481**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 06-55-GW(PJWx) | Date | December 18, 2014 |
|---|---|---|---|
| Title | *United States of America et al v. J-M Manufacturing Company, Inc.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Elizabeth J. Sher | Mark E. Masters |
| Eric Havian | Paul S. Chan |
| Kirk D. Dillman | David M. Bernick |
| Thomas Watson | |
| Brent Rushforth | |
| Harry P. Litman | |
| BY TELEPHONE: | |
| Ellen Head | |
| Joan C. Arneson | |
| R. Clayton Welch | |

**PROCEEDINGS:      HEARING RE ISSUES 1, 2 AND 3, RULE 9(b) AND QUI TAM ISSUES**

Oral argument is held.  The Court, as stated on the record, resolves the issue of standing and concludes that Phase 1 will not apply to Phase 2 non-exemplar plaintiffs.  The hearing is continued to January 12, 2015 at 9:30 a.m.  Parties will file a status report by noon on January 8, 2015.

|  | 2 | : | 05 |
|---|---|---|---|
| Initials of Preparer | JG | | |

**ER482**

(111 of 262), Page 111 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 111 of 262
Case 5:06-cv-00055-GW-MAR   Document 1960   Filed 06/30/14   Page 1 of 7   Page ID
#:80914

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 06-55-GW(PJWx) | Date | June 30, 2014 |
|---|---|---|---|
| Title | *United States of America et al v. J-M Manufacturing Company, Inc.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Eric Havian | Mark E. Masters |
| Harry P. Litman | Paul S. Chan |
| Brent Rushforth | Ekwon E. Rhow |
| Elizabeth J. Sher | Camilla M. Eng |
| BY TELEPHONE: | David M. Bernick |
| Joan C. Arneson | |
| R. Clayton Welch | |

PROCEEDINGS:   **DEFENDANT J-M MANUFACTURING COMPANY, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR ALTERNATIVELY, FOR NEW TRIAL [1833];**

**DEFENDANT J-M MANUFACTURING COMPANY, INC.'S MOTION TO MAINTAIN CERTAIN TRIAL EXHIBITS UNDER SEAL [1942];**

**DEFENDANT J-M MANUFACTURING COMPANY, INC.'S MOTION FOR RULE 16 CONFERENCE [1957]**

Further argument is held. The Court, as indicated on the record, DENIES Defendant J-M Manufacturing, Inc.'s Motion for Judgment as a Matter of Law.

Parties are ordered to meet and confer as to Defendant J-M Manufacturing, Inc.'s Motion for Rule 16 Conference, and attempt to resolve the issues raised including the integration of Phase I and II. Parties will file a stipulation re scheduling thereafter.

The Court's Tentative Ruling as to Defendant J-M Manufacturing, Inc.'s Motion to Maintain Certain Trial Exhibits Under Seal, is circulated and attached hereto. The Court adopts the Tentative as its Final Ruling.

|  | 2 | : | 30 |
|---|---|---|---|
| Initials of Preparer | JG | | |

**ER483**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | EDCV 06-55-GW(PJWx) | Date | June 30, 2014 |
| --- | --- | --- | --- |
| Title | *United States of America et al v. J-M Manufacturing Company, Inc.* | | |

Defendants' motion is DENIED.

A proposed date for further argument on Defendant J-M Manufacturing, Inc.'s Motion for New Trial will be included in the stipulation agreed to by the parties.

|  | 2 | : | 30 |
| --- | --- | --- | --- |
| Initials of Preparer | JG | | |

ER484

(113 of 262) Page 113 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 113 of 262
Case 5:06-cv-00055-GW-MAR Document 1960 Filed 06/30/14 Page 3 of 7 Page ID
#:80916

<u>*United States et al. v. J-M Manufacturing Company, Inc. et al.*</u>, Case No. 06-CV-0055
Tentative Ruling on Defendant J-M Manufacturing Company, Inc.'s Motion to Maintain Certain
Trial Exhibits Under Seal

## I. <u>Background</u>

In this motion to seal, J-M seeks to seal certain exhibits that were offered as evidence
during the Phase I trial of this matter. Plaintiff argues that none of the identified documents
should be sealed by the Court.

## II. <u>Legal Standard</u>

Generally, information disclosed as part of pretrial proceedings, including documents
produced in discovery and used in support of nondispositive motions, may be sealed pursuant to
the parties' agreement to do so and a showing of good cause. *Phillips ex rel. Estates of Byrd v.
General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002); *Foltz v. State Farm Mut. Auto Inc.
Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). Once those documents are introduced into evidence at
trial or otherwise used in open court, they become part of the public record. "It is well-
established that the release of information in open court 'is a publication of that information and,
if no effort is made to limit its disclosure, operates as a waiver of any rights a party had to restrict
its future use.'" *Littlejohn v. Bic Corp.*, 851 F.2d 673, 680 (3d Cir. 1988) (quoting *Nat'l Polymer
Prods. v. Borg-Warner Corp.*, 641 F.2d 418, 421 (6th Cir. 1981)). Therefore, in general,
information that was once subject to a protective order but is later used at trial is subject to a
waiver of confidentiality.

There is a strong presumption in favor of public access to court records. *Foltz*, 331 F.3d
at 1135; *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995). However, the right of access
"is not absolute and can be overridden given sufficiently compelling reasons for doing so." *Foltz*,
331 F.3d at 1135; *Hagestad*, 672 F.2d at 1434 (requiring district courts to have a "compelling
reason" and to "articulate the factual basis" in order to seal court records). Even if information
was publicly revealed at trial, the information may later be sealed by the Court if "the interests in
preserving the confidentiality of the material" outweigh the strong "interest in disseminating it
and the legitimate interest others may have in receiving it." *Nat'l Polymer Prods.*, 641 F.2d at
424. Courts may consider factors such as "the public interest in understanding the judicial
process and whether disclosure of the material could result in improper use of the material for
scandalous or libelous purposes or infringement upon trade secrets." *Id.* "The judge need not

1

(114 of 262) Page 114 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 114 of 262
Case 5:06-cv-00055-GW-MAR   Document 1960   Filed 06/30/14   Page 4 of 7   Page ID
#:80917

document compelling reasons to unseal; rather the proponent of sealing bears the burden with
respect to sealing." *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1182 (9th Cir.
2006).

## III. Analysis

The Court starts by looking to the language of the Protective Order to determine whether
that document constituted an "effort … to limit … disclosure" of the documents at trial. *See
Littlejohn*, 851 F.2d at 680, n.17. Here, the Protective Order clearly states that "[a]ny use of the
Protected Material at trial shall be governed by a separate agreement or order." (Docket No. 497,
at 4.) J-M does not dispute that it never sought a separate protective order or other confidentiality
agreement concerning the documents introduced as evidence at trial. Further, the Protective
Order also states that "[e]ven after final disposition of the litigation, the confidentiality
obligations imposed by this Order shall remain in effect until a Designating Party agrees
otherwise in writing or a Court order otherwise directs." (Docket No. 497, at 5.) In *Littlejohn*, the
protective order contained a similar requirement that documents be kept confidential "absent
further court order." *Id.* The court there found that "[t]he admission of the plaintiff's trial
exhibits into the trial record absent a seal constituted such an order" and therefore that "BIC
could no longer have reasonably relied on the confidentiality accorded under the PO." *Id.* The
same reasoning is applicable here, especially where the Protective Order also contains a
statement that "the protections conferred by this Order do not cover any information that … (b)
becomes part of the public domain at any time, unless as a result of (i) action or failure to act
where there is a duty to act on the part of the Receiving Party; or (ii) any breach of duty by any
third party." (Docket No. 497, at 4.) The Court previously stated that any documents that "were
originally designated as confidential but were allowed to come in at the trial without any further
preservation of confidentiality … [are] a matter of public record." (3/24/14 Hrg. Tr. 8:12-15.)
Therefore, the Protective Order does not protect the documents at issue here.

Second, the Court must determine whether the documents at issue were made part of the
public record at trial. Only those documents actually entered into evidence or otherwise made
publicly available by virtue of the trial must satisfy the "compelling reason" standard; documents
that were produced in discovery but were not made part of the public record may still be
protected by the Protective Order. *See Nat'l Polymer Prods.*, 641 F.2d at 424 ("Matter subject to
the protective order … not publicly disclosed at trial may not be divulged."). Here, the

2

**ER486**

documents were clearly part of the public record, as they were all admitted into evidence and many of them were discussed in open court during the trial. (*See* Opp. to Mtn., Docket No. 1952, App'x. A.) The Court has stated that the exhibits "weren't admitted on some sort of limited basis." (3/24/14 Hrg. Tr. 19:11-12.) Therefore, the documents were made part of the public record such that J-M must establish that there is a "compelling reason" for sealing these documents, despite their introduction at trial.[1]

J-M has the burden of establishing that the compelling reasons for maintaining these documents under seal outweigh the strong presumption in favor of making such records public. J-M advances two arguments as to why the documents should remain under seal: (1) they constitute protectable trade secrets and (2) J-M will suffer "serious harm" if the documents are made public.

As to the potential for "serious harm," aside from the recognized harm that comes from revelation of trade secrets or other sensitive business information of that type, J-M has not made a convincing showing that the inclusion of these eight documents in the public record from the Phase I trial will result in serious harm to it. J-M argues that many of these documents are misleading or cannot be understood when taken out of context. However, by including these documents in the complete trial record, the documents will be placed squarely *in* the context of all other similar, relevant evidence introduced at trial. Further, J-M expresses concern that Plaintiff will improperly use this information to taint the jury pool for Phase II, try this case in the press, and otherwise harm the good name and reputation of J-M. However, "[t]he mere fact that the production of records may lead to [J-M's] embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179. Therefore, any reputational harms or loss of competitive standing resulting from the documents' dissemination, aside from trade secret type harms, are not sufficient grounds to seal the records. Further, the Court and the parties are well-equipped to ensure that the jury selected for Phase II has not been "tainted" by any improper or misleading statements made about this case in the press. Therefore, J-M has not met its burden of showing that "serious

---

[1] Plaintiff argues that J-M has waived any right to claim that the documents at issue here should be sealed by refusing to object to their introduction at trial or request that their introduction be under seal. However, even in such circumstances a party has not waived their argument that a "compelling reason" justifies sealing the documents. *See, e.g., Nat'l Polymer Prods.*, 641 F.2d at 424; *Northwest Airlines, Inc. v. American Airlines, Inc.*, 870 F.Supp. 1504, 1511 (D. Minn. 1994).

harm," other than potential trade secret harm, will occur in the absence of an order sealing these exhibits.

Finally, the Court reaches the issue of whether any of the documents that J-M seeks to seal constitute trade secrets such that they are entitled to protection despite their introduction into the record during a public trial. Preliminarily, the Court notes that Plaintiff's prevalent argument that because much of this evidence is old, it should no longer be considered worthy of trade secret protection is misplaced. While the age of a document may be relevant to such a determination, it is not entitled to nearly as much weight in the analysis as Plaintiff argues it ought to be. Further, Plaintiff's argument that the identified exhibits should not be entitled to protection because J-M does not seek to seal many similar documents is unpersuasive; the Court ordered J-M to file a limited list of exhibits for it to consider on this motion, and J-M is free to determine that they are comfortable waiving trade secret protection for certain documents while seeking protection for others.

Under California law, a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process that (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1; *see also Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972). In order to satisfy its burden, J-M "must articulate compelling reasons supported by specific factual findings" that the documents at issue constitute protectable trade secrets. *Kamakana*, 447 F.3d at 1178; *see also San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102-03 (9th Cir. 1999).

After examining each of the eight documents in detail, it remains unclear to the Court why Defendant feels that any of them would constitute a trade secret. None of them appears to contain an undisclosed formula, a revelation as to novel technology or process, confidential customer lists, or other proprietary information. A large portion of the documents refer to the results of testing on Defendant's products as required by the industry standards pursuant to which the items were marketed. In most instances, the testing procedures are only generally discussed, and it is not clear what competitive advantage someone could obtain by looking at the particular document (other than the advantage gained by a competitor from the bad light in which this document could paint the Defendant, which is NOT a reason to seal).

4

(117 of 262) Page 117 of 262
Case 5:06-cv-00055-GW-MAR   Document 1960   Filed 06/30/14   Page 7 of 7   Page ID
#:80920
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 117 of 262

However, it might well be that this Court has failed to fully appreciate the nature of the information contained in one or more of the delineated documents. Therefore, the Court will allow Defendant's counsel to more fully explicate on the subject at the hearing.

## IV. <u>Conclusion</u>

Unless convinced otherwise at the hearing, the Court would DENY the motion to seal as to all documents.

1  Terry W. Bird - State Bar No. 49038
    twb@birdmarella.com
2  Ekwan E. Rhow - State Bar No. 174604
    eer@birdmarella.com
3  Paul S. Chan - State Bar No. 183406
    psc@birdmarella.com
4  BIRD, MARELLA, BOXER, WOLPERT,
    NESSIM, DROOKS & LINCENBERG, P.C.
5  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
6  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
7
8  Attorneys for Defendant J-M
   Manufacturing Company, Inc.
   d/b/a JM Eagle
9

10              **UNITED STATES DISTRICT COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13  UNITED STATES, THE STATES OF          CASE NO. ED CV 06-00055GW
    CALIFORNIA, DELAWARE,
14  FLORIDA, ILLINOIS, INDIANA,           Hon. George H. Wu
    NEVADA, NEW MEXICO, NEW
15  YORK, and TENNESSEE, THE              **J-M MANUFACTURING
    COMMONWEALTHS OF                      COMPANY, INC.'S RENEWED
16  MASSACHUSETTS AND VIRGINIA,           MOTION FOR JUDGMENT AS A
    and THE DISTRICT OF COLUMBIA          MATTER OF LAW OR,
17  ex rel. JOHN HENDRIX,                 ALTERNATIVELY, MOTION FOR
                                          NEW TRIAL [F.R.C.P. RULES 50(b)
18              Plaintiffs,               & 59]; MEMORANDUM OF
                                          POINTS AND AUTHORITIES**
19       vs.
                                          **[Declaration of Paul S. Chan Filed
20  J-M MANUFACTURING COMPANY,            Concurrently; Supplemental Declara-
    INC. d/b/a JM EAGLE, a Delaware       tion of Paul S. Chan Filed Under Seal]**
21  corporation, and FORMOSA PLASTICS
    CORPORATION, U.S.A., a Delaware       Date:    February 24, 2014
22  corporation,                          Time:    8:30 a.m.
                                          Crtrm.:  10
23              Defendants.

24

25

26

27

28

(119 of 262), Page 119 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 119 of 262
Case 5:06-cv-00055-GW-MAR    Document 1833    Filed 01/14/14    Page 2 of 48    Page ID
#:67162

1    **NOTICE OF MOTION AND MOTION**

2    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3        PLEASE TAKE NOTICE that defendant J-M Manufacturing Company, Inc.

4    ("J-M") will and hereby does renew its motion for judgment as a matter of law, or al-

5    ternatively, move for a new trial, pursuant to Federal Rules of Civil Procedure 50(b)

6    and 59, on all claims asserted by plaintiffs City of Reno, Nevada ("Reno"), City of Nor-

7    folk, Virginia ("Norfolk"), Calleguas Municipal Water District ("Calleguas"), Palmdale

8    Water District ("Palmdale") and South Tahoe Public Utility District ("South Tahoe")

9    (collectively, "Plaintiffs") in this Phase One trial.

10        This motion is made on the grounds that Plaintiffs failed to submit substantial

11    evidence of falsity, materiality, or scienter, as those elements are properly defined and

12    understood in a conventional substandard-product case brought under the applicable

13    False Claim Acts ("FCA"); and alternatively, (1) the Phase One verdict is unworkable

14    and does nothing to streamline this litigation, including any Phase Two; (2) certain jury

15    instructions were erroneous and insufficient; (3) the Phase One verdict is replete with

16    factual inconsistencies and deficiencies; and (4) an enormous amount of irrelevant and

17    prejudicial evidence was admitted in contravention of Federal Rules of Evidence 401-

18    404.

19        This Motion is based on this notice, the attached memorandum of points and

20    authorities, the Declaration of Paul S. Chan, the pleadings, records and files in this case,

21    and such other matters that may be raised at the hearing.

22    DATED: January 14, 2014          Respectfully submitted,

23                                     BIRD, MARELLA, BOXER, WOLPERT,
24                                      NESSIM, DROOKS & LINCENBERG, P.C.

25                                     By:      /s/ Paul S. Chan
26                                              Paul S. Chan
27                                     Attorneys for Defendant J-M Manufacturing
                                       Company, Inc. d/b/a JM Eagle

28

i

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................1

II. PROCEDURAL HISTORY ..............................................................................3

A. The Court bifurcated this case to allow the five representative Plaintiffs to attempt to prove certain FCA elements before proceeding with findings concerning "each individual Plaintiff." ................3

B. Plaintiffs subsequently proceeded on a "Conventional Substandard-Product" theory of liability, expressly disclaiming all other theories. ..........3

C. The Court repeatedly warned Plaintiffs that any finding of "falsity" must be tied to the claims for payment and products that Plaintiffs received. ...................................................................................................6

D. The jury instructions insufficiently defined the "tying" aspect of falsity, allowing Plaintiffs to ditch their substandard-product theory and assert their "uniform compliance" theory...............................................8

E. At trial, Plaintiffs repeatedly admitted that they had no evidence that they had received non-compliant pipe—so they proposed a "uniform compliance" theory to mask their insufficient evidence..............9

F. The verdict reflected the jury's acceptance of Plaintiffs' abandonment of their substandard-products theory in favor of an unprecedented "uniform compliance" theory. ............................................. 13

III. MOTION FOR JUDGMENT AS A MATTER OF LAW....................................... 13

B. Standard of review........................................................................................ 13

C. Plaintiffs failed to prove falsity..................................................................... 14

1. Plaintiffs conceded that they failed to prove the falsity element of their substandard-product FCA claim............................ 14

2. Plaintiffs' "uniform compliance" theory is legally untenable, practically unworkable, and unsupported by substantial evidence........................................................................................... 17

a. Plaintiffs' "uniform compliance" theory transforms the FCA into a strict-liability statute—something that Congress never intended............................................................ 18

b. Plaintiffs' "uniform compliance" theory violates due process and casts constitutional doubt over the FCA. ........ 19

3. The jury's "uniform compliance" findings and verdict are factually unsupported because the industry standards that J-M promised to meet do _not_ require perfect manufacturing consistency. ........................................................................................ 20

i

(121 of 262) Page 121 of 262ase: 25-2499, 08/29/2025, DktEntry: 22.4, Page 121 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 4 of 48   Page ID
#:67164

| | | a. | A facial reading of the industry standards confirms J-M's reading of them and refutes Plaintiffs' misinterpretation. | 21 |
| | | b. | The trial testimony likewise supported J-M's reading of the industry standards and refuted Plaintiffs' reading. | 23 |
| | | c. | Plaintiffs' "uniform compliance" theory is doomed by their concession that J-M's compound—the only arguably uniform part of the production process—was not substandard. | 25 |
| | D. | | Plaintiffs failed to prove scienter. | 26 |
| | E. | | Plaintiffs failed to prove materiality. | 27 |
| IV. | MOTION FOR A NEW TRIAL | | | 28 |
| | A. | | At a minimum, the Court should grant J-M a new trial | 28 |
| | B. | | Standard of review | 29 |
| | C. | | The empty jury finding invited by Plaintiffs' counsel does not provide a factual basis for a Phase Two trial or achieve the goals of bifurcation. | 30 |
| | D. | | A new trial is necessary to correct errors and insufficiencies in the jury instructions. | 32 |
| | E. | | A new trial also is necessary because the verdict suffers from glaring factual inconsistencies that render it legally erroneous. | 33 |
| | | 1. | The jury erroneously identified as "Claims For Payment" documents that simply are not claims for payment. | 33 |
| | | 2. | The jury erroneously determined that J-M made "false representations of uniform compliance" in documents that do not contain any such representation. | 34 |
| | | 3. | The jury erroneously found that J-M "knowingly" made false representations of uniform compliance to Plaintiffs based on documents and events unrelated to Plaintiffs or their projects. | 34 |
| | F. | | A new trial is necessary because irrelevant and prejudicial evidence, including improper character/propensity evidence about J-M, was admitted and likely affected the verdict | 35 |
| | | 1. | The Quick Burst 6400-psi requirement | 35 |
| | | 2. | The pre-2008 UL 1285 tensile strength requirement | 36 |
| | | 3. | Quality control requirements | 38 |

ii

1    V. CONCLUSION.................................................................................................. 40

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

**ER494**

3077495.1

## TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*Applied Med. Res. Corp. v. United States Surgical Corp.,*
   549 F. Supp. 2d 1208 (C.D. Cal. 2008) .................................................... 13

*Arthur Young & Co. v. U. S. Dist. Court,*
   549 F.2d 686 (9th Cir. 1977) ................................................................... 30

*Campbell v. Wood,*
   18 F.3d 662 (9th Cir. 1994) .................................................................... 38

*Cohn v. Papke,*
   655 F.2d 191 (9th Cir. 1981) ................................................................... 39

*Gasoline Prods. Co. v. Champlin Ref. Co.,*
   283 U.S. 494 (1931) ............................................................................. 30

*Hagood v. Sonoma County Water Agency,*
   81 F.3d 1465 (9th Cir. 1996) ................................................................. 27

*Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee,*
   624 F.2d 798 (7th Cir. 1980) ....................................................... 14, 30, 32

*Lakeside-Scott v. Multnomah County,*
   556 F.3d 797 (9th Cir. 2009) ................................................................. 14

*Landes Const. Co., Inc. v. Royal Bank of Canada,*
   833 F.2d 1365 (9th Cir. 1987) ............................................................... 29

*Murphy v. City of Long Beach,*
   914 F.2d 183 (9th Cir. 1990) ................................................................. 29

*Oregon v. Ashcroft,*
   368 F.3d 1118 (9th Cir. 2004) ............................................................... 19

*Skilling v. United States,*
   561 U.S. 358, 130 S. Ct. 2896 (2010) ..................................................... 19

*U.S. ex rel. Cericola v. Federal Nat'l Mortgage Ass'n,*
   529 F. Supp. 2d 1139 (C.D. Cal. 2007) ................................................... 17

*U.S. ex rel. Hendow v. Univ. of Phoenix,*
   461 F.3d 1166 (9th Cir. 2006) ............................................................ 3, 4

iv

*U.S. ex rel. K&R Ltd. Partnership v. Mass. Housing Fin. Agency*,
    530 F.3d 980 (D.C. Cir. 2008) ............................................................ 27

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
    No. 1:03-CV-680-SEB-WGH, 2012 WL 4357438
    (S.D. Ind. Sept. 24, 2012) ............................................................ 16, 17

*U.S. ex rel. McLean v. County of Santa Clara*,
    2011 WL 5223076 (N.D. Cal. Oct. 31, 2011) ............................................ 17

*U.S. ex. rel. Stebner v. Steward & Stevenson Services, Inc.*,
    305 F. Supp.2d 694 (S.D. Tex. 2004),
    *aff'd* 144 Fed. Appx. 389 (5th Cir. 2005) ................................ 15, 16, 17

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002) ............................................... 14, 15, 33

*United States ex rel. Cox v. General Dynamics Armament and Technical Products, Inc.*,
    No. 4:07CV3264, 2010 WL 2218614 (D. Neb. May 28, 2010) .................................. 16

*United States ex rel. Crews v NCS Healthcare of Ill., Inc.*,
    460 F.3d 853 (7th Cir 2006) ............................................................ 16

*United States ex rel. Klusmeier v. Bell Contractors, Inc.*,
    469 Fed. Appx. 718, 2012 WL 555736 (11th Cir. Feb. 21, 2012) .......................... 16

*United States v. 4.0 Acres of Land*,
    175 F.3d 1133 (9th Cir. 1999) ......................................................... 29

*United States v. Banks*,
    556 F.3d 967 (9th Cir. 2009) .......................................................... 18

*United States v. Martinez*,
    182 F.3d 1107 (9th Cir. 1999) ......................................................... 39

*United States v. Williams*,
    553 U.S. 285, 128 S.Ct. 1830 (2008) .................................................. 19

*Wang v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992) ......................................................... 18

**FEDERAL STATUTES**

18 U.S.C. § 1346 ............................................................................ 19

31 U.S.C. § 3729(a)(1), (b)(1) ............................................................. 18

v

ER490

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RULES**

Fed. R. Civ. P. 50(a)(1) ................................................................ 13

Fed. R. Civ. P. 59 ....................................................................... 29

Fed R. Evid. 401-404 ........................................................ 29, 38, 39, 40

**CONSTITUTIONAL PROVISIONS**

Seventh Amendment ................................................................ 2, 30

**OTHER AUTHORITIES**

11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ....................... 29

11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2801 (3d ed.) ....................... 29

John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 1.06 at 1-40 (4th ed. 2011) ..................................................................... 3, 15

Merriam-Webster http://www.merriam-webster.com/dictionary/uniform ............... 18

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

**ER497**

3077495.1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

The relevant False Claims Acts ("FCA") require (among other things) the presence of a false claim—a "call upon the government fisc"—for liability to attach.  Substandard goods for which the defendant makes no "call upon the government fisc" are legally irrelevant because there is no false claim as to those goods.  Over the course of these protracted proceedings, this Court repeatedly warned Plaintiffs that their failure to link any alleged misconduct by J-M to the claims for payment and products Plaintiffs actually received would prove fatal – because such misconduct "doesn't give rise to a False Claims Act claim unless there is something that really connects that conduct to a claim or to an invoice." Chan Decl., Ex. M (10/25/13 Tr. at 7556:22 – 7557:10).

But that is where this case ended up.  After seven years of litigation and seven weeks of trial, Plaintiffs never proved that the goods that ***they were asked to pay for*** failed to comply with industry standards, either in terms of their physical properties or in the way they were manufactured or quality tested. Cross-examined under oath, Plaintiffs admitted that the pipe that J-M sold them might be fully compliant with industry standards; indeed, two of them continued to buy J-M pipe long after this suit.  Thus, the link the Court repeatedly demanded that Plaintiffs establish was never shown. Their case ends here and now.  The Court should grant judgment as a matter of law.

Recognizing that they could not prove the FCA substandard-goods case that they had promised, Plaintiffs, in closing, pulled out of their back pocket an unprecedented legal theory that they had been holding in reserve for such an eventuality.  Their counsel cunningly exploited ambiguities in the jury instructions to argue that Plaintiffs had no burden to prove that the goods they were asked to pay for were noncompliant. Disclaiming any reliance upon the substandard-goods theory, counsel argued instead that J-M had sold Plaintiffs an iron-clad guarantee of absolute manufacturing consistency.  Under this imaginary guarantee, J-M supposedly promises that every stick of pipe that it sells to everyone everywhere in the world complies with industry standards,

1

(127 of 262) Page 127 of 262Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 127 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 10 of 48   Page
ID #:67170

1   just as did the qualifying sample of pipe submitted to the standards agencies.  A prod-

2   uct or testing failure anywhere in the world allegedly renders J-M strictly liable to every

3   customer, including the vast majority who receive excellent and fully standards-

4   compliant pipe.  This "uniform-compliance" theory conveniently solved Plaintiffs' evi-

5   dentiary problem by relieving them of their burden to prove that J-M had falsely

6   claimed payment **from them** for noncompliant pipe that **they** had purchased.

7        But Plaintiffs' uniform-compliance theory depends on an industry standard that

8   does not exist, that no manufacturer could possibly meet or would ever agree to meet,

9   that no public entity or other customer would ever expect, and that no industry testing

10  agency has ever promulgated or enforced.  (Indeed, no such agency has ever delisted J-

11  M.)  This fictitious industry standard also was completely at odds with the limited con-

12  tractual warranty that J-M actually provides to its customers, including Plaintiffs.  The

13  very existence of that warranty disproves any contention that Plaintiffs could have be-

14  lieved that they were purchasing a guarantee of absolute manufacturing consistency.

15       As explained below, Plaintiffs' uniform-compliance theory of FCA liability is

16  both legally and factually untenable and must be rejected.  Accepting it would trans-

17  form the statute into one imposing strict liability, deny defendants the fair notice that

18  due process requires, distort industry standards (indeed, distort the very notion of in-

19  dustry standards), and unleash an unfair and unworkable new form of liability upon an

20  already fragile national economy.

21       Although there is no likelihood that a retrial under any recognized FCA theory

22  could result in liability, J-M also moves in the alternative for a new trial in which new

23  jury instructions would categorically preclude the miscarriage of justice that occurred

24  here.  At a bare minimum, retrial is necessary because the case was bifurcated so as to

25  divide the unitary issue of falsity between two juries, a violation of the Seventh

26  Amendment.  The bifurcation also resulted in an empty verdict that provides no factual

27  basis sufficient to proceed with the damages phase of the trial.  If a retrial is deemed

28  necessary, the Court also should exclude evidence of test results and product flaws that

2

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

ER499

3077495.1

(128 of 262) Page 128 of 262 ase: 25-2499, 08/29/2025, DktEntry: 22.4, Page 128 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 11 of 48   Page
ID #:67171

1    have nothing to do with the pipe purchased by these Plaintiffs.

2         For all these reasons, as stated more fully below, the Court should grant judg-

3    ment as a matter of law in J-M's favor, or alternatively, grant J-M's new trial request.

## II.  PROCEDURAL HISTORY

**A.    The Court bifurcated this case to allow the five representative Plaintiffs to attempt to prove certain FCA elements before proceeding with findings concerning "each individual Plaintiff."**

7         At Plaintiffs' urging, and over J-M's objections, this Court bifurcated this case in

8    December 2011.  Under the Bifurcation Order, the Phase One jury was to make certain

9    findings as to the FCA elements of falsity, scienter, and materiality, so as to assist the

10   Phase Two jury in making more specific findings "with respect to each individual Plain-

11   tiff."  Chan Decl., Ex. A (Doc. No. 551 at 10 of 11).  The Bifurcation Order was prem-

12   ised upon the Court's understanding (at the time) that Plaintiffs' "paradigm" was "basi-

13   cally that ***all of the piping*** fails to meet these standards and requirements of the certi-

14   fying agencies."  Chan Decl., Ex. B (9/26/11 Tr. at 6:1-3; emphasis added).  The Court

15   cautioned that "if, in fact, the plaintiffs are wrong on their paradigm … their case is

16   over."  Chan Decl., Ex. B (9/26/11 Tr. at 6:10-13).

**B.    Plaintiffs subsequently proceeded on a "Conventional Substandard-Product" theory of liability, expressly disclaiming all other theories.**

19        There are five recognized categories of FCA cases, each with its own require-

20   ments for establishing liability.  John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM

21   ACTIONS § 1.06 at 1-40 (4th ed. 2011) ("Boese").[1]

---

[1] The five FCA liability theories are: (1) "substandard product or service" cases; (2) "false certification" cases; (3) "fraud-in-the-inducement" cases; (4) "mischarge" cases; and (5) "reverse false claim" cases.  Boese § 1.06 at 1-40.  Plaintiffs abandoned the "false certification" and "fraud-in-the-inducement" theories of FCA liability, presuma- bly to avoid meeting the additional evidentiary burdens that those theories entail. A "false certification" theory would have required proof that, among other things, J-M certified compliance with a statute or government regulation as a condition to govern- ment payment, and that such certification was a prerequisite to, and a *sine qua non* of, obtaining the government benefit.  *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166,

3

1   Among these is the so-called "substandard-product" case—a variant of the "ar-

2   chetypal" FCA case in which "a private company overcharges under a government

3   contract." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).

4   Such a case may be brought as a "Type 1" case (in which the claim for payment must

5   itself be false), or a "Type 2" case (in which the claim and a record or statement made

6   or used to get it paid must be false).   Chan Decl., Ex. C (Doc. No. 1792 (Court's Final

7   Jury Instructions) at 6-7 of 9).

8   After the case was bifurcated, Plaintiffs framed their Phase One case as a "con-

9   ventional" substandard-product claim, in which "the bills for payment were 'false

10  claims' because **the goods delivered** differed materially from what they were repre-

11  sented to be."   Chan Decl., Ex. D (Plaintiffs' 5/16/12 letter at 4; emphasis added).

12  One year before trial, Plaintiffs confirmed that their theory "is simply a conven-

13  tional False Claims Act claim **for delivery of 'substandard products**.'"   Chan Decl.,

14  Ex. E (Doc. No. 758-1 at 6-7 of 75; emphasis added); Ex. F (5/7/12 Tr. at 14:6-8;

15  14:25-15:5 (Plaintiffs' counsel: "This is a substandard product case …. If I tell you here

16  is this product and here is what it is, and I know it's not what I'm telling you it is, that's

17  just a substandard products case.")).   The day before trial, Plaintiffs reiterated that they

18  were not going to present a fraudulent-inducement theory in Phase One.   Chan Decl.,

19  Ex. G (9/16/13 Tr. at 26:22-23; 28:13-22 ("[W]e're not making that [fraudulent in-

20  ducement] argument here; we will make that argument in Phase 2.")).[2]

21  Plaintiffs thus committed themselves to a conventional substandard-product

---

22  1171-73 (9th Cir. 2006).   A "fraud-in-the-inducement" theory would have required

23  proof that, at the outset, the contract or extension of government benefit was originally

24  obtained by J-M through false statements or fraud, and that such false statements or

     fraud were material to Plaintiffs at that time.   *Hendow*, 461 F.3d at 1173-74.   The "mis-

25  charge" and "reverse false claim" theories are inapplicable and were not pursued.

26  [2] Plaintiffs have never cited any support for their position that they can mix and match

27  theories of liability between Phases One and Two, such that they get the plaintiff-
     friendly benefits of a given theory in one phase while evading the burdens of that theo-

28  ry in another phase.   J-M continues to object to Plaintiffs' inexcusable theory-switching.

1   theory.  As explained in Part III.C.1 below, that theory requires Plaintiffs to prove they

2   did not receive what they paid for—pipe that met the promised industry standards.

3       But Plaintiffs also tried to hedge their bets, articulating what they sometimes

4   called their "lottery ticket" theory, and by the end of trial were calling their "uniform

5   compliance" theory.  They invented this theory—unknown in the law books—to avoid

6   having to prove they had received non-compliant pipe.  Plaintiffs claimed that, because

7   J-M had promised to meet industry standards, and because those standards (supposed-

8   ly) required J-M to produce absolutely consistent pipe all the time, a failure to achieve

9   consistency in *any* pipe sold to *anyone in the world* rendered J-M's claims for pay-

10  ment to *Plaintiffs* false—even if the pipe that *Plaintiffs* had purchased was perfectly

11  fine.  In other words, if *any one* stick of J-M pipe *anywhere* failed to comply with in-

12  dustry standards, then *all* J-M pipe (not just the non-compliant stick) should be

13  deemed to be "falsely" marked / stamped because J-M had "falsely" represented that

14  "all" its pipe "uniformly complied" with industry standards.

15      On J-M's summary adjudication motion, the Court commented unfavorably on

16  this theory, warning Plaintiffs that the Court would hold them to the requirement that

17  they tie the alleged falsity to the products and claims for payment they had received:

18  • At the March 2013 hearing, the Court stated that: "[E]ven as to the [exemplar

19     Plaintiffs] in Phase 1, they have to establish that each plaintiff that's raising

20     that particular defect or manufacturing problem or false representation vis-à-

21     vis, you know, what's called for in the contract, that that particular plaintiff

22     has the standing to argue it by showing that, yes, we got this particular pipe

23     that we're complaining about or we got this pipe that was supposed to have

24     been manufactured in a particular way that was not manufactured in that par-

25     ticular way." Chan Decl., Ex. H (Doc. No. 851 at 13-14 of 33).

26  • In its March 2013 order, the Court similarly explained that: "Either each

27     plaintiff must demonstrate receipt (in connection with a claim) of an actually

28     defective product, or none of them do, but instead need only show it re-

1    ceived a product which was not subject to the quality testing as represented."

2    Chan Decl., Ex. I (Doc. No. 836 at 3 of 5 n.4).

3    Thus, while the Court recognized that a product may be "substandard" *either*

4    because it was itself defective *or* because it was not subjected to the required quality as-

5    surance testing (a point J-M does not dispute), the Court made clear that in order to tie

6    falsity to the claim, Plaintiffs would still need to show ***actual receipt*** of product that

7    did not comply with industry standards with respect to its manufacturing or testing.

8    **C.**    **The Court repeatedly warned Plaintiffs that any finding of "falsity" must
       be tied to the claims for payment and products that Plaintiffs received.**

9

10   Recognizing this legal tying requirement, and that this case is neither a false ad-

     vertising nor a negligence case, the Court repeatedly warned Plaintiffs (both before and

11   during trial) that they would have to tie any alleged falsity to the particular claims for

12   payment and pipes they had received.  This included:

13   •    **The day before trial started**: "[T]he F, M, and the S relate to the claim.

14        The F, M, and S aren't something that's separate. All those three concepts

15        relate to the claim; and if they're not related to the claim, then I would

16        think there would be a problem because, again, if that were the situation,

17        then it becomes some sort of ***pseudo-strict liability requirement*** which

18        is not required here … or something else." Chan Decl., Ex. G (9/16/13

19        Tr. at 39:7-16) (emphasis added).

20   •    **The second day of trial:** "The problem is … that the falsity has to relate

21        to a claim and if the falsity is not related to a claim, what's the relevance

22        of that supposed falsity?" Chan Decl., Ex. J (9/18/13 Tr. at 513:1-5).

23   •    **Three weeks into trial**: "It can't be a basis for the false claim. I hope you

24        recognize that because ***it's going to be based on what [Plaintiffs]***

25        ***purchased***, not on everything.  It's the basis of those claims.  You guys

26        chose -- you guys got exemplar plaintiffs.  You guys got to choose which

27        claims you wanted.  Those are the claims that we are litigating. We are not

28

6

1    litigating everything. I hope you recognize that." Chan Decl., Ex. K

2    (10/7/13 Tr. at 3634:24 – 3635:7) (emphasis added).

3    • **Four weeks into trial**: "[T]he problem here is that this case is somewhat

4    unique because the -- normally, it is so readily apparent what the falsity is

5    in regards to the claim that, you know, you don't need any really further

6    articulation. This one, however, is kind of like a bank shot. It's stuff in

7    steps. But there has to be this connection between the falsity and the

8    claim. But the falsity has to be part of the claim in some way." Chan

9    Decl., Ex. L (10/21/13 Tr. at 6256:10-17).

10   • **Five weeks into trial:** "Well, but let me just caution you. The fact that

11   there is a noncompliance would not necessarily give rise to a false claim

12   even under the lottery theory … Now, the fact that, for example, that

13   there may have been, you know, rumblings amongst personnel at J-M

14   about plant managers removing tags from pipe that was designated

15   initially as scrap, that doesn't give rise to a False Claims Act claim ***unless***

16   ***there is something that really connects that conduct to a claim or to***

17   ***an invoice***." Chan Decl., Ex. M (10/25/13 Tr. at 7556:22 – 7557:10)

18   (emphasis added).

19   • **Shortly before closing argument:** "[Y]ou have to not only reference the

20   standard, but you have to reference the way in which the standard is

21   involved in a claim to make it false or a statement upon which the claim

22   rests to make the claim false." Chan Decl., Ex. N (11/1/13 Tr. at 57:4-8).

23   Plaintiffs nevertheless ignored these admonitions and continued to promise the

24   Court that their "lottery-ticket" or "uniform compliance" theory would demonstrate

25   the necessary link between the alleged falsity and the claims for payment and products

26   Plaintiffs received.

27

28

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

**ER504**

3077495.1

(133 of 262) Page 133 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 133 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 16 of 48   Page
ID #:67176

**D.**   **The jury instructions insufficiently defined the "tying" aspect of falsity, allowing Plaintiffs to ditch their substandard-product theory and assert their "uniform compliance" theory.**

Before trial, the Court recognized that it would be necessary to define falsity (and the other elements) in this sprawling, complicated FCA case.  Chan Decl., Ex. G (9/16/13 Tr. at 39:7-16).  J-M proposed an elements jury instruction that, by tying falsity to the products received by Plaintiffs, would have defined falsity in accordance with (a) clearly established law in conventional substandard-products cases (summarized in Part III.C.1 below), and (b) the Court's own articulation of that law in its summary-adjudication order and repeated admonitions to Plaintiffs' counsel throughout the course of these proceedings.  J-M's proposed instruction stated:

> The claim presented itself was false (for Type 1 FCA claims), or the record/statement were false (for Type 2 FCA claims), "in that the PVC pipe made by J-M and actually received by each plaintiff in connection with the claim was actually defective or was not actually subject to quality testing as represented by J-M."

Chan Decl., Ex. O (Doc. No. 1554-3 at 4-5 of 37).

But the Court declined to give J-M's proposed instruction and instead simply instructed the jury that the claim and supporting record or statement had to "contain or [be] based upon an assertion that [was] untrue when made or when used."  Chan Decl., Ex. C (Doc. No. 1792 at 7 of 9).

Additionally, at Plaintiffs' urging, the Court instructed the jury that "[n]o showing of actual damage is required to establish a false or fraudulent claim for payment."  Chan Decl., Ex. C (Doc. No. 1792 at 8 of 9).  At the charging conference, the Court made clear that this instruction was only meant to explain that the jurors did not need to find the existence or amount of monetary damages when completing the Phase One verdict form.  Chan Decl., Ex. P (11/4/13 Tr. at 7725:22 – 7726:6).  J-M agreed that monetary damages, if any, were not at issue in Phase One.  But J-M objected to this instruction, accurately foreseeing that Plaintiffs would seize upon it to argue that—contrary to the law governing substandard-product cases—they need not even show that the J-M pipes they received were noncompliant.  Chan Decl., Ex. Q (Doc. No.

1756 at 2-3 of 4); Ex. P (11/4/13 Tr. at 7725:11 – 7727:23). Nevertheless, the Court gave the instruction.[3]

**E.    At trial, Plaintiffs repeatedly admitted that they had no evidence that they had received non-compliant pipe—so they proposed a "uniform compliance" theory to mask their insufficient evidence.**

At trial, Plaintiffs' witnesses uniformly admitted that they had no evidence that the specific pipe they received violated any industry standards. For example:

- The representative for Norfolk, David Speer, admitted that it was possible that "100 percent" of Norfolk's J-M pipe is "good pipe." Chan Decl., Ex. R (10/9/13 Tr. at 4370:18-4371:9, 4406:20-23).

- The representative for Palmdale, Matthew Knudsen, admitted that there is "[n]o way to verify" whether Palmdale's J-M pipe met industry standards. Chan Decl., Ex. S (10/8/13 Tr. at 4224:3-21).

- The representative for Reno, Terry Svetich, could not say whether Reno's J-M pipe "does or does not meet" industry standards. Chan Decl., Ex. T (10/2/13 Tr. at 3381:22- 3382:16).

- Plaintiffs' standards experts, James Paschal and Rafael Ortega, both admitted that they did not know whether Plaintiffs received J-M pipe that failed to meet industry standards. Chan Decl., Ex. U (9/20/13 Tr. at 1230:25-1231:9, 1233:6-10); Ex. R (10/9/13 Tr. at 4494:16-22).

Plaintiffs needed to put distance between this evidence and their previous sub-standard-product theory, which clearly was going to fail. Accordingly, ignoring the Court's repeated rulings and admonitions, they argued in closing that their case was "not about substandard products." Chan Decl., Ex. V (11/6/13 Tr. at 8136:2-20). Rather, they claimed, it was based on a failure to meet an alleged industry standard of absolute manufacturing consistency.

---

[3]   With regard to all jury instructions, J-M stood on its pre-trial proposed instructions and associated briefing, and objected to the Court's decision not to include those instructions. Chan Decl., Ex. P (11/4/13 Tr. at 7725:11-7727:23).

9

1    Plaintiffs cynically exploited the absence of a specific "tying" instruction to mis-

2 lead the jury into wrongly believing that Plaintiffs had no burden to prove that their

3 pipes failed to conform to industry standards:

> [J-M's counsel] told you there's no evidence the plaintiffs here got sub-
> standard pipe so they shouldn't recover …. Ladies and gentlemen, look at
> the jury instructions. ***The court will never instruct you anywhere that
> we have to show we got substandard pipe.*** This is not a products lia-
> bility case. This is a False Claims Act case. All we need to show is that J-M
> misrepresented its products to our clients or caused someone to misrepre-
> sent them, to cause a false statement. This is a False Claims Act case. It is
> about false statements. It is not, no matter how many times [J-M's coun-
> sel] would say it or want you to believe it, ***it is not about substandard
> products and we do not have to show that in this phase of this case
> in order to prevail. That is nowhere in the jury instructions.***

10 Chan Decl., Ex. V (11/6/13 Tr. at 8136:2-20) (emphasis added).

11    As J-M had predicted, Plaintiffs also exploited the "no damage" instruction to

12 argue that the jurors need not even consider whether Plaintiffs' pipe was compliant:

> ***There's nothing that requires you to figure out if a particular stick
> of pipe that's in the ground was falsely marked or not falsely
> marked.*** …
>
> Now, of course, we don't know exactly what pipes from which plants
> went to the plaintiff because J-M mixes it up. They sometimes ship from
> one plant, sometimes ship from another. ***But as the jury instruction
> tells you … we don't have to prove actual damage. So we don't have
> to prove which plant shipped pipe to us.***

18 Chan Decl., Ex. W (11/5/13 Tr. at 7944:5-10) (emphasis added); Ex. V (11/6/13 Tr. at

19 8148:25 – 8149:6) (emphasis added).

20    Citing Note 10 of the PPI TR-3 standard, Plaintiffs' counsel argued instead that

21 J-M had sold Plaintiffs a guarantee that J-M employs "a process that continually manu-

22 factures the pipe" so that "***all of it***"—"***not just most of it***"—has "***the same***" long-

23 term strength and durability as the originally qualified pipe.   Chan Decl., Ex. V

24 (11/6/13 Tr. at 8144:19 – 8145:9) (emphasis added).

25    But Plaintiffs had a problem.  A liability theory that requires perfect manufactur-

26 ing consistency makes no sense and would repel any reasonable jury.  Plaintiffs' counsel

27 took steps to inoculate against this problem by rhetorically disclaiming the unattractive

28 aspects of his own theory.  His false reassurances to the jury took several forms.

10

(136 of 262) Page 136 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 136 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 19 of 48   Page
ID #:67179

1    **1.**    **Of course we're not demanding perfection!**  Plaintiffs' counsel disin-

2 genuously denied that this "uniform compliance" theory demanded perfect consistency

3 in manufacturing.  In the same breath, however, he asserted that the phrase "continual-

4 ly manufactured" in Note 10 "means all the time, not just some of the time."  Chan

5 Decl., Ex. V (11/6/13 Tr. at 8145:20-8146:24) (Plaintiffs' counsel: "The point is ***not***

6 ***just some of it is good*** …. [Plaintiffs] were told: We manufacture our pipe in a certain

7 way and it's a way that ensures that ***it's all good"*** *)* (emphasis added).

8    **2.**    **But . . . J-M promised perfection.**  In a further mischaracterization of

9 the evidence, Plaintiffs' counsel argued that J-M sold Plaintiffs a ***guarantee*** of manu-

10 facturing perfection, rather than a contractually-warrantied product subject to uninten-

11 tional mistakes and variations in the manufacturing process:

> And that's not what you're paying for.  ***You're not paying for luck of the draw.***  When these plaintiffs bought pipe, they're not paying for luck of the draw … .
>
> The point is ***you're buying that guarantee of consistency.  That's why it's a false statement if you say to people:  Our pipe is consistently made in this way, all of it.***

16 Chan Decl., Ex. V (11/6/13 Tr. at 8147:13-24) (emphasis added).

17    **3.**    **Don't worry—all a manufacturer has to do is "follow the rules."**

18 With equal lack of candor, Plaintiffs' counsel argued that all a manufacturer has to do

19 to satisfy Plaintiffs' fictional standard of perfect manufacturing consistency is to just

20 "follow the rules all of the time"—which was nothing more than another (disguised)

21 way of demanding perfection.  Chan Decl., Ex. W (11/5/13 Tr. at 7816:19-7817:2); Ex.

22 V (11/6/13 Tr. at 8087:17-19).

23    **4.**    **A manufacturer has nothing to fear as long as it doesn't pretend to**

24 **be perfect.**  Plaintiffs' counsel conflated the falsity and scienter elements by arguing

25 that J-M did not cross the line into falsity if its manufacturing was merely "subject to

26 normal human error," but did cross that line if it committed a "reckless or knowing vi-

27 olation" – meaning if it ***knew*** it could not manufacture pipe with perfect consistency:

28       The point is you're buying that guarantee of consistency.  That's why it's a

(137 of 262) Page 137 of 262
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 137 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 20 of 48   Page
ID #:67180

1  false statement if you say to people:  Our pipe is consistently made in this
2  way, all of it.  And again, everybody understands it's subject to normal
   human error.  What it's not subject to is recklessness or knowing violation.

3  Chan Decl., Ex. V (11/6/13 Tr. at 8147:21-8148:2).

4      Of course, no manufacturer's processes or outcomes are perfect, and every
5  manufacturer knows that.[4]

6      **5.    J-M made bad pipe.  For somebody.  Sometime.  Somewhere.**  Plain-
7  tiffs' counsel tried to support their "uniform compliance" theory by citing evidence of
8  internal J-M test results—***none*** of which linked a false statement by J-M to the specific
9  pipe for which J-M had sought payment.  Plaintiffs' primary argument was that J-M's
10 internal quick-burst, tensile-strength, and HDB test results had supposedly declined
11 over time.   Chan Decl., Ex. V (11/6/13 Tr. at 8162:24-8163:3).   As noted in Part
12 IV.F.1, however, Plaintiffs' evidence of a "decline" in quick burst results was based up-
13 on an artificial 7200-psi benchmark—not the industry standard 6400-psi requirement,
14 which J-M passed over 99% of the time.  And virtually all of Plaintiffs' evidence relat-
15 ing to tensile strength and HDB results stemmed from internal R&D and qualification
16 tests of pipe that was never commercialized or sold with agency markings / stamps.

17     Plaintiffs presented zero evidence that any of these internal R&D or qualification
18 results—or any "declining" test results—were linked to any pipe actually purchased by
19 any Plaintiff or any claim for payment actually submitted to any Plaintiff.

20 / / /
21 / / /
22

---

23 [4] Plaintiffs' conflation of these two elements was disingenuous and prejudicial to J-M.
24 In a substandard-products case, a defendant makes a false statement if it delivers a sub-
   standard product (even through normal human error) but calls it standard compliant.
25 Concepts such as "recklessness" or "knowing" go only to the separate (and subse-
26 quent) element of scienter, not to whether the statement was false in the first place.
   But by intentionally confusing these two elements, Plaintiffs won an erroneous finding
27 of falsity—despite the total absence of proof that they received noncompliant prod-
28 uct—just by acknowledging that they also had to prove scienter.

12

(138 of 262) Page 138 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 138 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 21 of 48   Page
ID #:67181

1  **F.      The verdict reflected the jury's acceptance of Plaintiffs' abandonment of their substandard-products theory in favor of an unprecedented "uniform compliance" theory.**

3      Plaintiffs' counsel urged the jury to complete the verdict form by finding that J-

4  M had in each instance made the same allegedly false representation: a representation

5  of "uniform compliance" with industry standards.  The jury did as instructed and found

6  a false representation of "uniform compliance" with respect to all five Plaintiffs, twen-

7  ty-six projects, and the numerous alleged claims for payment on those projects.  This

8  was the exclusive basis for the liability verdict.  Chan Decl., Ex. X (Doc. No. 1794).

9  The jury was not asked to, and did not, find that Plaintiffs had received something oth-

10 er than what J-M had asked them to pay for—pipe that met the promised standards.

## III.  MOTION FOR JUDGMENT AS A MATTER OF LAW

12 **A.      The Court should grant judgment for J-M as a matter of law because Plaintiffs submitted no substantial evidence of falsity, knowledge, or materiality under the FCA.**

14      Judgment as a matter of law is warranted because Plaintiffs did not and cannot

15 prove any of the three elements tried in Phase One, as those elements are properly de-

16 fined and understood in a conventional substandard-product case.

17 **B.      Standard of review.**

18      "If a party has been fully heard on an issue during a jury trial and the court finds

19 that a reasonable jury would not have a legally sufficient evidentiary basis to find for

20 the party on that issue, the court may (A) resolve the issue against the party; and (B)

21 grant a motion for judgment as a matter of law against the party on a claim or defense

22 that, under the controlling law, can be maintained or defeated only with a favorable

23 finding on that issue."  Fed. R. Civ. P. 50(a)(1).  A court should "grant a JMOL motion

24 when there is a 'complete absence of probative facts to support the conclusion reached

25 so that no reasonable juror could have found for the nonmoving party.'"  *Applied Med.*

26 *Res. Corp. v. United States Surgical Corp.*, 549 F. Supp. 2d 1208, 1210 (C.D. Cal. 2008)

27 (quoting *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 761 (8th Cir. 2003)).

28 "[A] reasonable inference cannot be supported by only threadbare conclusory state-

1  ments instead of significant probative evidence." *Lakeside-Scott v. Multnomah County*, 556

2  F.3d 797, 802 (9th Cir. 2009) (quotation marks and citations omitted).  Further, "a mere

3  scintilla is not enough to sustain a verdict for the prevailing party."  *Id.* (citing *Willis v.*

4  *Marion County Auditor's Office*, 118 F.3d 542, 545 (7th Cir. 1997)).

5  **C.  Plaintiffs failed to prove falsity.**

6  As explained below, Plaintiffs failed to prove falsity—indeed, deliberately evaded

7  their burden of proof—in two ways.

8  ***First***, Plaintiffs failed to submit any evidence that they did not receive the goods

9  that J-M asked them to pay for—namely, pipe that met the promised industry stand-

10  ards.  Even now, after ***years*** of litigation and ***weeks*** of trial, the actual condition and

11  quality of the pipe sold to Plaintiffs remains unproven.

12  ***Second***, recognizing that their substandard-product case had failed, Plaintiffs as-

13  serted in closing that theirs was no longer a substandard-products case at all—even

14  though they had firmly committed themselves to that theory and had long ago disa-

15  vowed any other recognized FCA theory.  The replacement theory that Plaintiffs

16  cooked up was not only legally unsupportable, but also disastrous from the standpoint

17  of fairness and policy.  In essence, Plaintiffs urged the jury to believe that J-M had

18  made and broken a promise of absolute manufacturing perfection—a promise that no

19  manufacturer could ever keep.  This, in turn, required Plaintiffs to misrepresent what

20  the industry standards actually require.

21  **1.  Plaintiffs conceded that they failed to prove the falsity element of their substandard-product FCA claim.**

22

23  The FCA is a "false claim" statute that specifically "focuses on the submission of

24  a claim."  *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002-03

25  (9th Cir. 2002).  The plaintiff "must show an actual false claim for payment being made

26  to the Government"; and that false claim for payment is "the *sine qua non* of a False

27  Claims Act violation."  *Id.* at 1002 (internal quotation marks omitted).  As the Ninth

28  Circuit has explained, "the False Claims Act at least requires the presence of a claim—a

14

1   call upon the government fisc—for liability to attach." *Id.* (citing *Harrison v. Westing-*
2   *house Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)). Goods for which there was
3   no "call upon the government fisc" are irrelevant.

4       Accordingly, the plaintiff in a substandard-product case must prove that "a sup-
5   plier of goods or services provid[ed] an inferior substitute in place of the service or
6   product contracted for." Boese, §§ 1.06[D] at 1-48 (citing *United States v. Aerodex, Inc.*,
7   469 F.2d 1003 (5th Cir. 1972)). Unlike the fraudulent-inducement theory of FCA liabil-
8   ity, a substandard-product case ***cannot*** be based upon mere proof of an initial fraud in
9   the inducement of the contract, which then renders all subsequent invoices actionable.
10  Rather, substandard-product cases require the actual delivery of a substandard product.

11      What makes the claim false is that the defendant represented that ***the specific***
12  ***goods for which payment was claimed*** met a given standard of quality when those
13  goods actually were substandard. *U.S. ex. rel. Stebner v. Steward & Stevenson Services, Inc.*,
14  305 F. Supp.2d 694, 698, 701 (S.D. Tex. 2004), *aff'd* 144 Fed. Appx. 389, 395 (5th Cir.
15  2005) ("[T]he first step in finding an FCA violation must be to establish whether the
16  Government has received the benefit of its bargain. If it has, then no false or fraudu-
17  lent claim exists and summary judgment for the defendant is appropriate."); *Aflatooni*,
18  314 F.3d at 1002 (a "false claim" is "a claim for goods or services not provided").

19      In other words, a plaintiff proceeding on a substandard-product FCA claim must
20  establish that the public entity that was asked to pay the false claim ***did not receive***
21  ***what it was asked to pay for***—*i.e.*, a product that met a promised standard, either
22  with respect to its manufacturing or testing. There is no other legally correct way to
23  conceive of the falsity in a substandard-product case.[5]

24      It is ***not*** enough to show merely "a limited probability that ***some*** [product] may

---

[5] Plaintiffs acknowledged this in May 2012 ("the bills for payment were 'false claims'
because the goods delivered differed materially from what they were represented to
be"), while inconsistently arguing (without support) that "plaintiffs need not prove un-
der the False Claims Act that any particular product delivered to an exemplar plaintiff
was 'substandard.'" Chan Decl., Ex. D (Plaintiffs' 5/16/12 letter at 4).

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

**ER512**

3077495.1

1   need repairs" in the future. *Stebner,* 305 F. Supp.2d 694, 701 (emphasis added); *United*

2   *States ex rel. Crews v NCS Healthcare of Ill., Inc.,* 460 F.3d 853 (7th Cir 2006) (rejecting re-

3   lator's claim that proving a 6% to 12% probability that recycled medication was sold to

4   Medicaid patients met her burden of alleging that defendant's resale of the medications

5   constituted submitting false claims to Medicaid).  Rather than relying on a statistical

6   possibility that Plaintiffs **may** have paid for substandard product—a possibility that

7   Plaintiffs did not even try to quantify in this case[6]— a plaintiff must focus on "what the

8   Government **actually received**"; and Plaintiffs' burden is to "demonstrate noncon-

9   formance that deprives the Government of its bargain." *Stebner,* 305 F. Supp. 2d at 700

10  (granting summary judgment because plaintiff produced "no evidence that any … in-

11  voice expressly claimed to deliver something more than what the Government actually

12  received"); *U.S. ex rel. Lusby v. Rolls-Royce Corp.,* No. 1:03-CV-680-SEB-WGH, 2012 WL

13  4357438, at *11 (S.D. Ind. Sept. 24, 2012) (granting defendant's motion for summary

14  judgment in part because plaintiff was "unable to identify individual parts and transac-

15  tions involving nonconforming goods sold to the government" and thus failed to "pre-

16  sent evidence of at least one knowingly false claim that was actually submitted to the

17  government") (internal quotation marks omitted).[7]

18  _____

19  [6] Plaintiffs made no showing, for example, that the "possibility" they received sub-

20  standard pipe exceeded 50% and thus satisfied the civil "more-likely-than-not" stand-
    ard of proof (assuming, *arguendo,* that such a showing would suffice in an FCA case).

21  [7] *See also United States ex rel. Cox v. General Dynamics Armament and Technical Products, Inc.,*

22  No. 4:07CV3264, 2010 WL 2218614 at *3–*10 (D. Neb. May 28, 2010) (holding that

23  "[i]t is not enough for [relator] to describe manufacturing defects that he discovered
    while inspecting various products and parts.  [Relator] must provide details showing

24  that **claims for payment were actually made with respect to the allegedly defec-**
    **tive products and parts**" and that "the government **was actually billed for a prod-**

25  **uct that failed to pass his inspection**.") (emphasis added); *United States ex rel. Klusmei-*

26  *er v. Bell Contractors, Inc.,* 469 Fed. Appx. 718, 2012 WL 555736 at *1, *3–*4  (11th Cir.
    Feb. 21, 2012) (affirming dismissal of FCA complaint despite detailed allegations of

27  non-compliant work and contract violations; relators failed to allege that defendant's

28  monthly invoices "**actually billed for the non-compliant work.**") (emphasis added).

(142 of 262) Page 142 of 262
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 142 of 262
Case 5:06-cv-00055-GW-MAR    Document 1833    Filed 01/14/14    Page 25 of 48    Page
ID #:67185

1    Here, Plaintiffs repeatedly admitted at trial that they did **not** have evidence that

2    the pipe they had paid for violated any industry standards.  As described above, their

3    witnesses stated that, for all they knew, the J-M pipe that they had purchased was just

4    fine. In closing, therefore, Plaintiffs' counsel switched theories and denied that Plain-

5    tiffs needed any evidence tying the allegedly false claims to pipe they had purchased.

6    Plaintiffs' conceded lack of tying evidence is fatal and requires that judgment be

7    entered for J-M as a matter of law.  Just as in *Stebner* and *Lusby*, Plaintiffs cannot suc-

8    ceed where they managed to prove only "a limited probability that some [product] may

9    need repairs [in the future]," but made no showing that the Government was actually

10    invoiced for "something more than what the Government actually received."  *Stebner*,

11    305 F.Supp. at 698, 701; *see also U.S. ex rel. McLean v. County of Santa Clara*, 2011 WL

12    5223076 (N.D. Cal. Oct. 31, 2011) (stating that the "use of probability as a backbone to

13    a False Claims Act suit has been denounced" by federal courts, including within the

14    Ninth Circuit, and rejecting "anecdotal and highly speculative stories… coupled with

15    complex, contrived comparative analyses of statistical data" as evidence of a false

16    claim); *U.S. ex rel. Cericola v. Federal Nat'l Mortgage Ass'n,* 529 F. Supp. 2d 1139, 1145-46

17    (C.D. Cal. 2007) (rejecting allegation that seventy percent of 28,000 claims that defend-

18    ant caused to be submitted were false).  And just as the *Stebner* and *Lusby* relators could

19    not tie the alleged misconduct in those cases to the products or services actually deliv-

20    ered and the claims for payment actually submitted, so too Plaintiffs here failed to tie

21    any evidence of alleged misconduct to the pipes for which they had paid.

22    The jury's determination that J-M told a falsehood is therefore deficient as a

23    matter of law and judgment must be granted for J-M.

24    **2.**    **Plaintiffs' "uniform compliance" theory is legally untenable, practically unworkable, and unsupported by substantial evidence.**

25

26    Plaintiffs' "uniform compliance" theory requires that manufacturers such as J-M

27    achieve perfect manufacturing consistency. Anything short of such perfection—even a

28    single 20-foot stick of non-compliant pipe delivered to a **non-Plaintiff** as a result of

17

1    inadvertent error—constitutes falsity under this unprecedented theory.[8]

2        As discussed below, Plaintiffs' "uniform compliance" theory fails as a matter of

3    law and fact on multiple grounds.

4               **a.**      **Plaintiffs' "uniform compliance" theory transforms the FCA**

5                       **into a strict-liability statute—something that Congress never intended.**

6        A statute should be interpreted so as to give effect to all of its terms. *United*

7    *States v. Banks*, 556 F.3d 967, 978 (9th Cir. 2009) ("Definitions should be adopted that

8    'give effect, if possible, to every word of the statute'" (quoting *Bowsher v. Merck & Co.,*

9    460 U.S. 824, 833 (1983)). The relevant FCA provisions contain scienter requirements

10    denoted by the term "knowingly." 31 U.S.C. § 3729(a)(1), (b)(1). That term means that

11    a person has actual knowledge of information, or acts in deliberate ignorance or reck-

12    less disregard of the truth or falsity of the information. *Wang v. FMC Corp.*, 975 F.2d

13    1412, 1420 (9th Cir. 1992). To read that element out of the statute would transform the

14    FCA into a strict-liability statute. But that is exactly what happened here.

15        Before trial started, the Court foresaw that some kind of impermissible "pseudo-

16    strict liability" would result if Plaintiffs were not required to tie falsity (and also the

17    other FCA elements) to the claim for payment. Chan Decl., Ex. G (9/16/13 Tr. at

18    39:7-16). What the Court feared has come to pass. Plaintiffs' "uniform compliance"

19    theory makes J-M strictly liable not only to a customer who receives a single stick of

20    non-compliant pipe, but also to all of its customers who received *compliant* pipe if

21    even just one non-compliant stick is sold to a single customer. Such a standard effec-

22    tively eliminates the FCA's falsity element.

23        Because Plaintiffs' "uniform compliance" theory fundamentally rewrites the

24

---

25    [8]   The plain meaning of the term "uniform" shows that "uniform compliance" means

26    unvarying, constant compliance. *See* "Uniform," *Merriam-Webster.com*, Merriam-Webster

27    http://www.merriam-webster.com/dictionary/uniform ("**uni·form** *adjective*: not vary-

28    ing or changing : staying the same at all times, in all places, or for all parts or mem-

bers") (January 14, 2014).

1    FCA, no verdict founded upon that theory can stand.

2        **b.    Plaintiffs' "uniform compliance" theory violates due process and casts constitutional doubt over the FCA.**

3

4        Like all other statutes, the FCA must be interpreted, if possible, to comply with

5    constitutional requirements. *See, e.g., Oregon v. Ashcroft*, 368 F.3d 1118, 1125 (9th Cir.

6    2004) ("[I]t is a 'cardinal principle' of statutory interpretation that 'where an otherwise

7    acceptable construction of a statute would raise serious constitutional problems, [feder-

8    al courts shall] construe the statute to avoid such problems unless such construction is

9    plainly contrary to the intent of Congress.'") (quoting *Edward J. DeBartolo Corp. v. Fla.

10   Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).  But Plaintiffs' "uni-

11   form compliance" theory is incompatible with the most elementary notions of due pro-

12   cess, which requires that statutes give citizens fair notice of what the law prohibits.

13   *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 1845 (2008).  Accepting that

14   theory would violate the rule of constitutional avoidance.  *See Skilling v. United States*,

15   561 U.S. 358, 130 S. Ct. 2896, 2929-33 (2010) (limiting reach of 18 U.S.C. § 1346 to

16   bribery/kickback schemes, in order to "avoid constitutional difficulties"; as so limited,

17   statute was not unconstitutionally vague because it gave "fair notice" of what consti-

18   tutes prohibited conduct).

19       Due process in the form of fair notice is wholly lacking under Plaintiffs' "uni-

20   form compliance" theory.  Under that theory, a manufacturer seeking to avoid running

21   afoul of the FCA knows only this:

22       (1) even selling standards-compliant product to a customer who later sues will

23   not absolve the manufacturer of liability to that customer for making a false statement;

24       (2) the manufacturer will be liable to that customer merely by virtue of produc-

25   ing some unknown quantity of substandard product (perhaps no more than one unit),

26   even though he never sold that product to that customer;

27       (3) any customer who sues the manufacturer will have the power to decide how

28   much substandard product constitutes a false statement, without ever having to quanti-

19

1  fy or prove that amount (or even disclose what the amount is), and will be able to avoid

2  answering that legitimate question by dismissively telling the manufacturer to "just fol-

3  low the rules, all of the time"; and

4        (4) at trial, the customer will be able to obscure the limitless ramifications of his

5  misinterpretation of the falsity element by conflating that element with scienter.

6        These are the consequences of Plaintiffs' "uniform compliance" theory, which

7  snubs the law's simple but critical requirement that the plaintiff prove receipt of a sub-

8  standard product. Properly interpreted to avoid constitutional doubt, the FCA cannot

9  countenance this.

10       **3.**     **The jury's "uniform compliance" findings and verdict are factually**

11              **unsupported because the industry standards that J-M promised to meet do _not_ require perfect manufacturing consistency.**

12        As the basis for their "uniform compliance" theory, Plaintiffs cited J-M sales

13  brochures stating that J-M C900 pipe "Meets AWWA C900," and noted that the C900

14  standard incorporates Note 10 of PPI TR-3. First, the phrase "uniform compliance" is

15  found nowhere in, nor can it reasonably be inferred from, the brochures. Moreover,

16  C900 and PPI TR-3 do **not** require perfect manufacturing consistency—an impossibil-

17  ity—and J-M's generalized statement that it met those standards did not make or imply

18  any such promise.[9]

19

20

21

_____

22  [9] Importantly, the claims that J-M submitted to Plaintiffs billed them only for the par-

23  ticular pipe that they received and made no representations whatsoever with respect to any other pipe. For example, the first alleged claim for payment specified in the verdict

24  form relates to Calleguas' Lake Bard Oxygenation Project. Chan Decl., Ex. Y (Trial Exhibit 7758). That document clearly states that what was sold to Calleguas was "1300

25  LF [linear feet] of PVC Piping" for that particular project. _Id._ (Trial Exhibit 7758 at

26  65253). No statements – and certainly no "guarantees" – about any J-M pipe other than those 1300 linear feet were ever made to Calleguas in that document or in any as-

27  sociated documents. **_The same is true for all alleged claims for payment and as-_**

28  **_sociated documents that Plaintiffs presented at trial_**.

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1

(146 of 262) Page 146 of 262
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 146 of 262
Case 5:06-cv-00055-GW-MAR    Document 1833    Filed 01/14/14    Page 29 of 48    Page
ID #:67189

### a.    A facial reading of the industry standards confirms J-M's reading of them and refutes Plaintiffs' misinterpretation.

At trial, J-M submitted overwhelming evidence that pipe manufacturing is always and inevitably subject to variation due to conditions beyond the manufacturer's control. *See* Part III.C.3.b below.  Like all other pipe manufacturers, J-M recognizes and provides for this reality by giving customers a contractual warranty.  The very existence of that warranty belies any assertion that J-M or its customers expect perfect manufacturing consistency.[10]

Given the inevitability of variation, it comes as no surprise that neither C900 nor PPI TR-3 requires perfect manufacturing consistency.  As noted in Part III.C.3.b below, the certification system expressly contemplates a lack of "uniform compliance" by allowing variances and notices of correction.  C900's "Quality Control" provisions merely require that the manufacturer take "adequate measures" in the production of its pipe products to "assure product compliance with the requirements of this standard."[11] Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at Section 5.1).  And Note 10 to PPI TR-3 simply states that the manufacturer is "responsible to insure that his product is continually manufactured in such a manner as to maintain the long-term strength and durability consistent with the long-term data supplied to the HSB [Hydrostatic Stress

---

[10]   The warranty provides: "The limited and exclusive remedy for breach of the above warranty by J-M shall be the resupply of a like quantity of non-defective product." Chan Decl., Ex. Z (Trial Ex. 7976 at RENO-0003404).  In other words, rather than promising uniform compliance, J-M expressly accounts for the possibility that it has not achieved manufacturing perfection, and defines the remedy it will offer should a buyer receive non-compliant pipe.

[11]   Likewise, the "Pipe Requirements" section merely requires that "[w]hen manufactured, pipe shall be homogeneous throughout; free from voids, cracks, inclusions, and other defects; and *__as uniform as commercially practical__* in color, density and other physical properties." Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at Section 4.3.1) ("Workmanship") (emphasis added). Thus, to the extent that any "uniformity" concept exists in C900 at all, the standard qualifies that concept with the common-sense principle that uniformity is only required to the extent that it is "commercially practical." Plaintiffs' theory, on the other hand, admits of no such common-sense limitation.

21

1    Board].” Chan Decl., Ex. BB (Trial Exhibit PPI-033 at p. iv).

2        But everyone in the real world understands that a manufacturer may take “ade-

3    quate measures” to “assure product compliance” or to “insure that his product is con-

4    tinually manufactured” in a particular manner, and nevertheless manufacture some

5    product that does not comply with each and every aspect of those two standards.  For

6    instance, if a manufacturer produces 10,000,000 sticks of pipe, and of those, one hun-

7    dred sticks (1 out of every 100,000) are non-compliant, are the manufacturer’s

8    measures still deemed “adequate”?  Of course they are.  But if that amount of non-

9    compliant manufacturing does not prove that a manufacturer is “uniformly” violating

10   the standards, what amount does?  Plaintiffs cleverly avoided answering this pivotal

11   question, and introduced no expert evidence on it.

12       Plaintiffs avoided the issue because, in fact, the standards do not require such

13   perfection – nor do they deem an entire manufacturer’s inventory “non-compliant”

14   simply because certain sticks or batches of pipe do not comply.  For example, C900 is

15   clear that when non-compliant pipe is manufactured, the manufacturer must identify it

16   and remove it from inventory – but the manufacturer may release and sell the remain-

17   ing compliant lots.  Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at Section 5.1.11).

18   Likewise, with respect to quality assurance testing, sampling tests are to be performed

19   periodically to maintain general compliance – such as once every 24 hours for Pipe

20   Burst Strength.  *Id.* (Trial Exhibit AWWA 4 at Section 5.1.4).  If perfect consistency

21   were required, simply testing once every 24 hours could never suffice.

22       In short, the plain text of the standards themselves lends no support to Plain-

23   tiffs’ theory that **all** of the manufacturer’s production inventory (hundreds of millions

24   of pieces of pipe in J-M’s case) must be considered “non-compliant” simply because

25   individual pieces or lots of pipe fail to conform.[12]

26   

27   [12]   Moreover, although Plaintiffs claimed that variations and lapses in J-M’s manufac-

28   turing process constituted a failure to meet their imaginary “uniform compliance”

22

**b.    The trial testimony likewise supported J-M's reading of the industry standards and refuted Plaintiffs' reading.**

J-M's reading of the standards was confirmed at trial by standards-agency witnesses who explained that occasional instances of non-compliance are a reality of modern manufacturing and in no way rendered J-M's continued use of the agency marks on conforming products "false" or "fraudulent."  In hundreds of audits over the course of nearly two decades, and knowing that J-M was representing that it "met" AWWA, NSF, and UL standards, both agencies found instances of J-M non-compliance—but they never concluded that J-M was violating the standards to anywhere near a degree that would warrant delisting.  Thus, the most authoritative arbiters of the standards knew that J-M was not achieving "uniform compliance," but nevertheless allowed J-M to state that it "met" standards anyway.  Specifically:

(1)    The NSF witness, Tim Haenftling, testified that in the context of NSF's compliance audits, notices of "variation" (or failures to comply with NSF standards and procedures) were "not uncommon"; that no manufacturers "pass all audits all the

---

standard, the industry standards at issue do not regulate the extrusion process at all. These standards are concerned only with the **outcome** of the pipe-manufacturing process (*i.e.*, whether the finished pipes meet the standards), not with the processes used to get there. Plaintiffs' expert Jim Paschal made this clear, acknowledging that UL and NSF do not regulate the process used to extrude pipe; that the agencies do not set forth what speed, temperature, torque, or equipment must be used to make pipe; and, when discussing C900 § 5.1, that not every change in manufacturing process or equipment will violate an alleged "representativeness" requirement or result in decreased long-term strength. Chan Decl., Ex. U (9/20/13 Tr. at 1389:19–1394:14). J-M's expert, Gene Palermo, corroborated Paschal, noting that the AWWA and ASTM standards, as well as Note 10 to PPI TR-3, "don't tell the manufacturer how to make the pipe" and that "the important point is that the pipe that is produced has to meet the requirements of the standard." He added that PPI TR-3 does not establish manufacturing parameters. Chan Decl., Ex. CC (10/17/13 Tr. at 5776:3-20). As such, J-M's representation that it "met" certain standards was not a representation that it made everywhere the same way. J-M could not have violated, and did not violate, any standard by failing to "uniformly comply" with any given manufacturing methodology—because the standards require no such compliance in the first place.

23

1  time"; and that J-M and other PVC pipe manufacturers received notices of variation.

2  But NSF never determined that J-M was receiving an unacceptably high level of varia-

3  tion notices; and in fact, J-M never lost any NSF certification for the products at issue.

4  Chan Decl., Ex. DD (10/16/13 Tr. at 5414:5-5415:19; 5418:4-7).

5      (2)    Haenftling further testified that, in circumstances where certain lots of J-

6  M pipe were found to be out of compliance (as was the case with the A28 product hold

7  at the McNary, Oregon plant), the non-compliant pipe was required to be destroyed,

8  while pipe that passed NSF's tests was cleared for sale to customers. Chan Decl., Ex.

9  DD (10/16/13 Tr. at 5449:5-5450:4).

10      (3)    The UL witness, George Laverick, similarly testified that it "occur[s] in

11  production commonly that the production doesn't quite meet" UL standards; that the

12  extent of non-compliance could vary depending on whether "it's one psi off or if it's

13  hundreds of psi off"; and that in such situations, it is simply up to the manufacturer to

14  "rectify the situation." Chan Decl., Ex. EE (10/23/13 Tr. at 6941:6-21). Laverick too

15  confirmed that J-M had never lost a UL 1285 certification for any listed product despite

16  occasional non-compliance.  Chan Decl., Ex. EE (10/23/13 Tr. at 6915:10-13).

17      Neither Haenftling nor Laverick testified that these isolated instances of non-

18  compliance would automatically cause a manufacturer's entire inventory to be deemed

19  "non-compliant" due to some imagined failure to "uniformly comply" with all industry

20  standards across all products at all times. Both witnesses repeatedly confirmed that

21  their agencies never found that J-M had intentionally violated any NSF or UL standards

22  or policies, nor attempted to mislead or cheat the agencies in any context. Chan Decl.,

23  Ex. DD (10/16/13 Tr. at 5420:1-21, 5411:10-5412:12); Ex. EE (10/23/13 Tr. at

24  6898:21-24). In the absence of such findings, the handful of examples of non-

25  compliance discussed at trial – whether to do with specific plant audits or specific test

26  results – are simply insufficient to support a conclusion that J-M made false representa-

27  tions of "guaranteed" standards compliance to "all" customers including Plaintiffs.

28

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

ER521

3077495.1

1            **c.**      **Plaintiffs' "uniform compliance" theory is doomed by their**
2                     **concession that J-M's compound—the only arguably uniform part of the production process—was not substandard.**

3      Until closing argument, Plaintiffs asserted that pipe manufactured with the J-M

4  PVC compound JM-90 did not meet the 4000 psi HDB standard.  But in closing argu-

5  ment, Plaintiffs turned 180 degrees and claimed that they never had challenged J-M

6  compound's compliance with industry requirements:

7         Was J-M's material or compound good? This is not about compound. …
       We have never claimed that the JM-90 compound is bad. It certainly was
8         possible to make good pipe with J-M's compound.

9         So when you hear talk about compound test, we are not challenging the
       compound. It's possible to make good pipe with that compound. …We
10         are challenging how they made the pipe, not what they made it with.

11  Chan Decl., Ex. W (11/5/13 Tr. at 7811:6-16).

12      Plaintiffs thereby admitted that there was nothing substandard – *i.e.*, no false

13  statement was made – about the one and only thing that is even arguably "uniform" in

14  the pipe manufacturing process: the compound from which that pipe was made.

15      Since there was nothing wrong (and J-M did not lie) about the compound, the

16  only issue left was whether any given pipe ***made from*** that compound was substandard

17  (either with respect to its manufacturing or testing), and if so, whether that pipe was

18  falsely represented to be standards-compliant. As explained above, however, in a sub-

19  standard-products case that issue can only be analyzed on a product-by-product (here,

20  pipe-by-pipe) basis.  The evidence on which Plaintiffs fixated—such as isolated R&D

21  test failures, or the pipe placed on hold at the McNary plant—at most showed that the

22  particular pipe tested or placed on hold at a particular plant was substandard. That evi-

23  dence did not and could not show anything about any other pipe, including Plaintiffs'

24  pipe. Plaintiffs' acknowledgment that J-M made no false statements about its com-

25  pound guts their "uniform compliance" theory and requires reversal.

26      Plaintiffs promised the Court and J-M that they would "identify every industry

27  standard, every subpart of every industry standard that was violated." Chan Decl., Ex.

28  M (10/25/13 Tr. at 7556:3-5).  But Plaintiffs did no such thing. Instead, they resorted

1    to their "uniform compliance" theory, which was nothing more than an end-run

2    around the FCA's falsity requirement. Their failure to prove falsity under any cogniza-

3    ble FCA theory requires that judgment as a matter of law be granted for J-M.

4    **D.    Plaintiffs failed to prove scienter.**

5         The jury instructions defined scienter to mean "that a person, with regard to in-

6    formation: (a) has actual knowledge of the true information, or (b) acts with deliberate

7    ignorance of the truth or falsity of the information, or (c) acts in reckless disregard of

8    the truth or falsity of the information." Chan Decl., Ex. C (Doc No. 1792 at 7 of 9).

9         The only "information" that Plaintiffs persuaded the jury to find J-M knew was

10   that J-M was not perfect – *i.e.*, at some time in its history J-M had produced some un-

11   determined amount of substandard pipe. But every manufacturer knows that, because

12   no manufacturer is perfect, and J-M never represented that it was perfect. This shows

13   how Plaintiffs' "uniform compliance" theory effectively swallows the scienter require-

14   ment and turns the FCA into a strict-liability statute. Any plaintiff allowed to pursue

15   that theory would automatically establish scienter just by proving non-uniform (*i.e.*,

16   less-than-perfect) compliance with complex industrial-manufacturing standards.

17        To help guard against this result, the Court instructed the jury that "[i]nnocent

18   mistakes, mere negligent misrepresentations, and good faith differences in interpreta-

19   tions do not constitute knowingly false statements under a False Claims Act statute."

20   Chan Decl., Ex. C (Doc. No. 1792 at 8 of 9). And the Court cautioned Plaintiffs that it

21   would grant judgment or at least a new trial for J-M if the jury returned any verdict in-

22   consistent with this "innocent mistake" instruction:

23            … I mean, that is, I think, established law that is applicable to this case
             …. The question is if the jury were not so informed and if the jury some-
24           how reaches a determination that is contrary to that, that would, to my
             mind, be a basis to reverse the jury verdict. And we could possibly get that
25           in this situation because, as envisioned, the jury is going to be asked to
             specify the basis for its findings as to false and fraudulent. And so if the
26           jury comes back and does something of this sort with the verdict, I would
             be required, I feel, to either grant a judgment notwithstanding the verdict
27           or at least setting aside the jury verdict.

28   Chan Decl., Ex. P (11/4/13 Tr. at 7720:25 – 7721:23).

1   The "uniform compliance" verdict procured by Plaintiffs flaunts the Court's in-
2   struction and eviscerates the FCA's scienter requirement – by allowing liability to be
3   based even upon substandard pipe made inadvertently (*i.e.*, through "innocent mistake"
4   or "mere negligence"). The "uniform compliance" finding established at most an inad-
5   vertent failure to achieve absolute manufacturing consistency, but it did not establish
6   any knowledge with respect to Plaintiffs' claims for payment and pipe. As the Court
7   foresaw, this contradicts the jury instruction and the verdict must be overturned.

8   Moreover, Plaintiffs' contention that the standards require "uniform compli-
9   ance" is based solely upon Plaintiffs' own (incorrect) interpretation of those standards.
10  As explained in Part III.C.3 above, it is far more reasonable to interpret the standards
11  as allowing a manufacturer to say that it continues to "meet" standards, notwithstand-
12  ing the occasional inadvertent production of non-compliant pipe. Given that it is at
13  least equally plausible to interpret the standards (as J-M does) as ***not*** requiring "uniform
14  compliance," in the sense of absolute manufacturing consistency, there can be no find-
15  ing that J-M made any ***intentionally*** false or reckless representations regarding its
16  compliance. *See, e.g., Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477-78 (9th
17  Cir. 1996) (where regulations contained "imprecise and discretionary language" and
18  there were "disputed questions" as to how to comply with them, plaintiff could not es-
19  tablish that defendant made a knowingly false claim); *U.S. ex rel. K&R Ltd. Partnership v.*
20  *Mass. Housing Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (where both relator's and
21  defendant's "interpretations" of the operative contract requirements "are plausible,"
22  the relator could not show that defendant "knowingly" submitted false claims).

23  **E.    Plaintiffs failed to prove materiality.**

24  The alleged "uniform compliance" representation cannot be material to Plain-
25  tiffs, as it means nothing more than that J-M was not perfect. The jury instructions de-
26  fine materiality as follows: "A false statement is 'material' if it has a natural tendency to
27  influence, or is capable of influencing, the decision of the government's decision-
28  making body to which it is addressed." Chan Decl., Ex. C (Doc. No. 1792 at 7 of 9).

27

1  As the Court recognized, the fact that some unknown amount of non-compliant pipe

2  may have been inadvertently delivered to other customers does not constitute materiali-

3  ty to these Plaintiffs because other customers' pipe was not included in any claims for

4  payment that J-M arguably submitted to these Plaintiffs:

> THE COURT: … It can't be a basis for the false claim. I hope you rec-
> ognize that because it's going to be based on what [Plaintiffs] purchased,
> not on everything. It's the basis of those claims. You guys chose -- you
> guys got exemplar plaintiffs. You guys got to choose which claims you
> wanted. Those are the claims that we are litigating. We are not litigating
> everything. I hope you recognize that.
>
> [PLAINTIFFS' COUNSEL]: Your Honor, we do recognize that.
>
> THE COURT: Okay. …
>
> THE COURT: But it has to be material. And if they have no considera-
> tion of it because it's not included in the claim, then it can't be material,
> can it?

13  Chan Decl., Ex. K (10/7/13 Tr. at 3634:24–3636:4).

14  Indeed, Palmdale and South Tahoe both conceded that the supposed lack of

15  "uniform compliance" was immaterial to them, as they continued to purchase signifi-

16  cant quantities of J-M pipe long after learning that J-M pipe purportedly does not "uni-

17  formly comply" with industry standards. Chan Decl., Ex. S (10/8/13 Tr. at 4177:14–

18  4180:19); Ex. FF (9/19/13 Tr. at 851:20– 853:22). What Palmdale and South Tahoe

19  recognized—namely, that occasional deviations from standards are an unavoidable fact

20  of manufacturing—is understood by every purchaser, including the other Plaintiffs.

## IV.  MOTION FOR A NEW TRIAL

### A.  At a minimum, the Court should grant J-M a new trial.[13]

23  After seven years of litigation and seven weeks of trial produced only a meaning-

24  less "uniform compliance" finding, it is inconceivable that Plaintiffs could muster on

25  retrial any different or better evidence that could establish falsity, scienter, or materiality

---

[13]  In this section concerning grounds for a new trial, J-M incorporates by reference all
of the preceding discussion.

28

(154 of 262)  Page 154 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 154 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 37 of 48   Page
ID #:67197

1   as properly defined under the FCA. But even if that were possible, a new trial still

2   would be necessary for at least four reasons: (1) the Phase One verdict is unworkable

3   and does nothing to streamline Phase Two of this litigation; (2) certain jury instructions

4   were erroneous or insufficient; (3) the Phase One verdict is replete with factual incon-

5   sistencies and deficiencies; and (4) an enormous amount of irrelevant and prejudicial

6   evidence was admitted in contravention of Federal Rules of Evidence 401-404.

7   **B.      Standard of review.**

8        "Rule 59 recognizes the common-law principle that it is the duty of a judge who

9   is not satisfied with the verdict of a jury to set the verdict aside and grant a new trial."

10  11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2801 (3d ed.).  "Rule 59 gives the trial

11  judge ample power to prevent what the judge considers to be a miscarriage of justice.

12  It is the judge's right, and indeed duty, to order a new trial if it is deemed in the interest

13  of justice to do so."  *Id.*, § 2803.

14       In ruling on a motion for a new trial, the district judge has the right, and indeed

15  the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury,

16  even though supported by substantial evidence, where, in his conscientious opinion,

17  the verdict is contrary to the clear weight of the evidence, or to prevent, in the sound

18  discretion of the trial judge, a miscarriage of justice.  *Murphy v. City of Long Beach*, 914

19  F.2d 183, 187 (9th Cir. 1990) (citation omitted).  The district judge may also grant a

20  new trial if it is based upon evidence which is false.  *United States v. 4.0 Acres of Land*,

21  175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted).  If, having given full respect to

22  the jury's findings, the judge on the entire evidence is left with the definite and firm

23  conviction that a mistake has been committed, it is to be expected that he will grant a

24  new trial.  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th

25  Cir. 1987) (citing 11 Wright & Miller, *Federal Prac. and Proc. Civ.* § 2806 at 48-49 (1973);

26  *see also* 11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2805 (3d ed.) (discussing district

27  court's broad discretion to grant new trial "to prevent injustice").  The Court may de-

28  termine that a combination of factors—ranging from the erroneous admission of evi-

29

1   dence, to faulty jury instructions, to juror confusion resulting in a verdict against the

2   weight of the evidence—requires a new trial in the interest of justice. *See, e.g., Juneau*

3   *Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee*, 624 F.2d 798, 806 (7th Cir. 1980).

4   **C.   The empty jury finding invited by Plaintiffs' counsel does not provide a factual basis for a Phase Two trial or achieve the goals of bifurcation.**

5        In urging this Court to bifurcate this case (over J-M's repeated objections), Plain-

6   tiffs claimed that the Phase One jury verdict would streamline this litigation and facili-

7   tate the necessary Phase Two adjudications "with respect to each individual plaintiff."

8        But the jury finding that Plaintiffs ultimately asked for and received—that J-M

9   falsely represented "uniform compliance"—does no such thing. At Plaintiffs' urging,

10   the Phase One jury reached a finding that says nothing more about J-M or its products

11   than can be said of every major manufacturer in the world: that J-M is not perfect and

12   occasionally in its decades-long history produced some non-conforming product.  Vir-

13   tually nothing from this Phase One verdict can be used to guide the Phase Two deter-

14   minations of FCA liability and damages "with respect to each individual plaintiff."

15        Based upon the Phase One findings, the Phase Two jury is supposed to deter-

16   mine (among other things): (1) whether false representations were made to "each indi-

17   vidual plaintiff"; (2) how many "false claims" each individual plaintiff received; and (3)

18   "[w]hat damage did the individual plaintiff suffer as a result of the false claims?"  Chan

19   Decl., Ex. A (Doc. No. 551 at 10 of 11).

20        But the case never should have been bifurcated along those lines.  Where the is-

21   sues sought to be bifurcated are "'(s)o interwoven . . . that the [one] cannot be submit-

22   ted to the jury independently of the (other) without confusion and uncertainty which

23   would amount to a denial of a fair trial . . . ,' the bifurcation [is] unconstitutional" under

24   the Seventh Amendment to the U.S. Constitution. *Arthur Young & Co. v. U. S. Dist.*

25   *Court*, 549 F.2d 686, 693 (9th Cir. 1977) (quoting *United Air Lines, Inc. v. Wiener*, 286

26   F.2d 302, 306 (9th Cir. 1961)); *see also Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S.

27   494, 500 (1931).  Here, the bifurcation order and jury verdict in Phase One divided the

28

30

1   adjudication of a single liability element—falsity—between two juries.  This occurred

2   because, among other reasons, the Phase One jury was asked to adjudicate the falsity

3   element in the abstract (which cannot properly be done in an FCA substandard-

4   product case), while the Phase Two jury purportedly will re-adjudicate falsity all over

5   again, this time with specific reference to "each individual plaintiff."  Even with the

6   Phase One jury's verdict that J-M falsely represented "uniform compliance," the Phase

7   Two jury cannot possibly "independently" adjudicate the questions of whether and

8   how many false representations were made to each individual Plaintiff.

9       Indeed, the Phase One jury's verdict is completely insufficient to support a

10  Phase Two trial of these and many other FCA issues. Even if the Phase One verdict

11  were accepted, many foundational questions would remain unanswered, including: (1)

12  To which, if any, customers was any non-compliant pipe sold, including – critically –

13  was any non-compliant pipe sold to any Plaintiff that claims damages in Phase Two? (2)

14  How much of J-M's billions of pounds of pipe was not in "uniform compliance"? (3)

15  To what extent was any such pipe not in "uniform compliance"? (4) With which sec-

16  tions of the AWWA and UL standards at issue was any such pipe not in "uniform

17  compliance" – the sections pertaining to Quick Burst testing, HDB testing, tensile test-

18  ing, or something else? (5) How was such pipe not in "uniform compliance" with such

19  standards?  For example, did the Phase One jury believe that some undefined amount

20  of J-M pipe from some unidentified plants had a substandard tensile strength and, if so,

21  by how much was the tensile strength substandard – 1 psi, 10 psi, 100 psi, etc.? (6)

22  When and how often was any non-compliant pipe manufactured?

23      Because such basic questions have been left totally unanswered, the Phase Two

24  jury cannot make individualized determinations even as to the five Phase One Plain-

25  tiffs, let alone the dozens of additional Plaintiffs and hundreds of Real Parties who

26  were not at trial. For example, because the Phase One jury did not even determine

27  whether any Phase One Plaintiff actually received pipe that did not comply with stand-

28  ards, the verdict provides no guidance to the Phase Two jury in deciding whether false

31

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1

1  representations were made to any "individual plaintiff." If the Phase One verdict is left

2  undisturbed, the parties will simply be required to re-litigate in Phase Two the same

3  underlying issues as to FCA falsity, scienter, and materiality—but this time "with re-

4  spect to each individual plaintiff."

5         The Phase One verdict is also insufficient to support any meaningful determina-

6  tion of causation or damages. Because the Phase One jury made no determination as to

7  how much J-M pipe is non-compliant, to what extent such pipe was non-compliant, or

8  whether any Plaintiffs even received any non-compliant pipe, there can be no meaning-

9  ful assessment of what, if any, compensable damages Plaintiffs suffered. These factual

10  issues will also have to be re-litigated with a second jury in Phase Two.

11         Plaintiffs persuaded the Court to bifurcate this case by selling the Court a "para-

12  digm" under which "all of the piping fails to meet these standards and requirements of

13  the certifying agencies."  Chan Decl., Ex. B (9/26/11 Tr. at 6:1-3).  But at the end of

14  the day, Plaintiffs gave up on this paradigm (because they could never get close), and

15  instead tried to make this trial about whether **any** J-M pipe ever failed to comply with

16  standards, as opposed to whether **all** of it, or even the small amount **they** purchased,

17  complies.  Proof that Plaintiffs' pipe or that all J-M pipe was non-compliant might have

18  had some significance, but a finding that some J-M pipe somewhere may have been

19  non-compliant (which is at most what the Phase One jury's verdict says) is so narrow

20  and limited as to be meaningless.  That J-M may have on occasion and inadvertently

21  produced some non-conforming pipe even though its brochures contain the words

22  "Meets AWWA" is not a point that needed to be litigated over a seven-week trial.  The

23  verdict is not enough to support a finding of FCA liability, let alone individualized find-

24  ings of causation or damages "with respect to each individual plaintiff."

25  **D.    A new trial is necessary to correct errors and insufficiencies in the jury
        instructions.**

26

27         Two key errors and insufficiencies in the jury instructions require a new trial.

28         ***First***, the elements instruction did not tie the alleged falsity to the pipe or claims

32

(158 of 262)   Page 158 of 262   Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 158 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 41 of 48   Page
ID #:67201

1   received by Plaintiffs.  Indeed, that instruction did not define falsity in any case-specific

2   way at all; it merely informed the jury that a claim is false "if it contains or is based up-

3   on an assertion that is untrue when made or when used."  In a case as scattershot and

4   untethered as Plaintiffs' case was, that generic definition did not adequately convey the

5   FCA requirement for tying falsity to the claim in substandard-product cases.

6        ***Second***, although the Court never intended it this way, Plaintiffs' exploitation of

7   the "no damage" instruction took the jury's focus completely away from whether the

8   pipe sold to Plaintiffs was noncompliant, and therefore whether any false statements

9   were made to Plaintiffs.

10       Plaintiffs seized on these errors and deficiencies to secure a legally invalid verdict

11  from the jury.  A new trial must be granted to correct this.

12  **E.   A new trial also is necessary because the verdict suffers from glaring
     factual inconsistencies that render it legally erroneous.**

13

14       Type 1 FCA claims require a falsity in the claim for payment itself, as opposed to

15  a falsity in an accompanying statement or record.  Chan Decl., Ex. C (Doc. No. 1792 at

16  6-7 of 9).  Type 2 FCA claims require a falsity in a claim for payment and also in a

17  statement or record that accompanies and relates to the claim.  *Id.*  Virtually none of

18  the exhibits identified by the jury as claims for payment, or the exhibits that supposedly

19  demonstrate falsity, knowledge, and materiality, support the jury's findings.

     **1.   The jury erroneously identified as "Claims For Payment"
20         documents that simply are not claims for payment.**

21       "It seems to be a fairly obvious notion that a False Claims Act suit ought to re-

22  quire a false claim."  *Aflatooni,* 314 F.3d at 997.  But many of the "claims for payment"

23  identified by the jury simply are not claims for payment. Some of the documents are in

24  fact project specifications and contract documents generated by Plaintiffs themselves

25  (not J-M) in order to solicit bids, and do not make any demand for payment – let alone

26  a demand by J-M. Chan Decl., Ex. GG (Chart re: Trial Exhibits cited in Verdict

27

28

1  Form).[14] Other documents identified as "claims for payment" include submittals con-

2  taining J-M brochures, but these generic brochures are not invoices, bills, or other re-

3  quests for payment.  *Id.*

4          **2.**      **The jury erroneously determined that J-M made "false**

5                    **representations of uniform compliance" in documents that do not contain any such representation.**

6         None of the documents that the jury erroneously identified as "claims for pay-

7  ment" mentions "uniform compliance" –the only alleged falsity identified by the jury—

8  and thus do not contain the alleged false representation.  Nor do any of the submittals

9  containing J-M brochures promise uniform compliance, as explained above.

10         Moreover, the jury somehow concluded that, for the twenty-six projects at issue,

11  J-M "falsely represented uniform compliance with UL 1285," even though: (1) the

12  claims for payment cited in the verdict form as support for this determination never

13  even mention UL 1285; (2) Plaintiffs did not require compliance with UL 1285 on any

14  of the projects at issue;[15] and (3) Plaintiffs uniformly testified that UL 1285 was irrele-

15  vant to them at the times and for the projects in question.[16]

16           **3.**      **The jury erroneously found that J-M "knowingly" made false**

17                  **representations of uniform compliance to Plaintiffs based on documents and events unrelated to Plaintiffs or their projects.**

18         The jury identified a list of exhibits that supposedly prove J-M knew that the al-

19  leged "claims for payment" were false. But none of those exhibits relate to any pipes

20

21  [14]  Such trial exhibits are attached to the under seal Supplemental Chan Declaration for

22  the Court's reference.

23  [15]  Chan Decl., Ex. FF (09/19/13 Tr. at 840:3-15, 841:1-3, 841:18-21) (South Tahoe);

24  Ex. R (10/9/13 Tr. at  4283:22-4284:2, 4364:10-21) (Norfolk); Ex. S (10/8/13 Tr. at 4201:6-22) (Palmdale); Ex. T (10/2/13 Tr. at 3392:5-15) (Reno); Ex. J (9/18/13 Tr. at

25  663:1-20, 666:22-667:21) (Calleguas).

26  [16]  Chan Decl., Ex. FF (09/19/13 Tr. at 840:20-25) (South Tahoe); Ex. R (10/9/13 Tr.

27  at 4364:12-21) (Norfolk); Ex. S (10/8/13 Tr. at 4201:23-4202:11) (Palmdale); Ex. T (10/2/13 Tr. at 3392:16-3395:12) (Reno); Ex. J (9/18/13 Tr. at 663:5-672:5)

28  (Calleguas).

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

**ER531**

3077495.1

1   actually sold to Plaintiffs, and none establishes that any production pipe sold to Plain-

2   tiffs was noncompliant.  Chan Decl., Ex. GG.  Instead, these exhibits consist of a grab-

3   bag of documents—R&D tests, scrap rates, reject tags, production goals, diary entries

4   regarding types and sizes of pipe never purchased by Plaintiffs – unconnected to the

5   claims for payment and pipes Plaintiffs actually received.  Notably, many of these ex-

6   hibits communicate information about events that occurred **after** Plaintiffs received

7   particular claims for payment for the twenty-six projects, and therefore do not and

8   cannot speak to J-M's knowledge at the times in question. Chan Decl., Ex. GG. One

9   exhibit identified by the jury – 1535 – does not even exist.

10  **F.    A new trial is necessary because irrelevant and prejudicial evidence, including improper character/propensity evidence about J-M, was admitted and likely affected the verdict.[17]**

11

12      **1.    The Quick Burst 6400-psi requirement.**

13      Plaintiffs spent a vast amount of time at trial attempting to prove that Quick

14  Burst test results for J-M pipe that were below 7,200 psi somehow indicated that J-M

15  pipe was substandard, even if those results were higher than 6,400 psi.  But the undis-

16  puted evidence at trial was that the industry standard is and always has been 6,400 psi

17  and no higher. Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at AWWA-000049 (Table

18  3, Note)); Ex. CC (10/17/13 Tr. at 5753:10-14 (Palermo: "[T]here is absolutely no ba-

19  sis at all for questioning a quick burst value less than 7200 psi" but above 6400 psi)),

20  Ex. U (9/20/13 Tr. at 1244:5-1245:1 (Paschal never believed that industry standard of

21  6,400 psi for Quick Burst Test should be increased)).

22      Moreover, the trial exhibit derived from Plaintiffs' own compilation of J-M's

23  Quick Burst test records showed that, among the thousands of tests compiled, J-M

24  pipe met or exceeded the 6,400 psi standard more than 99% of the time. Chan Decl.,

25  

---

26  [17]   J-M objected to the evidence discussed in this section (as well as the Javete log) and moved to exclude such evidence prior to trial on various grounds, including the grounds identified here. *See* J-M's Motions in Limine Nos. 1, 3, 13, 20, and 29. Those motions were denied.

27

28

35

1    Ex. HH (Trial Exhibit 7596-D).

2         In light of what the Quick Burst standard **actually** requires (6,400 psi), the evi-

3    dence and argument about Quick Burst test results less than 7,200 psi were irrelevant,

4    misleading, and prejudicial to J-M, and should not have been admitted.  The likelihood

5    of prejudice was extremely high, as Plaintiffs' counsel chose to highlight this "evi-

6    dence" in his closing argument.  *See, e.g.*, Chan Decl., Ex. W (11/5/13 Tr. at 7850:7-15

7    (Plaintiffs' counsel: "So let's look at the next set of tests that went over the cliff.  Quick

8    burst test results … The quick burst failure is below 7200.  7200 is the benchmark

9    we're using now … This just shows you the quick burst results by themselves going

10   over a cliff.")); Chan Decl., Ex. V (11/6/13 Tr. at 8153:17-21 (Plaintiffs' counsel: "[The

11   defense's point that J-M] still passed 6400 … misses the point, doesn't it?")).[18]

12        **2.    The pre-2008 UL 1285 tensile strength requirement.**

13        Plaintiffs presented evidence of R&D tensile strength test failures relating to J-

14   M's unsuccessful attempts to qualify large-diameter pipe with UL.  Plaintiffs also

15   stressed this evidence heavily.  *See, e.g.*, Chan Decl., Ex. W (11/5/2013 Tr. at 7854:12-

16   20) (Plaintiffs' closing argument: "The third thing that goes through the floor are the

17   UL 1285 tensile strength tests… It goes from a hundred percent passing to zero.  They

18

---

19   [18]  Plaintiffs also attempted to prove that the Quick Burst test, which is a test of short-

20   term pipe strength, is somehow linked to the long-term HDB test of PVC compound.

21   But the overwhelming weight of the evidence at trial demonstrated that there is no

22   such link, and Plaintiffs provided no competent evidence establishing otherwise. Chan

23   Decl., Ex. II (Trial Exhibit 6708 (ASTM D1599 at Section 4.1: Data obtained by Quick

24   Burst Test "are generally not indicative of the long-term strength of thermoplastic or

25   reinforced thermosetting resin pipe, tubing, and fittings.")); Ex. CC (10/17/13 Tr. at

26   5753:9-17 (Palermo: "there is absolutely no relationship between the short-term quick

27   burst test and the long term LTHS test")); Ex. DD (10/16/13 Tr. at 5603:25-5604:5

28   (Haenftling: NSF's view is that the Quick Burst Test is not a test of long term

     strength); Ex. T (10/2/13 Tr. at 3568:2-3569:1 (William Fassler: original hypothesis

     linking Quick Burst to HDB was later proved wrong)). Plaintiffs ultimately abandoned

     their argument that Quick Burst results relate to HDB results, and made no reference

     to such theory in closing argument.  But the damage was done.

36

1  cannot pass that UL 1285 test where you take the section from the finished pipe."); Ex.

2  W (11/5/2013 Tr. at 7860:12-24) (citing R&D UL 1285 test failures).

3       But the large-diameter sizes were never qualified and therefore were never UL-

4  listed or marketed as UL-compliant. As Plaintiffs' own expert James Paschal conceded,

5  pipe that is not UL-listed carries no representation of UL compliance, so there can be

6  no "false" representation or "false" claims associated with such pipe. Chan Decl., Ex.

7  U (9/20/13 Tr. at 1306:13-15) (Paschal: "if you are not stating that a product complies

8  with the standard and it's not marked as complying, then none of the requirements ap-

9  ply."). Plaintiffs presented no evidence that any of them even purchased unlisted pipe

10 in these large-diameter sizes from J-M, let alone UL-listed pipe in those sizes.[19]

11      Moreover, the so-called "failing" tensile results stemmed from tensile samples

12 cut directly from pipe pursuant to a flawed, pre-2008 version of the UL 1285 standard

13 that was changed (to eliminate any requirement that samples be cut from pipe) after UL

14 recognized that the prior version was "problematic" and "had issues with repeatability

15 of the results." Chan Decl., Ex. EE (10/23/13 Tr. at 6870:21-6871:7). The old lan-

16 guage in the standard about taking samples from pipe was so flawed that the UL wit-

17 ness himself candidly noted, "I wanted to get rid of it." Chan Decl., Ex. EE (10/23/13

18 Tr. at 7038:16-24).

19      J-M's compliance with UL 1285 was demonstrated by Laverick, who testified

20

21 [19]  Plaintiffs mischaracterized as a "failing" tensile test a January 2006 R&D report, the

22 only R&D tensile test concerning UL-listed sizes (4 inch DR18 and DR25 pipe). Alt-

23 hough the report does state that the "apparent" tensile strength of the samples was be-

24 low the desired level, the evidence was undisputed that the results were based on "non-

25 standard" test specimens that had not been prepared in conformance with testing
   standards. Accordingly, both the test report's author (Fassler) and the UL witness con-

26 firmed that the test results revealed nothing about the actual tensile strength values of
   J-M's UL-listed pipe. Chan Decl., Ex. EE (10/23/13 Tr. at 7064:11-23 (Laverick:

27 "There is no way to determine compliance with UL 1285 if the samples were not made
   to the specification.")); Ex. T (10/2/13 Tr. at 3574:15-3575:6 (Fassler: results of testing

28 on non-standard specimens did not show actual tensile strength of tested samples).

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1

(163 of 262) Page 163 of 262Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 163 of 262
Case 5:06-cv-00055-GW-MAR   Document 1833   Filed 01/14/14   Page 46 of 48   Page
ID #:67206

1   that UL conducted a special investigation of J-M in 2010 (after the lawsuit's allegations

2   were unsealed), involving a comprehensive surprise audit and testing of pipe and com-

3   pound from seven different J-M locations.  The results of that special 2010 investiga-

4   tion found that "everything complied with the standards," and UL "did not find any

5   evidence" –through this 2010 investigation or at any other time—that J-M was "inten-

6   tionally violating UL 1285 or any other UL rules." Chan Decl., Ex. EE (10/23/13 Tr.

7   at 6898:17-24). Laverick further confirmed that J-M had never lost any UL 1285 listing

8   due to an intentional failure to follow UL standards. Chan Decl., Ex. EE (10/23/13 Tr.

9   at 6915:10-13). Thus, evidence about J-M's purported "failures" – which occurred in

10  R&D experiments, pursuant to a flawed and superseded standard, on pipe sizes that

11  Plaintiffs never bought and that J-M never represented to comply with UL 1285 –

12  lacked any probative value, was confusing, and should not have been admitted.  Plain-

13  tiffs' improper emphasis on this evidence was prejudicial.

### 3.   Quality control requirements.

15      Plaintiffs also presented evidence of supposedly "improper" or "insufficient"

16  quality-control practices at certain J-M plants at certain points in time—such as the al-

17  leged removal of QC tags from specific lots of pipes at the Stockton and McNary

18  plants, and the malfunctioning quick-burst machinery at the McNary and Butner plants.

19      As a general matter, this evidence was irrelevant because (as this Court correctly

20  noted) the mere fact that QC tags were removed at certain plants, or that a testing ma-

21  chine was out of order at a plant for some period of time, "doesn't give rise to a False

22  Claims Act claim unless there is something that really connects that conduct to a claim

23  or to an invoice." Chan Decl., Ex. M (10/25/13 Tr. at 7557:8-10.  In other words, be-

24  cause this evidence was utterly untethered to Plaintiffs' pipe, it had no probative value

25  in this FCA substandard-products case. *See Campbell v. Wood*, 18 F.3d 662, 685 (9th Cir.

26  1994) (noting that Rule 401 "defines relevant evidence as that which tends to make the

27  existence of a fact of consequence more or less probable than it would be without the

28  evidence").

38

1    Furthermore, admission of this evidence violated Federal Rule of Evidence

2   404(a). The only inference that Plaintiffs derived from it was that J-M had shoddy

3   manufacturing and QC practices, with which it must have acted in accordance when it

4   manufactured and sold pipe to plaintiffs. That inference is exactly the one forbidden by

5   Rule 404(a).  *See, e.g., United States v. Martinez*, 182 F.3d 1107, 1111 (9th Cir. 1999) (not-

6   ing that evidence of an individual's "bad character from which the government hopes

7   for an inference of conduct consistent with bad character" is inadmissible); *Cohn v.*

8   *Papke*, 655 F.2d 191, 193-194 (9th Cir. 1981) (discussing Rule 404).

9    In any event, any occasional failures to meet QC standards were not widespread

10  and never even rose to a level of concern within the auditing agencies themselves. For

11  example, Haentfling explained that NSF conducted hundreds of audits of J-M plants

12  over the relevant time period, which specifically checked for a vast array of quality-

13  control requirements including whether quality-control records were in place and

14  quick-burst machinery was working.  These audits sometimes uncovered instances of

15  malfunctioning or non-functioning test equipment.  But NSF never determined that J-

16  M had followed a policy of maintaining "inaccurate, incomplete or false quality control

17  testing or records," and NSF never determined that J-M was attempting to mislead

18  NSF or violate NSF rules.  Chan Decl., Ex. DD (10/16/13 Tr. at 5408:22–5409:16,

19  5411:25–5413:2, 5469:22–5470:20). Laverick similarly testified that UL's 2010 special

20  investigation "went beyond the normal audit inspection-type tests," and still deter-

21  mined that "everything complie[d] with the requirements." Chan Decl., Ex. EE

22  (10/23/13 Tr. at 6892:11-6894:22, 6896:8-15, 6898:1-20).

23   Plaintiffs' own witnesses corroborated this. Plaintiffs' expert Jim Paschal, the

24  head of NSF's testing lab from 1988-2002, testified that he personally tested samples of

25  J-M pipe collected from dozens of surprise NSF plant audits, and did not believe J-M

26  "cheated or did something improper" to pass those tests during that entire 14-year time

27  period. Chan Decl., Ex. U (9/20/13 Tr. at 1299:13-16). Likewise, KC Yang admitted

28  that J-M's CEO Walter Wang was "focused on producing quality pipe" and told Yang

1   to "be tougher [on quality] than anyone else in the company"; Yang was consistently

2   instructed "to make sure the quality control equipment was working properly" in the

3   plants.   Chan Decl., Ex. JJ (9/24/13 Tr. at 1897:17-20, 1898:20-1899:3); Ex. KK

4   (9/25/13 Tr. at 2036:4-14).

5        In sum, taken in context, the admission of evidence about J-M's QC practices,

6   which plaintiffs never connected to the pipe they received, was in error because it con-

7   travened Federal Rules of Evidence 401-404.

8                                   **V.  CONCLUSION**

9        For the reasons set forth above, the Court should grant J-M's motion for judg-

10  ment as a matter of law. Alternatively, the Court should grant J-M a new trial.

11  DATED: January 14, 2014                Respectfully submitted,

12                                         BIRD, MARELLA, BOXER, WOLPERT,
13                                          NESSIM, DROOKS & LINCENBERG, P.C.

14                                         By:      /s/ Paul S. Chan
15                                                    Paul S. Chan
16                                              Attorneys for Defendant J-M Manufacturing
                                               Company, Inc. d/b/a JM Eagle
17

18

19

20

21

22

23

24

25

26

27

28

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1



FILED
CLERK, U.S. DISTRICT COURT

NOV 14 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., ) ) ) Plaintiffs, ) ) ) v. ) ) ) J-M MANUFACTURING COMPANY, INC., ) ) Defendant. ) ) | No. EDCV 06-55-GW(PJWx) **SPECIAL VERDICT FORM** |

# SPECIAL VERDICT FORM

We the jury, being duly impaneled and sworn, find as follows:

## Plaintiff Calleguas Municipal Water District

1.    As to plaintiff Calleguas Municipal Water District ("Calleguas"),

### Type 1 FCA Claim

(a) Did Defendant J-M Manufacturing Company, Inc. ("J-M") present or cause to be presented to a Calleguas officer or employee a claim for payment or approval that was false or fraudulent?

_____✓_____ Yes    _____ No

### Type 2 FCA Claim

(b) Did Defendant J-M make, use or cause to be made or used a false record or statement in order to get a false or fraudulent claim paid or approved by Calleguas?

_____✓_____ Yes    _____ No

If your answers to questions 1(a) and 1(b) were both "No," do not answer questions 2 through 9 and go directly to question 10.

If your answers to questions 1(a) and 1(b) were both "Yes," answer questions 2-9.

If your answer was "Yes" to question 1(a), go to question 2, below.

If your answer was "No" to question 1(a) and "Yes" to question 1(b), go directly to question 6, below.

3001336.2

−1−

(168 of 262) Page 168 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 168 of 262
Case 5:06-cv-00055-GW-MAR   Document 1794   Filed 11/14/13   Page 3 of 50   Page ID
#:66873

<u>Type 1 FCA Claims</u>

2.      Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each false or fraudulent claim presented or caused to be presented to Calleguas by Defendant J-M.

_Lake Bard Oxygenation Project_

If you find more than one such claim, please list all of them separately below:

7758
7752
7757

3.      As to each such false or fraudulent claim presented or caused to be presented by J-M to Calleguas, please identify/describe why the claim was false and/or fraudulent.

Claim _7758_

_Jm falsely represented uniform compliance with AWWA C905 and UL 1285_

Claim _7752_

_Jm falsely represented uniform compliance with AWWA C905 and UL 1285_

Claim ___7757___

_JM falsely represented uniform compliance_
_with Awwa C905 and UL 1285_

If you have additional claims, please use the extra pages attached to this verdict form.

4.    Did J-M act "knowingly" in regards to the false or fraudulent claim as to each of the claims identified in question 3, above?

As to Claim ___7758___

  _✓_ Yes    ____ No

As to Claim ___7752___

  _✓_ Yes    ____ No

As to Claim ___7757___

  _✓_ Yes    ____ No

If you have additional claims, please use the extra pages attached to this verdict form.

5.    As to each claim where you answered "yes" in question 4, was the false or fraudulent aspect of the claim "material" to Calleguas's decision-making body?

As to Claim ___7757___

  _✓_ Yes    ____ No

3001336.2                                    —3—

(170 of 262) Page 170 of 262se: 25-2499, 08/29/2025, DktEntry: 22.4, Page 170 of 262
Case 5:06-cv-00055-GW-MAR   Document 1794   Filed 11/14/13   Page 5 of 50   Page ID
#:66875

As to Claim _____7758_____

_____√_____ Yes     _____ No


As to Claim _____7752_____

_____√_____ Yes     _____ No

If you have additional claims, please use the extra pages attached to this verdict form.


Type 2 FCA Claims

Answer questions 6-9 only if you answered "yes" to question 1(b).

6.      Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each claim wherein J-M made or used (or caused to be made or used) a false record or statement in order to get a false or fraudulent claim to be paid or approved by Calleguas.

_____Lake Bard Oxygenation Project_____

If you find more than one such claim, please list all of them separately below:

___7841_____

___O87754  7757_____

___7758_____

_____

_____

_____


3001336.2                  –4–

7.    As to each such false record or statement made, used or caused to be made or used by J-M in order to get a false or fraudulent claim paid or approved by Calleguas, please identify/describe why the record or statement was false and why the claim was false and/or fraudulent.

Claim _____7841_____

_____JM falsely represented uniform compliance with AWWA C905 and UL 1285_____

Claim _____7754 7757_____

_____JM falsely represented uniform compliance with AWWA C905 and UL 1285_____

Claim _____7758_____

_____JM falsely represented uniform not compliance with AWWA C905 and UL 1285_____

If you have additional claims, please use the extra pages attached to this verdict form.

8.    Did J-M act "knowingly" in regards to the false record(s) or statement(s) and as to the false or fraudulent claim(s) as to each of the claims identified in question 7, above?

3001336.2

—5—

ER543

As to Claim ___7841___

___✓___ Yes          _____ No


As to Claim ___7754~ 7757~___

___✓___ Yes          _____ No


As to Claim ___7758___

_____ Yes          ___✓___ No


If you have additional claims, please use the extra pages attached to this verdict form.

9.      As to each claim where you answered "yes" in question 8, were the false record or statement and false or fraudulent aspect of the claim "material" to Calleguas's decision-making body?

As to Claim ___7841___

___✓___ Yes          _____ No


As to Claim ___7757~___

___✓___ Yes          _____ No


As to Claim ___7758~___

___✓___ Yes          _____ No


If you have additional claims, please use the extra pages attached to this

3001336.2                              –6–

**ER544**

verdict form.

———

**Plaintiff City of Norfolk**

10.  As to plaintiff City of Norfolk ("Norfolk"),

Type 1 FCA Claim

(a) Did Defendant J-M Manufacturing Company, Inc. ("J-M") present or cause to be presented to a Norfolk officer or employee a claim for payment or approval that was false or fraudulent?

_____✓_____Yes    _____No

Type 2 FCA Claim

(b) Did Defendant J-M make, use or cause to be made or used a false record or statement in order to get a false or fraudulent claim paid or approved by Norfolk?

_____✓_____ Yes    _____ No

If your answers to questions 10(a) and 10(b) were both "No," do not answer questions 11 through 18 and go directly to question 19.

If your answers to questions 10(a) and 10(b) were both "Yes," answer questions 11-18.

If your answer was "Yes" to question 10(a), go to question 11, below.

If your answer was "No" to question 10(a) and "Yes" to question 10(b), go directly to question 15, below.

Type 1 FCA Claims

11.  Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each false or fraudulent claim presented or caused to be presented to Norfolk by Defendant J-M.

3001336.2

—8—

(175 of 262) Page 175 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 175 of 262
Case 5:06-cv-00055-GW-MAR   Document 1794   Filed 11/14/13   Page 10 of 50   Page
ID #:66880

1994-2006

City of Norfolk Capital Improvement Projects
Fairmount Park Phase 3 / Fairmount Park Phase 4

If you find more than one such claim, please list all of them separately below:

Fairmount Park Phase 3: 7904-2
Fairmount Park Phase 3: 7904-3

Fairmount Park Phase 4: 7888

12.    As to each such false or fraudulent claim presented or caused to be presented by J-M to Norfolk, please identify/describe why the claim was false and/or fraudulent.

Claim    7904-2

Jm falsely represented uniform compliance with AWWA C900 and UL 1284

Claim    7904-3

Jm falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ___7888_____

_____Jm_falsely_represented_uniform_compliance_
_with_AWWA_C900_and_UL_1285_____

If you have additional claims, please use the extra pages attached to this verdict form.

13.    Did J-M act "knowingly" in regards to the false or fraudulent claim as to each of the claims identified in question 12, above?

As to Claim ___7904 - 2_____

√ Yes        _____No

As to Claim ___7904 - 3_____

√ Yes        _____No

As to Claim ___7888_____

√ Yes        _____No

If you have additional claims, please use the extra pages attached to this verdict form.

14.    As to each claim where you answered "yes" in question 13, was the false or fraudulent aspect of the claim "material" to Norfolk's decision-making body?

3001336.2                        –10–

As to Claim ___7904 - 7___

    ___✓___ Yes    _____ No

As to Claim ___7904 - 3___

    ___✓___ Yes    _____ No

As to Claim ___7888___

    ___✓___ Yes    _____ No

If you have additional claims, please use the extra pages attached to this verdict form.

Type 2 FCA Claims

Answer questions 15-18 only if you answered "yes" to question 10(b).

15.    Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each claim wherein J-M made or used (or caused to be made or used) a false record or statement in order to get a false or fraudulent claim to be paid or approved by Norfolk.

___City of Norfolk Capital Improvement Projects 1996-2006___

If you find more than one such claim, please list all of them separately below:

___Fairmount Park Phase 3: 7904-4___
___Fairmount Park Phase 4: 7900-1___
___Fairmount Park Phase 4: 7900-2___

3001336.2

–11–

(178 of 262) Page 178 of 262ase: 25-2499, 08/29/2025, DktEntry: 22.4, Page 178 of 262
Case 5:06-cv-00055-GW-MAR Document 1794 Filed 11/14/13 Page 13 of 50 Page
ID #:66883

16.     As to each such false record or statement made, used or caused to be
made or used by J-M in order to get a false or fraudulent claim paid or approved by
Norfolk, please identify/describe why the record or statement was false and why the
claim was false and/or fraudulent.

Claim   7904 - 4

JM falsely represented uniform compliance
with AWWA C900 and UL 1285

Claim   7900 - 1

JM falsely represented uniform compliance
with AWWA C900 and UL 1285

Claim   7900 - 2

JM falsely represented uniform compliance
with AWWA C900 and UL 1285.

If you have additional claims, please use the extra pages attached to this
verdict form.

3001336.2

−12−

17.    Did J-M act "knowingly" in regards to the false record(s) or statement(s) and as to the false or fraudulent claim(s) as to each of the claims identified in question 16, above?

As to Claim ___7904 - 4___

___✓___ Yes         _____ No

As to Claim ___7900 - 1___

___✓___ Yes         _____ No

As to Claim ___7900 - 2___

___✓___ Yes         _____ No

If you have additional claims, please use the extra pages attached to this verdict form.

18.    As to each claim where you answered "yes" in question 17, were the false record or statement and false or fraudulent aspect of the claim "material" to Norfolk's decision-making body?

As to Claim ___7904 - 4___

___✓___ Yes         _____ No

As to Claim ___7900 - 1___

___✓___ Yes         _____ No

(180 of 262) Page 180 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 180 of 262
Case 5:06-cv-00055-GW-MAR   Document 1794   Filed 11/14/13   Page 15 of 50   Page
ID #:66885

As to Claim _____7902_____

_____√_____ Yes         _____No

If you have additional claims, please use the extra pages attached to this verdict form.

### Plaintiff Palmdale Water District

19.     As to plaintiff Palmdale Water District ("Palmdale"),

#### Type 1 FCA Claim

(a) Did Defendant J-M Manufacturing Company, Inc. ("J-M") present or cause to be presented to a Palmdale officer or employee a claim for payment or approval that was false or fraudulent?

\_\_\_\_✓\_\_\_Yes          _____No

#### Type 2 FCA Claim

(b) Did Defendant J-M make, use or cause to be made or used a false record or statement in order to get a false or fraudulent claim paid or approved by Palmdale?

\_\_\_\_✓\_\_\_ Yes          _____ No

If your answers to questions 19(a) and 19(b) were both "No," do not answer questions 20 through 27 and go directly to question 28.

If your answers to questions 19(a) and 19(b) were both "Yes," answer questions 20-27.

If your answer was "Yes" to question 19(a), go to question 20, below.

If your answer was "No" to question 19(a) and "Yes" to question 19(b), go directly to question 24, below.

#### Type 1 FCA Claims

20.     Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each false or fraudulent claim

presented or caused to be presented to Palmdale by Defendant J-M.

1996 – 2006

_Palmdale Water District Capital Improvement Projects_

If you find more than one such claim, please list all of them separately below:

Spec 9802 : 7929 A-1
Spec 9806 : 7930 A-1
Spec 9807 : 7931 - A-1
Spec 0001 : 7932 A-1
Spec 0004 : 7934 A-2
Spec 012 : 7933 A-1
Spec 0201 : 2310 - 2312
Spec 0402 : 7539 A-1

    21.    As to each such false or fraudulent claim presented or caused to be presented by J-M to Palmdale, please identify/describe why the claim was false and/or fraudulent.

Claim ~~9802~~ 7929 A-1

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ~~9806~~ 7930 A-1

JM falsely represented uniform compliance with AWWA C900 and UL 1285

3001336.2

–16–

**ER554**

Claim  7931 - A - 1

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim  7932  A-1

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim  7934  A-2

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim  7933 - A-1

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim  2310 - 2312

These TRA's testing tensil strength average PSI fails to meet UL requirements.

Claim _____7539___ - A-1_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

_____

_____

If you have additional claims, please use the extra pages attached to this verdict form.

22.    Did J-M act "knowingly" in regards to the false or fraudulent claim as to each of the claims identified in question 21, above?

As to Claim __7929__ A-1_____

_____√_____ Yes    _____No

As to Claim __7930__ A-1_____

_____√_____ Yes    _____No

As to Claim __7931__ A-1_____

_____√_____ Yes    _____No

As to Claim __7932__ A-1_____

_____√_____ Yes    _____No

As to Claim    7934   A-2  

  ✓ Yes     ____ No

As to Claim    7933   A-1  

  ✓ Yes     ____ No

As to Claim    2310 – 2312  

  ✓ Yes     ____ No

As to Claim    7539   A-1  

  ✓ Yes     ____ No

If you have additional claims, please use the extra pages attached to this verdict form.

23.    As to each claim where you answered "yes" in question 22, was the false or fraudulent aspect of the claim "material" to Palmdale's decision-making body?

As to Claim   7929   A-1  

  ✓ Yes     ____ No

As to Claim   7930   A-1  

  ✓ Yes     ____ No

As to Claim _____7931  A-1_____

_____√_____ Yes     _____No


As to Claim _____7932  A-1_____

_____√_____ Yes     _____No


As to Claim _____7934   A-2_____

_____√_____ Yes     _____No


As to Claim _____7933    A-1_____

_____√_____ Yes     _____No


As to Claim _____2310 — 2312_____

_____√_____ Yes     _____No


As to Claim _____7539   A-1_____

_____√_____ Yes     _____No


If you have additional claims, please use the extra pages attached to this
verdict form.


3001336.2

–20–

Type 2 FCA Claims

Answer questions 24-27 only if you answered "yes" to question 19(b).

24.     Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each claim wherein J-M made or used (or caused to be made or used) a false record or statement in order to get a false or fraudulent claim to be paid or approved by Palmdale.

1996-2006
Palmdale Water District Capital Improvement Projects

If you find more than one such claim, please list all of them separately below:

Spec 9802 : 7929-A-2
Spec 9806 : 7930-A-2
Spec 9807 : 7931-A-1
Spec 0001 : 7932-A-2
Spec 0004 : 7934-A-2
Spec 0102 : 7933-A-2
Spec 0201 : 7915
Spec 0402 : 7935-A-2

25.     As to each such false record or statement made, used or caused to be made or used by J-M in order to get a false or fraudulent claim paid or approved by Palmdale, please identify/describe why the record or statement was false and why the claim was false and/or fraudulent.

Claim  7929-A-2

JM falsely represented uniform compliance with AWWA C900 and UL 1285

3001336.2

–21–

**ER559**

Claim ___7930 - A-2___

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285___

Claim ___7931- A-1___

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285___

Claim ___7932   A-2___

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285___

Claim ___7934   A-2___

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285___

Claim ___7933   A-2___

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285.___

Claim ___7915_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ___7935 - A-2_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

If you have additional claims, please use the extra pages attached to this verdict form.

26.    Did J-M act "knowingly" in regards to the false record(s) or statement(s) and as to the false or fraudulent claim(s) as to each of the claims identified in question 25, above?

As to Claim ___7929  A-2_____

    ✓ Yes     ____ No

As to Claim ___7930  A-2_____

    ✓ Yes     ____ No

As to Claim ___7931 - A-1_____

    ✓ Yes     ____ No

3001336.2

–23–

As to Claim _____ 7932   A-2 _____

‎       √ ___ Yes ____No

As to Claim _____ 7934   A-2 _____

‎       √ ___ Yes ____No

As to Claim _____ 7933 - A-2 _____

‎       √ ___ Yes ____No

As to Claim _____ 7915 _____

‎       √ ___ Yes ____No

As to Claim _____ 7935   A-2 _____

‎       √ ___ Yes ____No

If you have additional claims, please use the extra pages attached to this verdict form.

27.    As to each claim where you answered "yes" in question 26, were the false record or statement and false or fraudulent aspect of the claim "material" to Palmdale's decision-making body?

As to Claim _____ 7929   A-2 _____

‎       √ ___ Yes ____No

As to Claim _____7930   A-2_____

_____✓ Yes    _____No

As to Claim _____7931 - A - 1_____

_____✓ Yes    _____No

As to Claim _____7932    A - 2_____

_____✓ Yes    _____No

As to Claim _____7934 —  A - 2_____

_____✓ Yes    _____No

As to Claim _____7933    A - 2_____

_____✓ Yes    _____No

As to Claim _____7915_____

_____✓ Yes    _____No

As to Claim _____7935  A - 2_____

_____✓ Yes    _____No

3001336.2

–25–

If you have additional claims, please use the extra pages attached to this verdict form.

ER564

**Plaintiff City of Reno**

28.     As to plaintiff City of Reno ("Reno"),

<u>Type 1 FCA Claim</u>

(a) Did Defendant J-M Manufacturing Company, Inc. ("J-M") present or cause to be presented to a Reno officer or employee a claim for payment or approval that was false or fraudulent?

_____√_____Yes       _____No

<u>Type 2 FCA Claim</u>

(b) Did Defendant J-M make, use or cause to be made or used a false record or statement in order to get a false or fraudulent claim paid or approved by Reno?



_____√_____ Yes       _____ No

If your answers to questions 28(a) and 28(b) were both "No," do not answer questions 29 through 36 and go directly to question 37.

If your answers to questions 28(a) and 28(b) were both "Yes," answer questions 29-36.

If your answer was "Yes" to question 28(a), go to question 29, below.

If your answer was "No" to question 28(a) and "Yes" to question 28(b), go directly to question 33, below.

<u>Type 1 FCA Claims</u>

29.     Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each false or fraudulent claim presented or caused to be presented to Reno by Defendant J-M.

3001336.2                           –27–

**ER565**

1996-2004

City of Reno Capital Improvement Projects

**If you find more than one such claim, please list all of them separately below:**

Reno Phase 1 Rescure System: 7976

Reno Phase 1 Resuse System: 7954

Reno Phase 3 Reuse System: 7973-1

30.     As to each such false or fraudulent claim presented or caused to be presented by J-M to Reno, please identify/describe why the claim was false and/or fraudulent.

Claim _____ 7976 _____

JM falsely represented uniform compliance with AWWA C900 and is UL on the brochure.

Claim _____ 7954 _____

JM falsely represented uniform compliance with AWWA C900 and is UL on the brochure

Claim _____ 7973-1 _____

JM falsely represented uniform compliance

3001336.2                                    –28–

**ER566**

_with AWWA C900 and UL 1285_

If you have additional claims, please use the extra pages attached to this verdict form.

31.     Did J-M act "knowingly" in regards to the false or fraudulent claim as to each of the claims identified in question 30, above?

As to Claim _____7976_____

_✓_ Yes     _____ No

As to Claim _____7954_____

_✓_ Yes     _____ No

As to Claim _____7973-1_____

_✓_ Yes     _____ No

If you have additional claims, please use the extra pages attached to this verdict form.

32.     As to each claim where you answered "yes" in question 31, was the false or fraudulent aspect of the claim "material" to Reno's decision-making body?

As to Claim _____7976_____

_✓_ Yes     _____ No

3001336.2                                    –29–

**ER567**

(196 of 262) Page 196 of 262
Case 5:06-cv-00055-GW-MAR   Document 1794   Filed 11/14/13   Page 31 of 50   Page ID #:66901
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 196 of 262

As to Claim _____7954_____

          _√_ Yes     _____No

As to Claim _____7973-1_____

          _√_ Yes     _____No

     If you have additional claims, please use the extra pages attached to this verdict form.

Type 2 FCA Claims

     Answer questions 33-36 only if you answered "yes" to question 28(b).

     33.    Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each claim wherein J-M made or used (or caused to be made or used) a false record or statement in order to get a false or fraudulent claim to be paid or approved by Reno.

_City of Reno Capital Improvement Projects_

     If you find more than one such claim, please list all of them separately below:

_Reno Phase 1 Reuse System: 7954 - 1B_
_Reno Phase 3 Reuse System: 7973-1_
_Reno Phase 3 Reuse System: 7973 A - 1A_
_____
_____
_____
_____
_____

3001336.2

34.   As to each such false record or statement made, used or caused to be made or used by J-M in order to get a false or fraudulent claim paid or approved by Reno, please identify/describe why the record or statement was false and why the claim was false and/or fraudulent.

Claim   7954-1B

JM falsely represented uniform coupliance with
AWWA C900 and UL 1285 listed on the brochure
JB C900

Claim   7973-1

JM falsely represented uniform coupliance
with AWWA C900 and UL 1285

Claim   7973 A-1A

JM falsely represented uniform coupliance
with AWWA C900 and UL 1285

If you have additional claims, please use the extra pages attached to this verdict form.

35.   Did J-M act "knowingly" in regards to the false record(s) or statement(s) and as to the false or fraudulent claim(s) as to each of the claims identified in question 34, above?

3001336.2                              –31–

**ER569**

(198 of 262) Page 198 of 262
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 198 of 262
Case 5:06-cv-00055-GW-MAR Document 1794 Filed 11/14/13 Page 33 of 50 Page ID #:66903

As to Claim   7954 – 1 – B

    ✓ Yes     ____ No

As to Claim   7973 – 1

    ✓ Yes     ____ No

As to Claim   7973 A – 1A

    ✓ Yes     ____ No

If you have additional claims, please use the extra pages attached to this verdict form.

36.    As to each claim where you answered "yes" in question 35, were the false record or statement and false or fraudulent aspect of the claim "material" to Reno's decision-making body?



As to Claim   7954 – 1 – B

    ✓ Yes     ~~No~~

As to Claim   7973 1

    ✓ Yes     ~~No~~

As to Claim   7973 A – 1A

    ✓ Yes     ~~No~~

If you have additional claims, please use the extra pages attached to this verdict form.

**Plaintiff South Tahoe Public Utility District**

37.  As to plaintiff South Tahoe Public Utility District ("South Tahoe"),

Type 1 FCA Claims

(a) Did Defendant J-M Manufacturing Company, Inc. ("J-M") present or cause to be presented to a South Tahoe officer or employee a claim for payment or approval that was false or fraudulent?

_____√_____Yes         _____No

Type 2 FCA Claims

(b) Did Defendant J-M make, use or cause to be made or used a false record or statement in order to get a false or fraudulent claim paid or approved by South Tahoe?

_____√_____ Yes         _____ No

If your answers to questions 37(a) and 37(b) were both "No," do not answer questions 38 through 45.  The foreperson should sign and date the verdict form on the last page.

If your answers to questions 37(a) and 37(b) were both "Yes," answer questions 38-45.

If your answer was "Yes" to question 37(a), go to question 38, below.

If your answer was "No" to question 37(a) and "Yes" to question 37(b), go directly to question 42, below.

Type 1 FCA Claims

38.  Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each false or fraudulent claim

3001336.2

–33–

presented or caused to be presented to South Tahoe by Defendant J-M.

South Tahoe Public Utility District Capital Improvement Projects 1996-2006

If you find more than one such claim, please list all of them separately below:

Echo View Intertie : 8004 - #2 ab

Ponderosa Street Pump Station : 8013 - 2

Flagpole Booster Pump Station : 7999 - 1

Tata Lane and F Street WL : 8002 - 4

Highway 50/Midway Road Water Line : 8000 - 2

Flagpole Tank Site work Project : 8011 - 3

Lookout Tank Site work Project : 8012 - 3

Rail road Tank Site work and Forest Mount Tank Site work and pump station 8001 - 2 ab

39. As to each such false or fraudulent claim presented or caused to be presented by J-M to South Tahoe, please identify/describe why the claim was false and/or fraudulent.

Claim  8004 - #2  ab

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim  8013 - 2

JM falsely represented uniform compliance with AWWA C900 and UL285

Claim  7999 - 1

JM falsely represented uniform compliance

with AWWA C900 and UL 1285

Claim ~~8004~~ 8002-4.

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim 8000-2

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ~~8011~~ 8011-43 a₁⁷

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim 8012-3.

JM falsely represented uniform compliance with AWWA C900 and UL ~~#~~ 1285

Claim 8001-2

JM falsely represented uniform compliance

3001336.2

–35–

with AWWA C900 and UL 1285.

Claim 7997 2

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim 8004 8003-4

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim 8010-3

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim 8008-3

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim 7985

JM falsely represented uniform compliance with AWWA C900 and UL 1285

3001336.2

—36—

_____

_____

If you have additional claims, please use the extra pages attached to this verdict form.

40.    Did J-M act "knowingly" in regards to the false or fraudulent claim as to each of the claims identified in question 39, above?

As to Claim  8004 - 2

     √    Yes    _____  No

As to Claim  8013 - 2

     √    Yes    _____  No

As to Claim  7999 - 1

     √    Yes    _____  No

As to Claim  8002 - 4

     √    Yes    _____  No

As to Claim  8000 - 2

     √    Yes    _____  No

As to Claim  8011 - B

     √    Yes    _____  No

As to Claim  8012 - 3

3001336.2

–37–

(204 of 262) Page 204 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 204 of 262
Case 5:06-cv-00055-GW-MAR    Document 1794    Filed 11/14/13    Page 39 of 50    Page
ID #:66909

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim   8001 - 2

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim   7997 - 2

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim   8003 - 4

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim   8010 - 3

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim   8008 - 3

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim   7985

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

If you have additional claims, please use the extra pages attached to this verdict form.

41.    As to each claim where you answered "yes" in question 40, was the false or fraudulent aspect of the claim "material" to South Tahoe's decision-making body?

As to Claim   8004 - 2

&#95;&#95;✓&#95;&#95; Yes    &#95;&#95;&#95;&#95;&#95; No

As to Claim ___8013 – 2_____

        ___✓___ Yes     _____ No

As to Claim ___7999 – 1_____

        ___✓___ Yes     _____ No

As to Claim ___8002 – 4_____

        ___✓___ Yes     _____ No

As to Claim ___8000 – 2_____

        ___✓___ Yes     _____ No

As to Claim ___8011 – 3_____

        ___✓___ Yes     _____ No

As to Claim ___8012 – 3_____

        ___✓___ Yes     _____ No

As to Claim ___8001 – 2_____

        ___✓___ Yes     _____ No

As to Claim ___7997 – 2_____

        ___✓___ Yes     _____ No

As to Claim ___8003 – 4_____

        ___✓___ Yes     _____ No

3001336.2

–39–

**ER577**

As to Claim ___8010 – 3_____

_✓_ Yes   ____No

As to Claim __8008 – 3_____

_✓_ Yes   ____No

As to Claim _7985_____

_✓_ Yes   ____No

If you have additional claims, please use the extra pages attached to this verdict form.

Type 2 FCA Claims

Answer questions 42-45 only if you answered "yes" to question 37(b).

42.    Identify - by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number - each claim wherein J-M made or used (or caused to be made or used) a false record or statement in order to get a false or fraudulent claim to be paid or approved by South Tahoe.

_____South Tahoe Public Utility District Capital Improvement Projects_____
                                    1996

If you find more than one such claim, please list all of them separately below:

Echo View Intertie : 8004-4
Ponderosa Street (HT) Pump : 8013-4     ok
Flagpole Booster Pump Station : 7999-4
Tata Lane & F. Street WL : 8002-5
Highway 50 /midway Road Water Line : 8000-4
Flagpole Tank Sitework Project : 8011-5
Lookout Tank Sitework Project : 8012-4

3001336.2                          –40–

**ER578**

43.    As to each such false record or statement made, used or caused to be made or used by J-M in order to get a false or fraudulent claim paid or approved by South Tahoe, please identify/describe why the record or statement was false and why the claim was false and/or fraudulent.

Claim   8004-2

Jm falsely represented uniform compliance with AWWA C900 and UL 1285

Claim   8013-2

Jm falsely represented uniform compliance with AWWA C900 and UL 1285

Claim   7999-1

Jm falsely represented uniform compliance with AWWA C900 and UL 1285

Claim   8002-4

Jm falsely represented uniform compliance with AWWA C900 and UL 1285

3001336.2                              —41—

Claim ___8000-2_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ___8011-3_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ___8012 — 3_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ___8001 — 2_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

Claim ___7997-2_____

JM falsely represented uniform compliance with AWWA C900 and UL 1285

3001336.2

–42–

Claim _8003 – 4_____

___Jm falsely represented uniform to compliance___
___with AWWA C900 and UL 1285_____
_____
_____

Claim _8010 – 3_____

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285_____
_____
_____

Claim _8008 – 3_____

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285_____
_____
_____

Claim _7985_____

___Jm falsely represented uniform compliance___
___with AWWA C900 and UL 1285_____
_____
_____

    If you have additional claims, please use the extra pages attached to this verdict form.

    44.   Did J-M act "knowingly" in regards to the false record(s) or statement(s) and as to the false or fraudulent claim(s) as to each of the claims identified in question 43, above?

3001336.2

–43–

**ER581**

As to Claim  8004 - 2

        ✓ Yes       No

As to Claim  8013 - 2

        ✓ Yes       No

As to Claim  7999 - 1

        ✓ Yes       No

As to Claim  8002 - 4

        ✓ Yes       No

As to Claim  8000 - 2

        ✓ Yes       No

As to Claim  8011 - 3

        ✓ Yes       No

As to Claim  8012 - 3

        ✓ Yes       No

As to Claim  ~~8~~ JB 8001 - 2

        ✓ Yes       No

As to Claim  7997 - 2

        ✓ Yes       No

As to Claim   8003-4

       ✓ Yes      No

As to Claim   8010-3

       ✓ Yes      No

As to Claim   8008-3

       ✓ Yes      No

As to Claim   7985

       ✓ Yes      No

If you have additional claims, please use the extra pages attached to this verdict form.

45.    As to each claim where you answered "yes" in question 44, were the false record or statement and false or fraudulent aspect of the claim "material" to South Tahoe's decision-making body?

As to Claim   8004-2

       ✓ Yes      No

As to Claim   8013-3

       ✓ Yes      No

As to Claim   7991-1

       ✓ Yes      No

3001336.2

As to Claim ___8002 – 4___

⎯√⎯ Yes    _____ No

As to Claim ___8000 – 2___

⎯√⎯ Yes    _____ No

As to Claim ___8011 – 3___

⎯√⎯ Yes    _____ No

As to Claim ___8012 – 3___

⎯√⎯ Yes    _____ No

As to Claim ___8001 – 2___

⎯√⎯ Yes    _____ No

As to Claim ___7997-2___

⎯√⎯ Yes    _____ No

As to Claim ___8003 – 4___

⎯√⎯ Yes    _____ No

As to Claim ___8010 – 3___

⎯√⎯ Yes    _____ No

As to Claim ___8008 – 3___

⎯√⎯ Yes    _____ No

3001336.2                    –46–

**ER584**

As to Claim ___7985_____

___✓___ Yes      _____ No

If you have additional claims, please use the extra pages attached to this verdict form.

Dated: __Nov. 14__, 2013      Signed: _____
                                              FOREPERSON

## ADDITIONAL PAGES FOR USE BY THE JURY AS NEEDED

You may use these pages as needed.   If you do so, please write in the applicable question number(s) to which your answer(s) apply.   Please also indicate the applicable claim(s) to which your answer(s) apply.

(38) Gardner Mountain WL Replacement Phase 1 and 2: 7997-2
Gardner mountain site work + WL Replacement + Forest Mountain site work:
Gardner mountain sewer pump station + Cornelian Drive Water: 8010 [8003-4]
Flagpole, + Elks Club Well Control Buildings: 8008-3
Highway 50-2004 WL Replacement Project: 7985-

(42) Railroad Tank Sitework + Forest Mount Tank Sitework
+ Pump Station: 8001-4
Gardner Mountain WL Replacement Phase 1 and
2: 7997-4
Gardner Mountain Sitework + WL Replacement + Forest
mountain Sitework: 8003-5
Gardner Mountain Sewer Pump Station + Cornelian Drive
Water Booster Pump Station: 8010-4
Flagpole and Elks Club Well Control Buildings: 8008-4
Highway 50-2004 WL Replacement Project: 7992, 7993

(4) - 2315, 7539, 114, - Calleguas

(13) 2317, 2318, 2118, 3053, 7046, 7062, 7150, 7320,
7322, 7539, 7314, 7367, ~~77~~ 7748, 1535, 1051,
7601-2, Norfolk

(~~19~~)(22) 2305, 2307, 2310, 2311, 2312, 2315, 2317,
2328, 2330, 2118, 7062, 7150, 7539, 156, 7748,
1535, 244, 114 - Palmdale

(40) 2305, 2307, 2310, 2311, 2312, 2315, 2317, 2328,
2330, 2118, ~~75~~ 7062, 7150, 7539, 156, 7748, 1535, 244,
114 - Tahoe

**ER586**

Reno

(31) 2310, 2311, 2312, 2315, 2317, 2318, 2330, 2118, 3053, 7046, 7062, 7150, 7320, 7322, 7539, 7314, 7367, 7748, 7712, 7709, 1535, 1051, 7601-2, 244, 114,

(8) 2315, 7539, 14   Calleguas

(16) 2305, 2307, 2310, 2311, 2312, 2315, 2317, 2328, 2330, 2118, 7062, 7150, 7539, 156, 7748, 1535, 244, 114   Palmdale

(17) 2317, 2318, 2118, 3053, 7046, 7062, 7150, 7320, 7322, 7539, 7314, 7367, 7748, 1535, 1051, 7601-2   Norfolk

(14) 2305, 2307, 2310, 2311, 2312, 2315, 2317, 2328, 2330, 2118, 7062, 7150, 7539, 156, 7748, 1535, 244, 114   Tahoe

(35) 2310, 2311, 2312, 2315, 2317, 2318, 2330, 2118, 3053, 7046, 7062, 7150, 7320, 7322, 7539, 7314, 7367, 7748, 7712, 7709, 1535, 1051, 7601-2, 244, 114

3001336.2

–49–

# CALLEGUAS MUNICIPAL WATER DISTRICT
# CAPITAL IMPROVEMENT PROJECTS
# 1996-2006

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| Lake Bard Oxygenation Project | Standard Specifications | 755 |
| | Submittal | 7757 |
| | Agreement | 7752 |
| | Payment Information | 7758 |

## CITY OF NORFOLK CAPITAL IMPROVEMENT PROJECTS
## 1996-2006

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| **Fairmount Park Phase 3** | Hampton Roads Standards | 7880 |
| | Standard Design Criteria Manual | 328 |
| | Project Manual | 7904-1 |
| | List of Materials | 7904-2 |
| | Agreement | 7904-3 |
| | Application No. 7 | 7904-4 |
| | | |
| **Fairmount Park Phase 4** | Hampton Roads Standards | 7880 |
| | Standard Design Criteria Manual | 328 |
| | Project Manual | 7883 |
| | Submittal | 7888 |
| | Agreement | 7885 |
| | Application No. 8 | 7900-1 |
| | Application No.12 | 7900-2 |

## PALMDALE WATER DISTRICT CAPITAL IMPROVEMENT PROJECTS 1996-2006

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| **Spec. 9802** [Ex. 7929A] | Standard Specifications | 264 |
| | Project Specifications | 271 |
| | Bid Proposal | 7929A-1 |
| | Agreement | 7929A-2 |
| | Job Cost Envelope | 7929A-3 |
| | | |
| **Spec. 9806** [Ex. 7930A] | Standard Specifications | 264 |
| | Project Specifications | 594 |
| | Bid Proposal | 7930A-1 |
| | Agreement | 7930A-2 |
| | Job Cost Envelope | 7930A-3 |
| | | |
| **Spec. 9807** [Ex. 7931A] | Standard Specifications | 264 |
| | Project Specifications | 591 |
| | Bid Proposal | 7931A-1 |
| | Agreement | 7931A-2 |
| | Job Cost Envelope | 7931A-3 |
| | | |
| **Spec. 0001** [Ex. 7932A] | Standard Specifications | 264 |
| | Project Specifications | 596 |
| | Bid Proposal | 7932A-1 |
| | Agreement | 7932A-2 |
| | Job Cost Envelope | 7932A-3 |
| | | |
| **Spec. 0004** [Ex. 7934A] | Standard Specifications | 264 |
| | Project Specifications | 593 |
| | Bid Proposal | 7934A-1 |
| | Agreement | 7934A-2 |
| | Job Cost Envelope | 7934A-3 |
| | | |
| **Spec. 0102** [Ex. 7933A] | Standard Specifications | 264 |
| | Project Specifications | 595 |
| | Bid Proposal | 7933A-1 |
| | Agreement | 7933A-2 |
| | Job Cost Envelope | 7933A-3 |
| | | |
| **Spec. 0201** | Standard Specifications | 265 |
| | Project Specifications | 590 |
| | Bid Proposal | 7913 |
| | Agreement | 7915 |
| | Job Cost Envelope | 281 |
| | | |

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| **Spec. 0402**  [Ex. 7935A] | Standard Specifications | 265 |
| | Project Specifications | 589 |
| | Bid Proposal | 7935A-1 |
| | Agreement | 7935A-2 |
| | Payment Information | 7935A-3 |

Palmdale
.

**ER591**

## CITY OF RENO CAPITAL IMPROVEMENT PROJECTS
## 1996-2006

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| **Reno Phase 1 Reuse System** [Ex. 7954] | Standard Specifications | 511 |
| | Project Specifications | 507 |
| | Submittal | 7976 |
| | Agreement | 7943 |
| | Payment Information | 7954-1A |
| | Invoice | 7954-1B |
| | Payment Information | 7954-2A |
| | | |
| **Reno Phase 3 Reuse System** [Ex. 7973] | Standard Specifications | 511 |
| | Project Specifications | 509 |
| | Agreement | 509 |
| | Invoice | 7973-1 |
| | Invoice | 7973A-1A |

# SOUTH TAHOE PUBLIC UTILITY DISTRICT
## CAPITAL IMPROVEMENT PROJECTS
## 1996-2006

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| **Echo View Intertie** [Ex. 8004] | Specifications and Contract Documents | 8004-1 |
| | Shop Drawing Transmittal | 8004-2 |
| | Agreement | 8004-3 |
| | Pay Estimate Summary | 8004-4 |
| | | |
| **Ponderosa Street (HT) Pump Station** [Ex. 8013] | Specifications and Contract Documents | 8013-1 |
| | Shop Drawing Transmittal | 8013-3 |
| | Agreement | 8013-2 |
| | Pay Estimate Summary | 8013-4 |
| | | |
| **Flagpole Booster Pump Station** [Ex. 7999] | Specifications and Contract Documents | 7999-1 |
| | Shop Drawing Transmittal | 7999-2 |
| | Agreement | 7999-3 |
| | Pay Estimate Summary | 7999-4 |
| | | |
| **Tata Lane and F Street WL** [Ex. 8002] | Specifications and Contract Documents | 8002-1 |
| | Bid Submittal Chart | 8002-2 |
| | Brochures | 8002-4 |
| | Agreement | 8002-3 |
| | Pay Estimate Summary–Final | 8002-5 |
| | | |
| **Highway 50/Midway Road Water Line** [Ex. 8000] | Specifications and Contract Documents | 8000-1 |
| | Shop Drawing Transmittal | 8000-2 |
| | Agreement | 8000-3 |
| | Pay Estimate Summary-Final | 8000-4 |
| | | |
| **Flagpole Tank Sitework Project** [Ex. 8011] | Specifications and Contract Documents | 8011-1 |
| | Shop Drawing Transmittal | 8011-3 |
| | Agreement | 8011-2 |
| | Pay Estimate Summary-Final | 8011-4 8011-5 |
| | | |
| **Lookout Tank Sitework Project** [Ex. 8012] | Specifications and Contract Documents | 8012-1 |
| | Shop Drawing Transmittal | 8012-3 |
| | Agreement | 8012-2 |
| | Pay Estimate Summary | 8012-4 |
| | | |

| PROJECT NAME | PROJECT DOCUMENTS | EXHIBIT # |
|---|---|---|
| **Railroad Tank Sitework and Forest Mount Tank Sitework and Pump Station** [Ex. 8001] | Specifications and Contract Documents | 8001-1 |
| | Shop Drawing Transmittal | 8001-2 |
| | Agreement | 8001-3 |
| | Pay Estimate Summary-Final | 8001-4 |
| | | |
| **Gardner Mountain WL Replacement Phase 1 and 2** [Ex. 7997] | Specifications and Contract Documents | 7997-1 |
| | Shop Drawing Transmittal | 7997-2 |
| | Agreement | 7997-3 |
| | Pay Estimate Summary-Final | 7997-4 |
| | | |
| **Gardner Mountain Sitework and WL Replacement and Forest Mountain Sitework** [Ex. 8003] | Specifications and Contract Documents | 8003-1 |
| | Shop Drawing Transmittal | 8003-2 |
| | Brochures | 8003-4 |
| | Agreement | 8003-3 |
| | Pay Estimate Summary-Final | 8003-5 |
| | | |
| **Gardner Mountain Sewer Pump Station and Cornelian Drive Water Booster Pump Station** [Ex. 8010] | Specifications and Contract Documents | 8010-1 |
| | Shop Drawing Transmittal | 8010-3 |
| | Agreement | 8010-2 |
| | Pay Estimate Summary | 8010-6 |
| | | |
| **Flagpole and Elks Club Well Control Buildings** [Ex. 8008] | Specifications and Contract Documents | 8008-1 |
| | Shop Drawing Transmittal | 8008-3 |
| | Agreement | 8008-2 |
| | Pay Estimate Summary-Final | 8008-4 |
| | | |
| **Highway 50 – 2004 WL Replacement Project** | Specifications and Contract Documents | 7981 |
| | Shop Drawing Transmittal | 7985 |
| | Shop Drawing Transmittal | 7986 |
| | Agreement | 7983 |
| | Pay Estimate Summary | 7992 |
| | Pay Estimate Summary and Payment documents | 7993 |



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) ) ) | No. EDCV 06-55-GW(PJWx) |
| Plaintiffs, | ) ) | **FINAL JURY INSTRUCTIONS** |
| v. | ) ) ) | |
| J-M MANUFACTURING COMPANY, INC., | ) ) ) | |
| Defendant. | ) ) | |

# FINAL JURY INSTRUCTIONS

## I. Initial Instructions

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case. Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

You must not infer from these instructions or from anything I may have said or done as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

The Plaintiffs in this case are various state and local governmental entities/agencies. For purposes of this trial, five representative Plaintiffs have been chosen. They are: 1) Calleguas Municipal Water District, 2) City of Norfolk, 3) City of Reno, 4) Palmdale Water District, and *c.5)* South Tahoe Public Utility District. The Defendant herein is J-M Manufacturing Company, Inc. (which will be referred to as "J-M" or "Defendant").

Plaintiffs have brought this action under certain "False Claims Act" statutes. In general, under a False Claims Act statute, any person (including a corporation) who knowingly presents (or causes to be presented) to an officer or employee of a governmental entity/agency a false or fraudulent claim for payment or approval, or who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government is liable to that government.

Plaintiffs contend that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards. Plaintiffs contend that this representation was false because J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength, or durability that the applicable industry standards require. Plaintiffs contend that J-M made these representations with one of three states of mind - (1) knowing that they were false, (2) consciously avoiding learning the truth, or (3) with reckless disregard for the truth. Plaintiffs contend that J-M's representations were capable of influencing the governmental Plaintiffs' decisions to pay for J-M pipe. Plaintiffs contend that each of the five governmental Plaintiffs received a claim for payment for J-M pipe. The Plaintiffs have the burden of proving these claims by a preponderance of the evidence.

Defendant J-M disagrees with and denies Plaintiffs' allegations. J-M contends that its PVC pipe was manufactured and tested in accordance with applicable industry standards, including the applicable quality, strength, and durability requirements. J-M contends that the pipe received by each of the five Plaintiffs met industry standards and has performed as promised

-1-

for the Plaintiffs. J-M contends that because certain industry standards were never requested or specified by the Plaintiffs, representations of compliance with those industry standards could not have influenced the Plaintiffs' decision to purchase and/or pay for the pipe. J-M contends that it acted in good faith at all times, and that it did not knowingly present any false claims for payment to anyone, including to any Plaintiff.

When a party has the burden of proof on any claim by a preponderance of the evidence, it means you must be persuaded by the evidence presented during the trial that the claim is more probably true than not true.

After weighing all of the evidence, if you cannot decide that something is more likely to be true than not true, you must conclude that the party did not prove it. You should consider all the evidence, no matter which party produced the evidence.

You should decide the case as to each Plaintiff separately. Unless otherwise stated, the instructions apply to all parties.

The evidence you are to consider in deciding what the facts are consists of:
1) the sworn testimony of any witness; and
2) the exhibits which are received into evidence.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they said (or will say) in their opening statements, their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any

-2-

evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on sprinkler system, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

There are rules of evidence that control what can be received into evidence at a trial. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overruled the objection, the question was answered or the exhibit was received. If I sustained the objection, the question was not answered, or the exhibit was not received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

During the trial, I allowed jurors to pose questions for witnesses. However, there were times when I did not ask one or more of those questions or I rephrased the question. Do not speculate as to why that happened. Also, do not give undue weight to questions you or other jurors proposed. You should evaluate the answers to those questions in the same manner you evaluate all of the other evidence.

When I instruct that an item of evidence may be admitted for a limited purpose, you must consider it only for that purpose.

In this trial, you heard witnesses testify about statements made by people other than the witness who was testifying. If I ruled that the statement was hearsay, then it may not be considered as evidence. If I ruled that the statement was not hearsay because it was not offered for the truth of the statement, then you may consider the statement as evidence for the limited purpose for which it was offered. For example, a statement of someone other than the witness testifying may be offered to show that the witness was aware that the statement was made. In that example, the evidence may be considered for the limited purpose for which it was offered. The statement may not be considered as evidence of the truth of the statement.

The law treats some statements made outside of court differently than others. You may use evidence of statements made outside the courtroom like any other evidence unless I ruled otherwise.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

-3-

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence;

(7) a witness's prior inconsistent sworn statements, and

(8) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

The law does not require any party to call as a witness every conceivable person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

During the trial, certain video recordings were played to you which included a transcription of the recorded statements. Please bear in mind that the video recording is the evidence, not the transcript. If you heard something different than from what appeared in the transcript, what you heard is controlling.

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath, before the actual trial, in response to questions that were submitted in writing under established court procedures. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Certain charts and summaries not received in evidence have been and/or will be shown to you in order to help explain the contents of records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

-4-

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

One or more of the admitted exhibits are in an electronic format. If you wish for the exhibits to be played back during your deliberation, feel free to make such a request and a computer, projector, printer and/or accessory equipment will be available to you in the jury room.

## II. Parties and Officers/Employee/Agents

All parties are equal before the law and governmental entities and corporations are each entitled to the same fair and conscientious consideration by you as any other party or person.

Under the law, a corporation is considered to be a person. However, it can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of their authority.

Knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, can be imputed to the corporation itself.

## III. Issues To Be Decided By The Jury

As noted above, this is a False Claims Act case and its elements will be defined below. However, you will only be asked to answer certain questions which will be described herein and specifically set out in the "verdict form."

Initially, you should understand that a False Claims Act lawsuit is different from a breach of contract, breach of warranty, negligence, defective manufacture of a product, or other type of action that you may have previously been exposed to or heard about. Therefore, please pay close attention to the language and terms used in these jury instructions.

In this False Claims Act case, there are two separate ways in which a Plaintiff can establish its case against J-M.

First, a Plaintiff can meet its burden by proving the following elements by a preponderance of the evidence:

(1) the Defendant presented (or caused to be presented) to an officer or employee of the Plaintiff governmental entity or agency

(2) a claim for payment or approval that was false or fraudulent

(3) the Defendant acted "knowingly," as defined below, (sometimes referred to as "scienter") and

(4) the false or fraudulent aspect of the claim was "material," as defined below, to the

-5-

**ER600**

(229 of 262) Page 229 of 262
Case 5:06-cv-00055-GW-MAR   Document 1792   Filed 11/14/13   Page 7 of 9   Page ID
#:66862
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 229 of 262

governmental decision-making body.

Second, a Plaintiff can meet its burden by proving the following elements by a preponderance of the evidence:

(1) the Defendant made or used (or caused to be made or used) a false record or statement in order to get

(2) a false or fraudulent claim paid or approved by the Plaintiff governmental entity or agency

(3) the Defendant acted "knowingly," as defined below, (sometimes referred to as "scienter")

(4) the Defendant made the false record or statement for the purpose of getting the false or fraudulent claim paid or approved by the Plaintiff, and

(5) the false or fraudulent claim and the false record or statement were "material," as defined below, to the governmental decision-making body.

In this case, the jury will be asked to decide as to each Plaintiff:

(1) Did J-M present (or cause to be presented) to the Plaintiff a false or fraudulent claim for payment or approval; and/or did J-M make or use (or cause to be made or used) a false record or statement in order to get a false or fraudulent claim paid or approved by the Plaintiff?  If so, what was the false or fraudulent claim and/or false record or statement?

(2) If the answer to question (1) is "yes," as to the false or fraudulent claim and/or the false record or statement, did J-M act "knowingly," as defined below, (with the required scienter)?

(3) Were the false or fraudulent claim and/or false record or statement (if any) "material," as defined below, to the Plaintiff's decision-making body?

A "claim" includes any request or demand, whether under a contract or otherwise, for money or property that is made to a contractor, grantee or other recipient if a Plaintiff governmental entity/agency provides any portion of the money or property that is requested or demanded.

A claim, record or statement is "false" if it contains or is based upon an assertion that is untrue when made or when used.

A claim, record or statement is "fraudulent" if it contains or is based upon an assertion that is known to be untrue.

The terms "knowing" and "knowingly" mean that a person, with regard to information: (a) has actual knowledge of the true information, or (b) acts with deliberate ignorance of the truth or falsity of the information, or (c) acts in reckless disregard of the truth or falsity of the information.

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the government's decision-making body to which it is addressed. This test focuses on the potential effect of the false statement when it is made rather than on the

-6-

false statement's actual effect after it is discovered.

No showing of actual damage is required to establish a false or fraudulent claim for payment.

A False Claims Act case can be established by showing that a defendant has falsely certified or represented compliance with a statute, regulation, or contractual provision or requirement which it knows is a condition to receiving government payment or approval. However, a violation of a regulatory provision or contractual requirement, in the absence of a knowingly false or misleading representation, does not amount to fraud. Innocent mistakes, mere negligent misrepresentations, and good faith differences in interpretations do not constitute knowingly false statements under a False Claims Act statute.

## IV. Concluding Instructions

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right. It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet chat room, blog, website or other feature. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not

**ER602**

make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings. If any juror is exposed to any outside information, please notify the court immediately.

If you took notes during the trial, please keep them to yourself. Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist one's memory. You should not be overly influenced by your notes or those of your fellow jurors.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone – including me – how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

A verdict form has been prepared for you. Please follow the instructions on that form with care. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

-8-

ER603

(232 of 262), Page 232 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 232 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 1 of 28   Page ID
#:65134

1  HOLLAND & KNIGHT LLP
   Richard T. Williams (State Bar No. 52896)
2    Vince Farhat (State Bar No. 183794)
     Kristina S. Azlin (State Bar No. 235238)
3  400 South Hope Street, 8th Floor
   Los Angeles, California 90071-2040
4  Telephone (213) 896-2400
   Facsimile (213) 896-2450
5  Email: richard.williams@hklaw.com,
   Email: vince.farhat@hklaw.com,
6  Email: kristina.azlin@hklaw.com,

7  Attorneys for Defendant
   Formosa Plastics Corporation, U.S.A.

8

9              **UNITED STATES DISTRICT COURT**

10     **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

11  UNITED STATES, THE STATES        ) CASE NO. ED CV06-00055-GW(PJWx)
    OF CALIFORNIA, DELAWARE,         ) Assigned to Hon. George H. Wu
12  FLORIDA, ILLINOIS, INDIANA,      )
    NEVADA, NEW MEXICO, NEW          ) **DECLARATION OF RICHARD T.**
13  YORK, and TENNESSEE, THE         ) **WILLIAMS**
    COMMONWEALTHS OF                 )
14  MASSACHUSETTS AND                ) **IN SUPPORT OF JOINT NOTICE**
    VIRGINIA, and THE DISTRICT       ) **OF MOTION AND MOTION FOR**
15  OF COLUMBIA *ex rel*. JOHN       ) **APPROVAL OF SETTLEMENT AS**
    HENDRIX,                         ) **FAIR, ADEQUATE AND**
16                                   ) **REASONABLE**
                    Plaintiffs,      )
17                                   )
                                     )
18  vs.                              )
                                     ) Date:          Dec. 2, 2013
19  J-M MANUFACTURING               ) Time:          8:30 a.m.
    COMPANY, INC., d/b/a JM Eagle,   ) Location:      Courtroom 10
20  a Delaware corporation, and      )
    FORMOSA PLASTICS                 )
21  CORPORATION, U.S.A., a           )
    Delaware corporation,            )
22                                   )
                    Defendants.      )
23                                   )
                                     )
24                                   )
                                     )
25  ─────────────────────────────────)

26

27

28

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR**
**APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

# **TABLE OF CONTENTS**

**Page**

I. PROTRACTED PROCEDURAL HISTORY OF THE ALLEGATIONS  AGAINST FPC-USA IN THIS FCA ACTION ................ 1

II. EXTENSIVE DOCUMENT DISCOVERY SPECIFICALLY AGAINST FPC-USA .................................................................. 7

III. LIMITED ROLE OF FPC-USA ................................................. 7

IV. THIS SETTLEMENT AGREEMENT MEETS THE CRITERIA FOR THIS COURT TO APPROVE IT AS FAIR, ADEQUATE AND REASONABLE .................................................................... 8

    A. The Settlement Agreement Is Presumed Fair ......................... 8

        1. Experience of Counsel ................................. 8

        2. Arm's Length Negotiation of Settlement ..................... 9

        3. Sufficiency of Investigation and Discovery for Evaluation ........................................ 10

    B. The Strengths and Weaknesses of Plaintiffs' Case And the Risk, Complexity and Expense of Further Litigation Demonstrate That The Settlement Is Proper ....................... 11

    C. Inadvertent Submittal Claims ............................................... 11

    D. ANALYSIS OF STRENGTHS AND WEAKNESSES OF CLAIMS AGAINST FPC-USA IN THE STATE ACTION ............... 15

        1. The Origins and Status of the State Action ................... 15

        2. Claims Alleged Against FPC-USA in the State Action ............. 15

        3. Fraud and Negligent Misrepresentation Claims ................ 18

        4. Strict Products Liability Claims .............................. 18

        5. Unjust Enrichment Claims ................................. 19

        6. Insurance .............................................. 20

V. EARLY DISCOUNT FOR GLOBAL SETTLEMENT ............... 20

VI. THE AMOUNT OF THE SETTLEMENT ALSO DEMONSTRATES THAT THE SETTLEMENT IS PROPER ................. 20

VII. THE STAGE OF THE PROCEEDINGS, THE EXPERIENCE AND VIEWS OF COUNSEL, AND THE REACTION OF THE PARTIES TO THE PROPOSED SETTLEMENT WARRANT APPROVAL ........................................................................ 22

VIII. THE SETTLEMENT AGREEMENT IS NOT THE RESULT OF FRAUD OR COLLUSION ........................................................ 24

**ER605**   i

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

(234 of 262), Page 234 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 234 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 3 of 28   Page ID
#:65136

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

## DECLARATION OF RICHARD T. WILLIAMS

1.     I am a partner with the law firm of Holland & Knight LLP ("H&K") with 41 years of experience in civil litigation.  I have been responsible, along with other partners in my firm, for the representation of Defendant Formosa Plastics Corporation, U.S.A. ("FPC-USA") in this matter.  I am licensed to practice law in the State of California and before this Court.  I have personal knowledge of the facts stated herein, except for those stated on information and belief, which I am informed and believe are true.  I could and would testify to these facts under oath if called upon to do so.

2.     A settlement has been negotiated between counsel for the Plaintiffs and counsel for FPC-USA resolving all claims between them in this matter and also in the State Action described below. The terms have been documented in a written Settlement Agreement; a true and correct copy of the fully executed Settlement Agreement is attached hereto as Exhibit "1".

3.     On behalf of FPC-USA, for the reasons set forth below, I recommend this Court's approval of the Settlement Agreement as "fair, adequate and reasonable under all the circumstances", pursuant to 31 U.S.C. § 3730(c)(2)(B), and similar state statutes.

## I.  PROTRACTED PROCEDURAL HISTORY OF THE ALLEGATIONS AGAINST FPC-USA IN THIS FCA ACTION

4.     This *qui tam* case has passed its seventh anniversary with more than 1,700 entries on the judicial docket attesting to the vigor of battle and thus underscoring that settlement herein is the product of arms' length negotiations.  More than two years of Court proceedings after its unsealing involved just settling the pleadings as to FPC-USA, indicating: (1) The fact and legal issues are complex, and (2) FPC-USA was successful in eliminating its exposure to Plaintiffs' direct violations claims, which this Court determined, after giving Plaintiffs multiple opportunities to amend their pleadings, rested on too insubstantial a fact foundation.

During this process, Plaintiffs submitted four separate Amended Complaints, to each of which FPC-USA responded with a motion to dismiss; three of those motions were granted by the Court. Ultimately, all claims of direct violations of federal and state FCAs were dismissed with prejudice as against FPC-USA, as well as one claim under the "inadvertent submittal" provisions of New Mexico law.

5.     This *qui tam* civil action was filed under seal on January 17, 2006 in the United States District Court for the Central District of California entitled *U.S. ex rel. Hendrix, et al. v. J-M Mfg. Co., Inc., et al.*, No. CV 06-0055-GW ("Federal Action"), alleging violations of the federal, California, and other states' FCAs by J-M Manufacturing Company, Inc. ("J-M") (Docket No. 1).  FPC-USA was not named a defendant to the original Complaint.

6.     All proceedings in this lawsuit continued to be sealed throughout 2006-February 2010.  On information and belief, it appears that between 2006 and 2008, various demands for the production of documents were issued by various federal and state officials to J-M, that extensive investigative work was done by various government officials and by Relator's counsel, and that thousands of documents were produced to government officials by J-M.

7.     In October 2008, a First Amended Complaint was filed herein (Docket No. 41), under seal. FPC-USA was added as a defendant to four counts asserted under "inadvertent submittal" provisions in the state FCAs in California, Massachusetts, Nevada and Tennessee; no claims were alleged against FPC-USA with respect to the federal FCA or with respect to direct violation of state FCAs. FPC-USA was given no contemporary notice of this filing.  In February 2010, the First Amended Complaint was unsealed.

8.     The "inadvertent submittal" provisions, unique to a handful of state FCAs, relate to conduct of a person after someone else has filed a false invoice or claim for payment with a government entity in those states and the claim has been paid.  *See* CAL. GOV'T CODE § 12651(a)(8) (West 2013); MASS. GEN. LAWS ch. 12, §

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**ER607**     2

DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE

5B(9) (2013); NEV. REV. STAT. § 357.040(h) (2013); and TENN. CODE ANN. § 4-18-103(8) (West 2013).  Under the "inadvertent submittal" provisions, a person may be held liable if that person "is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim."  *E.g.*, TENN. CODE ANN. § 4-18-103(8) (West 2013).  "Beneficiary" is a term neither defined nor limited in these state FCAs.  A person found liable under such provisions may be subject to treble damages, a multi-thousand dollar civil penalty for each false invoice involved, and for attorney's fees and costs of prosecution; liability for two persons found liable under these state FCAs may be joint and several.

9.     The Second Amended Complaint was filed herein on February 5, 2010 (Docket No. 96), and was unsealed by the Court on February 8, 2010 (Docket No. 105), along with notice by the United States that it declined to intervene in this action (Docket No. 100).  For the first time, the Second Amended Complaint added one count for direct violation of the federal FCA against FPC-USA and eleven counts for direct violation of state FCAs as well as one more count for violation of the "inadvertent submittal" provision, this time in the New Mexico FCA.  *See* N.M. STAT. ANN. § 44-9-3(A)(9) (2013).  The four inadvertent submittal counts against FPC-USA in the First Amended Complaint were carried forward to this Second Amended Complaint.

10.     Briefly, the Second Amended Complaint asserted that at least since January 1996, J-M has manufactured polyvinyl chloride ("PVC") pressure water pipe ("PVC pipe") whose tensile strength purportedly failed to meet industry standards specified by governmental entities for use in their water and sewer systems.  FPC-USA, as a major supplier of PVC resin to J-M, the main raw material in PVC pipe, was alleged to have reduced the inherent viscosity of its PVC resin supplied to J-M, purportedly contributing to weakness in the PVC pipe.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**ER608**   3

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

(237 of 262), Page 237 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 237 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 6 of 28   Page ID
#:65139

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

11. On May 10, 2010, FPC-USA and J-M each filed Motions to Dismiss the Second Amended Complaint. (Docket Nos. 183, 188). After multiple hearings and supplemental briefing, on December 1, 2010, the Court found the Second Amended Complaint insufficient as against FPC-USA and dismissed without prejudice all claims alleged against FPC-USA, granting leave to Plaintiffs to file a further amended complaint. (Docket No. 317).

12. Between January 5, 2010 and March 10, 2010, approximately 48 states, cities, and water districts formally intervened in this *qui tam* lawsuit as plaintiffs. (*See* Docket Nos. 58-117). In August and September 2010, the Intervenors moved the Court for permission to file Complaints in Intervention that largely incorporated the Second Amended Complaint, provided some additional transactional information, and also sought to bring non-FCA and common law counts for fraud, negligent misrepresentation, strict product liability, deceitful trade practices and unjust enrichment against FPC-USA, and the same counts, plus breach of warranty claims, against defendant J-M and also against Mr. Walter Wang, CEO of J-M. (Docket Nos. 252, 253, 254).

13. On December 1, 2010, and in an Order dated December 21, 2010, the Court denied the Intervenors' Motions and declined to exercise supplemental jurisdiction to allow non-FCA and common law claims. (Docket Nos. 317, 321).

14. Relator filed a Third Amended Complaint on January 20, 2011. (Docket No. 324). The same counts were alleged against FPC-USA in the Third Amended Complaint as in the Second Amended Complaint. Most of the allegations, although reorganized, were not substantially changed from the prior complaint. FPC-USA filed a motion to dismiss the Third Amended Complaint on February 10, 2011. (Docket No. 333).

15. In its tentative ruling issued May 2 (Docket No. 398), and in a final order issued May 9, 2011 (Docket No. 401), the Court granted FPC-USA's motion to dismiss with prejudice thirteen counts in the Third Amended Complaint alleging

**ER609** 4

(238 of 262). Page 238 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 238 of 262
Case 5:06-cv-00055-GW-MAR Document 1744 Filed 10/28/13 Page 7 of 28 Page ID
#:65140

direct violations by FPC-USA of the federal and state FCAs. The Court concurrently granted without prejudice FPC-USA's Motion to Dismiss the five remaining counts brought under the "inadvertent submittal" provisions in the FCAs of California, Massachusetts, Nevada, New Mexico and Tennessee in the Third Amended Complaint. The Court gave Relator until May 23 to file a Fourth Amended Complaint with respect to these inadvertent submittal claims.

16.     On May 23, 2011, Relator filed the Fourth Amended Complaint. (Docket No. 412). It enlarged some allegations and proffered supporting exhibits with respect to the five inadvertent submittal claims against FPC-USA in the Fourth Amended Complaint, the only claims pleaded against FPC-USA. On June 6, 2011, FPC-USA filed its motion to dismiss the Fourth Amended Complaint (Docket No. 423) and also filed a motion to strike selected allegations. (Docket No. 424). Following an offer of additional proof by Relator and additional briefing and argument, the Court denied FPC-USA's motion to dismiss on October 24, 2011. (Docket No. 498).

17.     On November 7, 2011, the Court granted dismissal with prejudice of one of the unique "inadvertent submittal" ("I/S") counts, alleged under New Mexico law as time-barred and not retroactive. (Docket No. 515).

18.     Following additional briefing, the Court granted in part and denied in part FPC-USA's motion to strike selected allegations on December 8 and in an Order dated December 15, 2011. (Docket Nos. 553, 564). The Court ordered a Fifth Amended Complaint be filed by December 23, 2011, conforming to the Court's prior rulings, and that FPC-USA filed its Answer to the Fifth Amended Complaint by January 20, 2012.

19.     The Fifth Amended Complaint was filed December 23, 2011. (Docket No. 570). FPC-USA filed its Answer on January 20, 2012. (Docket No. 579). These are the operative pleadings with respect to FPC-USA in this *qui tam* lawsuit.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

**ER610**   5

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

20.    Beginning in May 2011, continuing with statements from the parties in June 2011 (Docket Nos. 431, 432, 433), and with multiple memoranda and hearings thereafter, the Court decided upon bifurcation of this action, issuing its Order on December 7, 2011 (Docket No. 551) specifying that the first phase of discovery and trial would be limited to falsity of J-M's representations, their materiality and J-M's scienter, while other issues, including claims, any benefit to FPC-USA and damages, would be deferred to a later second phase.

21.    In light of the bifurcation Order and after filing its Answer to the Fifth Amended Complaint, FPC-USA attempted to narrow and eliminate the remaining four inadvertent submittal claims against it in this action through motions filed May 11, 2012:

(a)    A motion for partial summary judgment challenging claims under the Massachusetts FCA as time-barred prior to October 10, 2002 (Docket No. 639);

(b)    A motion for partial summary judgment challenging claims under the Nevada FCA as time-barred prior to July 1, 2002 (Docket No. 641);

(c)    A motion to dismiss the Fifth Amended Complaint because of prior public disclosures made in June 2000 in *U.S. ex rel. Stan Price v. J-M Mfg. Co., Ltd.*, No. 2:00-cv-01755-EBC (E.D. La. Oct. 19, 2001) for lack of subject matter jurisdiction (Docket No. 640); and

(d)    A motion for judgment on the pleadings or, in the alternative, for summary judgment dismissing the I/S claims as not applicable to persons who played no role in the filing of false claims (Docket No. 646).

The two statute of limitations motions were vacated, taken off calendar, without prejudice to being raised in Phase Two proceedings on July 9, 2012.  (Docket No. 672).  The public disclosure bar was denied without prejudice on September 10, 2012.  (Docket No. 707).  The motion for judgment on the pleadings or for summary

**ER611**    6

judgment interpreting the I/S statutes as inapplicable to persons not involved in the filing of false claims was denied without prejudice to being raised in Phase Two proceedings on February 11, 2013.  (Docket No. 785).

## II.    EXTENSIVE DOCUMENT DISCOVERY SPECIFICALLY AGAINST FPC-USA

22.    Beginning in February 2011, the Plaintiffs requested production of more than 40 categories of documents dating back to 1996 from FPC-USA, covering all of its PVC resin and PVC compound transactions with J-M, its corporate records and relationships with J-M, the spinoff in November 2005 of J-M from ownership by FPC-USA, insurance policies, customer specifications for PVC resin, and customer complaints, among other topics.  In response, FPC-USA has produced approximately 700,000 documents, more than 2,000,000 pages, of paper and electronic information to Plaintiffs. Further, J-M's extensive document production includes many communications with FPC-USA, as well.  Accordingly, the Plaintiffs have substantial information about FPC-USA from which to evaluate their claims against FPC-USA.

## III.    LIMITED ROLE OF FPC-USA

23.    The documents produced to Plaintiffs confirmed the very limited role of FPC-USA with respect to PVC pipe manufactured and marketed by J-M. Accordingly, on August 26, 2013, all Plaintiffs, FPC-USA and J-M, acting through counsel, stipulated to the following facts (Docket No. 1550):

(a)    FPC-USA did not make or sell any of the PVC pipe at issue in this case;

(b)    FPC-USA did supply some of the PVC resin and PVC compound used by J-M to make pipe;

(c)    FPC-USA did not submit any claims for payment to any of the government purchaser Plaintiffs concerning the PVC pipe at issue in this case, nor any of the PVC resin and/or PVC compound used by J-M to make that pipe;

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**ER612**    7

DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE

(d)   FPC-USA did not make any representations to any of the government purchaser Plaintiffs concerning the PVC pipe at issue in this case or any of the PVC resin and/or PVC compound used by J-M to make that pipe;

(e)   The Exemplar Plaintiffs had no contact whatsoever with FPC-USA in relation to the public works projects at issue in the Phase One trial.

## IV.   THIS SETTLEMENT AGREEMENT MEETS THE CRITERIA FOR THIS COURT TO APPROVE IT AS FAIR, ADEQUATE AND REASONABLE

### A.   The Settlement Agreement Is Presumed Fair

24.   A presumption of fairness arises where: (1) counsel is experienced in similar litigation; (2) the settlement was reached through arm's length negotiations; (3) investigation and discovery are sufficient to allow counsel and the court to act intelligently. *In re Heritage Bond Litig.*, No. 02-ML-1475DT, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005); *U.S. ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.,* No. 04-cv-3088, 2009 WL 637137, at *1-4 (S.D.N.Y. Mar. 5, 2009). Those conditions are met here.

#### 1.   Experience of Counsel

25.   Counsel for FPC-USA are experienced in litigating and resolving complex actions, including cases governed by the "fair, reasonable and adequate" standard such as class actions.  For example, in 1986, I represented the Air Transport Association of America and its member air carriers in designing and negotiating settlement of the distribution of more than one billion dollars in escrowed funds representing crude oil overcharges in violation of federal price controls. I negotiated that settlement with representatives of the U.S. Department of Energy, several states' Attorneys General (representing all 50 states), and counsel for major oil refiners, gasoline retailers, and farmer cooperatives, among others.  I helped obtain court approval of the settlement as "fair, reasonable and adequate" in *In re The Dep't of*

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

1   *Energy Stripper Well Exemption Litig., MDL No. 378,* 653 F.Supp. 108 (D. Kan.

2   1986).

3   26.   More recently, and before this Court, Kristina Azlin and I represented

4   Harris Corporation in settling and obtaining approval of a class action settlement

5   under FED. R CIV. P. (e) on February 8, 2010, in *NV Sec., Inc. v. Fluke Networks, Inc.*,

6   No. 2:05-cv-04217-GW (C.D. Cal. Feb. 8, 2010). In addition, my partner Vince

7   Farhat is a former Assistant U.S. Attorney ("AUSA") in the Central District of

8   California. As an AUSA, Vince successfully litigated and resolved numerous civil

9   and criminal cases, and prosecuted corporate defendants in parallel FCA and criminal

10  fraud investigations.

11  27.   The lawyers for Plaintiffs in this *qui tam* case include Eric Havian of the

12  law firm of Phillips & Cohen, one of the most experienced firms in the United States

13  in FCA litigation, and Kirk Dillman of the law firm McKool Smith Hennigen, with

14  extensive class action experience.

15  ## 2.   Arm's Length Negotiation of Settlement

16  28.   The settlement was reached after weeks of arms' length negotiation with

17  effective assistance by former Chief Magistrate Judge Edward A. Infante (Ret.) as

18  mediator. Following a day-long mediation on May 29, 2013, there were numerous

19  telephone conferences between each side and the mediator; FPC-USA's advocacy to

20  the mediator was vigorous. After apparent impasses in negotiations, the mediator

21  presented a proposal for settlement of compensatory damages claims, and both sides

22  agreed on July 16, 2013 to that proposal of $22,500,000. After further negotiations

23  and another impasse with respect to a compromise of attorneys' fees and costs, Judge

24  Infante made a second mediator's proposal of $5,500,000, which was accepted by

25  both sides on August 5, 2013. Counsel for Plaintiffs and FPC-USA then exchanged

26  multiple drafts of non-monetary provisions for the Settlement Agreement, negotiating

27  face to face and then through numerous telephone and email communications. As

28

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

part of these negotiations, it was agreed that the settlement payments would be made directly and promptly into an interest-bearing escrow account.

29.   On September 11, 2013, FPC-USA signed the Settlement Agreement; the Court was informed of multiple Plaintiffs' signatures and of the Settlement on September 13.  The Court approved the negotiated conditional dismissal without prejudice of claims against FPC-USA on September 13, 2013, and on September 17, 2013, all settlement payments were deposited in escrow by FPC-USA at U.S. Bank in an interest-bearing account.  FPC-USA was thereupon relieved from participation in the Phase One trial now underway.  The Settlement Agreement is now fully-executed.

### 3.   Sufficiency of Investigation and Discovery for Evaluation

30.   Plaintiffs' counsel has been investigating this case since its filing seven years ago.  In addition to examining hundreds of thousands of documents produced by J-M, including documents covering its transactions and relationships with FPC-USA, Plaintiffs requested and have received approximately 700,000 documents directly from FPC-USA, more than 2,000,000 pages of electronic and paper information.  Plaintiffs have participated in several dozen depositions over the past two years; through these and other investigative activities, Plaintiffs have had an ample occasion to evaluate the claims they have pleaded against FPC-USA and to determine appropriate parameters for settlement of those claims with FPC-USA.

31.   On behalf of FPC-USA, my colleagues and I have examined the documents FPC-USA produced, many of those produced by J-M, and we have attended or read transcripts from most of the depositions in this action; we have investigated exhaustively potential defenses, weaknesses and limitations in the claims asserted against FPC-USA and have been in close and frequent communication with our client about our analysis. I believe we and FPC-USA are well positioned to evaluate settlement with the Plaintiffs.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**ER615**   10

---

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

**B.** **The Strengths and Weaknesses of Plaintiffs' Case And the Risk, Complexity and Expense of Further Litigation Demonstrate That The Settlement Is Proper**

32.    The Court's bifurcation of proceedings has resulted in a Phase One trial currently underway involving five exemplar Plaintiffs and whether J-M made false representations that were material and were made with scienter.

33.    The outcome of the Phase One trial is unknown as of this writing. If Plaintiffs prevail, even in part, an additional phase of discovery and motion practice will commence and potentially lead to a Phase Two trial at some future date.  Unless FPC-USA's motion for judgment on the pleadings or for summary judgment (Docket No. 646) were to be promptly granted, FPC-USA would face exhaustive discovery on issues on questions of the nature and scope of its knowledge of false claims and on questions of damages, among other issues.  Discovery has already lasted two years; it would certainly be no less in Phase Two and likely would be greater.  Trial involving all the Plaintiffs and hundreds of Real Parties in Interest, all their false claims, and all the remaining issues, including damages, would be extraordinarily complex and lengthy.  As the legal issues involved in the claims against FPC-USA are largely matters of first impression, extensive post-trial motions and appeals by the unsuccessful side would be inevitable.

**C.** **Inadvertent Submittal Claims**

34.    The present *qui tam* case as pleaded against FPC-USA is inherently complex because it involves legal claims under "inadvertent submittal" provisions in state FCAs that have not been judicially interpreted, nor tested for constitutionality. FPC-USA vigorously contests any liability under these provisions.  Nonetheless, FPC-USA faces large litigation risks, given that Plaintiffs seek to impose joint and several liability for false claims on FPC-USA and its PVC resin was a principal ingredient in millions of feet of J-M's PVC pipe at issue; the risks are great, even if only a small portion of claims against FPC-USA are ultimately successful.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**ER616**   11

(245 of 262) Page 245 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 245 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 14 of 28   Page
ID #:65147

35.   For their part, Plaintiffs face multiple burdens in their claims against FPC-USA in this action, including the following:

(a)   Prevailing in the Phase One trial against J-M to demonstrate a predicate, that "false claims" occurred, to "inadvertent submittal" liability;

(b)   Defeating FPC-USA's summary judgment and statutes of limitations motions in Phase Two (*see* Docket Nos. 640, 642, 646);

(c)   Establishing the timing, source and content and scope of FPC-USA's knowledge of particular false claims presented to individual Plaintiffs, as to which Plaintiffs FPC-USA allegedly should have made disclosures;

(d)   Establishing that FPC-USA actually received a monetary benefit from funds paid by Plaintiffs to contractors upon particular false claims;

(e)   Establishing an appropriate measure of damages under the "inadvertent submittal" provisions of state FCAs; and

(f)   Surviving constitutional challenges to excessive liability and penalties relative to the monetary benefit purportedly received by FPC-USA for violation of the "inadvertent submittal" provisions.

36.   Over a year ago, FPC-USA filed its motion for judgment on the pleadings or in the alternative for summary judgment ("Statutory Construction Motion") arguing that the inadvertent submittal provisions do not apply to FPC-USA as a matter of law.  (*See* Docket No. 646).  Attached hereto as Exhibit "2" is a true and correct copy of the Statutory Construction Motion (without its supporting exhibits).

37.   If granted, the Statutory Construction Motion would have resulted in the complete dismissal of FPC-USA from this *qui tam* lawsuit.  However, Plaintiffs convinced the Court to defer ruling on the Statutory Construction Motion until after the Phase One trial.  In my view, Plaintiffs' insistence on deferring ruling on this key issue is partly an acknowledgment of the strength of the Statutory Construction Motion.

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

38.     As shown in the Statutory Construction Motion, the Inadvertent Submittal statutes do not apply to third parties such as FPC-USA who do not submit claims to government entities.  (*See* Exhibit 2).  Based on the statutory language and structure of the inadvertent submittal statutes read in context of the legislative history and FCA scheme, proof of liability under the inadvertent submittal provisions requires that:

(a)     The defendant submitted a false claim for payment to a government entity;

(b)     The defendant's submission of the false claim was "inadvertent," in that the "falsity" of the claim was not then known by the defendant;

(c)     The defendant "subsequently discovered" that the claim it had submitted was false;

(d)     The defendant is a "beneficiary" of the submitted claim; and

(e)     The defendant failed to report to the government entity, within a reasonable time after discovery of the falsity, that the claim was false.

39.     In the Statutory Construction Motion, FPC-USA submitted an appendix containing legislative history of the inadvertent submittal provisions.  The legislative history, although scant, confirms that these provisions apply only to those who themselves "inadvertently submitted" a false claim.  (*See* Docket No. 646 (with attached Requests For Judicial Notice of Legislative History)).  Moreover, if accepted by the Court, Plaintiffs' interpretation of the inadvertent submittal provisions would raise serious constitutional objections.  As discussed in the Statutory Construction Motion, Plaintiffs' interpretation of the inadvertent submittal provisions would be impermissibly vague, would violate guarantees of equal protection of the laws, and would violate the Constitutional prohibitions against Excessive Fines and Ex Post Facto punishments.  (*See* Exhibit 2).

40.     Even if this action proceeds to Phase Two and the Court does not grant FPC-USA's Statutory Construction Motion, I am confident Plaintiffs would fail to

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

1   meet their burden of proof under the inadvertent submittal provisions.  As set-forth in

2   FPC-USA's opposition to Plaintiffs' 2011 "Offer Proof", Plaintiffs' factual theory as

3   to how and why FPC-USA should be liable under the inadvertent submittal

4   provisions falls far short of showing that FPC-USA ever "discovered" any false

5   claims to any of the Real Parties or Intervenors in this case, or that it truly "benefited"

6   from such false claims.  (*See* Docket No. 488).  If Phase Two discovery is ever

7   undertaken, the evidence will show that FPC-USA did not "discover" any "false

8   claims" related to J-M's pipe such that it could have, or should have, made

9   disclosures; and, indeed, had no way of doing so.  (*Id.*).

10   41.   For all the foregoing reasons, Plaintiffs faced a very large litigation risk

11   of little or no recovery against FPC-USA on their inadvertent submittal claims.  In

12   any event, absent settlement, Plaintiffs also faced a large future multi-year litigation

13   expense to prove the factual bases for FPC-USA's liability and to overcome the

14   above-described legal challenges.  For its part, simply because J-M sold a very large

15   volume of PVC pipe during the period 1996-2005, when FPC-USA owned J-M's

16   stock, absent settlement FPC-USA faced multiple years of heavy expense for

17   discovery and Phase Two trial, post-trial and appellate proceedings, and a modest, but

18   non-zero, litigation risk of some liability to some Plaintiffs under the inadvertent

19   submittal statutes. Further, as explained below, insurance coverage for FPC-USA in

20   this *qui tam* lawsuit was denied by a ruling of the Superior Court in a declaratory

21   relief action brought by FPC-USA's insurance carriers; thus, the cost of settlement of

22   the Federal Action is borne by FPC-USA alone, making the continuing expense and

23   risks of litigation even more unattractive.

24   //

25   //

26   //

27   //

28   //

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

### D. ANALYSIS OF STRENGTHS AND WEAKNESSES OF CLAIMS AGAINST FPC-USA IN THE STATE ACTION

#### 1. The Origins and Status of the State Action

42. On April 19, 2011, a civil action entitled *The State of Nev., et al. v. J-M Mfg. Co., Inc., Formosa Plastics Corp., U.S.A. and Walter Wang* was filed in the Superior Court of California for Los Angeles County by the States of Nevada, New Mexico and Virginia and by numerous California cities, water districts and counties, and designated Case No. BC 459943 ("State Action"). On June 23, 2011 Plaintiffs served a First Amended Complaint upon FPC-USA, identical to the original Complaint except for the addition of five California municipal entities, bringing their total number to 52. Attached hereto as Exhibit "3" is a true and correct copy of the First Amended Complaint in the State Action.

43. On June 21, 2011, Plaintiffs filed a motion to stay all proceedings in the state action pending resolution of the federal *qui tam* lawsuit. All parties agreed to the motion and the stay was ordered; the stay remains in effect today, and no further pleadings or motions have been filed nor has discovery taken place in the State Action.

44. As is described in the First Amended Complaint in the State Action at Paragraphs 18-21 (Exhibit 3 hereto), all the claims brought in the State Action were initially sought to be brought in this *qui tam* lawsuit, the Federal Action. All the Plaintiffs in the State Action are Intervenors or Real Parties in Interest in the Federal Action. The same transactions, dating from 1996 to the present, for the same PVC pressure pipe products for potable water are at issue in the State Action as in the Federal Action.

#### 2. Claims Alleged Against FPC-USA in the State Action

45. As appears after Paragraph 523 in the First Amended Complaint in the State Action (Exhibit 3 hereto), all of the 24 various tort claims alleged against FPC-USA in the State Action are simultaneously pleaded against Defendants J-M

**ER620** 15

(249 of 262) Page 249 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 249 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 18 of 28   Page
ID #:65151

Manufacturing Company, Inc. ("J-M") and sometimes also against J-M's chief executive officer, Defendant Walter Wang:

- **Count I** - Negligent Misrepresentation (By California Localities Against All Defendants)

- **Count II** - Intentional Misrepresentation (By California Localities Against All Defendants)

- **Count III** - Fraudulent Concealment (By California Localities Against All Defendants)

- **Count IV** - Civil Conspiracy to Defraud (By California Localities Against All Defendants)

- **Count IX** - Strict Liability for Defective Products (By California Localities Against J-M and FPC-USA)

- **Count X** - Unjust Enrichment (By California Localities Against All Defendants)

- **Count XI** - Violations of Nevada's Deceptive Trade Practices Act (By Nevada Against All Defendants)

- **Count XII** - Negligent Misrepresentation (By Nevada Against All Defendants)

- **Count XIII** - Intentional Misrepresentation (By Nevada Against All Defendants)

- **Count XIV** - Fraudulent Concealment (By Nevada Against All Defendants)

- **Count XV** - Civil Conspiracy to Defraud (By Nevada Against All Defendants)

- **Count XX** - Strict Liability for Defective Products (By Nevada Against J-M and FPC-USA)

- **Count XXI** - Unjust Enrichment (By Nevada Against All Defendants)

- **Count XXII** - Violations of New Mexico's Unfair Practices Act (By New Mexico Against All Defendants)

- **Count XXIII** - Negligent Misrepresentation (By New Mexico Against All Defendants)

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

**ER621**   16

(250 of 262) Page 250 of 262 Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 250 of 262
Case 5:06-cv-00055-GW-MAR    Document 1744    Filed 10/28/13    Page 19 of 28    Page
ID #:65152

- **Count XXIV** - Intentional Misrepresentation (By New Mexico Against All Defendants)

- **Count XXV** - Fraudulent Concealment (By New Mexico Against All Defendants)

- **Count XXVI** - Civil Conspiracy to Defraud (By New Mexico Against All Defendants)

- **Count XXXI** - Strict Liability for Defective Products (By New Mexico Against J-M and FPC-USA)

- **Count XXXII** - Unjust Enrichment (By New Mexico Against All Defendants)

- **Count XXXIII** - Intentional Misrepresentation (By Virginia Against All Defendants)

- **Count XXXIV** - Fraudulent Concealment (By Virginia Against All Defendants

- **Count XXXV** - Civil Conspiracy to Defraud (By Virginia Against All Defendants)

- **Count XL** - Unjust Enrichment (By Virginia Against All Defendants)

For purposes of discussion and analysis, we are grouping these 24 claims by category of tort:

46.    **Fraud Claims**: Counts II, III, IV, XIII, XIV, XV, XXIV, XXV, XXVI, XXXIII, XXXIV, and XXXV

47.    **Negligent Misrepresentation Claims**: Counts I, XII,  and XXIII

48.    **Strict Liability for Defective Products Claims**: Counts IX, XX, and XXXI

49.    **Deceptive Trade Practices Claims**: Counts XI and XXII

50.    **Unjust Enrichment Claims**: Claims X, XXI, XXXII, and XL

51.    For each type of legal claim, I assess below the elements, the prospects for proof of liability, FPC-USA's risk of exposure to liability, and FPC-USA's affirmative defenses. Separately, I examine potential damage exposure.

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

### 3. Fraud and Negligent Misrepresentation Claims

52.     Affirmative misrepresentation and fraud claims, and negligent misrepresentation claims require, *inter alia*, proof of the "who, what, when, where and how" of each false or misleading statement by FPC-USA to each Plaintiff and the actual, justifiable reliance by each Plaintiff on each purported FPC-USA misrepresentation, for each time period surrounding each purported time period. Required also will be testimony of former employees of FPC-USA and Plaintiffs for each time period for each alleged utterance of a misrepresentation.

53.     Plaintiffs' concealment theory, in addition to the above, also requires the proof of a duty owing from FPC-USA to Plaintiffs. Plaintiffs' negligent misrepresentation theory requires the additional element of proving that they are in the class of persons entitled to rely on any representation made by FPC-USA. On top of the above, in a conspiracy claim plaintiffs must show that there was an agreement between FPC-USA and J-M (affecting only the post-2005 years) to engage in fraud against plaintiffs.

54.     Against the foregoing Plaintiffs' stipulation in the *qui tam* lawsuit with FPC-USA, must be considered: All the Plaintiffs acknowledge that FPC-USA made no representation to them concerning PVC pipe, PVC resin or PVC compound. Extensive document discovery from FPC-USA and ten Plaintiffs supports the factual accuracy of this voluntary, agreed-upon statement of fact. The very absence of dealings and communications between FPC-USA and the Plaintiffs means these fraud-based claims cannot be established and proven.

### 4. Strict Products Liability Claims

55.     Each Plaintiff must prove that there was a defect in the PVC pipe it received or in the PVC compound used to make that pipe, which defect of design or manufacture, was the proximate cause of a non-economic loss resulting from injury to person or property other than the defective PVC pipe itself.

DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

56.     Much of the evidence presented by Plaintiffs against J-M during Phase One proceedings involves: (1) Pipe manufacturing processes that physically transformed FPC-USA's raw materials in ways that diminished their properties of tensile strength (that is, extrusion too hot and too fast), and (2) Choices by J-M in combining FPC-USA's PVC resin with additives from other suppliers diminished the properties of the resulting PVC compound. That same evidence is an impediment to demonstrating defective design or manufacturing of FPC-USA's PVC resin. FPC-USA would be permitted to present alternative causation for injury shown to have been associated with each purportedly defective product.

57.     In addition, the Court will also have to address variations among state laws as to these state law claims, the defenses available under each jurisdiction thereto, and the respective measure and proof of damages. For example, claims under Nevada law must show that FPC-USA's PVC resin and compound were "unreasonably dangerous" as well as that the particular product defect caused a plaintiff's injury.  *Fyssakis v. Knight Equip. Corp.,* 108 Nev. 212, 214 (1992).

### 5.     Unjust Enrichment Claims

58.     Unjust enrichment claims require a prior relationship between the Plaintiffs and the defendant. However, the stipulation of Plaintiffs and FPC-USA is that there were no representations or dealings between them. Absent a prior relationship, claims against a raw materials supplier by customers of finished products are generally held to be too attenuated to support unjust enrichment recovery.  Apart from the foregoing, recovery would require tracing funds from the Plaintiffs back to FPC-USA and would be limited to restitution of Plaintiffs' money that actually reached FPC-USA. Recovery would therefore be expensive, as well as unlikely.

59.     The claims against FPC-USA in the State Action have not been tested by pleading motions and are nowhere near trial-ready; extensive discovery would be necessary.  FPC-USA has defended itself energetically, and is capable of continuing

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

(253 of 262)   Page 253 of 262  Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 253 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 22 of 28   Page
ID #:65155

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

to do so through trial and the appellate process.  In sum, for both sides, there is considerable risk in further litigation of the State Action claims, absent this settlement which provides Plaintiffs with a substantial, certain and timely recovery.

### 6.   **Insurance**

60.   For the years 1996 through May 31, 2007, FPC-USA and J-M were co-insured under the same commercial insurance policies.  In 2010, certain insurers filed an action in Los Angeles County Superior Court against J-M and FPC-USA seeking declaratory relief that they had no obligation to provide coverage to FPC-USA for the Federal *Qui Tam* Action.  *See Nat'l Union Fire Ins. Co. of Pittsburgh Pa., et al. v. J-M Mfg. Co., Inc., et al.*, No. BC 444309 (*Super. Ct. for Los Angeles Cnty*, filed Aug. 24, 2010).  On or about July 24, 2012, the Superior Court granted summary judgment against FPC-USA and in favor of the insurance carriers.  Although the Superior Court found there was no insurance coverage for the Federal *Qui Tam* Action, insurance coverage for the California State Action has not been litigated.

## V.   **EARLY DISCOUNT FOR GLOBAL SETTLEMENT**

61.   This is a "global" settlement resolving the claims against FPC-USA in both the Federal *Qui Tam* Action and the State Action.  In light of the above-described risk, expense, complexity, and likely duration of both cases and any appeals thereafter, recovery of $22,500,000 in cash for the Plaintiffs is an excellent result.  The compromise of attorneys' fees and costs of investigation for $5,500,000, or 24.4% of the damages settlement is very much in line with the award of attorneys' fees in other class action settlements.

## VI.   **THE AMOUNT OF THE SETTLEMENT ALSO DEMONSTRATES THAT THE SETTLEMENT IS PROPER**

62.   The damages settlement amount herein of $22,500,000 is substantial. The law firm of Gibson Dunn has published its 2013 Mid Year False Claims Act Update online and therein summarized 22 of the largest FCA settlements in 2013. *See* Gibson Dunn, *2013 Mid-Year False Claims Act Update* (July 10, 2013),

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

1  http://www.gibsondunn.com/publications/pages/2013-mid-year-false-claims-act-

2  update.aspx (a true and correct copy of the print out of which is attached as Exhibit

3  "4" hereto).  I have compared each of the 22 civil damages settlement amounts with

4  the $22,500,000 amount paid under the Settlement Agreement in this case. This civil

5  damages settlement payment is larger than those in 14 FCA settlements in 2013, the

6  same as in one other case, close in amount (within $4 million) of three other FCA

7  settlements in 2013, and smaller than only four FCA settlements in 2013.

8      63.    I have also examined recent settlements of class actions, in particular,

9  settlements of securities class actions, which are regularly accumulated and studied.

10  In this I have consulted the work of Dr. Renzo Comolli, Sukaina Klein, Dr. Ronald I.

11  Miller and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation:*

12  *2012 Full-Year Review*, NERA ECONOMIC CONSULTING (Jan. 29, 2013), *available at*

13  http://www.nera.com/nera-files/PUB_Year_End_Trends_01.2013.pdf.

14  Pertinent pages are attached hereto as Exhibit "5".  By comparison to federal

15  securities litigation class action settlements, the damages settlement amount herein is

16  <u>larger</u> than average. The 2012 study shows, at Figure 29, a comparison between

17  settlement amounts and aggregate investor losses.  Where investor losses are between

18  $200 million and $5 billion, settlement amounts average between 1.1% to 2.7% of

19  investor losses, that is, between $5.4 and $55 million). These are settlements by the

20  person making purportedly false or fraudulent representations in connection with the

21  purchase or sale of securities covered by the federal securities laws. The present

22  settlement is between FPC-USA, a peripheral actor that did not make representations

23  to the Plaintiffs, and government entities that had no dealings with FPC-USA.

24      64.    Further, in the present case, Plaintiffs have rarely suffered physical

25  failures in their PVC pipes but are seeking damages principally for the potential

26  reduced future lifespan of those pipes. The contribution, if any, of FPC-USA to that

27  reduced lifespan for pipe acquired by any particular Plaintiff is unproved.

28

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

65.     The settlement payment is in cash, already deposited in escrow, not a payment in kind. As the court remarked in *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009), a payment in cash "is a good indicator of a beneficial settlement."

66.     In the present case, and for the same reasons indicated above, Plaintiffs have appropriately accepted a discounted amount against FPC-USA, for settlement in advance of trial has relieved them of uncertainty and expense, and permitted a recovery years in advance of the end of litigation absent settlement.

## VII.   THE STAGE OF THE PROCEEDINGS, THE EXPERIENCE AND VIEWS OF COUNSEL, AND THE REACTION OF THE PARTIES TO THE PROPOSED SETTLEMENT WARRANT APPROVAL

67.     Plaintiffs' counsel investigated this litigation from its inception in January 2006, working closely with counsel for the United States and various states. Numerous witnesses were interviewed; hundreds of thousands of documents were collected and reviewed. On the basis of this investigation, claims were added in 2008, and in 2010 and thereafter in Amended Complaints herein against FPC-USA for direct violations of the federal and state FCAs and for "inadvertent submittal" violations of several state FCAs.

68.     Subsequent to unsealing of this litigation in early 2010, four separate motions to dismiss the amended complaints were filed by FPC-USA and granted in whole or in part by the Court, testing the Plaintiffs' allegations and dismissing with prejudice counts for direct violations by FPC-USA of federal and state FCAs.  In addition to these occasions for both sides' re-evaluations of their positions, Plaintiffs requested and have received approximately 700,000 documents from FPC-USA, more than two million pages of electronic and paper information, including all sales revenues of FPC-USA from transactions with J-M and communications related thereto.  Plaintiffs have also taken dozens of depositions.  Settling this case upon the eve of the Phase One trial meant that within the past couple months, Plaintiffs and

DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

1    FPC-USA prepared and exchanged pretrial memoranda of their positions, as well as

2    witness and exhibit lists. The more than 1700 entries in the Court's docket shows the

3    vigor of the protracted litigation battle.

4        69.    This effort supports approval of this settlement, just as in *Wilson v.*

5    *Airborne, Inc.*, No. EDCV 07-770-VAP, 2008 WL 3854963, at *7 (C.D. Cal. Aug.

6    13, 2008) ("Defendants have produced some 600,000 documents, and Plaintiff's

7    counsel also reviewed information concerning Airborne sales revenue in connection

8    with the settlement negotiations… The discovery conducted supports a conclusion

9    that the parties entered into the settlement agreement with enough information

10   concerning the facts of the case to support a fair, adequate, and reasonable

11   compromise.")

12       70.    In this case, all counsel have sufficient information to make informed

13   decisions about settlement, and, by this joint motion for approval, recommend it,

14   acknowledging that every settlement is a compromise. This settlement provides the

15   Plaintiffs with an immediate benefit and eliminates the risk that, given the

16   circumstances of this case, the Plaintiffs could ultimately recover less than they will

17   under this Settlement Agreement from FPC-USA**.**

18       71.    The reaction of the plaintiffs or class members to a settlement is a

19   significant factor in assessing its fairness and adequacy. Here, even though each

20   governmental Plaintiff has detailed procedures for internal reviews and approval of

21   this settlement, Plaintiffs' counsel won signatures from three-fourths of the Plaintiffs

22   within two weeks after submitting the Settlement Agreement for execution. All of the

23   Plaintiffs and Intervenors have now executed the Settlement Agreement. Copies of

24   the Settlement Agreement, as part of these moving papers, are also being mailed to

25   more than 300 real parties in interest; a proof of service reflecting that mailing will be

26   filed with the Court.

27

28

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

(257 of 262) Page 257 of 262
Case 5:06-cv-00055-GW-MAR   Document 1744   Filed 10/28/13   Page 26 of 28   Page
ID #:65159
Case: 25-2499, 08/29/2025, DktEntry: 22.4, Page 257 of 262

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

1   **VIII.   THE SETTLEMENT AGREEMENT IS NOT THE RESULT OF FRAUD**
2   **OR COLLUSION**

3   72.   None of the "red flags" that may hint at collusion in the settlement
4   process are present here:

5   • No disproportionate cash award to Plaintiffs' counsel coupled with a
6   cosmetic non-cash recovery to Plaintiffs;

7   • No "clear sailing" arrangement enabling payment to Plaintiffs' counsel
8   of an excessive fee in exchange for accepting an unfair settlement;

9   • No reversion of settlement money to FPC-USA (absent total failure of
10  the settlement)

11  73.   The Plaintiffs will receive payment of $22,500,000 in compromise of
12  damages claims; after the damages settlement was negotiated, by separate
13  negotiations, a compromise amount of $5,500,000 for Plaintiffs' Attorneys Fees and
14  Costs was agreed upon. That fee amount, 24.4 percent of the damages settlement
15  payment, is consistent with other settlements and not disproportionate.  No portion of
16  the settlement will revert to FPC-USA, absent a total failure of the settlement.

17  74.   This settlement also manifests each of the signals indicating the absence
18  of fraud or collusion:

19  • The participation of an experienced mediator, Hon. Edward A. Infante
20  (Ret.), who spent hours in separate conferences with Plaintiffs and FPC-
21  USA, broke impasses and made Mediator's Proposals, which the parties
22  accepted.

23  • Oversight of negotiations by governments. The Attorneys General of
24  Nevada and Virginia have been active Plaintiffs throughout this
25  litigation and have been in frequent communication with Plaintiffs'
26  counsel during settlement negotiations. These Attorneys General were
27  among the very first Plaintiffs to sign the Settlement Agreement.

28

**ER629**   24

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

1  • The enthusiasm and rapidity with which more than 40 additional
2     intervenor Plaintiffs executed the Settlement Agreement in September
3     and October is another indicator of its fairness and adequacy.

4

5     This declaration is executed under penalty of perjury in Los Angeles,
6  California this 25th day of October 2013.

7                                    By: _Richard T Williams_____
8                                          Richard T. Williams

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400  Fax: 213.896.2450

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR
APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
Tel: 213.896.2400 Fax: 213.896.2450

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 400 S. Hope St., 8th Floor, Los Angeles, California 90071.

On October 28, 2013, I served the document described as **DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT NOTICE OF MOTION AND MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE** on the interested parties in this action as follows:

> **[X]** (**BY Electronic Transfer to the CM/ECF System**) In accordance with Federal Rules of Civil Procedure 5(d) (3), Local Rule 5-4, and the U.S. District Court of the Central District's General Order governing electronic filing, I uploaded via electronic transfer a true and correct copy scanned into an electronic file in Adobe "pdf" format of the above-listed documents to the United States District Court Central District of California' Case Management and Electronic Case Filing (CM/ECF) system on this date.  It is my understanding that by transmitting these documents to the CM/ECF system, they will be served on all parties of record according to the preferences chosen by those parties within the CM/ECF system.  The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on October 28, 2013, Los Angeles, California.

By: _____  //S//_____
Kristina S. Azlin

**DECLARATION OF RICHARD T. WILLIAMS IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AS FAIR, ADEQUATE AND REASONABLE**

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

|  |  |
|---|---|
| UNITED STATES, THE STATE OF CALIFORNIA, DELAWARE, FLORIDA, ILLINOIS, INDIANA, NEVADA, NEW MEXICO, NEW YORK, and TENNESSEE, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, and THE DISTRICT OF COLUMBIA ex rel. JOHN HENDRIX,<br><br>       Plaintiffs,<br><br>    v.<br><br>J-M MANUFACTURING COMPANY, INC., d/b/a JM Eagle, a Delaware corporation, and FORMOSA PLASTICS CORPORATION, U.S.A., a Delaware corporation<br><br>       Defendants. | Civil Action No. 11-cv-01691-MSK-MJW<br><br>Pending in the United States District Court for the Central District of California<br><br>Honorable George H. Wu, U.S.D.J.<br><br>CA Case No. ED CV-06-00055-GW |

**PLAINTIFFS' RESPONSE TO J-M MANUFACTURING COMPANY, INC.'S MOTION**

**FOR A RULING ON ITS FEBRUARY 13, 2012 OBJECTIONS TO MAGISTRATE**

**MICHAEL J. WATANABE'S JANUARY 26, 2012 ORDER [DOCKET NO. 74]**

## I.      INTRODUCTION

Relying on the thinly veiled excuse of "new evidence," defendant J-M Manufacturing Company Inc. ("J-M") presses this Court to issue a ruling on J-M's objections to the decision of Magistrate Judge Watanabe granting Plaintiffs' motion to quash J-M's subpoena for Plaintiffs' work product.  J-M has predicated its latest motion on two false assertions: (1) that Plaintiffs have somehow "changed their underlying theory" of liability; and (2) that Magistrate Judge Watanabe's ruling to preclude discovery of the Microbac test results was based upon a finding that those results were "not relevant" to the pending California action.  As demonstrated below, neither contention is supported by the record before this Court or the California District Court (Hon. George Wu) before which the main action is pending.  Accordingly, J-M's false characterizations provide no basis to revisit, much less overturn, Magistrate Judge Watanabe's ruling.[1]

## II.     J-M MISCHARACTERIZES PLAINTIFFS' THEORY OF LIABILITY.

J-M argues that Plaintiffs were previously pursuing "the 'lottery ticket' theory set forth in Judge Wu's [Bifurcation Order], [but] parties and Judge Wu recently clarified that this is not the case."  Motion at 2.  J-M suggests that Plaintiffs have abandoned the lottery ticket theory, and must now prove that *every* stick of pipe is physically defective.  J-M flatly misrepresents Plaintiffs' position and Judge Wu's ruling.

Plaintiffs' lottery ticket theory is simply a conventional False Claims Act claim for

---

[1] J-M's Motion should be denied on the additional ground that J-M failed to comply with D.C.Colo. LCivR 7.1(A), requiring counsel to confer with opposing counsel prior to the filing of any motion and to provide certification of such compliance.  This Court's Practice Standards specifically provide that "motions without a certification required by D.C.COLO.LCivR . . . 7.1A will be denied without prejudice *sua sponte*."  *See* Rule V.C., Judge Marcia S. Krieger's Practice Standards (Civil Actions)(emphasis in original).

delivery of "substandard products." In early briefing before Judge Watanabe, Plaintiffs

explained why such a theory does not require proof that every stick of pipe is physically

defective, merely that J-M distributed a random mix of conforming and nonconforming pipe:

> Plaintiffs have stated that every piece of J-M pipe constitutes a "false claim" because each bears a "mark" representing that all J-M pipe is manufactured uniformly, when in fact J-M pipe is randomly nonconforming…. But Plaintiffs do not allege that each pipe is defective.

(Plaintiffs' Reply in Support of Motion for Reconsideration at 4 n.1 [Dkt. #65].)

Recently, however, J-M argued before Judge Wu (as they do here) that Plaintiffs had

changed their legal theory and could no longer pursue a lottery ticket theory. J-M claimed that in

a substandard products case such as this one, a lottery ticket theory is not viable because "you

basically look at what did you contract for versus what did you receive." (June 6, 2012

Transcript of Hearing, at 27:10-11, attached as Exhibit 1 to the Declaration of Stuart Rennert

filed concurrently herewith.) J-M makes the same argument here. Motion at 2 ("The relevant

inquiry is to determine what was promised as compared to what was delivered"). Judge Wu

soundly rejected J-M's argument, holding that another "substandard products" case, *U.S. ex rel.

Compton v. Midwest Specialties,* 142 F.3d 296 (6th Cir.), also proceeded on a "lottery ticket"

theory:

> MR CHAN [J-M's Counsel]: We do not believe that this lottery theory can be brought under a facially false paradigm because the cases – none of these cases that they cite – none of these cases are lottery theory cases….
>
> THE COURT: Why isn't *Compton* a lottery theory? *Compton* really was, it is to my mind clearly a lottery theory.
>
> \*          \*          \*
>
> MR. CHAN: Well, respectfully, Your Honor, [*Compton*] was not a lottery theory….
>
> THE COURT: [*Compton*] is, to my mind, much more of a lottery type thing ….

(June 6, 2012 Tr. at 35-36, Ex. 1 to Rennert Decl.)

Yet J-M persists in trying to re-define Plaintiffs' case, despite Plaintiffs' repeated